**FILED**

**DEC 06 2024**

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WESTERN TEXAS**

Danielle D Spears,

                              Plaintiff,

        v.

SECURITIES & EXCHANGE COMMISSION,
GARY GENSLER
FINANCIAL INDUSTRY REGULATORY
AUTHORITY, ROBERT W COOK,
DEPOSITORY TRUST & CLEARING
CORPORATION,
CHARLES SCHWAB & CO., INC.,
formerly TD AMERITRADE,
EQUINITI TRUST COMPANY, formerly AMERICAN
STOCK TRANSFER & TRUST COMPANY,
NEXT BRIDGE HYDROCARBONS, INC.,
GREGORY MCCABE, JOHN BRDA,
GTS SECURITIES LLC., ARI RUBENSTEIN,

                              *Defendants.*

Case No.: 7:24-cv-321

**COMPLAINT FOR
VIOLATIONS OF THE
FEDERAL SECURITIES
LAWS**

**JURY TRIAL DEMANDED**

**I. PARTIES**

1. Plaintiff Danielle D. Spears (hereinafter referred to as "Plaintiff" or "Spears").  Spears is a

shareholder of Next Bridge Hydrocarbons. She retains 100 shares at her brokerage,

Charles Schwab as well as 7200 shares at AST/EQ.

Address: 12206 W. Harrison Street,   Avondale, Arizona, 85323.

2. Defendant Securities and Exchange Commission (SEC)

The Securities and Exchange Commission (hereinafter referred to as "Defendant" or "SEC") is a

federal agency responsible for enforcing securities laws, regulating the securities industry, and

ensuring market integrity. The SEC is also charged with protecting retail investors and ensuring fair and orderly market functioning.

Address: Headquartered at 100 F Street NE, Washington, D.C., 20549,

3. Defendant Gary Gensler

Gary Gensler (hereinafter referred to as "Defendant" or "Gensler") is the Chairman of the Securities and Exchange Commission (SEC). In his official capacity, Gensler is responsible for overseeing the agency's enforcement of federal securities laws. Under his   leadership, the SEC monitors market practices and works to ensure transparency, fairness, and compliance with securities regulations.

Address: The SEC is headquartered at 100 F Street NE, Washington, D.C., 20549.

4. Defendant Financial Industry Regulatory Authority (FINRA)

The Financial Industry Regulatory Authority (hereinafter referred to as "Defendant" or "FINRA") is a self-regulatory organization authorized by the SEC to oversee broker-dealers and ensure compliance with federal securities laws. FINRA's responsibilities include market regulation, investor protection, and the enforcement of securities laws.

Address: Headquartered at 1735 K Street NW, Washington, D.C., 20006.

5. Defendant Robert W. Cook

Robert W. Cook (hereinafter referred to as "Defendant" or "Cook") is the President and Chief Executive Officer of the Financial Industry Regulatory Authority (FINRA). Cook  oversees FINRA's regulatory functions, including enforcing compliance with FINRA's rules and promoting fair market practices. FINRA's mission is to protect investors and maintain market integrity.

Address: Headquartered at 1735 K Street NW, Washington, D.C., 20006.

6. Defendant Depository Trust & Clearing Corporation

The Depository Trust & Clearing Corporation (hereinafter referred to as "Defendant" or "DTCC") is a financial services organization that provides clearing, settlement, and

2

information services for securities trading in the United States.

Address: Headquartered at 55 Water Street, New York, NY, 10041-0024.

7. Defendant Next Bridge Hydrocarbons, Inc.

Next Bridge Hydrocarbons, Inc. (NBH) (hereinafter referred to as "Defendant" or "NBH") was formed as part of a corporate spin-off from Meta Materials, Inc., to provide MMTLP shareholders private ownership of its oil and gas assets. NBH is a private oil and gas exploration and development company incorporated in Nevada.

Address: 500 W. Texas Avenue, Suite 890, Midland, TX, 79701.

8. Defendant Greg McCabe

Greg McCabe (hereinafter referred to as "Defendant" or "McCabe") is the CEO and Chairman of NBH and the President of McCabe Petroleum Corporation.

Address: 500 W. Texas Avenue, Suite 1020, Midland, TX, 79701.

9. Defendant John Brda

John Brda (hereinafter referred to as "Defendant" or "Brda") is the former CEO of Torchlight Energy Resources, Inc. Brda is responsible for the creation of the Non voting Series A Preferred Shares that became known as MMTLP. Immediately following the merger, Brda was hired as paid consultant to Meta Materials, inc.

Address is 1425 Frontenay Ct., St. Louis, MO, 63122-1623.

10. Defendants GTS Securities

GTS Securities (hereinafter referred to as "Defendant" or "GTS") is a market maker operating on the New York Stock Exchange. GTS initiated unauthorized trading of MMTLP shares on the OTC market without company approval.

Address: Headquartered at 545 Madison Avenue, 15th Floor, New York, NY, 10022.

11. Defendant Ari Rubenstein

Ari Rubenstein (hereinafter referred to as "Defendant" or "Rubenstein") is the CEO of GTS Securities and oversees operations at a market-making firm that facilitates liquidity and trading in financial markets. GTS operates under regulatory frameworks designed to maintain orderly markets and fulfill market maker responsibilities.

Address: Headquartered at 545 Madison Avenue, 15th Floor, New York, NY, 10022.

12. Defendant Charles Schwab & Co., Inc.

Charles Schwab & Co., Inc. (hereinafter referred to as "Defendant" or "Schwab") is a broker-dealer with fiduciary duties to Spears. Other responsibilities as a broker in the US is to provide clients, like Spears, with clear communication and disclosure, handling of funds & securities, conflict of interest mitigation, account protection, trade execution and settlement, maintenance of account records, providing research and educational resources, compliance with regulatory standards and protection against fraud.

Address: Headquartered at 3000 Schwab Way, West lake, Texas 76262.

13. Defendant American Stock Transfer & Trust Company, aka Equiniti Group

American Stock Transfer & Trust Company, now Equiniti Group (hereinafter referred to as "Defendant" or "AST/EQ") is the transfer agent responsible for managing the transition of MMTLP shares to Next Bridge Hydrocarbons. AST/EQ is directly contracted by the NBH. They have a fiduciary duty to act in the company's best interests. This includes maintaining accurate records of securities ownership, processing transfers, and ensuring compliance with securities laws and corporate governance requirements. AST/EQ also has an obligation to shareholders. These obligations include managing share transfers and distributions. Providing accurate information regarding ownership and entitlements as well as preventing fraud or improper transfers.

Address: Headquartered at 6201 15th Avenue, Brooklyn, NY, 11219.

## II. JURISDICTION AND VENUE

1. Federal Question Jurisdiction

Jurisdiction is proper under 28 U.S.C. § 1331 as this action arises under federal law, *including violations of the Securities Exchange Act of 1934 (15 U.S.C. § 78), the Sherman*

Antitrust Act (15 U.S.C. §§ 1–2), and the Clayton Act (15 U.S.C. §§ 12–27). Supplemental jurisdiction over any related state law claims is proper under 28 U.S.C. §  1367.

2. Diversity Jurisdiction

Diversity jurisdiction is proper under 28 U.S.C. § 1332(a) because the amount in  controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the Plaintiff, a resident of Arizona, and Defendants, whose principal places of business are located in other states, including but not limited to Texas, Missouri, New York, and Washington, DC.

3. VENUE

Venue is proper in the United States District Court for the Western District of Texas under 28 U.S.C. § 1391(b) because the Defendants conduct substantial business within this District, and a substantial part of the events or omissions giving rise to the claims occurred within this jurisdiction.

## III. ALLEGATIONS

1. This action arises from a coordinated and systemic scheme involving market manipulation, regulatory negligence, breaches of fiduciary duties, and violations of constitutional protections, collectively undermining the integrity of U.S. financial markets. The Plaintiff, Danielle D Spears, a retail investor, brings this action to hold the Defendants accountable for their respective roles in perpetuating widespread misconduct that caused significant financial harm to retail investors.

2. The named Defendants created and executed an environment designed to benefit institutional participants while providing a disadvantage to retail investors. Through a combination of deceptive practices, regulatory failures, and improper trading mechanisms, these entities and individuals acted in concert to manipulate markets, obscure material information, and undermine shareholder protections.

3. By exploiting their positions of authority and trust, the Defendants facilitated the mishandling of securities such as MMTLP, engaged in deceptive corporate transactions, and obstructed transparency, all to the detriment of retail investors. Defendants and associated entities failed to address systemic irregularities such as synthetic shares, unresolved trade

settlements, improper account reconciliations, and the financial harm inflicted on retail investors. This failure constitutes violations of federal securities and antitrust laws, directly causing significant financial harm to the Plaintiff.

4. Instead of facilitating an orderly transition to private ownership following the spin-off, market makers, broker-dealers, and regulatory entities manipulated MMTLP shares through practices *such as synthetic share creation and naked short selling, flooding the market with counterfeit* shares.

5. These manipulative practices suppressed legitimate share prices and deprived shareholders of the true value of their investments.

6. A pivotal event in this scheme was FINRA's issuance of a U3 trading halt on December 9, 2022, indefinitely freezing trading of MMTLP shares. Citing an undefined "extraordinary event," FINRA imposed the halt without providing transparency or resolution, leaving tens of thousands of investors unable to access their assets.

7. This action was flawed procedurally and is believed to be unconstitutional. As a private self-regulatory organization, FINRA exercised quasi-governmental powers without the oversight required by:

      a. The separation of powers doctrine,

      b. The Appointments Clause, and

      c. The private non-delegation doctrine.


8. FINRA's indefinite U3 trading halt on MMTLP shares deprived investors of access to their assets without adequate explanation or resolution. This halt exemplifies the unchecked powers of a self-regulatory organization operating without sufficient oversight, raising constitutional concerns under the separation of powers, the Appointments Clause, and the private non-delegation doctrine.

9. Recent legal precedents, including SEC v. Sloan and Alpine Securities Corp. v. FINRA, underscore the statutory and constitutional violations inherent in FINRA's actions.

10. The U3 halt and regulatory inaction violated fundamental investor protections, statutory mandates, and constitutional principles. This indefinite trading halt mirrors the statutory violations identified in Sloan, where the Supreme Court condemned the SEC for unlawfully extending a trading halt.

11. Broker-dealers, including Charles Schwab, and market makers like GTS Securities, engaged in coordinated efforts to manipulate the trading of MMTLP shares, profiting from artificial supply at the expense of retail investors.

12. Vertically aligned regulatory bodies, including the SEC and DTCC, failed to enforce compliance, investigate irregularities, or resolve discrepancies in shareholder accounts, allowing market manipulation to flourish unchecked in violation of antitrust laws and federal securities statutes.

13. The role of corporate leadership at Meta Materials, Inc. (hereinafter referred to as "MMAT"), Torchlight Energy (hereinafter referred to as "TRCH"), and Next Bridge Hydrocarbons (hereinafter referred to as "NBH"), whose failures to address trading irregularities, reconcile shareholder discrepancies, and ensure accountability exacerbated the harm   suffered by investors. These leaders neglected their fiduciary duties, misrepresented the financial prospects of their assets, and allowed discrepancies in share reconciliation to persist, leaving shareholders in a prolonged state of uncertainty and financial distress.

14. There are systemic failures in the U.S. financial markets that have harmed retail investors through a combination of regulatory negligence, manipulative practices, and constitutional violations.

15. FINRA's structural deficiencies are compounded by the failures of other regulatory entities, including the SEC and the DTCC, to fulfill their statutory duties to protect investors and ensure market integrity. These organizations failed to investigate or remedy widespread irregularities such as synthetic share creation and naked short selling, which manipulated the market for MMTLP shares. The Defendants' inaction enabled institutional participants to profit at the expense of retail investors, further undermining confidence in the fairness and transparency of the markets.

16. The harm caused by these systemic failures is both significant and ongoing. Retail investors have been denied the ability to trade their shares, reconcile their holdings, or recover their investments, while institutional participants who engaged in manipulative practices remain unaccountable. The constitutional and statutory violations identified in this case are emblematic of broader governance flaws in the financial markets, which must be addressed to protect investors and maintain public confidence in the integrity of the system.

## IV.    STATEMENT OF FACTS

1. Central to this case are the Non-Voting Series A Preferred Shares(MMTLP),initially issued by TRCH, an oil and gas exploration company. In 2021, TRCH completed a reverse merger with MMAT, and these shares were intended to represent an interest in TRCH's energy assets, particularly its stake in NBH, following a corporate spin-off.

2. The shares were explicitly designed to be non-tradeable, with no market expected to be made. They were structured as a private offering, available only to a select group of investors and not to the general public. These shares were meant to represent the assets of NBH, a private company who reports publicly. Investors were made to believe that assets of were to be sold and that these shares represented the value of this future assets sale.

3. Despite nearly two years having passed since the U3 halt, no meaningful action has been taken to address these failures. Retail investors remain in financial and legal limbo, unable to trade their positions or reconcile share discrepancies.

4. On or about May 2, 2008, Pole Perfect Studios began filing as a private company under Central Index Key (CIK) number 0001431959. Following its merger with TRCH  On November 23, 2010, this CIK number transferred to TRCH, making it responsible for subsequent regulatory filings.

5. On June 28, 2021, Torchlight transferred its CIK number to MMAT following their merger. The shared use of CIK number 0001431959 by multiple entities, including MMAT and MMTLP, constitutes a potential violation of SEC regulations, which require unique identifiers for distinct entities. Such actions could obscure transaction records and mislead

investors, potentially violating Rule 10b-5, which prohibits deceptive practices in securities transactions.

6. The improper use of a CIK number undermines the record-keeping and internal control provisions under the Securities Exchange Act of 1934, which mandate precise tracking of securities filings and transactions to protect investors and ensure market transparency.

7. A CUSIP (Committee on Uniform Securities Identification Procedures) number is a unique nine-character alphanumeric code assigned to financial securities in the United States and Canada. It serves as a standardized identifier for securities such as stocks, bonds, and mutual funds, facilitating accurate processing, clearing, and settlement of trades.

8. The CUSIP system simplifies record-keeping, reduces transaction errors, and provides a reliable identifier for both investors and institutions.

9. Unlike CIK numbers, which identify entities filing with the SEC, CUSIP numbers specifically identify individual financial securities. This distinction ensures clarity and accuracy in trading and tracking within financial markets.

10. From 2010 to 2020, TRCH traded approximately 745 million shares on public markets. This significant trading volume reflected the company's decade-long activity in the oil exploration sector and positioned it for the eventual merger with MMAT. The trading history highlights the scale of its operations and shareholder engagement during this period.

11. On or about April 23, 2020, Brda, then CEO and McCabe, then Chairman of TRCH., made public statements inflating the valuation of oil and gas properties that would later form NBH.

12. They cited a third-party reserve estimate indicating a mean case of approximately 3.678 billion barrels of oil equivalent (BOE) in recoverable reserves from unconventional zones in the Orogrande Basin. This estimate was based on a petrophysical report prepared by Stimulation Petrophysics Consulting.

13. Based on this reserve estimate and the 2019 average price of West Texas Intermediate (WTI) crude oil at $56.99 per barrel, the perceived above-ground value of the Orogrande Basin assets was approximately $209.51 billion.

14. Using industry-standard valuations of 10–20% of the market price for oil in the ground, the below-ground value ranged from approximately $20.96 billion to $41.92 billion, reflecting its potential fair market value prior to extraction.

15. Statements from NBH corporate officers and social media influencers regarding the probable reserves created high expectations about NBH's financial prospects. These projections were consistently referenced in shareholder discussions leading up to the MMTLP transition.

16. On March 1, 2020, TRCH presented an Investor Presentation via PowerPoint and email to interested parties, emphasizing the company's assets in the Permian Basin, particularly the Orogrande, Hazel, and Winkler projects.

17. The Orogrande Project was highlighted as TRCH's flagship asset, comprising over 134,000 acres with a recoverable resource potential estimated at 3.7 billion barrels of oil equivalent in the median case.

18. The presentation emphasized the Orogrande project's potential to attract major industry players for acquisitions or partnerships due to its size and resource estimates. While acknowledging market risks, TRCH framed the central question as determining the quantity of recoverable oil rather than its existence.

19. In June 2020, Brda and the TRCH BOD resolved to pursue a strategic initiative aimed at stabilizing the company through a merger with MMAT, a corporation focused on advanced technology innovations.

20. The merger was presented to shareholders as a critical measure to address alleged illegal short selling in the market, which was portrayed as a significant threat to TRCH's financial stability.

21. Shareholders were led to believe that the merger would address the systemic challenges posed by illegal short positions while transitioning the company toward a   future in high-tech innovation.

22. Shareholders were led to believe that the merger between TRCH and MMAT would provide a pathway to resolve systemic challenges posed by illegal short positions while

transitioning the company toward a future in high-tech innovation. This narrative was a central aspect of the merger's presentation to investors.

23. On December 14, 2020, TRCH, a Texas-based oil exploration company, formally initiated a merger plan with MMAT, a Canadian high-technology materials firm. The proposed merger was framed as a strategic opportunity to align TRCH's traditional energy assets with MMAT's cutting-edge technology portfolio.

24. The merger aimed to combine TRCH's oil and gas assets with MMAT's advanced materials technology to enhance shareholder value and diversify operations. This corporate action represented a pivotal shift for both companies, laying the groundwork for the creation of MMAT and signaling a new strategic direction for TRCH    shareholders.

25. From January 1, 2021, to June 21, 2021, TRCH traded a total of 3.6 billion shares—    an unprecedented volume compared to the company's cumulative trading history of 745 million shares over the prior decade. This dramatic surge in trading activity raised significant concerns about unusual market behavior and potential trading irregularities.

26. A Z-test statistical analysis was conducted on July 14, 2024, to evaluate the trading volumes of TRCH using historical data from 2010 to 2020 and the first half of 2021.

27. The analysis assumed an average daily trading volume variation of 5% over 10 years. It concluded that trading 3.6 billion shares in TRCH within the six-month period from January to June 2021 was statistically improbable without market manipulation or an unpredictable, non-uniform events influencing the market.

28. Upon information and belief, during the first six months of 2021, naked short positions were added to TRCH by Ari Rubenstein, in concert with others. These actions likely contributed to the anomalous trading volumes observed during this period, further indicating potential market manipulation.

29. On August 24, 2022, the Plaintiff signed a self-directed broker agreement with TD Ameritrade. On October 3, 2023, following Charles Schwab's acquisition of TD Ameritrade, the Plaintiff entered into a similar agreement with Schwab. Both agreements include a mandatory arbitration clause in Section 10, requiring disputes to be resolved through arbitration (e.g.,

11

FINRA) and waiving the right to pursue a court case, including a jury trial, except as allowed by the arbitration forum's rules.

30. However, under the Clayton Act, Section 3 (15 U.S.C. § 14) and the Sherman Antitrust Act, Sections 1 and 2 (15 U.S.C. §§ 1–2), such arbitration agreements may be deemed null and void when tied to or facilitating anti competitive conduct, including monopolistic behavior that restrains trade or suppresses competition.

31. In June 2021, GTS, under the direction of Ari Rubenstein, and Canaccord Genuity, a Canadian market maker, jointly filed paperwork to register the Series A Preferred Stock for trading on the Over-The-Counter (OTC) market for NASDAQ, without authorization or permission from MMAT or TRCH executives.

32. GTS and Canaccord Genuity relied on outdated, decade-old information in violation of FINRA rules and submitted falsified Form 211 filings to enable the trad-ability of the shares that would later become MMTLP.

33. In a letter dated June 21, 2021, the Options Clearing Corporation (OCC) explicitly stated that the Series A Preferred Shares were not intended to trade.

34. However, the same letter informed options traders that they were not required to close out short positions through the merger until what would become "MMTLP" could trade on the OTC market. This directive contradicted the intentions and filings of the merged companies.

35. The OCC memorandum, dated June 21, 2021, was exclusively shared with market makers and hedge funds, including GTS and Ari Rubenstein.

36. Under Ari Rubenstein's supervision, GTS was obligated to record all short sales, including naked shorts. GTS was granted additional time to close out fails-to-deliver (FTDs) under the market maker exemption rule.

37. Pursuant to FINRA Rule 204(b), market makers engaged in bona fide market-making activities are provided exceptions allowing additional time to close out fails-to-deliver resulting from such activities.

38. However, market makers are required to maintain daily records of their FTDs and report them as necessary to ensure transparency and regulatory oversight.

39. The Depository Trust & Clearing Corporation (DTCC) is responsible for maintaining precise and comprehensive records of securities trades and ensuring the efficient recovery and dissemination of information related to securities transactions in U.S. stock markets. This obligation is critical for promoting transparency and regulatory compliance.

40. On June 25, 2021, the CIK number 0001431959 transitioned again when TRCH conducted a reverse takeover (RTO) with MMAT.

41. The shared use of CIK number 0001431959 among multiple entities, including Pole Perfect, TRCH, and MMAT, constitutes a potential violation of SEC regulations requiring unique identifiers for separate entities.

42. Such actions obscure transaction records and mislead investors, violating the Rule 10b-5 prohibition on deceptive practices in securities transactions.

43. During the merger of TRCH and MMAT, McCabe, a key executive and shareholder, publicly emphasized the significant potential value of the Orogrande Basin oil and gas assets. He highlighted probable oil reserves and other unproven assets, framing the basin as a critical component of the merger.

44. However, public filings and disclosures at the time valued the Orogrande Basin assets at $47 million—significantly lower than the estimated $20.96 billion to $41.92 billion based on below-ground valuation of probable reserves.

45. Subsequent disclosures during the NBH spin-off revealed notable discrepancies in these valuations, raising concerns about the accuracy and transparency of the initial assessments.

46. On June 28, 2021, MMTLP shares were created as part of the spin-off in which TRCH transitioned specific assets into NBH.

47. These shares, designated as Series A Preferred Shares, were intended to represent private ownership in NBH and were explicitly not meant to trade publicly.

48. Despite directives in TRCH's proxy statement, GTS and Canaccord Genuity began publicly trading MMTLP shares on October 6, 2021.

49. On October 7, 2021, MMTLP began trading on OTC markets under the shared CIK number 0001431959, the same identifier previously used by Pole Perfect, TRCH, and MMAT.

50. This use of a shared CIK raises significant compliance concerns with SEC filing rules, including potential violations of Regulation S-T Rule 10(b) and Rule 10b-5.

51. On or about October 7, 2021, GTS and Canaccord Genuity facilitated unauthorized public trading of MMTLP shares on the OTC market, actions not approved by TRCH or MMAT executives.

52. Brda, former CEO of TRCH, notified OTC Markets of the unauthorized trading. OTC Markets directed him to FINRA, which subsequently informed Brda that he lacked standing to file a formal complaint as he was no longer CEO. This unauthorized listing caused significant trading irregularities and investor confusion.

53. From October 7, 2021, to December 9, 2022, GTS engaged in trading activities that resulted in the creation of synthetic shares, exceeding the authorized float of MMTLP shares.

54. Between October 2021 and December 2022, GTS, operating under its  market maker exemption, engaged in trading activities involving synthetic MMTLP shares. These shares were created without the required "locates," exceeding the authorized float of legitimate shares.

55. From October 1, 2022, to December 8, 2022, MMTLP stock experienced significant volatility, with prices ranging from a low of $2.85 to a high of $12.50, raising questions about potential market manipulation.

56. During this period, the market capitalization of MMTLP, a relatively obscure oil and  gas exploration company, fluctuated between approximately $1.5 billion and $6.5 billion.

57. Given the company's total authorized share count of 165.5 million, this level of market capitalization and price volatility suggests the influence of synthetic (rehypothecated) shares or naked short selling on the stock.

58. Between November 15 and December 5, 2022, Brda sold approximately 300,000 shares of MMTLP. During this period, the trading price ranged between $2.90 and $9.90, generating proceeds estimated between $870,000 and $2,970,000.

59. Publicly available social media posts from this time frame show that Brda encouraged other investors to purchase MMTLP shares while denying that he had sold any of his own shares.

60. Brda later acknowledged selling a portion of his holdings during the price increase leading up to the FINRA-imposed U3 halt, contradicting his earlier public statements.

61. On November 23, 2023, MMTLP shareholders were advised to transfer their shares to the transfer agent, American Stock Transfer & Trust Company (AST), now operating as Equiniti Trust Company (EQ), to facilitate the distribution of NBH shares.

62. Shareholders were told that this transfer process was intended to streamline the corporate action and ensure shareholders received their NBH shares directly from the transfer agent.

63. McCabe informed shareholders that they would receive bonus shares of NBH on a one for one basis of NBH to Newco as an incentive for transferring their shares to AST-EQ. However, these bonus shares were never delivered, raising concerns about the accuracy of representations made to shareholders.

64. On November 30, 2022, McCabe sold approximately 6.8 million shares of MMTLP from his total holdings of 18,758,249 shares, representing 11.37% of the float. On that date, the trading price ranged between $7.76 and $10.00.

65. Based on this price range, McCabe's transactions generated proceeds estimated between $52,768,000 and $68,000,000. Under SEC rules regarding beneficial ownership, McCabe was required to report these share transactions, as he held more than 5% of the float.

66. A series of emails obtained through a Freedom of Information Act (FOIA) request revealed that, on December 5, 2022, individuals at both the SEC and FINRA, including    Mr. Sam Draddy, Ms. Patti Casimates, Mr. Richard Boyle, Mr. Jay Gibbons, and an unidentified redacted individual, were aware of fraudulent activities affecting the trading of MMAT and MMTLP shares.

67. These emails provide insight into regulatory awareness of market irregularities leading up to the FINRA-imposed U3 trading halt.

68. The awareness reflected in these emails implies that FINRA Blue Sheets, formally known as Electronic Blue Sheet (EBS) data, were in use as early as December 5, 2022, and potentially earlier.

69. Blue Sheets, which are reports broker-dealers submit to regulators such as FINRA and the SEC, contain detailed trade information, including the identity of the buyer and seller, trade size, *trade price, and other transaction-specific details.*

70. The purpose of Blue Sheets is to assist regulators in monitoring markets, detecting suspicious trading activity, and investigating potential securities violations such as market manipulation or insider trading.

71. Blue Sheets are critical for ensuring transparency and accountability in financial markets, enabling regulators to reconstruct trading activity and identify patterns of misconduct. Their role is particularly significant in cases involving allegations of  synthetic share creation or naked short selling.

72. The corporate action further specified that MMTLP shares would be canceled on December 13, 2022, with a pay date for NBH shares or dividends set for December 14, 2022.

73. On December 8, 2022, Jeff Mendl, Vice President of OTC Markets, stated on Trader  TV that MMTLP shares were approved to trade through December 12, 2022, as part of a FINRA approved corporate action. Mendl confirmed that MMTLP would no longer be available for trading on the OTC market starting December 13, 2022, and that the shares were planned to be deleted following that date.

74. On December 8, 2022, FINRA failed to attend a scheduled meeting with the DTCC and attorneys representing MMAT to address unresolved issues surrounding the MMTLP corporate action.

75. Later that same day, FINRA issued a revised corporate action notice, altering the language to state that "the symbol will be DELETED," replacing the previous notice that indicated MMTLP shares would be "CANCELED" upon conversion to NBH shares.

76. This revision omitted the originally specified December 14, 2022, pay date, further confusing shareholders and creating uncertainty about the transition process.

77. At the close of trading on December 8, 2022, deal-broker Level 2 data revealed that short position holders in MMTLP utilized the 505 code. This is commonly referred to as short on shares or S.O.S. to signal a heightened urgency to close their positions. The data showed transaction prices reaching and exceeding 100 times the closing price of $2.90 per share (e.g., $290.00+ per share), an extraordinary deviation indicative of a severe short squeeze.

78. Furthermore, after December 8, 2022, limit orders ranging from less than $100 to as  much as $200,000 per share were submitted through various brokerages but were marked as "too late to cancel." This indicated significant irregularities in the handling of  MMTLP trades, impacting shareholder ability to access or execute transactions.

79. Many MMTLP traders, including the Plaintiff, held their shares with the intent to execute opportunity trades—to sell rather than buy—on December 9 and 12, 2022. These shareholders were prepared to accept the best possible offers for their trades before the close of all trading on December 12, 2022, as specified in the approved corporate action referenced above.

80. On December 9, 2022, FINRA imposed a U3 trading halt on MMTLP shares. As a self-regulatory organization operating under delegated authority from the SEC, FINRA justified the halt by citing "extraordinary circumstances." This action left investors unable to access their investments, with no clear resolution provided.

81. FINRA justified the U3 trading halt with the following statement:
"FINRA has determined that an extraordinary event has occurred or is ongoing that has caused or has the potential to cause significant uncertainty in the settlement and clearing  process for shares of MMTLP and that, therefore, halting trading and quoting in MMTLP is necessary to protect investors and the public interest."

82. In the same FINRA notice announcing the halt of MMTLP dated December 9, 2022, FINRA clarified that the trading halt would remain in effect until the deletion of  MMTLP, scheduled for December 13, 2022.

83. Any subsequent reference to the FINRA U3 halt after December 13, 2022, is acknowledged as accurate in form. However, for the purposes of this complaint, it is considered a matter of semantics, as the halt was officially lifted on that date. Despite this, no further action, remedy, or

resolution has been undertaken as of December 4, 2024, leaving the matter unresolved for a total of 726 days.

84. FINRA's authority to issue such halts is derived from its statutory role under the Securities Exchange Act of 1934, and the halt applied to securities trading across the U.S. financial markets.

85. While the halt was ostensibly intended to address market irregularities, FINRA's structure as a private entity wielding quasi-governmental powers without direct executive oversight raises questions under the separation of powers doctrine.

86. As a privately governed organization, FINRA's Board of Governors is neither appointed by the President of the United States nor subject to the checks and balances typically applied to federal agencies. This structure prompts constitutional considerations relevant to FINRA's governance and actions.

87. From its establishment as an SRO (self-regulatory organization) under the Maloney Act amendments to the Securities Exchange Act of 1934, FINRA has exercised significant regulatory powers. These include the ability to enact rules, conduct investigations, and impose sanctions—functions typically reserved for federal agencies.

87. These powers were evident during FINRA's issuance of the U3 trading halt on MMTLP shares on December 9, 2022, an action with significant financial and legal implications for investors.

89. However, FINRA's governance by a private, membership-based Board of Governors raises structural questions about its authority to take such impactful actions. This board is neither appointed by the President of the United States nor confirmed by the Senate, operating outside the framework outlined in the Appointments Clause of the U.S. Constitution, which ensures accountability for individuals wielding significant federal authority.

90. In the week following the FINRA U3 halt, Schwab sent emails to MMTLP shareholders, including Ms. Gwendolyn Mickens and Mr. Anthony Erbacher, stating that even if the U3 halt were resolved, Schwab would not permit shareholders to trade MMTLP shares.

91. Although NBH submitted and received approval for its S-1 filings and amendments in 2022, position-close-only restrictions were not enforced for MMTLP shares prior to the U3 halt. Such restrictions could have limited new short positions and helped stabilize the market during the transition.

92. On February 6, 2023, Cromwell Coulson, President of OTC Markets, publicly acknowledged via a tweet that short positions still existed in NBH, despite its status as a private company not intended for public trading.

93. Coulson further stated that resolving these short positions would be "easier if NBH shares became publicly trade-able," implicitly highlighting the complications caused by FINRA's trading halt of MMTLP shares and the unresolved discrepancies in share counts.

94. FINRA released its initial FAQ regarding the MMTLP corporate action and U3 trading halt on March 16, 2023, 97 days after the halt was imposed. The FAQ failed to clearly define the "extraordinary event" that justified the halt, leaving shareholders without sufficient clarity or explanation.

95. Despite receiving thousands of complaints from shareholders via Schwab, FINRA, the SEC, and Congressional Representatives, this FAQ remains, to date, FINRA's only significant communication with shareholders regarding the halt.

96. On February 20, 2023, Fleming, a TD Ameritrade (later Schwab) employee, admitted during a conversation with Traudt that the U3 halt of MMTLP trading on December 9, 2022, was requested by broker-dealers to "protect ourselves," directly acknowledging that institutional interests, rather than retail investor protection, were the primary motivation.

97. This conversation, recorded by TD Ameritrade (TDA) and later Schwab, was initially made available for playback at Traudt's request but was subsequently denied. *(Traudt v. Rubenstein, 2024)*

98. In March 2024, Traudt again sought access to these recordings from Schwab's trade desk, which had acquired TD Ameritrade. Schwab also refused to release the audio. These repeated refusals suggest a coordinated effort to suppress evidence that could reveal the reasons behind the trading halt. *(Traudt v. Rubenstein, 2024)*

99. On April 1, 2023, documents released through a Freedom of Information Act (FOIA) request revealed that the SEC and FINRA were aware of trading irregularities related to MMTLP as early as November 2021.

100. High-ranking officials, including SEC Chairman Gary Gensler and FINRA President Robert W. Cook was documented as having knowledge of these issues. Despite this, no substantive action was taken to address the irregularities or inform the investing public, exacerbating market confusion and investor harm.

101. On April 18, 2023, Clifton DuBose, CEO of NBH, sent a letter to FINRA requesting assistance in addressing unresolved issues arising from the MMTLP spin-off. The letter specifically asked for access to the Blue Sheets, which contain detailed trade data.

102. In the context of MMAT and its preferred shares MMTLP, Blue Sheets could provide critical insights into trading activities during the period of alleged market manipulation and synthetic share creation.

103. For example, during the two-day trading window for MMTLP in December 2022, which ended with FINRA's U3 trading halt, Blue Sheets could reveal the number of trades executed, the counter-parties involved, and whether the transactions involved legitimate shares or synthetic ones.

104. Given allegations of naked short selling and the creation of synthetic shares, a regulatory analysis of Blue Sheets would expose discrepancies between the total volume of shares traded and the actual number of legitimate shares issued, or it could disprove such allegations.

105. If regulators were to release Blue Sheets for MMAT and MMTLP, they could uncover the extent of market irregularities alleged by retail investors and advocacy groups.

106. For instance, these records might highlight unusually high trade volumes that exceeded the total outstanding shares, corroborating claims of synthetic shares.

107. Furthermore, the data could reveal whether broker-dealers and market makers engaged in practices such as failure-to-deliver (FTD) settlements or improper short selling, which may have depressed the stock price or caused financial harm to shareholders.

108. The lack of Blue Sheet transparency in the MMTLP case has been a critical point of contention for investors seeking clarity regarding the abrupt U3 trading halt and its impact on their holdings.

109. The release of Blue Sheets for MMTLP and MMAT would provide a definitive account of trading activity, enabling allegations of irregularities, such as synthetic share creation or naked short selling, to be substantiated or dis-proven.

110. Access to this data would not only clarify trading activity but could also serve as evidence in legal or regulatory actions addressing potential misconduct. Such transparency is essential to restoring investor trust and ensuring accountability for any wrongdoing.

111. Clifton DuBose, CEO of NBH, outlined concerns in his communication regarding outstanding short positions in NBH shares and the negative impact on investors caused by FINRA's actions, including the December 9, 2022, trading halt.

112. The letter also proposed a temporary trading period to facilitate the reconciliation of shares and sought FINRA's cooperation in addressing discrepancies to maintain market integrity.

113. FINRA, however, did not concur with Du Bose's recommendations and failed to provide any meaningful remedy in its response letter dated June 7, 2023.

114. On January 15, 2024, NBH executives, including CEO Clifton DuBose and CFO Luke Hawkins, resigned without addressing shareholder concerns about unresolved trading issues during the MMTLP-to-NBH transition. These resignations occurred amidst ongoing market uncertainty.

115. On or about July 15, 2022, NBH received its own Central Index Key (CIK) number, 0001936756, in preparation for its planned spin-off from MMTLP. This was the same CIK initially assigned to Pole Perfect, subsequently used by TRCH, then MMAT, and now NBH, while MMAT remains a legal entity.

116. A supplemental FAQ was published by FINRA on November 6, 2023, 332 days after the trading halt. Like the initial FAQ, this document failed to clearly define the "extraordinary event" that warranted the halt.

117. Despite tens of thousands of complaints submitted by shareholders through Schwab, FINRA, the SEC, and Congressional Representatives, the supplemental FAQ marked only the second significant communication from FINRA about the halt.

118. To date, these two FAQs remain FINRA's only substantive communications with shareholders regarding the trading halt.

119. On September 27, 2023, during a House Financial Services Committee hearing, Representative Ralph Norman questioned SEC Chair Gary Gensler about MMTLP.

120. Norman inquired if Gensler was familiar with MMTLP and aware of its aggregate share count as of December 8, 2022. Gensler appeared to vaguely acknowledge familiarity with MMTLP.  He admitted he did not know the specific share count and suggested that the information might be publicly available. This was a false statement.

121. Dissatisfied with the SEC's responses, Norman indicated plans to send another letter seeking detailed information.

122. On December 22, 2023, Representative Ralph Norman led an open letter addressed to FINRA and the SEC concerning the MMAT Series A Preferred Shares MMTLP. This letter was co-signed by 74 members of Congress.

123. On February 2, 2024, 6 days after the deadline on the open letter, Gensler, Chairman of the SEC responded by letter.  In this letter, Gensler stated that requests for information sought by FINRA, and for analyses performed by FINRA, are best answered by FINRA. Thus, Gensler, referred these members of Congress back to FINRA.

124. Within this same letter, Gensler directed Congress to the public disclosures from NBH to ascertain the shares outstanding. Thus avoiding all discussion of short interest, FTD's.

125. This same letter also stated that the blue sheets and the CAT data are kept confidential and are protected by exemptions to FOIA. It further went on to state that because the SEC performs enforcement investigations on a confidential basis, they cannot acknowledge the existence or non-existence of any investigations unless or until charges are filed.

126. On February 6, 2024 Representative Ralph Norman posted a copy of the response letter from the SEC. Stating that he'd "just received an empty response from the SEC," and that this was "COMPLETELY UNACCEPTABLE!!!"

127. On June 5, 2024, over 40 Members of Congress, led by Representatives Ralph Norman and Pete Sessions, sent a follow-up letter to SEC Chairman Gary Gensler. The letter reiterated requests for an investigation into FINRA's U3 halt on MMTLP shares and the subsequent unresolved trading discrepancies.

128. The letter emphasized that FINRA's actions led to widespread investor harm and confusion, referencing over 40,000 letters from affected constituents. It called for transparency, an independent audited share count, and a briefing on the SEC's findings.

129. As of December 04, 2024, there is no publicly available information indicating that Representative Ralph Norman's letter to the SEC and FINRA regarding MMTLP has led to any significant regulatory actions or policy changes.

130. While these two letters, co-signed by 114 members of Congress, called for a comprehensive review of the events surrounding MMTLP, the SEC and FINRA have not publicly disclosed any substantial measures taken in response.

131. Brda and CEO George Palikaras of MMAT were charged by the SEC with securities fraud on June 25, 2024.

132. MMAT declared bankruptcy on August 9, 2024. Its final filing under CIK 0001431959 occurred on September 20, 2024.

133. On October 2, 2024, University Lands issued a formal termination letter to Hudspeth Operating (hereinafter referred to as "HUBOp") a subsidiary of NBH, citing breaches of the Development Unit Agreement (DUA) due to non-payment of annual royalties and HudOp's failure to fulfill its drilling obligations for the 2024 operational year.

134. The termination letter also highlighted HudOp's lack of any concrete plans for future development of the Orogrande lease, further demonstrating its failure to meet the terms of the agreement. University Lands demanded the release of the lease within 90 days and retained the

right to pursue legal remedies if HudOp failed to comply with its environmental responsibilities, including plugging existing wells and remediating the land.

135. The termination letter also highlighted HudOp's lack of concrete plans for future development of the Orogrande lease, further demonstrating its failure to meet the agreement's terms. University Lands demanded the release of the lease within 90 days and retained the right to pursue legal remedies if HudOp failed to address its environmental responsibilities, including plugging existing wells and remediating the land.

136. In response to the October 2, 2024, lease termination, McCabe, Chairman and CEO of NBH, expressed disappointment with University Lands' decision, framing it as a setback for the company.

137. However, NBH has taken no formal corporate measures to address the lease termination, leaving shareholders questioning the company's commitment to the Orogrande project and its broader operational strategy. This inaction has further fueled concerns about NBH's management and the viability of its core assets.

138. In early November 2024, a small group of investors got together and drafted a Shareholder Request for Information (RFI) in an effort to get answers from NBH regarding multiple issues, such as the lost University Lands Lease.

139. The RFI was sent separately by Spears and approx. 9 other shareholders. The RFI letters were sent via email to the NBH Investor Relations website. The emails were confirmed as early as November 11, 2024. Additionally, these RFI's were sent by USPS Registered &/or Certified Mail to NBH's registered address at 6300 Ridglea Pl, Suite 950, Fort Worth, TX, 76116. Investors were informed of receipt of these letters as early as November 13, 2024 via the USPS.

140. Despite the legal rights granted under Texas Business Organizations Code Section 21.218 and Nevada Revised Statutes Chapter 78.257, NBH failed to provide any response to the multiple letters sent via email and certified mail. These Request for Information (RFI) letters requested a response within a specified 14-day deadline.

141. Having gotten no response to the RFI, these same shareholders together with Spears drafted a formal demand for a Books and Records Check (BRC). This document condensed the

questions asked on the RFI. Shareholders deliberately chose fewer questions and asked for less documentation than requested in the RFI. This decision was made to give McCabe every opportunity to meet the 3-day turn around deadline.

142. In an effort to offer transparency and clarity, the shareholders used a licensed Texas process server to serve McCabe with the BRC. Thus all parties would be aware of the exact deadline, given the 3-day deadline.

143. The first attempt of service was attempted at 6300 Ridglea Place, Suite 950, Fort Worth, TX 76116. NBH filed a 10-Q with the SEC on September 30, 2024 which provided this address.

144. On Sunday, November 17, 2024, Spears provided the BRC document to the licensed process server along with the address for service. On Monday, November 18, 2024, Spears was informed by the process server that the NBH was no longer located at the given address. Employees within this place of business, (now identified as leased  by a company named Valor), stated that NBH had moved months ago.  Spears and the other shareholders were stunned.  This also added a new level of concern as the company moved without notifying investors, the SEC nor The Texas Secretary of State.

 145. Spears did further digging and located a business address for McCabe Petroleum Corporation (MPC). The BRC, requesting lawful shareholder access to records held by NBH and McCabe, was finally served on November 19, 2024 when McCabe accepted service at 500 W Texas Ave Ste 890, Midland, TX 79701.

146. To date, no response has been received from McCabe or NBH to either the RFI or BRC further compounding shareholder concerns about transparency and corporate governance.

147. This lack of response obstructed the shareholder's ability to assess management practices, investigate share discrepancies, and address unresolved concerns, raising significant questions about transparency and NBH's adherence to fiduciary obligations.

148. On November 22, 2024, Auxier, one of the shareholders represented by both the RFI and BRC, issued a Formal Demand Letter to NBH Board of Directors. This demand letter reiterated entitlement to corporate records under Texas Business Organizations Code Section 21.218 and applicable federal securities laws.

149. The demand letter specifically sought explanations regarding the withdrawal of the SEC S-1 filing, the termination of the University Lands Lease and justifications for a $2 million loan obtained at above-average interest rates.  Many other questions were asked. Auxier, Spears and the other investors are still waiting for answers.

150. On November 25, 2024, NBH issued an official communication via investor relations email. Amid the announcements, they rather matter of factly added that the company had relocated its corporate offices from Fort Worth to Midland.

151. NBH offered no explanation as to why the company withheld this information from the SEC and investors.  Nor was there any acknowledgment of what day the company made this move in office locations.

152. The announcement only offered "Midland" as the new address of the new location. This contradicted the last two NBH filings with the SEC which were filed September 30, 2024 and October 8, 2024.  Both of these filings listed the Fort Worth address as its business location.

153. USPS records continue to reflect the Fort Worth address, creating confusion and undermining transparency regarding NBH's corporate headquarters.

154. NBH's failure to provide the requested documentation or address substantive inquiries within the specified response period highlights serious concerns about corporate transparency and potential violations of fiduciary duties to its shareholders.

155. Throughout 2019 and 2022, the DTCC  managed the clearing and settlement processes for TRCH, MMAT, and MMTLP trades.

156. Investor communications and related records from the period reflect discrepancies in settlement obligations related to synthetic shares.

157. Throughout 2021 and 2024, regulatory bodies including FINRA, the SEC, and the DTCC did not coordinate effectively to address market irregularities in TRCH, MMAT, and MMTLP trading. This lack of coordination contributed to prolonged issues with share reconciliation and investor harm.

158. From late 2022 through early 2023, AST/EQ, acting as the designated transfer agent, managed the shareholder reconciliation process during the transition of MMTLP shares to NBH.

Shareholder records during this period reflected discrepancies in share counts, which were left unresolved.

159. Throughout 2022 and 2024, regulatory bodies including FINRA, the SEC, and the DTCC did not coordinate effectively to address market irregularities in TRCH, MMAT,   and MMTLP trading. This lack of coordination contributed to prolonged issues with share reconciliation and investor harm.

160. Throughout 2023 and 2024, shareholders with valid CUSIP records experienced ongoing discrepancies in share reconciliation during the MMTLP-to-NBH transition. These discrepancies remain unresolved, leaving some shareholders without clarity on their holdings.

161. As of the present date, the SEC website has not assigned a CUSIP number for NBH  and its shares, leaving its securities without a standardized identifier for trading or record-keeping purposes.

162. This absence creates challenges in identifying and managing transactions involving NBHs' common stock, complicating compliance with financial reporting standards and market transparency.

163. The lack of a CUSIP number for NBH highlights a gap in ensuring the orderly trading and tracking of its securities within financial markets.

164. It has been well established that over 18 different internal CUSIPs are or have been used to track MMTLP holdings in various Broker/ Dealers; such as Robinhood, TradeStation, E*Trade, JP Morgan, Fidelity, Vanguard, Interactive Brokers, among many others.

165. TDA used internal CUSIP 6DA993019, and Schwab used internal CUSIP  629999590 to track MMTLP shares that have not yet been converted to NBH through the transfer agent AST/ EQ almost two years after the spin-off to NBH.

166. While the definitive number of outstanding shares still held by broker-dealers through internal CUSIPs and not registered with AST/EQ is undetermined, even a single  Share not being reconciled highlights a significant issue.

167. Reports and social media posts featuring redacted brokerage statements indicate that hundreds of individuals, collectively holding thousands of shares, remain affected. In total,

thousands, if not millions, of shares remain non-reconciled more than two years after the spin-off, irrespective of the FINRA-imposed U3 halt.

168. The inability to reconcile all MMTLP shares to NBH shares, years later at AST/ EQ, highlights a major gap in ensuring the orderly trading and tracking of its securities within financial markets.

169. In January 2021, the Game stop (GME) event unfolded as retail investors, coordinated through social media platforms like Reddit's WallStreetBets, initiated a short squeeze targeting heavily shorted stocks. This led to Game stop's stock price surging over 1,000% within days.

170. Regulators, including the SEC, responded swiftly with public statements about market volatility and integrity, and brokerages such as Robinhood imposed temporary trading restrictions, citing liquidity concerns. These restrictions, while controversial, were quickly lifted, allowing GME trading to resume.

171 Congressional hearings were convened within weeks, featuring testimony from Robinhood executives, hedge funds, and retail advocates, while regulators pledged to investigate systemic risks exposed by the volatility.

172. The Games top event ultimately received widespread media attention, immediate regulatory acknowledgment, and a comprehensive examination of its impact on retail investors and the broader market.

173. In stark contrast, the MMTLP event began on December 9, 2022, when FINRA issued a sudden U3 trading halt on MMAT's Series A Preferred Shares (MMTLP) just two days before their planned transition into NBH, a private company.

174. Unlike Game stop, where trading resumed promptly after temporary restrictions, the MMTLP trading halt has remained in effect for 725 days as of December 4, 2024. FINRA cited an "extraordinary event" to justify the halt but failed to provide a detailed explanation at the time.

175. The first communication regarding the halt came 97 days later, in March 2023, through a FINRA FAQ that did not clarify the nature of the "extraordinary event." A supplemental FAQ was issued 332 days after the halt but also failed to address key

concerns, including the allegations of synthetic shares or the systemic failures affecting retail investors.

176. Despite tens of thousands of complaints submitted to FINRA, the SEC, and Congressional Representatives, no Congressional hearings or meaningful investigations have taken place. Shareholders remain unable to trade their positions, and MMTLP investors continue to face financial harm with no clear recourse.

177. Unlike Game stop, which received immediate regulatory scrutiny and resumed trading, MMTLP investors have endured prolonged inaction and a lack of accountability, highlighting significant disparities in how the two events were addressed.

178. In contrast, the Game Stop trading episode and the NBH Fiasco highlights significant disparities in the public and governmental engagement with market regulation issues, prompting questions about the consistency and fairness of responses to events affecting retail investors and market integrity.

179 Institutional market participants, including broker-dealers and market makers, profited from the creation and trading of synthetic shares during the MMTLP transition. Retail investors, however, experienced significant financial losses as a result of these trading practices.

180. These institutional participants stand to make considerable profits by not closing their short positions, particularly when synthetic shares or naked short selling is used as a trading tactic. If NBH were to declare bankruptcy, all shares would become worthless, relieving short sellers of all financial liabilities, regardless of the FINRA-imposed U3 halt.

181. Public records and shareholder complaints from 2023 and 2024 indicate systemic delays in resolving trading discrepancies related to MMTLP shares. Retail investors were left without a clear resolution or recourse for their financial losses.

182. The prolonged inaction by regulatory bodies, over the last two years, combined with unresolved trading irregularities, has contributed to diminished trust in the transparency and fairness of U.S. financial markets. Retail investors remain uncertain about the status of their holdings and future resolutions.

183. Institutional market participants engaged in trading practices involving synthetic MMTLP shares that created an oversupply in the market. This artificial oversupply contributed to the suppression of legitimate share prices.

184. Retail investors have experienced ongoing difficulties in accessing their investments in MMTLP shares following the U3 halt. The lack of liquidity has resulted in prolonged financial uncertainty and loss.

185. To date, FINRA has refused all attempts to provide access to the Blue Sheet records for MMAT and MMTLP, despite repeated requests from shareholders, legal and government representatives, or advocacy groups seeking transparency regarding trading activity.

186. This lack of disclosure has obstructed efforts to investigate allegations of naked short selling, synthetic share creation, and market manipulation during the trading periods in question. Specifically, Blue Sheet data is critical to understanding the abrupt and unprecedented U3 trading halt of MMTLP shares on December 9, 2022, and whether such actions were influenced by irregular or unlawful trading practices.

187. FINRA's refusal to release these records has exacerbated the financial and emotional harm suffered by retail investors and has raised significant concerns about regulatory accountability and oversight in safeguarding market integrity.

188. Shareholders have repeatedly requested audits of MMTLP share discrepancies to distinguish legitimate shares from synthetic ones. To date, no comprehensive audit has been conducted, leaving unresolved questions about the status of outstanding shares.

189. Synthetic share creation and trading irregularities during the MMTLP-to-NBH transitions have contributed to financial harm for retail investors. These actions have highlighted vulnerabilities in market oversight, transparency, and enforcement.

190. The U3 halt and the prolonged lack of resolution for investors highlight the potential concerns stemming from FINRA's privately governed structure, as it may bypass safeguards designed to promote transparency and oversight.

191. FINRA's authority over market participants, particularly in cases of disciplinary or enforcement actions like the trading halt, underscores its substantial role in securities regulation and the constitutional considerations of its accountability and governance.

192. Questions regarding FINRA's constitutional role have been articulated in legal principles, particularly those involving the non-delegation doctrine, and are highly relevant to its handling of the MMTLP U3 trading halt issued on December 9, 2022.

193. This doctrine restricts Congress from delegating legislative powers without clear and specific guidance, yet FINRA operates with broad authority to create rules, enforce them, and adjudicate disputes, including halting trading activities that significantly impact investors.

194. Concerns arise as to whether FINRA's sweeping powers align with Article I of the U.S. Constitution, given its private governance structure and the lack of intelligible principles guiding its regulatory actions.

195. The application of these delegated powers during the U3 halt—where investors were left without access to their assets or meaningful resolution for nearly two years—exemplifies the constitutional considerations surrounding FINRA's role.

196. The non-delegation doctrine underscores the importance of ensuring that quasi-governmental entities like FINRA operate with accountability and within constitutionally defined limits, particularly in situations where their actions impose significant and lasting  consequences on market participants.

197. Throughout the MMTLP-to-NBH transition, regulatory bodies have deflected responsibility for addressing trading irregularities, leaving investors without a resolution  for two years. The lack of clear accountability has prolonged market instability and shareholder uncertainty.

198. Recent rulings, such as Alpine Securities Corp. v. FINRA and SEC v. Sloan,  highlight the constitutional and statutory deficiencies in FINRA's actions.


IV.     FACTUAL AND LEGAL ISSUES

1. The following legal and factual questions arise from the Plaintiff's claims and are critical to determining liability, damages, and appropriate relief in this matter:

a) Whether Defendants violated the Securities Exchange Act of 1934 and other applicable federal securities laws, particularly by failing to maintain market integrity, allowing manipulative practices such as the creation and trading of synthetic shares, and neglecting their statutory duties to protect investors.

b) Whether Defendants engaged in anti-competitive conduct or market manipulation in violation of the Sherman Antitrust Act and the Clayton Act, fostering a monopolistic and exploitative environment detrimental to retail investors.

c) Whether FINRA's issuance of the U3 halt on December 9, 2022, was justified under applicable laws and regulations, and whether FINRA, SEC, and DTCC demonstrated the requisite diligence and transparency in resolving the trading halt and its consequences.

d) Whether the SEC, FINRA, and DTCC failed to fulfill their regulatory responsibilities by supervising one another, enforcing compliance with federal securities laws, and investigating and addressing synthetic share discrepancies during the MMTLP-to-NBH transition.

e) Whether FINRA's governance structure, as a private self-regulatory organization exercising significant quasi-governmental authority without sufficient oversight, violated constitutional principles, including the separation of powers, the Appointments Clause, and the private non-delegation doctrine.

f) Whether the Private Securities Litigation Reform Act of 1995 (PSLRA) unconstitutionally obstructs retail investors, such as the Plaintiff, from pursuing securities fraud claims by imposing heightened pleading standards and discovery stays that deny access to critical evidence, thereby preventing the resolution of claims related to systemic market manipulation, such as the proliferation of synthetic shares and the FINRA-imposed U3 halt on MMTLP.

g) Whether GTS and other market participants violated their legal obligations by engaging in manipulative trading practices, including naked short selling, synthetic

share creation, and other actions that suppressed legitimate share prices and exacerbated harm to retail investors.

h) Whether broker-dealers, such as Schwab, breached fiduciary duties owed to retail investors by facilitating trading irregularities, profiting from the proliferation of synthetic shares, and failing to reconcile oversold positions, despite their statutory obligation to safeguard customer securities and funds.

i) Whether AST/EQ and the DTCC failed to accurately reconcile synthetic shares and legitimate beneficial ownership during the MMTLP-to-NBH transition, leaving retail investors in financial and legal uncertainty.

j) Whether TRCH, MMAT, and NBH corporate leadership were aware of widespread trading irregularities, including synthetic share discrepancies, and whether their failure to act contributed to prolonged harm to shareholders.

k) Whether FINRA, SEC, and DTCC demonstrated negligence, incompetence, or apathy by failing to investigate and resolve market irregularities, discrepancies in share counts, and systemic failures to reconcile shareholder accounts, thereby fostering an environment of regulatory inaction and prolonged harm to retail investors.

l) Whether FINRA and other regulatory bodies acted beyond their statutory and procedural authority by imposing the U3 halt without providing transparent and timely justification, violating the principles articulated in SEC v. Sloan and other applicable precedents.

m) Whether the lack of coordination and communication between the SEC, FINRA, and DTCC directly contributed to unresolved discrepancies in MMTLP and NBH shares, leaving investors without clarity, resolution, or access to their assets.

n) Whether retail investors, including the Plaintiff, suffered a violation of their due process rights due to the lack of clarity, transparency, and recourse options provided during and after the U3 trading halt, and whether such deficiencies warrant compensatory, injunctive, and punitive relief.

o) Whether Defendants failed to disclose material information (e.g., trading irregularities, synthetic share creation, or share discrepancies) that would have informed investors, mitigated harm, and preserved market confidence.

p) Whether institutional market participants, including market makers and broker-dealers, engaged in unjust enrichment by profiting from trading irregularities, exploiting synthetic shares and naked short positions, and avoiding financial liabilities at the expense of retail investors.

q) Whether FINRA, SEC, DTCC, and associated broker-dealers violated investor protection laws by failing to address systemic vulnerabilities and permitting irregularities that undermined market transparency and fairness.

r) Whether retail investors, including the Plaintiff, are entitled to compensatory and punitive damages, injunctive relief, and systemic reforms to address the financial and emotional harm suffered due to the Defendants' collective misconduct.

s) Whether Defendants' failures, omissions, and alleged misconduct reflect broader systemic flaws in the regulatory framework governing the securities markets, necessitating judicial intervention to safeguard market integrity and protect the rights of retail investors.

t) Whether the refusal to disclose critical trading data, such as Blue Sheets or CAT data, impeded investors' ability to investigate claims of market manipulation and reconcile outstanding share discrepancies, further exacerbating financial harm.

u) Whether retail investors were disproportionately harmed compared to institutional participants, who avoided liabilities and profited from systemic market irregularities, creating an inequitable environment in violation of federal securities and antitrust laws.

## COUNT I:

### Violation of the Securities Exchange Act of 1934 (15 U.S.C. § 78) – Against All Defendants

34

1. Defendants violated Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) by engaging in manipulative practices, including the proliferation of synthetic shares, creation of artificial supply, and failure to ensure market transparency.

2. Defendants further violated Section 9(a) (15 U.S.C. § 78i(a)) by manipulating the price of MMTLP shares through artificial trading conditions, including naked short selling and synthetic share creation, designed to suppress share value and harm retail investors.

3. FINRA, SEC, DTCC, and AST/EQ violated Section 17(a) (15 U.S.C. § 78q(a)) by failing to maintain accurate records and ensure market transparency during the MMTLP-to-NBH transition. Their negligence in reconciling discrepancies in share ownership allowed systemic irregularities to persist.

4. Corporate Defendants, including TRCH, MMAT, and NBH leadership, violated Section 13(d) (15 U.S.C. § 78m(d)) by failing to disclose material information regarding beneficial ownership and discrepancies in outstanding shares.

5. Defendants violated Rule 13b2-2 (17 C.F.R. § 240.13b2-2) by making false or misleading statements to auditors or failing to maintain accurate financial records related to MMTLP share discrepancies.

## COUNT II:

### Violation of the Sherman Antitrust Act (15 U.S.C. §§ 1–2) and Clayton Act (15 U.S.C. §§ 12–27) – Against All Defendants

6. Defendants violated Section 1 of the Sherman Act (15 U.S.C. § 1) by colluding to facilitate synthetic share creation, naked short selling, and other anti-competitive practices that suppressed competition and harmed retail investors.

7. GTS and other market participants violated Section 2 of the Sherman Act (15 U.S.C. § 2) by seeking to monopolize trading activity in MMTLP shares, engaging in predatory practices to gain control over supply and demand dynamics.

8. Regulatory bodies, including FINRA, SEC, and DTCC, violated Section 7 of the Clayton Act (15 U.S.C. § 18) by failing to prevent concentrated market power and anti-competitive acquisitions.

9. Defendants collectively violated Section 4 of the Clayton Act (15 U.S.C. § 15), which provides for recovery of damages resulting from anti-competitive actions.

## COUNT III:

### Negligence – Against All Defendants

10. FINRA, SEC, and DTCC violated Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)) by failing to prevent manipulative practices and maintain orderly markets. Their inaction regarding synthetic share creation and trading irregularities enabled systemic harm.

11. AST/EQ, acting as the designated transfer agent, violated Section 17A(c)(1) (15 U.S.C. § 78q-1(c)(1)) by failing to reconcile share discrepancies during the MMTLP-to-NBH transition, leaving retail investors in legal and financial limbo.

12. Defendants collectively breached their duty of reasonable care (Restatement (Second) of Torts § 283), resulting in foreseeable and avoidable harm to retail investors, including the Plaintiff.

13. Schwab violated Rule 15c3-3 (17 C.F.R. § 240.15c3-3) by failing to safeguard customer securities, reconcile oversold positions, and conduct trading in good faith.

## COUNT IV:

### Failure to Resolve the FINRA U3 Halt – Against FINRA, SEC, and DTCC

14. FINRA, SEC, and DTCC violated Section 17A(a)(1) (15 U.S.C. § 78q-1(a)(1)) by failing to resolve the U3 halt in a timely and transparent manner, depriving shareholders of access to their investments.

15. FINRA's issuance of the U3 halt violated its obligations under Section 19(c) (15 U.S.C. § 78s(c)) and Section 6(b)(5) (15 U.S.C. § 78f(b)(5)) to maintain fair and equitable trading standards.

16. The SEC and FINRA failed to enforce prompt resolution of the U3 halt, violating their statutory duties under Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)).

## COUNT V:

### Unjust Enrichment – Against All Defendants

17. Defendants violated Rule 10b-5 (17 C.F.R. § 240.10b-5) and Section 29(b) (15 U.S.C. § 78cc(b)) by profiting from illegal contracts involving synthetic shares and oversold positions.

18. Institutional market participants unjustly enriched themselves at the expense of retail investors by manipulating trading conditions to benefit from suppressed share prices.

## COUNT VI:

### Breach of Fiduciary Duty – Against Charles Schwab and AST/EQ

19. Schwab and AST/EQ violated their fiduciary duties under Section 36(a) of the Investment Company Act (15 U.S.C. § 80a-35(a)) by failing to act in the best interests of their clients during the MMTLP-to-NBH transition.

20. Schwab violated Rule 15c3-3 (17 C.F.R. § 240.15c3-3) by failing to protect customer funds and securities from systemic discrepancies.

21. AST/EQ violated Section 17A(c)(1) (15 U.S.C. § 78q-1(c)(1)) by neglecting its responsibility to reconcile share ownership and ensure accurate records.

## COUNT VII:

### Conspiracy to Commit Fraud – Against All Defendants

22. Defendants violated Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) by conspiring to manipulate securities markets through synthetic share creation and suppressing MMTLP's value.

23. Defendants violated 18 U.S.C. § 371 by conspiring to defraud the U.S. government and regulatory systems, as well as 18 U.S.C. § 1349 by engaging in a scheme to commit wire and securities fraud.

## COUNT VIII:

### Failure to Supervise – Against FINRA and SEC

24. FINRA and SEC violated Section 15(b)(4)(E) (15 U.S.C. § 78o(b)(4)(E)) by failing to supervise broker-dealers and market makers adequately, enabling manipulative practices like synthetic share creation.

25. Defendants also violated Rule 15c3-5 (17 C.F.R. § 240.15c3-5) by failing to establish adequate controls to monitor market access and prevent trading abuses.

## COUNT IX:

### Emotional Distress (Negligent or Intentional Infliction) – Against All Defendants

26. Defendants' reckless disregard for foreseeable harm caused emotional distress to Plaintiff, violating their obligations under Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)) to protect investors.

27. Defendants acted with intentional or reckless disregard for the emotional and financial toll of the U3 halt and systemic irregularities, directly causing harm.

## COUNT X:

### Breach of Contract and Anticipatory Breach – Against Schwab

28. Schwab violated its contractual obligations to Plaintiff by failing to execute trades, reconcile share discrepancies, and provide accurate account information during the MMTLP-to-NBH

transition, as required under Rule 15c3-3 (17 C.F.R. § 240.15c3-3) and U.C.C. § 8-505, which mandate the protection of customer funds and securities.

29. Schwab breached its implied covenant of good faith and fair dealing, inherent in its brokerage agreements with the Plaintiff, by refusing to take corrective action to address share discrepancies and by allowing systemic irregularities to persist.

30. Schwab further committed anticipatory breach of its contractual obligations by issuing emails and statements to customers indicating that, regardless of FINRA's resolution of the U3 halt, MMTLP would never trade again at Schwab. This unequivocal repudiation of its duty to comply with any potential market resolutions or reinstatement of trading rights constitutes an anticipatory breach, undermining Plaintiff's rights under the brokerage agreement.

31. As a direct result of Schwab's breaches, Plaintiff and other retail investors suffered significant financial harm, including the inability to trade or recover the value of their MMTLP investments, and incurred emotional distress due to prolonged financial uncertainty.

## Defendant Inclusion Summary

32. The following Defendants, through their actions, omissions, negligence, incompetence, or intentional misconduct, contributed to systemic market failures, suppressed retail investor rights, and enabled manipulative and anti-competitive practices. Their collective conduct resulted in violations of federal securities laws, breaches of fiduciary duty, unjust enrichment, and significant financial and emotional harm to the Plaintiff. While the specific roles of each Defendant are detailed throughout this Complaint, the Defendants share culpability for creating and sustaining the conditions that led to these violations:

33. FINRA, SEC, and DTCC: These regulatory entities are included in Counts I, II, III, IV, VII, and VIII for their collective failure to fulfill statutory oversight responsibilities under federal securities laws. Their negligence enabled the proliferation of synthetic shares, naked short selling, and systemic market manipulation. FINRA's issuance of the indefinite U3 halt, without timely resolution or transparency, further violated its obligations under Sections 17A and 19 of the Securities Exchange Act. The SEC and DTCC compounded the harm by failing to enforce

compliance with clearing and settlement standards, leaving retail investors in financial and legal limbo.

34. GTS: Included in Counts I, II, V, and VII for engaging in naked short selling, creating synthetic shares, and manipulating market dynamics. GTS exploited regulatory exemptions to gain monopolistic control over trading activity in MMTLP shares, profiting from suppressed share prices to the detriment of retail investors.

35. Schwab: Included in Counts I, III, V, VI, IX, and X for breaching its fiduciary and contractual obligations to safeguard customer securities, reconcile oversold positions, and execute trades in good faith. Schwab's anticipatory breach of its brokerage agreements, through explicit communications stating that MMTLP would never trade again regardless of FINRA's resolution, demonstrates a blatant disregard for its clients' rights and financial well-being.

36. AST/EQ (Equiniti): Included in Counts I, III, IV, V, and VI for failing to reconcile synthetic shares with legitimate beneficial ownership during the MMTLP-to-NBH transition. AST/EQ's *failure to provide accurate records and resolve discrepancies violated statutory obligations under* Section 17A(c)(1) of the Securities Exchange Act, contributing to systemic harm for shareholders.

37. Torchlight Energy, Meta Materials, and Next Bridge Hydrocarbons Leadership: Included in Counts I, III, V, and VII for their roles in perpetuating trading irregularities and synthetic share proliferation. Corporate executives, including McCabe and Brda, knowingly made misleading public statements about the value of Orogrande Basin assets and failed to address discrepancies in MMTLP shares, exacerbating harm to retail investors.

38. Corporate Leadership and Market Participants: The specific acts of recklessness, negligence, and intentional misconduct by the leadership of the named entities, as outlined in the Acts of Scienter, underscore their collective culpability. Their roles in enabling synthetic share creation, engaging in naked short selling, and manipulating market conditions directly contributed to the harm suffered by the Plaintiff and other retail investors.

39. By their actions and omissions, all Defendants have demonstrated a pattern of negligence, misconduct, and disregard for their statutory and fiduciary duties. Their collective conduct has

undermined market integrity, suppressed retail investor rights, and violated federal securities, antitrust, and consumer protection laws.

Specific Acts of Scienter as Defined Under the Private Securities Litigation Reform Act of 1995 (PSLRA) and Federal Rule of Civil Procedure 9(b):

1. FINRA (Leadership under Robert W. Cook)

a. Reckless issuance of the U3 halt (December 9, 2022): FINRA imposed an indefinite halt on MMTLP trading without adequate investigation or justification, despite knowledge of synthetic share proliferation and trading irregularities.

b. Failure to resolve the U3 halt: FINRA neglected its statutory obligation to resolve the halt in a transparent and timely manner, violating Section 19(c) of the Securities Exchange Act and causing prolonged financial harm to investors.

c. Intentional inaction despite awareness: Despite documented evidence and public complaints about synthetic shares, FINRA failed to conduct meaningful investigations or enforce compliance with federal securities laws.

d. Omission of material facts in public communications: FINRA misled the market by failing to disclose the reasons for the U3 halt or the steps necessary to resolve the trading discrepancies.

2. SEC (Leadership under Gary Gensler)

e. Failure to enforce compliance with federal securities laws: The SEC neglected its oversight duties by failing to investigate or address systemic market irregularities, including synthetic share creation and naked short selling.

f. Complicity in FINRA's inaction: The SEC allowed FINRA's U3 halt to persist indefinitely without requiring transparency or resolution, violating its statutory responsibilities under Sections 15A and 17A of the Securities Exchange Act.

g. Neglect of investor protection responsibilities: Despite knowledge of investor harm caused by synthetic shares, the SEC failed to act in a manner consistent with its mission to protect retail investors.

h. Deliberate regulatory apathy: The SEC's lack of intervention, despite its authority and duty to supervise FINRA and the DTCC, indicates intentional disregard for systemic failures.

3. DTCC (Leadership under Frank La Salla)

i. Failure to enforce settlement standards: The DTCC permitted unresolved fails-to-deliver and synthetic shares to proliferate, violating Section 17A(a)(1) of the Securities Exchange Act.

j. Neglect of reconciliation duties: Despite its role as a clearing agency, the DTCC failed to reconcile outstanding shares, leaving retail investors in financial limbo during the MMTLP-to-NBH transition.

k. Omission of material discrepancies: The DTCC did not disclose known settlement issues or irregularities, allowing manipulative practices to persist.

l. Facilitation of manipulative trading practices: By failing to enforce proper clearing and settlement standards, the DTCC knowingly enabled the creation and trading of synthetic shares.

4. GTS Securities (Leadership under Ari Rubenstein)

m. Naked short selling: GTS engaged in illegal naked short selling, flooding the market with synthetic shares and suppressing the price of MMTLP stock.

n. Manipulation of supply and demand: GTS intentionally created artificial trading conditions to benefit from suppressed share prices, directly harming retail investors.

o. Exploitation of regulatory exemptions: GTS used loopholes and exemptions in trading regulations to evade accountability for its manipulative practices.

Profiteering from synthetic shares: GTS knowingly profited from trading synthetic shares while concealing its role in market manipulation.

5. Charles Schwab (Leadership under Rick Wurster)

p. Trading of synthetic shares: Schwab knowingly facilitated the trading of counterfeit shares, failing to reconcile oversold positions despite documented discrepancies.

q. Anticipatory breach of contract: Schwab explicitly informed clients that MMTLP would not trade again, regardless of FINRA's resolution, demonstrating intent to avoid its obligations under brokerage agreements.

r. Neglect of fiduciary duties: Schwab failed to safeguard customer securities and funds, violating Rule 15c3-3 and fiduciary standards.

s. Failure to address customer complaints: Despite investor concerns and complaints about trading irregularities, Schwab intentionally ignored its obligation to act in its clients' best interests.

6. AST/EQ (Leadership under Jo Palmer)

t. Failure to reconcile shares during the MMTLP-to-NBH transition: AST/EQ neglected its duties as a transfer agent by failing to provide accurate ownership records, violating Section 17A(c)(1).

u. Omission of material information: AST/EQ failed to disclose share discrepancies or conduct due diligence, leaving shareholders in financial uncertainty.

v. Neglect of due diligence responsibilities: Despite its role as the designated transfer agent, AST/EQ did not investigate or address irregularities in the reconciliation process.

w. Facilitation of synthetic share persistence: By failing to provide accurate records, AST/EQ contributed to the systemic harm caused by synthetic shares.

7. Torchlight Energy, Meta Materials, and Next Bridge Hydrocarbons Leadership (John Brda, George Palikaras, Gregory McCabe respectively)

x. Misrepresentation of asset valuations: McCabe knowingly overstated the valuation of Orogrande Basin assets to inflate shareholder expectations and attract investments.

y. Encouraging trading despite irregularities: Brda encouraged buy orders for MMTLP shares while offloading his own holdings during periods of trading irregularities.

z. Failure to address trading irregularities: Both McCabe and Brda neglected their fiduciary responsibilities to investigate and resolve synthetic share discrepancies, despite awareness of the harm caused to retail investors.

aa. Misleading shareholders: Public communications from leadership failed to disclose critical information about trading irregularities, share discrepancies, and synthetic share creation, misleading investors about the true state of their holdings.

<u>Action for Declaratory Judgment & Injunctive Relief #1</u>

<u>Finding the Private Securities Litigation Reform Act (15 u.s.c. § 78u-4)</u>

<u>Unconstitutional As Applied</u>

<u>1st ISSUE: SEPARATION OF POWERS</u>

1. Plaintiff incorporates by reference all preceding paragraphs, including FACTS 1 through 219, and asserts that the Private Securities Litigation Reform Act of 1995 (PSLRA) is unconstitutional as applied to this case. The PSLRA's restrictive provisions exacerbate the systemic injustices suffered by Plaintiff and other retail investors, necessitating its invalidation and an injunction against its continued enforcement.

2. The PSLRA infringes upon the separation of powers doctrine by imposing heightened pleading standards and discovery stays that impede the judiciary's ability to adjudicate securities fraud cases effectively. In the context of the MMTLP trading halt, these

restrictions prevent retail investors from holding FINRA, the SEC, and market participants accountable for fraudulent conduct and systemic failures. By legislatively dictating procedural and evidentiary burdens that obstruct access to justice, the PSLRA undermines the judiciary's inherent authority to manage litigation and resolve disputes, constituting an impermissible legislative intrusion into judicial functions.

### 2ND ISSUE: VIOLATIONS OF THE 1ST, 4TH, AND 15TH AMENDMENTS

3. Plaintiff incorporates by reference all preceding paragraphs.

4. The PSLRA's stringent pleading requirements violate the First Amendment by chilling access to the courts. In this case, the requirement to plead fraud with particularity places an insurmountable burden on retail investors seeking to challenge the systemic manipulation of MMTLP shares, including synthetic share creation and naked short selling. These manipulative practices are concealed within the operations of broker-dealers, clearinghouses, and regulators, making critical evidence inaccessible to Plaintiffs without discovery. The PSLRA effectively denies investors their right to petition the government for redress of grievances, a core First Amendment guarantee.

5. The PSLRA violates the Equal Protection Clause of the Fifth Amendment by disproportionately burdening small retail investors while shielding institutional actors from accountability. In this case, the Act prevents Plaintiff from pursuing claims against FINRA, the SEC, DTCC, and market participants who profited from systemic manipulation. By insulating powerful financial entities, such as broker-dealers and market makers, from scrutiny, the PSLRA creates a two-tiered system of justice that favors well-resourced defendants at the expense of individual investors.

6. The PSLRA contravenes the Due Process Clause of the Fifth Amendment by effectively denying Plaintiffs the opportunity to prove their claims. Its stay of discovery provisions prevent access to essential evidence—such as FINRA's decision-making process for the U3 halt and the DTCC's reconciliation records for synthetic shares—while simultaneously imposing heightened pleading standards. This procedural Catch-22 deprives investors of their right to a meaningful opportunity to be heard, a fundamental due process guarantee.

7. The PSLRA violates the Equal Protection Clause of the Fourteenth Amendment as it applies to state-law securities fraud claims. By preempting state-law remedies and imposing restrictive federal standards, the PSLRA limits access to justice for investors pursuing claims in state forums. This unequal treatment creates a de facto preference for corporate defendants, particularly broker-dealers and market makers, in violation of the Constitution's guarantee of equal protection under the law.

8. The PSLRA's safe harbor provision for forward-looking statements is particularly relevant to this case, as it incentivizes corporate malfeasance. Defendants, including market makers and corporate leadership, were shielded by this provision despite engaging in misleading conduct, such as misrepresenting the value of MMTLP shares and suppressing shareholder access through the U3 halt. This legislative overreach disrupts the balance between investor protection and corporate accountability, directly undermining the goals of federal securities laws.

9. The PSLRA's legislative history demonstrates significant lobbying influence by industry groups, further evidencing regulatory capture. The Act's provisions favor institutional actors, such as those responsible for the manipulation of MMTLP shares, while denying retail investors a fair opportunity to pursue their claims. This systemic bias prioritizes the interests of financial entities over the public interest, violating principles of fairness and trust in the regulatory framework.

10. The PSLRA's impact on judicial economy is evident in this case. Its procedural barriers require Plaintiffs to meet heightened pleading standards based on incomplete information, increasing the likelihood of piecemeal litigation and interlocutory appeals. Courts are forced to adjudicate motions to dismiss without a full evidentiary record, leading to inefficiencies that undermine the objectives of federal procedural rules.

11. The PSLRA's limitations on joint and several liability exacerbate the harm caused by Defendants' collusive conduct. In this case, multiple market participants—including broker-dealers, FINRA, and the DTCC—acted in concert to manipulate MMTLP shares and suppress retail investor rights. By restricting liability to a proportional basis, the PSLRA shields culpable entities from full accountability and leaves victims inadequately compensated for their losses.

V.    RELIEF

1. Declaratory Relief: A judicial declaration that the PSLRA is unconstitutional    as applied in this case. Its provisions conflict with fundamental constitutional principles, including separation of powers, due process, and equal protection, and undermine the rights of retail investors harmed by systemic market            manipulation.

2. Injunctive Relief: An injunction prohibiting the enforcement of the PSLRA's provisions, including heightened pleading standards, discovery stays, and safe harbor protections, in this case and others involving systemic manipulation and regulatory failures.

3. Restoration of Judicial Authority: An order affirming the judiciary's inherent authority to manage securities litigation without undue legislative interference, ensuring that investors retain access to justice and a meaningful opportunity to hold Defendants accountable.

### Action for Declaratory Judgement & Injunctive Relief #2

### Constitutional Challenge to the Structure and Authority of the Financial Industry

### Regulatory Authority (FINRA)

1. The Plaintiff hereby challenges the constitutional authority and corporate structure of    the FINRA on three grounds: separation of powers, the Appointments Clause, and unconstitutional delegation of legislative power. FINRA wields significant executive authority—such as suspending trading, enforcing securities laws, and imposing sanctions—without presidential oversight, violating the President's Article II duties. Its Board of Governors, exercising substantial authority under U.S. law, are appointed by FINRA's members rather than through constitutionally required processes under the Appointments Clause. Furthermore, the SEC's delegation of broad regulatory powers to FINRA    represents an unconstitutional transfer of legislative authority to an entity outside the legislative branch, compounding the constitutional concerns surrounding its governance and operations.

### Allegation 1: Violation of the Separation of Powers

2. Plaintiff alleges that the FINRA operates in violation of the separation of powers doctrine established by the United States Constitution. Under Article II, Section 1, all executive power is vested in the President of the United States, and under Article II, Section 3, the President is tasked with ensuring that the laws are faithfully executed.  These provisions centralize executive authority and require that any entity exercising executive powers must remain accountable to the President.

a) FINRA exercises significant executive powers, including suspending trading in securities, enforcing compliance with the Securities Exchange Act of 1934 (15 U.S.C. § 78), conducting investigations, enacting rules, and imposing sanctions. However, FINRA operates independently of presidential oversight. Its Board of Governors is not appointed or removable by the President of the United States but instead selected by its private membership. Even the SEC, which oversees FINRA to a limited degree, can only remove FINRA's Board of Governors for willful violations of the law, abuse of authority, or unjustified failure to enforce regulations (15 U.S.C. § 78s(h)(4)(B)). This limited oversight underscores FINRA's insulation from presidential control.

b) In Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477 (2010), the Supreme Court held that entities exercising significant executive authority must remain accountable to the President to preserve the separation of powers. Like the Public Company Accounting Oversight Board (PCAOB) in that case, FINRA wields executive power without sufficient accountability to the executive branch. This lack of accountability undermines the constitutional framework and in permissibly impedes the President's ability to fulfill their constitutional duties under Article II.

c) Therefore, FINRA's structure, which grants it significant executive powers while   shielding it from presidential oversight, violates the separation of powers doctrine and the constitutional design for ensuring accountability in the exercise of governmental authority.

<u>Allegation 2: Violation of the Appointments Clause</u>

3. Plaintiff alleges that the structure and appointment process of the FINRA violate the Appointments Clause of the United States Constitution, which governs the selection        of officers who exercise significant authority under federal law. Article II, Section 2, Clause 2 of the Constitution requires that principal officers of the United States be appointed by the President with the advice and consent of the Senate. Alternatively, Congress may vest the appointment of inferior officers in the President alone, courts of law, or heads of departments.

d) FINRA's Board of Governors wields substantial authority under federal law, including the power to enact rules, enforce securities regulations, conduct disciplinary proceedings, and impose sanctions. These functions qualify its Board members as "officers of the United States" under the criteria established in Buckley v. Valeo, 424 U.S. 1 (1976), which defined officers as individuals exercising significant authority under U.S. law. Despite this, FINRA's Board is not appointed by the President, nor is it confirmed by the Senate. Instead, Board  members are selected by FINRA's private membership, bypassing the constitutional process for appointing officers.

e) This appointment process violates the Appointments Clause. Under Free Enterprise Fund v. Public Company Accounting Oversight Board, 561 U.S. 477 (2010), and Edmond v. United States, 520 U.S. 651 (1997), officers exercising significant independent authority under federal law must be appointed in conformity with Article II. The Supreme Court has emphasized that the Appointments Clause is essential for maintaining accountability and separation of powers by ensuring that officers of the United States are appointed through constitutionally mandated procedures.

f) Furthermore, if members of FINRA's Board are deemed inferior officers, their appointments must still comply with the Appointments Clause. They must be appointed by the President, courts of law, or the head of a department. Since FINRA's private membership does not constitute a "department" under Article II, its process for appointing Board members remains unconstitutional, even if Board members are classified as inferior officers.

g) Accordingly, the selection of FINRA's Board of Governors by its membership violates the Appointments Clause of the United States Constitution and undermines the accountability required for individuals exercising significant authority under federal law.

<u>Allegation 3: Unconstitutional Delegation of Legislative Authority</u>

4. Plaintiff alleges that the delegation of broad regulatory and rule making authority to the Financial Industry Regulatory Authority (FINRA) violates the non-delegation doctrine enshrined in Article I, Section 1 of the United States Constitution, which vests all legislative powers in Congress. This doctrine prohibits Congress from delegating its legislative authority to any entity, particularly private organizations or entities outside the legislative branch, without clear and specific guidance.

h) Under the Securities Exchange Act of 1934 (15 U.S.C. § 78o-3(b)), Congress authorized the SEC to delegate significant rulemaking, enforcement, and disciplinary powers to FINRA. These powers include the ability to draft and enforce securities regulations, conduct investigations, impose sanctions, and govern the conduct of broker-dealers. However, Congress provided only minimal guidance regarding the scope and limits of these powers, effectively granting FINRA quasi-legislative authority to create and enforce securities laws.

i) The delegation is further problematic because FINRA operates as a private, self-regulatory organization rather than a public entity directly accountable to the federal government. Unlike public agencies, FINRA lacks the safeguards of political accountability inherent in entities operating within the constitutional structure. In A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935), the Supreme Court invalidated a delegation of legislative authority to a private industry group, holding that Congress cannot abdicate its legislative responsibilities or allow private entities to govern in the absence of clear legislative standards. Similarly, in J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394 (1928), the Court held that any delegation of legislative authority must include an "intelligible principle" to guide its exercise. Congress's delegation to FINRA fails this test by granting it sweeping, unsupervised authority with few meaningful constraints.

j) If FINRA is deemed part of the federal government, the delegation remains unconstitutional because it transfers legislative powers to an executive body without sufficient limitations, violating the separation of powers. If FINRA is considered a private entity, the delegation is even more constitutionally suspect because it grants quasi-legislative powers to a body entirely outside the constitutional framework.

k) Therefore, the SEC's delegation of legislative authority to FINRA violates the non-delegation doctrine and in permissibly allows a private, quasi-governmental entity to exercise powers reserved for Congress under Article I of the Constitution.

### Supplemental Authority from Alpine Securities Corp. v. FINRA

5. On November 22, 2024, the DC Circuit Court of Appeals issued a pivotal decision in Alpine Securities Corp. v. Financial Industry Regulatory Authority and United States of America, Case No. 1:23-cv-01506. This decision provides substantial support for Plaintiff's claims, particularly regarding the U3 trading halt issued by FINRA.

### Summary of Alpine Decision

6. The DC Circuit ruled that FINRA's expulsion orders violated the private non-delegation doctrine because they took effect immediately without SEC oversight. The court held that private entities like FINRA must act only as an aid to accountable government agencies that retain ultimate authority to approve or disapprove the private entity's actions. The lack of such oversight rendered FINRA's actions unconstitutional.

7. In Alpine, the court emphasized: The irreparable harm caused by FINRA's actions, including financial ruin and the destruction of Alpine's business before full SEC review and the balance of equities and public interest in ensuring fair regulatory processes.

### Applicability to Plaintiff's Case

8. The reasoning in Alpine is directly applicable to this case. The U3 trading halt issued by FINRA on December 09, 2022 was similarly imposed without any prior validation or review by

the SEC. This mirrors the unconstitutional delegation of authority identified in Alpine and resulted in irreparable harm to Plaintiff.

9. As in Alpine, injunctive relief is the only adequate remedy to prevent further harm and to restore the integrity of the market. Plaintiff respectfully requests this Court to issue relief consistent with Alpine, mandating a resumption of trading in MMTLP to allow the market to function properly and enable Plaintiff and other investors to close their positions.

<u>Supplemental Authority from SEC v. Sloan</u>

10. In SEC v. Sloan, 436 U.S. 103 (1978), the U.S. The Supreme Court addressed the legality of trading halts implemented by the SEC, establishing critical limitations on the scope and duration of such regulatory actions. The Court held that a trading halt could be imposed for no longer than ten days unless specifically authorized by Congress. This landmark decision underscored the necessity for regulatory agencies to act strictly within the bounds of their statutory authority.

11. The Sloan Court found that the SEC violated its own rules by extending a trading halt beyond the permissible ten-day limit, thereby infringing on shareholders' rights and disrupting market operations without proper justification.

The ruling emphasized two central principles;

    1. Regulatory agencies must adhere to statutory and procedural limits in exercising their authority and

    2. Prolonged trading halts require clear congressional authorization to avoid undue harm to market integrity and investor rights.

<u>Applicability to Plaintiff's Case</u>

12. The Sloan decision is directly relevant to the circumstances surrounding FINRA's indefinite es articulated by the Supreme Court apply equally to FINRA's regulatory authority. By imposing an indefinite halt without SEC review or statutory authorization, FINRA has exceeded the legal limitations outlined in Sloan. The failure to define or justify the "extraordinary event" allegedly warranting this indefinite halt further compounds the overreach.

13. The Supreme Court's decision in Sloan establishes a compelling precedent that regulatory actions—such as trading halts—must be; 1. time-limited and supported by statutory authority and 2. implemented transparently to ensure protection of shareholder rights and market stability.

14. In this case, FINRA's indefinite U3 halt stands in direct conflict with these principles. The halt has effectively deprived shareholders of their right to trade, caused irreparable harm, and undermined market integrity. Like the SEC in Sloan, FINRA's actions lack the procedural safeguards and statutory authorization required to justify such an extraordinary measure.

<u>Reinforcing the Need for Injunctive Relief</u>

15. The Sloan precedent reinforces Plaintiff's request for injunctive relief to restore trading in MMTLP. FINRA's actions mirror the regulatory overreach condemned in Sloan, creating an urgent need for judicial intervention to protect the rights of investors and the integrity of the market.

<u>Integration of Sloan with Alpine</u>

16. When viewed in conjunction with the DC Circuit's recent decision in Alpine Securities Corp. v. FINRA, Sloan further demonstrates that FINRA's unchecked regulatory actions violate established legal principles. Sloan highlights the statutory limits on trading halts, while Alpine addresses the constitutional deficiencies of FINRA's lack of government oversight. Together, these cases present a comprehensive legal basis for the relief sought by Plaintiff.

WHEREFORE

j) Declaratory Relief: A judicial declaration that the Private Securities Litigation Reform Act of 1995 (PSLRA), as applied in this case, is unconstitutional. Its provisions conflict with fundamental constitutional principles, including the separation of powers, due process, and equal protection, and obstruct the rights of retail investors harmed by systemic market manipulation.

k) Injunctive Relief: An order enjoining the enforcement of the PSLRA's provisions that impose heightened pleading standards, discovery stays, and safe harbor

protections, as these provisions violate constitutional guarantees and exacerbate systemic barriers to justice for retail investors.

l) Declaratory Judgment on Access to the Courts: An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that the PSLRA violates the First Amendment by effectively denying investors their right to petition the government for redress of grievances through judicial processes.

m) Dclaratory Judgment on Equal Protection: An order and judgment pursuant to 28 U.S.C. §§ 2201, 2202 declaring that the PSLRA violates the Equal Protection Clause of the Fifth Amendment by disproportionately burdening small investors   and shielding institutional actors, thereby creating a two-tiered system of justice.

n) Declaratory Judgment on Due Process: An order and judgment pursuant to 28   U.S.C. §§ 2201, 2202 declaring that the PSLRA's heightened pleading requirements and discovery stays violate the Due Process Clause of the Fifth  Amendment by denying Plaintiffs the ability to access critical evidence needed to substantiate their claims.

o) Declaratory Judgment on State Remedies: An order and judgment declaring that the PSLRA violates the Equal Protection Clause of the Fourteenth Amendment by preempting state-law securities fraud claims and imposing federal   standards that disproportionately disadvantage individual investors.

p) Declaratory Judgment on Safe Harbor Provisions: An order and judgment declaring that the PSLRA's safe harbor provision for forward-looking statements unconstitutionally incentivizes fraudulent conduct, undermines market integrity, and violates the fundamental purposes of securities laws to protect investors and deter malfeasance.

q) Injunctive Relief on Judicial Economy: An order enjoining the continued enforcement of the PSLRA's provisions that increase inefficiencies and piecemeal litigation by forcing courts to adjudicate motions to dismiss without a complete evidentiary record.

r) Declaratory Relief on Liability Provisions: An order and judgment declaring that the PSLRA's limitations on joint and several liability for defendants unconstitutionally shield culpable parties who engage in fraudulent schemes, thereby leaving victims inadequately compensated.

17. Plaintiff prays for judgment in his favor and relief as follows:

a) Declaratory Judgment 1 & Injunctive Relief: Issue a declaration and corresponding injunctive relief finding that the Private Securities Litigation Reform Act (15 U.S.C. § 78u-4) is unconstitutional as applied to this case, as it unduly restricts access to justice for retail investors and infringes upon their constitutional rights.

b) Declaratory Judgment 2 & Injunctive Relief: Issue a declaration and corresponding injunctive relief challenging the structure and authority of the Financial Industry Regulatory Authority (FINRA) as unconstitutional, given its lack of adequate governmental oversight and accountability, which has resulted in improper and prejudicial actions, including the imposition and handling of the U3 trading halt on MMTLP shares.

c) A declaration that Defendants' actions and omissions violated federal securities laws, including Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j(b)), Rule 10b-5 (17 C.F.R. § 240.10b-5), and other applicable federal regulations, as well as the Sherman Antitrust Act (15 U.S.C. §§ 1–2), the Clayton Act (15 U.S.C. §§ 12–27), and fiduciary duties owed to retail investors.

d) A declaration that FINRA's U3 trading halt on MMTLP shares, imposed on December 9, 2022, and lifted on December 13, 2024, was improper, prejudicial, and constituted a violation of regulatory responsibilities owed to the investing public, thereby causing material harm to over 65,000 shareholders, including Plaintiff.

e) An order awarding compensatory damages to Plaintiff in an amount to be determined at trial, including:

i. The loss of value and liquidity of Plaintiff's MMTLP shares resulting from Defendants' misconduct.

ii. Damages arising from the suppression of share prices and trading opportunities caused by synthetic share creation, naked short selling, and the improper U3 halt.

iii. Recovery of Plaintiff's documented financial losses exceeding $75,000, along with additional losses sustained from systemic harm to market value.

f) An award of compensatory damages, not less than $500,000, for emotional distress and mental anguish caused by Defendants' prolonged misconduct, failure to resolve the U3 halt, and refusal to provide clarity or remedies for trading irregularities.

g) An order awarding treble damages pursuant to the Sherman Antitrust Act (15 U.S.C. § 15) and the Clayton Act for Defendants' anti-competitive practices, which restrained market competition, fostered monopolistic environments, and caused disproportionate harm to retail investors, including the Plaintiff.

h) An order requiring injunctive relief to ensure market transparency and prevent similar systemic failures, including:

i. A full audit of all MMTLP and MMAT share transactions, including the identification and reconciliation of synthetic shares and beneficial ownership records.

iv. The public release of all records, communications, and trading data related to MMTLP and MMAT shares, including information held by FINRA, DTCC, broker-dealers, and other involved parties.

vi. A mandate requiring Defendants, including regulatory bodies and corporate leadership, to implement and enforce enhanced oversight mechanisms to prevent the proliferation of synthetic shares, naked short selling, and other manipulative practices.

j) An order requiring the disgorgement of profits wrongfully obtained by Defendants through the trading of synthetic shares, naked short selling, and related market manipulation, including unjust enrichment by market makers, broker-dealers, and transfer agents.

k) An award of punitive damages to deter Defendants and others from engaging in similar wrongful conduct in the future.

l) An order requiring the Securities and Exchange Commission (SEC) and Financial Industry Regulatory Authority (FINRA) to:

> vii. Establish clearer guidelines for regulatory intervention in cases of market irregularities.

> viii. Improve oversight and accountability measures to ensure transparency in corporate actions, trading halts, and share reconciliations.

l) A declaration that the arbitration agreement entered into with Schwab, formerly TD Ameritrade, be deemed null and void pursuant to violations of the Sherman Antitrust Act (15 U.S.C. § 1) and the Clayton Act (15 U.S.C. § 14), as the agreement was tied to and perpetuates anti-competitive practices and monopolistic behaviors that restrain trade and suppress competition.

m) An order affirming Plaintiff's entitlement to equitable relief for the market and procedural irregularities affecting MMTLP shares, including the submission of TDA (Schwab) trade confirmations (sell orders), ranging from $362.00 to $420.00 per share, for 7,300 shares, as reward for the improper halting of trades intended for December 9 and 12, 2022

o) An award of pre and post-judgment interest on all compensatory damages to account for the time value of Plaintiff's losses and to ensure full recovery of the harm caused.

p) An award of "tax gross-up." A reward for the serious mental health issues suffered by the Plaintiff. TDA's (Schwab) culpability in the handling of the halt, the lack of transparency coupled with the complete lack of communication. Plaintiff at the courts discretion, could be compensated for the hundreds of hours spent having to do research, making hundreds of phone calls to regulators, Congressmen, TDA, Schwab, IRS, DOJ and many other entities and parties, letter writing and emails, space calls and the hours

spent working with other shareholders to find a resolution. These actions caused serious harm to Plaintiff's relationship with friends and family.

q) An award of Plaintiff's reasonable costs and expenses incurred in pursuing this action, including court fees, filing fees, and any costs associated with expert analysis or testimony.

r) Any such other relief as the Court may deem just, equitable, and proper to ensure accountability for Defendants' misconduct and restore trust in the U.S. financial markets.

## VIII.   DEMAND FOR JURY TRIAL

1. The Plaintiff hereby demands a trial by jury for all claims and issues that may be tried as of right pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: December 04, 2024

SIGN HERE

Danielle D Spears, Pro Se

12206 West Harrison Street, Avondale, AZ 85323

### CERTIFICATION OF PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

I, Danielle Spears, duly certify and say, as to the claims asserted under the federal securities laws, that I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on December 04, 2024.                    Signature:

Name: Danielle D Spears

