**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WESTERN TEXAS**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DANIELLE SPEARS                              \*
Plaintiff                                    \*

                                             \*    Docket Number: 7:24-cv-321
v.                                           \*    **JURY TRIAL DEMANDED**
                                             \*
                                             \*
NEXT BRIDGE HYDROCARBONS, INC.               \*    **2nd Amended Complaint**
Defendant                                    \*
                                             \*
GREGORY MCCABE                               \*
Defendant                                    \*
                                             \*
JOHN BRDA                                    \*
Defendant                                    \*
                                             \*
THE SECURITIES & EXCHANGE COMMISSION \*
Defendant                                    \*
                                             \*
Financial Industry Regulatory Authority      \*
Defendant                                    \*
                                             \*
JANE DOE 1-20, JOHN DO 1-20                  \*
Defendant                                    \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

---

## PARTIES

1. Plaintiff Danielle Spears (hereinafter referred to as "Plaintiff" or "Spears") has at all times

mentioned herein resided within Maricopa County, Arizona, previously of the city of Mesa and

currently residing in Avondale. Plaintiff, due to her disability, is a retired investor who purchased

shares of MMTLP and has been directly harmed by the Defendants misconduct. Plaintiff's

address 12206 West Harrison St., Avondale, AZ 85323

2. Defendant Next Bridge Hydrocarbons, Inc.  Next Bridge Hydrocarbons, Inc. (hereinafter referred to as "NBH") was formed as part of a corporate spin-off from Meta Materials, Inc. (hereinafter referred to as "MMAT II").  NBH is an independent, non-trading. public reporting, private oil and gas exploration and development company. Defendant Company is liable for the wrongful acts of its executives, including Brda and McCabe, under principles of agency and *respondeat superior*, as these individuals acted within the scope of their authority and executive roles at all relevant times. NBH is incorporated in Nevada, herein sued in its corporate capacity. Primary place of business at 500 W. Texas Avenue, Suite 890, Midland, TX, 79701

3. Defendant Greg McCabe (hereinafter referred to as "McCabe") is the CEO of NBH. He also served as a Director, contributing to governance responsibilities prior to becoming Chairman of the Board. McCabe is the Director and former owner of McCabe Petroleum Corporation (hereinafter referred to as "MPC") & Hudspeth Oil Corp., (hereinafter referred to as "Hudspeth"),. McCabe previously held a variety of positions at Torchlight Energy Resources, Inc. (hereinafter referred to as "TRCH") such as Chairman of the Board, Director, Investor and Advocate for Orogrande project and Strategic Advisor.  McCabe's home address is 6015 Green Hill Ct, Midland, TX 79707-1655.

4. Defendant John Brda (hereinafter referred to as "Brda") the former CEO of TRCH as well as other roles within the company such as President and Director. He was the Founder of its predecessor Torchlight Energy, Inc.  (hereinafter referred to as "TEI") Following the reverse takeover (hereinafter referred to as "RTO") between TRCH and Metamaterials, Inc., (hereinafter referred to as "MMAT I") Brda would serve as a paid consultant for the newly renamed Meta Materials, Inc., (hereinafter referred to as "MMAT II"). In his consulting role, it was expected

2

that he would continue to develop and to sell the Oil and Gas Assets that MMAT II inherited in the RTO. Brda's home address is 1425 Frontenay Ct., St. Louis, MO, 63122-1623.

5. Defendant Securities & Exchange Commission (hereinafter referred to as "SEC") is statutorily obligated under the Securities Exchange Act of 1934 (15 U.S.C. § 78a et seq.) to regulate and prevent market manipulation. Their Core Mission is to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation. The SEC is headquartered at 100 F Street NE, Washington, D.C., 20549.

6. Defendant Financial Industry Regulatory Authority (hereinafter referred to as "FINRA") is a self-regulatory organization authorized by the SEC to oversee broker-deals and ensure compliance with federal securities laws.  FINRA's responsibilities include market regulation, investor protection, and the enforcement of securities laws. FINRA is headquartered at 1735  K Street NW, Washington, D.C., 20006

7. John Does 1-20 and Jane Does 1-20 (hereinafter collectively referred to as "Doe Defendants") are individuals whose identities are currently unknown to the Plaintiff but who are believed to have carried out specific functions as part of the broader manipulation scheme described in this complaint.  Plaintiff anticipates that discovery will uncover the identities of these individuals and their roles within the manipulation scheme.

## I. INTRODUCTION

Danielle D Spears, a retail investor, has filed this lawsuit alleging a coordinated and systemic scheme that has undermined the integrity of U.S. Capital Markets. The scheme involved market manipulation, severe regulatory negligence, breaches of fiduciary duties, and violations of constitutional protections, causing significant financial harm to retail investors. Spears seeks to hold the Defendants accountable for their respective roles in perpetuating the misconduct.

Central to Plaintiff's claim is FINRA's abrupt and indefinite extraordinary U3 trading halt imposed on December 9, 2022. The clandestine halt, shrouded in secrecy for over two years, devoid of transparency, due process, or reconciliation of share discrepancies, inflicted immediate and irreparable financial devastation. This epitomizes FINRA's unchecked regulatory power and the Securities and Exchange Commission's deliberate disregard for investor protection.

This unprecedented regulatory action halted trades and locked up investor shares due a potential short squeeze, confirmed by a TD Ameritrade, now Schwab, representative days after the halt, along with an admission to oversold conditions by Trade Station, who remains unable to return shares to their rightful owners. This represents a new and alarming chapter in the history of U.S. capital markets.

Plaintiff believes Defendants acted in concert to manipulate markets, obscure material information, and undermine shareholder protections. Exploiting their positions of authority and trust. These failures violated federal securities and antitrust laws, directly harming Plaintiff and 65,000 fellow MMTLP investors. The plaintiff was further harmed by listening to those she now believes were undisclosed paid social media stock promoters and influencers. These individuals

repeatedly stated that FINRA was required to force short sellers to close their positions by December 12, 2022. However, FINRA did not take such action.

Plaintiff seeks corrective regulatory actions, including a court-ordered two-day 'close-only' trading period for MMTLP shares, compelling closure of all short and illegal short positions. Having survived two years in this purgatory, Plaintiff respectfully requests the immediate production and release of Electronic Blue Sheets ("EBS"), Consolidated Audit Trail data ("CAT DATA"), and other regulatory records to comprehensively assess share discrepancies and facilitate investor relief.

## II. JURISDICTION AND VENUE

### JURISDICTION

This Court has jurisdiction over this action under multiple statutory provisions.

8. This Court has jurisdiction under federal question jurisdiction pursuant to 28 U.S.C. § 1331, as Plaintiff's claims arise under federal laws, including the Securities Exchange Act of 1934 (15 U.S.C. § 78a et seq.), the Securities Act of 1933 (15 U.S.C. § 77a et seq.), the Sarbanes-Oxley Act of 2002 (Pub. L. No. 107-204), and the Dodd-Frank Wall Street Reform and Consumer Protection Act (12 U.S.C. § 5301 et seq.).

9. Supplemental jurisdiction under 28 U.S.C. § 1367 is proper, as Plaintiff's state law claims are integrally related to federal claims and form part of the same controversy.

10. Jurisdiction further exists under the Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. § 78bb(f), given Defendants' involvement in interstate commerce through extensive securities transactions.

11. This Court has jurisdiction under 28 U.S.C. § 1361 (Mandamus Jurisdiction) to compel the SEC to fulfill its statutory obligations, including enforcing federal securities laws, addressing regulatory failures related to MMTLP, restoring lost trading opportunities, and mandating closure of illegal short positions. Jurisdiction also arises from the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, which grants this Court authority to review SEC's actions and inaction.

12. Jurisdiction additionally extends under federal statutes addressing unlawful coordinated activities, including 18 U.S.C. § 1343 (Wire Fraud), due to Defendants' intentional dissemination of materially false information via electronic communications; 18 U.S.C. § 2261A

(Cyberstalking), regarding coordinated harassment and intimidation targeting investors; and relevant provisions governing fraudulent stock manipulation.

## **VENUE**

13. Venue is proper in the Western District of Texas pursuant to 28 U.S.C. § 1391(b), as substantial events and omissions giving rise to Plaintiff's claims occurred within this district. Defendant McCabe resides in Texas and maintains significant business operations here. Additionally, critical corporate decisions, transactions, and governance activities involving NBH, TRCH, MPC, Hudspeth, and related assets occurred primarily within Texas. Defendant Brda, although not a Texas resident, conducted substantial business activities within the state, thereby reinforcing the appropriateness of venue in this jurisdiction.

6

14. Texas is the nexus of critical evidence, including corporate records, asset documentation, and relevant securities transactions directly tied to Plaintiff's allegations. Crucial witnesses and Defendants, such as geologist Masterson, former CEO Clifton DuBose, former CFO Roger Wurtele, and Defendant McCabe, reside and operate businesses in Texas, significantly facilitating discovery, testimony, and efficient litigation.

15. Venue is additionally justified under 28 U.S.C. § 1404(a), as transferring the case from this district would severely burden Plaintiff, impose unnecessary delays, restrict access to evidence and witnesses, and unfairly advantage Defendants through improper forum shopping. The strong and explicit nexus between Defendants' conduct and this jurisdiction overwhelmingly supports retaining venues in the Western District of Texas.

16. Venue under Texas state law claims is further supported pursuant to Texas Civil Practice and Remedies Code §§ 15.002–15.003, as Defendants reside, conduct substantial business, and undertake key actions forming the basis of Plaintiff's claims within Texas

## III. ALLEGATIONS

17.  Plaintiff asserts corporate entities TRCH and NBH bear liability for securities fraud and related misconduct committed by their executives or agents, under the doctrine of respondeat superior as recognized in Paul F. Newton & Co. v. Texas Commerce Bank, 630 F.2d 1111 (5th Cir. 1980).

18. Plaintiff asserts McCabe, as a senior executive and substantial shareholder, had a fiduciary duty to shareholders to disclose known fraudulent activities. Even absent direct involvement,

McCabe's fiduciary role required transparency and disclosure of material misconduct. *Southland Securities Corp. v. INSpire Insurance Solutions, Inc.,* 365 F.3d 353 (5th Cir. 2004).

18. Plaintiff alleges Defendants Brda and McCabe deliberately engaged in practices intended to trigger short squeezes, manipulate securities markets, and artificially inflate share prices, violating Section 10(b) of the Securities Exchange Act of 1934, Rule 10b-5, and Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976).

19. Plaintiff alleges that in July 2004, John Brda, while employed by STL Capital Management, LLC, breached his fiduciary duty and embezzled corporate opportunities. Specifically, Brda improperly diverted the acquisition of Limelight Media Group ("LMG"), acquiring 500,000 shares intended for STL Capital Management. Following litigation (STL Capital Management, LLC v. Brda, 207 S.W.3d 649 (Mo. Ct. App. 2006)), the court found Brda liable for breach of fiduciary duty and ordered him to return 425,000 embezzled shares of LMG stock and pay associated monetary damages and attorneys' fees.

20. Plaintiff alleges that in 2007, Defendant John Brda was charged in *Timothy Armstrong, et al., v. American Pallet Leasing, Inc., et al.* (No. C07-4107-MWB), resulting in a judicial determination of guilt for multiple counts, including:

A.  Breach of fiduciary duty

B.  Conversion

C.  Negligent misrepresentations/nondisclosures

D.  Fraudulent misrepresentations and omissions under Section 10(b) and Rule 10(b-5) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b))

8

21. Plaintiff asserts this prior misconduct, characterized by intentional deception and asset diversion, aligns with the manipulative and self-enriching behavior alleged herein, reinforcing Plaintiff's claims under Section 10(b), Rule 10b-5, and standards outlined by the Supreme Court in Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)

22. On May 2, 2008, PPFT filed its initial Form S-1 Registration Statement with the SEC, and on July 14, 2008, this S-1 Registration Statement was declared effective, allowing PPFT to proceed with its initial public offering (IPO) and begin publicly trading.

23. Plaintiff alleges that on November 23, 2010, as a result of the Share Exchange Agreement between PPFT and TEI, Thomas Lapinski became the sole officer and director, and John Brda acquired beneficial ownership of approximately 20.3% of the newly combined entity. The change in control and management structure clearly positioned Brda to directly influence TEI's subsequent operations.

24. On February 7, 2011, Brda completed the first in a series of reverse takeovers, initially merging with PPFT. The name was legally changed to Torchlight Energy Resources, Inc. (hereinafter referred to as "TRCH"). Plaintiff asserts that regulatory paperwork requirements are likely significantly less intrusive when merging with a company already trading on the OTC Bulletin Board (OTCBB), thus providing a more favorable path to becoming publicly listed given Brda's prior securities-related charges.

25. Plaintiff alleges that on December 13, 2001, Roger Wurtele was serving as the Chief Financial Officer ("CFO") for Energy & Engine Technology Corporation (hereinafter referred to as "EENT"). During Wurtele's tenure, EENT received a cease-and-desist order from the SEC for

issuing unregistered shares as payment to stock promoters, actions which artificially inflated EENT's stock price by approximately 68%. Plaintiff asserts that these actions clearly violated federal securities laws prohibiting the distribution of unregistered securities and market manipulation, supported by precedents including *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321 (6th Cir. 2013), and *SEC v. Universal Exp., Inc.*, 475 F. Supp. 2d 412 (S.D.N.Y. 2007), holding companies and their executives liable for issuing unregistered securities and artificially inflating share prices.

26. Plaintiff alleges that on October 28, 2003, Energy & Engine Technology Corporation (EENT) became liable for a $150,000 judgment related to a project managed by Roger Wurtele, who was serving as both Chief Executive Officer (CEO) and Chief Financial Officer (CFO) of EENT at the time. *Solutions, Inc., 365 F.3d 353 (5th Cir. 2004)*, and reinforced by the standards articulated by the Supreme Court in *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)*.

27. Plaintiff alleges that on September 9, 2013, Roger Wurtele (hereinafter referred to as "Wurtele") was appointed Chief Financial Officer ("CFO") of Torchlight Energy Resources, Inc. (hereinafter referred to as "TRCH"). Plaintiff asserts that, upon assuming the CFO position, Wurtele became responsible for TRCH's financial reporting, compliance, and corporate governance, including adherence to SEC regulations prohibiting fraudulent or deceptive securities practices.

28. From 2011-2014, TRCH focused on expanding its presence in the oil and gas sector through strategic acquisitions and operational growth. Notably, the company engaged in the acquisition,

10

exploration, development, and production of oil and gas properties within the United States. These formative years laid the groundwork for TRCH's subsequent activities.

29. On April 21, 2014, Defendant Brda filed a Prospectus as part of TRCH's FORM S-1 Registration Statement with the SEC. This document explicitly outlined TRCH's business model, emphasizing drilling and working interest programs within the U.S. that provided rapid payback periods, high internal rates of return, and proven, bookable reserves.

30. The Prospectus explicitly acknowledged TRCH's precarious financial condition, stating: 'At December 31, 2013, we had not yet achieved profitable operations, had accumulated losses totaling $15,810,959 since inception, and expect to incur additional losses during the continued development of our business, raising substantial doubts about our ability to continue as a going concern.' This disclosure indicated significant financial vulnerability and uncertainty regarding TRCH's viability.

31. On August 7, 2014, TRCH executed a purchase agreement known as the Hudspeth Agreement. Under this agreement, TRCH acquired MPC and Hudspeth, entities solely owned by McCabe. This acquisition included substantial oil and gas assets comprising approximately 172,000 contiguous acres located in the Orogrande Basin (hereinafter referred to "Orogrande"), West Texas. McCabe received substantial consideration, including stock compensation, marking his initial substantial equity interest in TRCH

32. On September 25, 2014, the SEC issued a second letter to Brda in response to Amendment No. 1 of TRCH's Form S-1 filing. The SEC explicitly noted significant inadequacies and inaccuracies in TRCH's disclosures of proved undeveloped crude oil and natural gas reserves,

11

concluding that these deficiencies indicated ineffective disclosure controls and procedures at year-end. The SEC required TRCH to correct these deficiencies in Amendment No. 2, underscoring concerns regarding the company's reliability in financial disclosures and transparency.

33. Following Amendment No. 3, the  S-1 submission was finally approved and made effective by the SEC on November 5, 2014 at 5pm EST.

34. McCabe subsequently assumed an executive role. In a 2014 Amended S-1, Proxy materials were provided to potential investors. It proposed a share offering of 2,362,541 shares for approximately $4.4M.

35. On March 30, 2015 Greg McCabe entered into a letter agreement with TRCH (the "Option Agreement") whereby TRCH granted McCabe an option to acquire 631,250 shares of the Stock at a price per share of approximately $0.36 as consideration for Greg McCabe's agreement to extend the deadline for drilling on the real property leased by Hudspeth and MPC.

36. Plaintiff alleges McCabe's involvement marked the beginning of increasingly complex and opaque transactions, notably centered around the Orogrande Project, a 134,000-acre oil and gas lease in West Texas. These transactions enabled questionable mergers, asset transfers, and financial dealings, directly harming shareholders through corporate mismanagement, conflicts of interest, and self-dealing practices, actionable under the fiduciary standards established by the Fifth Circuit in *Gearhart Industries, Inc. v. Smith International, Inc.*, 741 F.2d 707 (5th Cir. 1984).

37. Plaintiff alleges McCabe owns or controls multiple entities, including MPC, Hudspeth Oil

Corporation, Wolfbone Investments LLC, McCabe Minerals & Royalties LLC, Magdalena

Royalties LLC, Founders Oil & Gas Operating, LLC, G Mc Exploration LLC, McCabe Ventures,

Manix Royalty Ltd., and Wildcatters Network. Plaintiff further alleges these entities engaged in

numerous transactions with TRCH and NBH, creating significant undisclosed conflicts of

interest, corporate mismanagement, and breaches of fiduciary duties, actionable under *Gearhart*

*Industries, Inc. v. Smith International, Inc.*, 741 F.2d 707 (5th Cir. 1984).

38. Plaintiff alleges McCabe orchestrated financial transactions through MPC involving TRCH

and MECO, resulting in personal financial benefits, specifically the acquisition of 2,500,000

restricted TRCH shares via Warwink Properties (hereinafter referred to as "Warwink") without

clear independent valuation or proper disclosure, constituting breaches of fiduciary duty as

outlined by the Fifth Circuit in *Southland Securities Corp. v. INSpire Insurance Solutions, Inc.*,

365 F.3d 353, 366 (5th Cir. 2004).

39. McCabe benefited from a complex transaction involving a $3,250,000 cash reimbursement

and an additional "performance fee" of $2,781,500 paid by MPC to TRCH, alongside a

drilling-cost benefit ("carry") valued at approximately $1,179,076. Such interconnected and

opaque transactions reflect breaches of fiduciary duty and self-dealing explicitly recognized as

improper in Southland Securities Corp. v. INSpire Insurance Solutions, Inc., 365 F.3d 353, 366

(5th Cir. 2004).

40. Plaintiff further alleges Defendant McCabe utilized the Orogrande transactions to secure

personal interests explicitly benefiting himself at the expense of TRCH shareholders.

Specifically, McCabe retained a 10% back-in after payout (BIAPO) interest and a 4.5% overriding royalty interest (ORRI) in the Orogrande through his entity Magdalena Royalties, LLC, despite acting as seller and controlling shareholder. Plaintiff contends these arrangements constituted deliberate self-dealing and breaches of fiduciary duties under Texas law and Fifth Circuit precedent, see *Southland Securities Corp.*, 365 F.3d at 366.

41. Plaintiff further alleges McCabe structured preferential loan arrangements and stock warrant issuances that prioritized his personal financial interests. TRCH provided loans secured by McCabe's entities' assets and subsequently reassigned these to subsidiaries under unclear circumstances. TRCH also repeatedly issued warrants and convertible instruments at discounted rates to McCabe, creating opportunities for disguised compensation or stock manipulation. Such transactions constitute explicit breaches of fiduciary duty and improper self-enrichment under standards recognized by the Fifth Circuit in *Southland Securities Corp.*, 365 F.3d at 366.

42. TRCH entered several ambiguous transactions involving either McCabe's family or entities he controlled, notably questionable payments structured as consultancy fees or compensation to entities such as Green Hill Minerals, LLC. Plaintiff alleges these familial and personal financial arrangements can easily be concealed, violating fiduciary standards under Texas law and federal securities regulations recognized by the Fifth Circuit in *Gearhart Industries, Inc. v. Smith International, Inc.*, 741 F.2d 707 (5th Cir. 1984).

43. Plaintiff alleges these financial schemes and insider transactions facilitated by Defendants Brda and McCabe were intentionally structured to obscure conflicts of interest and financial

14

self-dealing through complex inter-company dealings, undisclosed relationships, and circular financial transactions.

44. Defendants acted to enrich themselves at shareholder expense via patterns of deliberate concealment and breaches of fiduciary duty which aligns with behavior recognized as actionable under Fifth Circuit standards established in *Southland Securities Corp. v. INSpire Insurance Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004), and constitute violations under both Texas fiduciary standards and federal securities laws.

45. Brda, as CEO and Director of TRCH during this period, consistently facilitated and approved these complex transactions involving McCabe-controlled entities, failing to provide transparent disclosures or at times to obtain truly independent board approval, thus breaching fiduciary duties of care and loyalty required by Texas law, as clearly established in *Gearhart Industries, Inc. v. Smith International,* 741 F.2d 707 (5th Cir. 1984).

46. Brda's prior history, involving questionable business practices at entities such as STL Capital Management LLC and American Pallet Leasing, Inc., underscores a deliberate pattern of self-enrichment and disregard for shareholder transparency. As set forth in Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976), and further emphasized by the Supreme Court in Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007),

47. Plaintiff alleges that on February 7, 2021, McCabe converted $1.5 million of outstanding debt owed by TRCH into 4,000,000 common shares at a price of $0.375 per share. At the time of conversion, TRCH's prevailing market share price was substantially higher, providing McCabe

15

an immediate and substantial financial benefit. Plaintiff further alleges this transaction was not transparently disclosed to shareholders or the investing public.

48. Plaintiff asserts that TRCH repeatedly issued convertible debt and warrants to insiders, including McCabe, at prices significantly below prevailing market rates, without adequate public disclosure. Such sustained nondisclosure of materially insider-favorable transactions constitutes actionable securities fraud and explicit breaches of fiduciary disclosure duties, as supported by precedents including *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003) (affirming liability for non-disclosure of insider-favorable debt conversions at significantly below-market prices) and *In re Tyson Foods, Inc. Sec. Litig.*, 155 F. App'x 53 (3d Cir. 2005) (affirming liability for nondisclosure of materially insider-favorable transactions conducted at below-market value).

49. Similarly, in December 2017, McCabe received 2,500,000 restricted shares of TRCH stock as consideration for Warwink, without clear independent valuation or adequate disclosure justifying the price. Such insider-favorable terms and unclear repricing circumstances directly violated fiduciary duties of loyalty and care, clearly defined under Texas common law, specifically highlighted in *Gearhart Industries, Inc. v. Smith International, Inc.,* 741 F.2d 707 (5th Cir. 1984). These self-dealing transactions provided disproportionate personal financial benefits to McCabe, thereby breaching the fundamental fiduciary responsibilities that TRCH's leadership owed to its shareholders.

50. Plaintiff asserts that TRCH repeatedly engaged in the issuance of convertible debt and warrants to insiders, notably including a March 2018 transaction involving the sale of $5.37

16

million in convertible notes and associated warrants at prices significantly below prevailing market valuations. Plaintiff asserts that these issuances, priced materially below market, were inherently dilutive, deceptive, and violated FINRA Rule 5210, prohibiting manipulative or deceptive practices regarding the pricing and issuance of securities. Plaintiff further alleges these actions violated the principles of fairness, transparency, and full disclosure mandated by the Securities Act of 1933, as interpreted by established precedents such as:

E. *SEC v. Sierra Brokerage Services, Inc.*, 712 F.3d 321 (6th Cir. 2013), affirming that deceptive issuances of securities at below-market value constitute securities fraud under federal law; and

F. *In re Tyson Foods, Inc. Sec. Litig.*, 155 F. App'x 53 (3d Cir. 2005), affirming liability for failing to transparently disclose materially insider-favorable transactions executed below prevailing market values.

51. Plaintiff alleges that TRCH consistently failed to properly document, audit, or transparently disclose insider-related transactions, explicitly violating internal control requirements outlined in Section 404 of the Sarbanes-Oxley Act of 2002 (Pub. L. 107-204). Plaintiff asserts these failures included, among others, inadequate or absent documentation of insider transactions, resulting in repeated breaches of federally mandated financial disclosure and internal control obligations. Plaintiff relies upon applicable legal precedent confirming such violations constitute actionable securities fraud, specifically referencing the judicial findings established in (a) *SEC v. WorldCom, Inc.*, 2003 WL 22004827 (S.D.N.Y. 2003), recognizing liability for inadequate internal controls under Section 404 of the Sarbanes-Oxley Act; and (b) *In re Tyco International,*

17

*Ltd. Securities Litigation*, 2004 WL 2348315 (S.D.N.Y. 2003), affirming liability for persistent

failures to maintain adequate internal controls over insider-related financial disclosures

52. On March 1, 2020, TRCH presented an Investor Presentation via PowerPoint and email to

interested parties, emphasizing the company's assets in the Permian Basin, particularly the

Hazel, Winkler and as TRCH's flagship asset, the Orogrande comprising over 134,000 acres with

a recoverable resource potential estimated at 3.7 billion barrels of oil equivalent in the median

case.

53. The presentation emphasized the Orogrande project's potential to attract major industry

players for acquisitions or partnerships due to its size and resources estimate.  While

acknowledging market risks, TRCH framed the central question as determining the quantity of

recoverable oil rather than its existence.

54. Plaintiff alleges that proxy materials and public statements issued by Defendants, specifically

Brda as CEO and McCabe as Chairman, directly violated Section 14(a) of the Securities

Exchange Act of 1934 and SEC Rule 14a-9 by containing materially false or misleading

statements and omitting essential facts necessary for shareholders to make informed decisions.

For example, on or about April 23, 2020, Defendants publicly presented inflated valuations of oil

reserves and exaggerated the economic potential of properties such as Orogrande, which later

proved materially misleading. Such deceptive communications and omissions distorted investor

perceptions, directly violating the disclosure standards clearly articulated under Section 14(a),

Rule 14a-9, and reinforced by the Supreme Court in *TSC Industries, Inc. v. Northway, Inc.*, 426

U.S. 438 (1976).

55. Plaintiff alleges TRCH, under the oversight of Defendants Brda and McCabe, issued proxy materials and other public statements that prominently featured inflated projections of oil reserves and exaggerated economic potential of the Orogrande. These statements lacked adequate disclosure of substantial geological risks and uncertainties associated with oil extraction feasibility, thus misleading shareholders regarding the true value and risk profile of Orogrande.

56. Plaintiff asserts that as an investor, she was not informed that the geological assessments underpinning TRCH and NBH's asset valuations and projections were prepared by Masterson of Stimulation Petrophysics Consulting (hereinafter referred to as "SPC"), who maintained undisclosed relationships with McCabe. Plaintiff alleges these undisclosed insider relationships constitute violations of transparency and disclosure requirements under federal securities laws. Plaintiff further asserts such nondisclosure materially misled investors, breaching fiduciary disclosure duties and violating established securities disclosure standards articulated in (a) *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), affirming that failure to disclose material relationships affecting asset valuations constitutes securities fraud; and (b) *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011), confirming that omission of material facts, such as undisclosed conflicts of interest, violates securities laws by misleading reasonable investors.

57. Plaintiff highlights that the Orogrande Basin reserve estimates provided to investors—approximately 3.678 billion barrels of oil equivalent—implied substantial financial valuations based on the 2019 average market price of West Texas Intermediate (WTI) crude oil. These figures suggested an overall gross valuation ranging between approximately $41.92 billion at full market value and $20.96 billion at a conservative discount (50%). Plaintiff asserts that

Brda and McCabe failed to adequately disclose significant geological uncertainties, extraction

risks, and inflated economic projections, resulting in a materially misleading portrayal of the

project's feasibility and value. This omission of material risks, combined with exaggerated

reserve projections and undisclosed insider interests, directly misled investors, constituting clear

violations of Section 14(a) of the Securities Exchange Act of 1934 and SEC Rule 14a-9, as

further emphasized by the Supreme Court in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438

(1976).

58. Following these acquisitions, TRCH faced significant financial distress, as evidenced by

disclosures in multiple SEC filings prior to the Reverse Takeover (RTO). Plaintiff believes

Defendants Brda and McCabe strategically orchestrated an RTO by coordinating the issuance of

Series A Preferred Shares ("MMTLP"), conducting an At-The-Market ("ATM") offering, and

merging with a financially unrelated Canadian company, Meta Materials, Inc. ("MMAT I").

Given the complex regulatory processes typically required for these transactions, Plaintiff asserts

these simultaneous maneuvers strongly suggest premeditated planning rather than coincidence.

59. Plaintiff further alleges serious failures by SEC and FINRA regarding the regulatory

oversight and due diligence obligations concerning TRCH's simultaneous execution of complex

corporate transactions, including the RTO with MMAT I, an ATM offering, and the creation of

Series A Preferred Shares ("MMTLP"). Each of these transactions individually requires

extensive documentation, stringent financial reviews, disclosures, and regulatory approvals,

processes typically taking months of thorough regulatory scrutiny. Despite this, the SEC and

FINRA inexplicably permitted TRCH to complete these sophisticated and paperwork-intensive

financial maneuvers nearly simultaneously, seemingly without the rigorous regulatory oversight

mandated under the Securities Act of 1933, the Securities Exchange Act of 1934, and FINRA's own Rule 5110 governing corporate financing transactions. Plaintiff emphasizes that the compressed timeline and coordination required for an ATM offering, creation and issuance of MMTLP shares, and the finalized RTO strongly suggest substantial pre-planning and coordination—facts overlooked or ignored by SEC and FINRA regulators. These regulatory bodies failed to fulfill their statutory duties to ensure market transparency, fairness, and investor protection, as clearly mandated by *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976), which underscores the obligations of regulatory agencies to diligently enforce securities law to prevent fraud and deceptive practices. The SEC and FINRA's apparent lack of scrutiny and regulatory rigor permitted Brda and McCabe to execute their well-timed exit, directly contributing to the financial harm suffered by shareholders.

60. The average regulatory timelines for these transactions illustrate clearly that significant advance planning would have been required: An RTO typically takes 3 to 6 months to complete due to rigorous audits, reviews, and SEC filings. Creating and issuing a new class of preferred stock generally requires 2 to 4 months of preparation, legal compliance, and regulatory approval. Likewise, ATMs usually demand 1 to 3 months of regulatory filings and approvals. Therefore, the near-simultaneous timing of TRCH's RTO, the creation of the MMTLP preferred shares, and their ATM offering strongly suggests intentional premeditation and coordinated strategy rather than coincidence.

61. What is so egregious to Plaintiff is that SEC was very aware that TRCH was engaging in acts of market manipulation. Plaintiff has in her possession an email from Jeff Davies dated July 12, 2019. This email is between himself and 3 enforcement agents at SEC. The email reads, Subject

21

Torchlight To: Eric Werner, CC: Reece, David B., Cain, Kimberly it reads, "Weird how Torchlight spikes at the end of the day all the time. I'm sure that's not manipulation. John Brad the CEO hardly ever takes a cash salary and never sells the stock the pay him in. Must be independently wealthy, from his prior frauds. Once again, never been short, never worked with any short. Huge waste of my time and expertise to try and unravel this fraud. This is a layup. Retail, repeat offenders, gate keepers, social media. $150 million enterprise value now, for a company worth less than $0. This is going to feel like Miami Herald and Epstein when this finally implodes. Everyone knew but didn't care. Regards, Jeff."

62. An excerpt from *SEC v. Brda and Palikaras, Civ. Action No. 1:24-cv-004806* Filed June 25, 2024, "To accomplish his plan, Brda devised a series of transactions intended to create a short squeeze. Those transactions included a merger agreement between Torchlight and another company, along with a dividend—in the form of preferred stock issued to shareholders of record at closing—that Torchlight would not register or make available for immediate trading on any exchange ("Preferred Dividend"). Shareholders who received the Preferred Dividend would purportedly be entitled to receive the net proceeds of the sale of Torchlight's oil and gas assets. Brda believed, and intended to lead investors to believe, that the Preferred Dividend would force short sellers to exit their positions and trigger a short squeeze that would inflate the price of Torchlight's publicly traded stock." Plaintiff would certainly have liked to have seen a case such as this filed back in 2021 or 2022 before purchasing her first shares of MMTLP.

63. These executives took further action and deceptively promoted the Preferred Dividend. They did so through private communications with select investors and third-party consultants, intending these parties to disseminate their misleading narrative.

22

64. Upon information and belief Brda and McCabe paid undisclosed stock promoters and strategically leveraged social media influencers to further amplify misleading expectations about the value of the assets, significantly influencing investor decisions and inflating the stock's value artificially.

65. In June 2020, Brda and the TRCH BOD resolved to pursue a strategic initiative aimed at stabilizing the company through a reverse take over with MMAT I, a corporation focused on advanced technology innovations.

66. The merger aimed to combine TRCH's oil and gas assets with MMAT's advanced materials technology to enhance shareholder value and diversify operations. This corporate action represented a pivotal shift for both companies, laying the groundwork for the creation of MMAT II and signaling a new strategic direction for TRCH shareholders.

67. Shareholders were led to believe that the merger between TRCH and MMAT I would provide a pathway to resolve systemic challenges posed by illegal short positions while transitioning the company toward a future in high-tech innovation. This narrative was a central aspect of the merger's presentation to investors.

68. On December 14, 2020, TRCH, a Texas-based oil exploration company, formally initiated a merger plan with MMAT I, a Canadian high-technology materials firm. The proposed merger was framed as a strategic opportunity to align TRCH's traditional energy assets with MMAT I's cutting-edge technology portfolio. As part of their scheme, the executives also made false and misleading statements and omissions to investors about the Preferred Dividend to further inflate the value of TRCH stock. In TRCH's public filings and proxy statements, Brda made false and

misleading statements and omissions that were intended to create the false impression that
Torchlight's oil and gas assets would be quickly monetized and distributed to Preferred Dividend
holders within six months of the merger, when in fact there were no prospects of that happening.

69. From January 1, 2021, to June 21, 2021, TRCH traded a total of 3.6 billion shares—  an
unprecedented volume compared to the company's cumulative trading history of 745 million
shares over the prior decade. This dramatic surge in trading activity raised  significant concerns
about unusual market behavior and potential trading irregularities.

70. When TRCH stock price began to surge, Brda wrote to MMAT's CEO, Palikaras: "We have
two days to take advantage of the squeeze[.]" (emphasis added). Between June 18–24, 2021,
Brda caused Torchlight to sell off-the-shelf shares into the public markets in an ATM Offering.
Over the five-day ATM Offering, Torchlight sold 16.2 million shares to investors at an average
price of $8.50 per share.  In total, the last minute ATM Offering raised $137.5 million from
investors. These proceeds primarily benefitted the MMAT which appointed Palikaras as CEO.
And for his part, Brda demanded and  received a $1.5 million bonus for the ATM Offering.

71. Plaintiff believes Brda and McCabe, privately and selectively disseminated—through paid
consultants, private conversations with investors, and via social-media messages—the theory that
the Preferred Dividend would cause a short squeeze by forcing short-sellers to cover their
positions before Torchlight issued the Preferred Dividend or risk violating their short contracts
by having difficulty delivering the Preferred Dividend when the merger closed. Plans for a short
squeeze were not found in the public filings.

72. A Z-test statistical analysis was conducted on July 14, 2024, to evaluate the trading volumes of TRCH using historical data from 2010 to 2020 and the first half of 2021. The analysis assumed an average daily trading volume variation of 5% over 10 years. It concluded that trading 3.6 billion shares in TRCH within the six-month period from January to June 2021 was statistically improbable without market manipulation or unpredictable, non-uniform events influencing the market.

73. Brda succeeded in his aim to manipulate the price of TRCH stock in the days leading up to the closing of the RTO. Before the merger was announced, TRCH stock was trading below $1.00 per share. As a result of the Brda's scheme, TRCH's stock price sharply rose during a ten-day period between June 14–24, 2021 from $3.58 per share to as high as $10.88 per share before dropping back to $4.95 per share by June 25, 2021.

74. Upon the completion of the RTO, shareholders would receive one share of MMLTP for each share of TRCH (representing the oil and gas assets) and a half share of MMAT II.

75. The RTO was complete. Everyone who held TRCH had been told that the Series A Preferred Share was simply a placeholder. The dividend represented your share in the sale of the oil and gas assets. Not long after the RTO completed, shares of MMTLP started trading, leaving many TRCH shareholders angry.  This was supposed to have been a thank you for holding your TRCH shares through the RTO. Something only select investors were offered.

76. Immediately, Brda took some heat as he remained on social media on X.  The issue was that folks wanted Brda to explain why their dividend was trading. Brda, along with Palikaras,

publicly asserted that the trading of MMTLP commenced without their knowledge or authorization.

77. When asked how and why the shares began trading, in a recorded space call, Brda told shareholders that it wasn't his fault, yet with the same breath of air, he stated that there was a mistake in his paperwork. He states unequivocally that MMTLP began trading because of one tiny word. That word was "Transferrable."

78. Plaintiff asserts that this was a meticulously planned and executed strategy, deliberately utilizing vague or misleading language within regulatory filings, designed specifically to enable unauthorized trading, artificially inflate shareholder expectations, and ultimately facilitate significant personal enrichment of company insiders at the direct expense of retail investors. Such deliberate misuse and manipulation of disclosure language directly violates SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) and fundamental anti-fraud provisions established under Section 10(b) of the Securities Exchange Act of 1934, as affirmed by the Supreme Court in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976).

79. According to proxy materials, as well as an OCC memo, MMTLP was "supposedly" never meant to trade.  It was simply a placeholder to represent the oil and gas assets. Upon the sale of the assets, shareholders would receive a dividend. However, if the assets were not sold, then MMAT II would spin off the oil and gas assets into NBH.

80. Brda now needed an enhanced narrative. TRCH shareholders were angry and he needed positive retail sentiment if he was to obtain a second squeeze scheme. The original narrative led

investors to believe that systemic shorting would be addressed by issuing the dividend just like
Overstock. He simply needed to double down.

81. The social media push on X was difficult to miss. It seemed no matter what direction Plaintiff
listened, all she heard was a lot of talk about MMTLP. As Plaintiff did not begin to buy until
October 2022. In any event, the message heard by Plaintiff was multi-faceted.

82. The primary narrative disseminated by Brda and McCabe and their undisclosed paid stock
promoters emphasized a supposed "short squeeze," suggesting a scenario where short sellers
urgently needed retail investors' long-held MMTLP shares to cover and close their short
positions. Plaintiff contends this narrative intentionally misrepresented the scarcity and
unavailability of shares available to borrow or locate, potentially fabricating or exaggerating the
magnitude of existing short positions. Such conduct constitutes deliberate market manipulation
and violates Section 10(b) of the Securities Exchange Act of 1934, SEC Rule 10b-5 (17 C.F.R. §
240.10b-5), and Section 9(a)(2) (15 U.S.C. § 78i(a)(2)), prohibiting misleading statements
designed to artificially influence market perception and stock valuation. Courts have explicitly
recognized this behavior as fraudulent manipulation under federal securities laws, including;
*SEC v. Reynolds, 2008 U.S. Dist. LEXIS* 65669 (N.D. Tex. 2008) holding that intentionally
deceptive or undisclosed activities intended to manipulate market conditions, including secret
payments to promoters, constitute actionable securities fraud under Section 10(b) and Rule
10b-5. *Southland Securities Corp. v. Inspire Insurance Solutions, Inc.*, 365 F.3d 353 (5th Cir.
2004) holding that intentional or reckless misrepresentation and material omissions intended to
manipulate securities prices violate Section 10(b) and Rule 10b-5.

83. Further, undisclosed promotional activities constitute material omissions and deceptive practices prohibited under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. Courts have specifically ruled such conduct illegal: *SEC v. Reynolds, 2008 U.S. Dist. LEXIS 65669 (N.D. Tex. 2008),* holding undisclosed payments to promoters constitute actionable securities fraud when used to mislead investors.

84. To demonstrate concretely how these deceptive market manipulation strategies were executed, Plaintiff highlights the critical role played by undisclosed paid stock promoters, commonly known as "social media pumpers" who systematically spread misleading narratives across various platforms.

85. These influencers deliberately and repeatedly amplified claims regarding the alleged scarcity of MMTLP shares and the urgency of a supposed short squeeze, directly impacting investor sentiment and decisions. Plaintiff provides specific examples illustrating how these pumpers strategically coordinated their activities, effectively manipulating market perception to the benefit of Brda and McCabe and causing substantial financial harm to Plaintiff and other like retail investors.

86. On information and belief, Plaintiff believes Brda and McCabe used undisclosed, paid, social media stock promoters to pump the stock, such as John Does 1, 2, 3, 4, 11, 12, 13 & 14 and Jane Doe 1. As well as undisclosed, paid, proxies such as John Does 2, 3, 5, 6, 7, 8, 9, 12 & 14 and Jane Doe 2, 3, & 4.

87. During the run up in MMTLP during the last week of trading, Brda told people with Fidelity exactly how to place a trade through their trade desk.  Fellow investor Jennifer Vetrano followed this advice and purchased shares.

88. The narratives were convincing and used fear to drive retail behavior. We were told many times,"Diamond hands" and "know what you hold." Driving retail to believe that these shares, Plaintiffs shares included, were extremely valuable.

89. Plaintiff further emphasizes Brda and McCabe's coordinated use of multiple social media influencers, all disseminating identical narratives simultaneously, with Brda regularly reinforcing these messages through public endorsements. For instance, in a recorded social media event known as a "space call," Brda openly remarked that he intended to review the videos created by the influencer "Birdlady," explicitly noting they appeared accurate and trustworthy. Such public endorsement from TRCH II's former CEO implied insider knowledge that retail investors lacked, reinforcing investor confidence in holding shares. Plaintiff recalls influencers frequently declaring that MMTLP would provide "generational wealth" and promised returns "beyond investors' wildest dreams." These coordinated statements leveraged fear tactics as well, warning retail traders that short sellers would intentionally "hunt" for stop-loss orders to manipulate stock prices lower. Plaintiff personally acknowledges that these pervasive messages directly influenced her decision to abandon her usual investment safeguards, notably removing stop-loss protections on MMTLP shares. This strategic manipulation of investor behavior through social media influencers, amplified by Brda's explicit validation, constitutes deliberate deception and violates anti-fraud provisions outlined in Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 (17 C.F.R. § 240.10b-5).

90. John Doe #18 a stock pumper who used a graphic "Torch the Short." "Regarding short attacks (4 in total) today 911,414 shares 3.34% of volume. Please do not set stop losses on MMTLP. FINRA has not approved it yet, when approved DTC will have the go ahead from FINRA to send  Corporate Action notice to all brokers. Countdown Continue Trading days remaining 7 Trading hours remaining 45.5 hours."

91. Plaintiff's belief regarding mandatory short position closures was not only shaped by extensive social media communications but notably reinforced by direct public statements from Defendant Brda himself. Specifically, Brda publicly asserted that short positions in MMTLP could not legally persist into NBH because private companies, such as NBH, cannot have publicly traded short positions.

92. Plaintiff believes that Brda and McCabe inflated stock prices by use of paid social media influencers to pump the stock prior to the halt. Post halt, Plaintiff believes that these Defendants used paid social media influencers to disseminate a narrative to MMTLP shareholders post halt. These influencers seemingly rose to the top of the pyramid of a newly minted community of several thousand MMTLP shareholders. The permanent message, repetitively disseminated over a two year period, was to only focus our attention on the regulators and Congress, but never the Defendants. They have provided a constant stream of protection, thus insulating the Defendants from scrutiny. If anyone, such as the plaintiff did, so much as has an independent original idea that veers from their narrative, that shareholder is shamed and bullied in front of the entire community. This is done to send a clear message to other shareholders in the community, that if you step out of line, this is what we'll do to you too. In this manner, the Plaintiff was made an example of.

93. On June 15, 2021, John Doe 4 an influencer and consultant to Nextbridge Hydrocarbons on X, stated, "The OroGrande asset holds 3.7 billion barrels of oil. It's no joke. It's proven." He further wrote, "The special dividend will likely pay out between $10.00 and $20.00 per share. OroGrande has 3.7 billion bf reserve with oil at $70+ it's a slam dunk."

94. On information and belief, plaintiff assets there is a promissory note dated 2/29/2024 between John Doe 4 & McCabe &/or NBH. John Doe 4 is a consultant to NBH under the leadership of Greg McCabe and is currently receiving $10,000 a month for consultant fees.

95. The promissory note specifies that NBH unconditionally promises to pay CAPCO Holdings, Inc., a Texas corporation, the principal sum of $2,000,000, together with accrued and unpaid interest at a rate of 12% per annum. The note is secured by certain assets of NBH, as detailed in the agreement.

96. This note also references a consulting agreement executed between John Doe 4 and the company for $10,000 a month but specific details regarding his role or contributions have not been publicly disclosed, even when explicitly requested by shareholders.

97. On April 23, 2024, Aaron Chow, also known as Elephant Analytics on X, alleged that John Doe 4, doctored spreadsheets from the Texas Railroad Commission and posted them on April 20, 2020. These posts were purportedly intended to raise confidence and bolster interest in the Orogrande Asset, which would later become part of NBH through the Preferred Dividend that evolved into MMTLP and NBH.

31

98.  Aaron Chow's post on X clearly displays a standard query from the Texas Railroad Commission indicating that the oil quantity from Orogrande wells is 0 units. In contrast, John Doe 4's displayed query from the Texas Railroad Commission shows 1,926 units.

99. Wes Christian was publicly involved with Flamethrower, alongside Brda, in efforts to uncover evidence of alleged naked short selling in MMTLP. However, there is no public record indicating that any claims of illegal activity were formally identified or brought before a court of law between March 2023 and the present.  In Plaintiff's belief this was a distraction for shareholders of MMTLP.

100. On December 13, 2022 the SEC filed charges against eight individuals associated with the Atlas Trading group for their involvement in a pump-and-dump scheme, which included manipulating the stock of Torchlight Energy. The defendants, including Zack Morris (Edward Constantin), Perry Matlock, and others, allegedly used social media platforms to promote stocks, including Torchlight, to inflate their prices before selling their shares for substantial profits. The scheme reportedly generated around $100 million in profits. In total, the TRCH Participants' profits on TRCH from February 10 through February 23, 2021 were $288,603 for Hennessey; $336,138 for Matlock; $148,131 for Deel; and $2,757 for Knight. The case number for the SEC's complaint against the Atlas Trading group is 22-CV-221.

101. As early as 2019 John Doe 3 worked for Blackbox Stocks, a company that describes itself online as the ultimate platform for traders, offering trade execution, analysis, and community chat all in one place without switching between multiple websites. In 2020 Blackbox announced an integration deal with Tradestation that enabled Blackbox users to trade stocks and options via Tradestation without ever leaving the Blackbox platform. The Blackbox stocks Youtube channel

had 11.6k subscribers and 121 videos. In May of 2019, John Doe 3 was working for Blackbox and had recorded Youtube videos on the channel. His alias was Andrew McDeggins or Mr. McDeggins. He used the logo for the Blackbox stocks to create a very visually similar emblem on Stock twits under MrMcDeggins and on X/Twitter as @Freecommercials, @KarmaCollects and used these platforms to draw in his followers and manipulate markets pertaining to MMTLP and MMAT. From his Stock twits profile you can see he was coordinating with John Doe 1 and retweeting John Doe 1's posts and commenting on them. On March 13, 2022 he posted on Stock twits about "Blackboxstocks is offering the nuttiest special ever. 5 Bucks for a month. That's insane. If you're a day trader, you NEED to give it a shot. You'll never want to trade without it again." He hashtags both Blackbox stocks as well as MMTLP and MMAT tickers. On July 11, 2022 he uses his stock twits account to say, "I haven't chimed in on this at all but wouldn't it be HILARIOUS if everyone holding $MMTLP used their dividend payouts to SHORT $MMAT because they're all pissed off at @Palikaris &amp; Company for stringing them along all this time? Just thinking out loud." He says on Stock twits on 12/8/22 as he retweets John Doe 1's tweet, "I too expect gap down on open to grab as many shares as they can, and for them to drive prices down as hard as possible. Then, VIOLENT swings between Fri &amp; Monday. 5-10." This was the day before the U3 halt on MMTLP stock. He also tells his followers on Stock Twits in another post that, "I just called a securities attorney that I'm close with, and even he said he has never seen anything like this before. He said he THINKS the TRCH shorts would have no choice but to cover." In the plaintiff's view this seems to allude to the fact that John Doe 3 is leading his followers to believe that the TRCH shorts covering would trigger a short squeeze of the stock. In 2023 John Doe 3 pivoted on social media to X/twitter where he created multiple

accounts where he hosted over 1369 hours on X/twitterspaces according to an IT script run on X/twitter. In one tweet on or around 8/7/24, he says to Brda, "$MMTLP Hey @johnbrda based solely on actions that NBH has taken by retaining @johnnytabacco, and is currently taking by getting current, combined with what they've stated in PR's, do you believe that they have a plan to at least attempt to deliver some kind of resolution? I do." Brda responds, "I do." In the plaintiff's view he used his various profiles on the X/twitter platform to write scripts on a narrative that would encourage his followers to write and call Congressional members and ultimately distract them from taking any legal action for MMTLP and to act as a proxy for Nextbridge Hydrocarbons andBrda.

102. Prior to the U3 halt of MMTLP JOHN DOE 1 utilized stock twits in an attempt to influence the market for MMTLP. He claims to have a goal of 10 million MMTLP shares and a friend with at least 7.5 million MMTLP shares. He says that these shares are not original TRCH preferred shares and he claims to buy shares and manage 20 different MMTLP accounts for multiple companies in order for him to not be considered a 5% holder. John Doe 1 claims to have insider knowledge.

a. Brda tweets on 2/6/23 he had a nice chat with John Doe 3 and John Doe 1. Also says, "Wanted to let everyone know all our conversations have always been straight up and helpful. Never nefarious. Likely my fault for not paying attention to this issue, super busy. Let's all just stay pos. and focus on the prize."

b. John Doe 1 utilizes stock twits to send messages to his followers on October 12, 2021, "$MMTLP know what you own….you have preferred "A" stock not standard….there are

34

a lot more rules and guidelines that they must adhere to…They need the preferred stock to pay the short position in full by December 2021. Hold. Hold and hold and you will be paid one way or the other."

c. John Doe 1 utilizes stocktwits to send messages to his followers on October 9, 2022, "my avg is 1.43 and my friend has 16 million shares. I call over 100 per share easy…my hedge fund inside says they are scared and calling for 150 to 175…can you imagine that with my share count…and what everyone holding long will make!!!! The trick is everyone is going to have to hold and not give in to weakness as their account is shooting up! Takes a lot of stamina to hold!"

d. John Doe 1 utilizes stock twits to send a picture to his followers on February 9, 2022 of himself in front of a large plane and says, "looks like one of mine citation."

e. John Doe 1 utilizes stock twits to send another message to his followers on March 11, 2022 that reads, "@ramensoups @chavy45 I guess the truth hurts you should be careful of what you say and who you say it to and there are people in this world that have a lot of clout that can find out a lot of things that unnecessary you don't want to put out there! So but out and get off peoples back and quit spreading fud and go to another stock…Or is your way blocking me the way you deal with things…."

f. John Doe 1 utilizes stock twits on September 9, 2021 to reply to someone named @prince_of_persuasia saying "just like you called John Doe 10 full of shit too…he's my partner."

g. An account on X called @Ceopumpers doxes John Doe 1 as having a felony

35

conviction for sexual exploitation child sell/publish on March 9, 2023.

103. Between 9/21/22-9/9/22/22 John Doe 10 utilized Stock twits to tweet the following

posts;

h. "$MMTLP #2 reporting in. I will be buying a small country when this plays out. 1.58 million shares x $65=what? Stay strong. Will will be rich. Brda is the real deal. Had drinks with him in my backyard. Set your sell orders high. Stay strong. Rocket soon. Will Stuart in Cali."

i. $MMTLP I will be fighting with the shorts to buy more as the bake sale comes to an end.

j. $MMTLP this is your #2 shareholder reporting back (17.8 million shares). TD Ameritrade just stopped my ability to purchase more shares because I would not lend or sell my shares. They have been bugging me over the last few weeks to "play ball with them" by lending or selling my shares. Other fellow holders have given me a similar story. Bottom line, this tells you there are not enough shares to clear TD's books. This also explains why the limit "ask"continues to rise and is now above $350. They are doing this to understand the cost for the shares that they need to close out shorts, if necessary. IMO do not lend out shares and do not set limit sale orders with stops or trailing stops. The stock price will start to move violently up and down in an attempt to shake your confidence and grab your shares. Know what you hold. Go for the gold. This is not financial advice, just one person's opinion. Good luck to all. Stay strong."

104. Prior to the U3 halt of MMTLP Jane Doe 1 utilized Stock twits, YouTube and Twitter in an attempt to influence the market for MMTLP. She claims to represent a group of people with five million shares of MMTLP each. In direct messages with another influencer she also claims to have "a bunch of NDAs signed." She also says, "Why would this group I represent now get to meet with executives if the MMTLP they bought was fake?' She also claims that this group is not on the Meta Materials side. This influencer has made multiple videos on MMTLP and has influenced 7.17k subscribers with her marketing messages and false valuations of the Orogrande assets.

105. Brda attended a recorded X space call and relayed to influencers that his former SEC attorney told him, "there is nothing good that is going to happen by you reporting any of this to the SEC…. instead of looking at the shorts they are going to question everything you've ever done with the company."

106. Brda attended a recorded X space call and relayed to influencers that "my theory is MMTLP would've never happened had the books been fully balanced on the dividend date. So the brokerage houses, the prime brokers, and the hedge funds never cleared their positions."

107. Brda attended a recorded X space call and relayed to influencers that "I think there is a decent size short in MMTLP." "What you are going to see is that, this is my personal opinion, some brokerage houses are going to deny people to be able acquire MMTLP and they are going to say just like Robinhood did, sell only… Which is going to create all kinds of problems in MMTLP when the dividend is issued."

108. Brda attended a recorded X space call and relayed to influencers that he "has started to watch Jane Doe 1's videos, he gets distracted but one of these days I am going to watch them. Some other people have called me and recommended that I watch them."

109. Brda uses the X platform to tweet that hedge funds used old data from TRCH to get trading started for MMTLP. "The MMTLP profile is from 2012. This smells like nefarious from people who are not good people."

110. NOBO lists (Non-Objecting Beneficial Owner) are lists of shareholders who do not object to

having their identity disclosed to the company.. This allows the company to directly communicate with them. Generally, access to a NOBO list is restricted to current company employees, specifically those authorized to request it, such as officers or designated representatives. Ex-executives typically do not have the right to access this information once they have left the company.

    a. Brda tweets on June 14, 2024, at 1:15 pm "$MMTLP Hearing about a bit of confusion regarding Andrew and whether or not he is a shareholder. I do see him on the nobo list on June 2022 for 9,000 shares. So that should clear it up.

    b. John Doe 2 utilizes X and tweets on July 23, 2023 "I was assisting @johnbrda with European NOBO list holders' information. You can ask him directly. He will concur."

    c. Brda tweets on December 30, 2023, at 4:18 pm "$MMTLP just checked the NOBO list for TradeStation on June 1, 2022. TradeStation had 396,870 shares with a NOBO registration (shareholder not objecting) to give their info to the company on this date. The

bulk certificate issued to TradeStation is below. 122,622 shares on their bulk certificate. This does not include OBO shares and certainly with six months of trading it could have changed. Just giving you info."

111. Jane Doe 2 appeared more than twenty times referenced that she was privy to inside information regarding Nextbridge Hydrocarbons and MMTLP and investigations, but she appeared on social media (X) after the U3 trading halt. It is the plaintiff's view that this person utilizes her X profile with over 7200 followers to host spaces influencing followers not to investigate McCabe, Brda, and other individuals associated with NBH. She advised shareholders online to transfer their shares to AST (now Equiniti) trust company and encouraged them to do it for a "share count" but then at times would attempt to distance herself from any advice after making repeated pleas for MMTLP cusip holders to transfer even at the shareholder's cost into AST. Based on an analysis of IT script data for X, space calls related to MMTLP stock, Jane Doe 2 has hosted 1108 hours and 30 minutes with thousands of listeners discussing the MMTLP fiasco and has been a stalwart defender of McCabe and Brda even after the loss of the leases to malfeasance from University Lands in October 2024 due to the failure of Nextbridge Hydrocarbons to pay royalty payments to University Lands the prior 5 years and the outright fraud uncovered in that the Orogrande oil fields at the heart of this litigation hold, not oil.

112. Based on an analysis of IT script data for X, space calls related to MMTLP stock totaled 10,617 hours and 50 minutes including; Jane Doe 1, Jane Doe 3, John Doe 3, John Doe 5, John Doe 6, John Doe 7. Many influencers had hosted spaces with hundreds or thousands of people as follows; Jane Doe 2 completed 1108 hours and 30 minutes discussing the MMTLP fiasco, John Doe 5 completed 722h and 1minute discussing MMTLP fiasco, John Doe 3 completed 349 hours

and 43 minutes on his first profile and 1020 hours and 7 minutes on his second profile on spaces discussing MMTLP fiasco, Jane Doe 3 completed 332 hours and 32 minutes on spaces discussing MMTLP fiasco.

113. A financial market expert, and X social media influencer, Dave Lauer commented on X in regards to the "MMTLP community." He stated that "I don't understand when MMTLP became conflated with fair markets. The MMTLP community is the most abusive, toxic online community I have ever encountered. I have never encountered so much hate and negativity." In a separate post on X on 6/13/24 he states, "Because the last time I tried to help MMTLP investors I received death threats and the most horrific abuse I've ever been subjected to. I tried, you folks do not want my help, and that's fine." Dave Lauer is a Market Structure and Technology Architecture Consultant. His most recent work includes public policy with Better Markets and technology architecture with IEX, a new equity market. Previously, he worked as a senior quantitative analyst at Allston Trading and Citadel Investment Group. Dave Lauer has 199.1K followers on X/twitter. A link to his media profile is as follows https://linktr.ee/dlauer

114. Plaintiff asserts that the aggressive promotion by undisclosed stock promoters, reinforced by explicit public endorsements from Brda, directly set the stage for the abrupt and unauthorized U3 trading halt imposed by FINRA. These social media pumpers strategically and repeatedly assured retail investors that short sellers would be forced to close their positions by December 12, 2022, dramatically heightening investor anticipation of a lucrative short squeeze event.

115. From October 1, 2022, to December 8, 2022, MMTLP stock experienced significant volatility, with prices ranging from a low of $2.85 to a high of $12.50, raising questions about potential market manipulation.

116. During this period, the market capitalization of MMTLP, a relatively obscure oil and gas exploration company, fluctuated between approximately $1.5 billion and $6.5 billion.

117. Given the company's total authorized share count of 165.5 million, this level of market capitalization and price volatility suggests the influence of illegal short selling on the stock.

118. On 10/11/2022 Brda tweeted "This just in. Expect some volatility this morning. Another 550K shares borrowed.  Soon there will be none left." He also tweeted, "With Fidelity, you have to phone it into the fixed income desk.  You can sell online, but only buy via a phone call, last I heard." Plaintiff Vetrano, who filed a claim similar to this complaint, stated that she did follow his instructions to call buy orders of MMTLP at Fidelity via the trade desk.

119. Early social media statements by Brda related to shareholders that he hadn't sold any of his MMTLP position.  However, between November 15 and December 5, 2022, Brda sold approximately 300,000 shares of MMTLP. During this period, the trading price ranged between $2.90 and $9.90, generating proceeds estimated between $870,000 and $2,970,000.

120. Brda later acknowledged selling a portion of his holdings during the price increase leading up to the FINRA-imposed U3 halt, contradicting his earlier public statements. In fact when someone finally put him on the spot, he sported an air of "how dare you" attitude. I believe he said something such as, I don't work for the company, I have the right to sell just like any one else. True, except we didn't tell you to hold while we sold.

121. On November 30, 2022, McCabe sold 35% or approximately 6.77 million shares of MMTLP from his total holdings of 18,758,249 shares, representing 11.37% of the float. Making up 30% of all volume. On that date, the trading price ranged between $7.76 and $10.00. Based

41

on this price range, McCabe's transactions generated proceeds estimated between $52,768,000 and $68,000,000.

122. Under SEC rules regarding beneficial ownership, McCabe was required to report these share transactions, as he held more than 5% of the float. Under the U.S. Securities Exchange Act of 1934, SEC rules regarding Beneficial Ownership Reporting and Section 16 Reporting, McCabe was required to file a Form 4 report within two days from these share transactions. The plaintiff has not seen mention on any filings of such a document.

123. @Broncho24 made a solid point. "Assume (MMTLP) it was worth $100/share, that's more than half billion $ left on the table by McCabe. If the assets had any value he could have raised money easily with a PA or found an Operator to front drilling costs. He also removed his working interest position swapping for shares shortly after which anyone in the industry will tell you is a huge sign of no confidence."

124. @Broncho24 further says, "Brda was used as a mouthpiece to tell retail investors to hold & FINRA was at fault but Brda sold 300K shares but had received a $1.5M bonus months prior. Brda essentially left +$25M on the table if the $100/share was accurate to make sub $2M. They profited massively on a ZERO but even if it has a small value McCabe is the senior debt holder and will get paid back on any sale of assets even if it's a few million but investors get nothing."

125. On December 7, 2022, both FINRA and MMAT II corporate leadership confirmed the existence of an approved corporate action for MMTLP. According to this action, no new trades could be executed after December 8, 2022, but shareholders could settle positions, including short position close-only trades, through the end of trading on December 12, 2022. The corporate

action further specified that MMTLP shares would be cancelled on December 13, 2022, with a pay date for NBH shares or dividends set for December 14, 2022.

126. On December 7, 2022, Jeff Mendl, Vice President of OTC Markets, stated on Trader TV that MMTLP shares were approved to trade through December 12, 2022, as part of a FINRA- approved corporate action. Mendl confirmed that MMTLP would no longer be available for trading on the OTC market starting December 13, 2022, and that the shares were planned to be "deleted" following that date.

127. On December 8, 2022, FINRA failed to attend a scheduled meeting with the DTCC and attorneys representing MMAT II to address unresolved issues surrounding the MMTLP corporate action.

128. Later that same day, FINRA issued a revised corporate action notice, altering the language to state that "the symbol will be DELETED," replacing the previous notice that indicated MMTLP shares would be "CANCELED" upon.

129. In an affidavit signed by Palikaras, he states that these changes came with express instructions from FINRA that the issuer, MMAT II, accept it as is and make no edits. Plaintiff now views this act as a preemptive glance at exactly what caused the U3 Halt.  Eventually FINRA claimed there were settlement issues where prior to these changes, none were found.

130. This revision omitted the originally specified December 14, 2022, pay date, further confusing shareholders and creating uncertainty about the transition process.

131. At the close of trading on December 8, 2022, deal-broker Level 2 data revealed that short position holders in MMTLP utilized the 505 code. This is commonly referred to as short on shares or S.O.S. to signal a heightened urgency to close their positions. The data showed transaction prices reaching and exceeding 100 times the closing price of $2.90 per share (e.g., $290.00+ per share), an extraordinary deviation indicative of a severe short squeeze.

132. Furthermore, after December 8, 2022, limit orders ranging from less than $100 to as much as $200,000 per share were submitted through various brokerages but were marked as "too late to cancel." This indicated significant irregularities in the handling of MMTLP trades, impacting shareholder ability to access or execute transactions.

133. Many MMTLP traders, including the Plaintiff, held their shares with the intent to execute opportunity trades—to sell rather than buy—on December 9 and 12, 2022. These shareholders were prepared to accept the best possible offers for their trades before the close of all trading on December 12, 2022, as specified in the approved corporate action referenced above.

134. A series of emails obtained through a Freedom of Information Act (FOIA) request revealed that SEC and FINRA were aware of a problem with MMAT & MMTLP a year before the halt.

135. On November 29, 2021 recipients Mr. Sam Draddy and Ms. Patti Casimates, both of FINRA were identified in an email that stated, "I believe it was Patti Casimates from our Market Ops group who reached out to (Redaction) I have included her on the email so you can reach out to her directly. Hope all is well! Sam."

136. On December 2nd, 2022, just one week before the halt, another FOIA revealed in a second email Mr. Richard Boyle and Mr. Jay Gibbons of FINRA. Two names were redacted in the To: line.  The subject line is MMAT & MMTLP/Next Bridge Hydrocarbons, Inc. It states, "Good morning (two redacted names), I believe you've had conversations with FINRA's OTC Corporate Actions team regarding the above issuer and its proposed spin-off transaction.  Would one of you have time on Monday or Tuesday to discuss this matter?  FINRA's Market Fraud Investigations team recently received several times that appear to have also been sent to the SEC. Below are some proposed times to discuss but we can work around your schedules if these  don't work for you.  Thanks. Rich Boyle."

137. In a third FOIA obtained email, on Monday, December 5th, at 9:07am just 4 days prior to the U3 Halt, Mr. Sam Draddy of FINRA wrote to 5 individuals, Richard Boyle FINRA, and Jay Gibbons of FINRA as well as 3 SEC employees whose names were redacted. Subject line Inquiry.  Email contents, "(redacted name), looks like this MMAT/MMTLP matter has now hit my Fraud team's radar screen (and seemingly a lot of other radar screens as well). I know you have spoken to Patti Casimates and our General Counsel's office-but was wondering if it made sense for my Fraud team to have a conversation directly with you and your folks working on the matter so we are not duplicating efforts.  We are looking at the two issuers from a fraud/manipulation angle and, in fact, bluesheeting both MMAT and MMTLP as we speak.  If you think a comparison of notes is worth a quick call-let me know a good day/time.  I can set up a zoom and feel free to let me know if (redacted names) or anyone else should be included. Thanks (redacted names) Sam. Yet the investing public were never notified of these concerns. Plaintiff for example, purchased shares between 12/5-12/8/2022. Then again, they knew in 2021.

138. On July 19, 2023, Plaintiff personally contacted the SEC's FOIA department and spoke directly with Aaron Taylor, who identified himself as a Branch Manager. Plaintiff inquired about two FOIA requests she had previously submitted regarding MMTLP, both of which had been stalled for months with the status "In Process." Plaintiff explained that after sending email inquiries on July 18, 2023, she received abrupt, back-to-back denials the very next day. During the call, Taylor acknowledged familiarity with the MMTLP situation, stating explicitly that the SEC had been inundated with FOIA requests, causing significant backlogs, and further admitted, "we are not filling any requests related to MMTLP." When Plaintiff challenged this claim by mentioning a fulfilled request from another investor named Howard, Taylor conceded, stating that Howard's request had inadvertently been processed. Taylor then said, that's when we opened an investigation.  Immediately followed by pleas not to repeat this information. Plaintiff then questioned Taylor regarding the specific denial code used—Exemption 7(A), typically employed when releasing information might compromise an ongoing investigation. Taylor confirmed that exemption 7(A) indeed requires an active investigation, yet paradoxically added, "But I'm not saying there is an open investigation," and proceeded to laugh, further reinforcing Plaintiff's perception of misconduct, lack of transparency, and deliberate obstruction by the SEC.

139. These emails along with Plaintiff's own experience, provide insight into regulatory awareness of market irregularities leading up to the FINRA-imposed U3 trading halt. Additionally, the final email from the Fraud Department makes mention of "Blue Sheets" another hot topic and often cried for, yet always denied.

140. Plaintiff emphasizes the critical importance of obtaining Electronic Blue Sheets and CAT Data to quantify and substantiate allegations conclusively, arguing these records constitute

essential evidentiary components that regulatory entities improperly withheld, obstructing justice and investor recourse.

141. FINRA's indefinite and unexplained implementation of the extraordinary U3 trading halt on December 9, 2022, abruptly terminated all trading of MMTLP shares, causing immediate and lasting financial harm to Plaintiff and similarly situated investors. FINRA provided no transparent justification, failed to audit or reconcile share discrepancies, and offered misleading or incomplete information to investors, violating fundamental statutory duties of transparency and due process.

142. Electronic Blue Sheets ("EBS"), which broker-dealers submit to regulators such as FINRA and the SEC, provide detailed trade data including the identities of parties, share quantities, prices, and trading times. EBS data are critical tools for reconstructing market activity and identifying misconduct such as illegal short selling or other manipulative trading practices. 142. The failure of FINRA and the SEC to disclose or utilize EBS data, despite clear indications of irregularities, significantly undermined regulatory transparency and accountability. This regulatory negligence enabled Defendants' market manipulation schemes to persist unchecked, causing substantial harm to Plaintiff and other retail investors.

143. Despite Plaintiff's extensive and repeated efforts to obtain clarity—including numerous appeals to SEC and FINRA Ombudsmen and multiple members of Congress—both agencies persistently failed to produce any substantive explanation, meaningful resolution, or audit of the trading discrepancies tied to MMTLP. The ongoing refusal to provide EBS or Consolidated Audit Trail ("CAT DATA") reflects regulatory negligence and deliberate disregard of statutory obligations to investors, including Plaintiff.

144. Plaintiff highlights that the indefinite and unexplained FINRA U3 trading halt disproportionately affected retail investors by permanently trapping their shares in an illiquid state, while simultaneously shielding institutions holding illegal short positions from mandatory buy-to-cover transactions. Such differential regulatory treatment underscores significant statutory violations and raises fundamental constitutional concerns regarding equal protection and due process.

145. Plaintiff highlights that following the abrupt U3 halt, FINRA issued multiple FAQs containing incomplete, misleading, or inaccurate information without providing a transparent justification or audit addressing outstanding share discrepancies. FINRA and the SEC failed to respond meaningfully despite repeated inquiries by Plaintiff and nearly 100 members of Congress. Plaintiff diligently pursued administrative remedies, repeatedly contacting the SEC, FINRA, their respective Ombudsmen, and elected representatives. However, these extensive efforts yielded no substantive investigation or resolution, demonstrating that administrative remedies have been exhausted. This ongoing lack of regulatory accountability continues to disproportionately harm retail investors, who remain trapped in non-tradable shares, while institutional entities holding illegal short positions escape accountability. Such regulatory disparity highlights significant constitutional and statutory violations, undermining essential investor protections and market transparency, necessitating judicial intervention

146. After FINRA's unexpected U3 trading halt, Defendant Brda faced substantially greater scrutiny compared to his previous experience following the Reverse Takeover ("RTO"). Unlike the earlier period, this halt prompted immediate outrage among approximately 65,000 retail investors, intensifying demands for transparency and accountability. Plaintiff asserts that

48

Defendant Brda's subsequent high-profile advocacy was driven primarily by the necessity to manage mounting investor dissatisfaction, mitigate reputational harm, and create an impression of proactive concern rather than achieve genuine resolution or accountability.

147. On January 18, 2023, Defendant Brda publicly announced the formation of "Flamethrower," described as a shareholders' advocacy group organized to investigate alleged market manipulation involving MMTLP stock.

148. Flamethrower's stated objective was to examine potential market manipulation by market makers, engage the broader shareholder community, gather relevant information, and publicly spotlight issues affecting MMTLP investors, thereby amplifying investor concerns regarding the spin-off of NBH from MMAT II.

149. Plaintiff acknowledges Flamethrower successfully drew increased public attention and media coverage to issues of potential market manipulation and regulatory oversight failures surrounding MMTLP. The group's advocacy efforts intensified public scrutiny and elicited responses from certain regulatory authorities.

150. Flamethrower retained counsel and relied upon shareholder contributions and engagement to document potential misconduct and mobilize public awareness. Attorney Wes Christian, ESQ., of Texas, publicly participated in this effort, lending additional credibility and momentum to Flamethrower's activities. In public remarks emphasizing the significance of alleged misconduct, associates of Defendant Brda dramatically asserted that revelations regarding MMTLP would surpass highly publicized market manipulation cases involving GameStop and AMC. Specifically, Christian publicly stated in an interview: "You're going to see the mother lode of

49

shares that have been issued—that don't exist—come to the forefront. It's going to pale

GameStop; it is going to pale AMC," underscoring the magnitude of harm faced by MMTLP

shareholders.

151.  As of March 12, 2025, there is limited publicly available information regarding the current

activities of Flamethrower. The last notable public mention of Flamethrower was in March 2023,

discussing its formation and objectives. Leaving shareholders to wonder whether Flamethrower

was truly looking to bring assistance to the MMTLP community or whether it was just another

distraction to side track shareholders.

152. Plaintiff alleges Defendant McCabe deliberately misled shareholders in November 2023 by

publicly advocating for the transfer of MMTLP shares to AST under false pretenses. McCabe

assured shareholders, including Plaintiff, that such transfers would result in receiving equivalent

shares in "NEWCO," a purported entity with distinct assets and improved interests. Relying on

these representations, Plaintiff transferred all 100 shares to AST. Subsequently, Plaintiff learned

that no legitimate plans for NEWCO existed and the promised asset transfers were materially

false inducements. Furthermore, Plaintiff alleges McCabe and Brda possessed critical evidence

that Charles Schwab had initiated the U3 trading halt due to extreme market volatility, yet

deliberately withheld this material information. Such intentional concealment constitutes a

breach of fiduciary duties under Texas law and federal securities statutes, as established in TSC

Industries, Inc. v. Northway, Inc., 426 U.S. 438 (1976) and Southland Securities Corp. v. INSpire

Insurance Solutions, Inc., 365 F.3d 353 (5th Cir. 2004).

153. On December 9, 2022, FINRA imposed a U3 trading halt on MMTLP shares. As a

self-regulatory organization operating under delegated authority from the SEC, FINRA

justified the halt by citing "extraordinary circumstances." This action left investors unable to access their investments, with no clear resolution provided.

154. FINRA justified the U3 trading halt with the following statement:

"FINRA has determined that an extraordinary event has occurred or is ongoing that has caused or has the potential to cause significant uncertainty in the settlement and clearing  process for shares of MMTLP and that, therefore, halting trading and quoting in MMTLP is necessary to protect investors and the public interest."

155. In the same FINRA notice announcing the halt of MMTLP dated December 9, 2022, FINRA clarified that the trading halt would remain in effect until the deletion of MMTLP, scheduled for December 13, 2022.

156. While any subsequent reference to the FINRA U3 halt after December 13, 2022, is acknowledged as technically accurate, Plaintiff emphasizes that from a practical perspective, trading effectively ended on December 9, 2022. Despite the official lift date, no actionable resolution or remedy has been provided as of December 4, 2024, leaving shareholders without recourse for a total of 726 days.

157. FINRA's authority to issue such halts is derived from its statutory role under the Securities Exchange Act of 1934, and the halt applied to securities trading across the U.S. financial markets.

158. While the halt was ostensibly intended to address market irregularities, FINRA's structure as a private entity wielding quasi-governmental powers without direct executive oversight raises questions under the separation of powers doctrine.

159. As a privately governed organization, FINRA's Board of Governors is neither
appointed by the President of the United States nor subject to the checks and balances typically
applied to federal agencies. This structure prompts constitutional considerations relevant to
FINRA's governance and actions.

160. From its establishment as an SRO (self-regulatory organization) under the Maloney Act
amendments to the Securities Exchange Act of 1934, FINRA has exercised significant regulatory
powers. These include the ability to enact rules, conduct investigations, and impose
sanctions—functions typically reserved for federal agencies.

161. These powers were evident during FINRA's issuance of the U3 trading halt on
MMTLP shares on December 9, 2022, an action with significant financial and legal
implications for investors.

162. However, FINRA's governance by a private, membership-based Board of Governors raises
structural questions about its authority to take such impactful actions. This board is neither
appointed by the President of the United States nor confirmed by the Senate, operating outside
the framework outlined in the Appointments Clause of the U.S. Constitution, which ensures
accountability for individuals wielding significant federal authority.

163. In the week following the FINRA U3 halt, Schwab sent emails to MMTLP shareholders,
including Ms. Gwendolyn Mickens and Mr. Anthony Erbacher, stating that even if the U3 halt
were resolved, Schwab would not permit shareholders to trade MMTLP shares.

164. Although NBH submitted and received approval for its S-1 filings and amendments in 2022,
position-close-only restrictions were not enforced for MMTLP shares prior to the U3 halt. Such

52

restrictions could have limited new short positions and helped stabilize the market during the transition.

165. On February 6, 2023, Cromwell Coulson, President of OTC Markets, publicly acknowledged via a tweet that short positions still existed in NBH, despite its status as a private company not intended for public trading.

166. Coulson further stated that resolving these short positions would be "easier if NBH shares became publicly trade-able," implicitly highlighting the complications caused by FINRA's trading halt of MMTLP shares and the unresolved discrepancies in share counts.

167. FINRA released its initial FAQ regarding the MMTLP corporate action and U3 trading halt on March 16, 2023, 97 days after the halt was imposed. The FAQ failed to clearly define the "extraordinary event" that justified the halt, leaving shareholders without sufficient clarity or explanation.

168. Despite receiving thousands of complaints from shareholders via Schwab, FINRA, the SEC, and Congressional Representatives, this FAQ remains, to date, FINRA's only significant communication with shareholders regarding the halt.

169. On February 20, 2023, Fleming, a TD Ameritrade (later Schwab) employee, admitted during a conversation with Traudt that the U3 halt of MMTLP trading on   December 9, 2022, was requested by broker-dealers to "protect ourselves," directly       acknowledging that institutional interests, rather than retail investor protection, were the primary motivation.

170. This conversation, recorded by TD Ameritrade (TDA) and later Schwab, was initially made available for playback at Traudt's request but was subsequently denied. *(Traudt v. Rubenstein, 2024)*

171. In March 2024, Traudt again sought access to these recordings from Schwab's trade desk, which had acquired TD Ameritrade. Schwab also refused to release the audio. These repeated refusals suggest a coordinated effort to suppress evidence that could reveal the reasons behind the trading halt. *(Traudt v. Rubenstein, 2024)*

172. On April 18, 2023, Clifton DuBose, CEO of NBH, sent a letter to FINRA requesting assistance in addressing unresolved issues arising from the MMTLP spin-off. The letter specifically asked for access to the Blue Sheets, which contain detailed trade data.

173. In the context of MMAT and its preferred shares MMTLP, Blue Sheets could provide critical insights into trading activities during the period of alleged market manipulation and synthetic share creation.

174. For example, during the two-day trading window for MMTLP in December 2022, which ended with FINRA's U3 trading halt, Blue Sheets could reveal the number of trades executed, the counter-parties involved, and whether the transactions involved legitimate shares or synthetic ones.

175. Given allegations of naked short selling and the creation of synthetic shares, a regulatory analysis of Blue Sheets would expose discrepancies between the total volume of shares traded and the actual number of legitimate shares issued, or it could disprove such allegations.

176. If regulators were to release Blue Sheets for MMAT and MMTLP, they could uncover the extent of market irregularities alleged by retail investors and advocacy groups.

177. For instance, these records might highlight unusually high trade volumes that exceeded the total outstanding shares, corroborating claims of synthetic shares.

178. Furthermore, the data could reveal whether broker-dealers and market makers engaged in practices such as failure-to-deliver (FTD) settlements or improper short selling, which may have depressed the stock price or caused financial harm to shareholders.

179. The lack of Blue Sheet transparency in the MMTLP case has been a critical point of contention for investors seeking clarity regarding the abrupt U3 trading halt and its impact on their holdings.

180. The release of Blue Sheets for MMTLP and MMAT would provide a definitive account of trading activity, enabling allegations of irregularities, such as synthetic share creation or naked short selling, to be substantiated or dis-proven.

181. Access to this data would not only clarify trading activity but could also serve as evidence in legal or regulatory actions addressing potential misconduct. Such transparency is essential to restoring investor trust and ensuring accountability for any wrongdoing.

182. Clifton DuBose, CEO of NBH, outlined concerns in his communication regarding outstanding short positions in NBH shares and the negative impact on investors caused by FINRA's actions, including the December 9, 2022, trading halt.

183. The letter also proposed a temporary trading period to facilitate the reconciliation of shares and sought FINRA's cooperation in addressing discrepancies to maintain market integrity.

184. FINRA, however, did not concur with Du Bose's recommendations and failed to provide any meaningful remedy in its response letter dated June 7, 2023.

185. On January 15, 2024, NBH executives, including CEO Clifton DuBose and CFO Luke Hawkins, resigned without addressing shareholder concerns about unresolved trading issues during the MMTLP-to-NBH transition. These resignations occurred amidst ongoing market uncertainty.

186. A supplemental FAQ was published by FINRA on November 6, 2023, 332 days after the trading halt. Like the initial FAQ, this document failed to clearly define the "extraordinary event" that warranted the halt.

187. Despite tens of thousands of complaints submitted by shareholders through Schwab, FINRA, the SEC, and Congressional Representatives, the supplemental FAQ marked only the second significant communication from FINRA about the halt.

188. To date, these two FAQs remain FINRA's only substantive communications with shareholders regarding the trading halt.

189. On September 27, 2023, during a House Financial Services Committee hearing, Representative Ralph Norman questioned SEC Chair Gary Gensler about MMTLP.

190. Norman inquired if Gensler was familiar with MMTLP and aware of its aggregate share count as of December 8, 2022. Gensler appeared to vaguely acknowledge familiarity with

MMTLP.  He admitted he did not know the specific share count and suggested that the information might be publicly available. This was a false statement.

1915. Dissatisfied with the SEC's responses, Norman indicated plans to send another letter seeking detailed information.

192. On December 22, 2023, Representative Ralph Norman led an open letter addressed to FINRA and the SEC concerning the MMAT Series A Preferred Shares MMTLP. This letter was co-signed by 74 members of Congress.

193. On February 2, 2024, 6 days after the deadline on the open letter, Gensler, Chairman of the SEC responded by letter.  In this letter, Gensler stated that requests for information sought by FINRA, and for analyses performed by FINRA, are best answered by FINRA. Thus, Gensler, referred these members of Congress back to FINRA.

194. Within this same letter, Gensler directed Congress to the public disclosures from NBH to ascertain the shares outstanding. Thus avoiding all discussion of short interest, FTD's.

195. This same letter also stated that the blue sheets and the CAT data are kept confidential and are protected by exemptions to FOIA. It further went on to state that because the SEC performs enforcement investigations on a confidential basis, they cannot acknowledge the existence or non-existence of any investigations unless or until charges are filed.

196. On February 6, 2024 Representative Ralph Norman posted a copy of the response letter from the SEC. Stating that he'd "just received an empty response from the SEC,"  and that this was "COMPLETELY UNACCEPTABLE!!!"

197. On June 5, 2024, over 40 Members of Congress, led by Representatives Ralph Norman and Pete Sessions, sent a follow-up letter to SEC Chairman Gary Gensler. The letter reiterated requests for an investigation into FINRA's U3 halt on MMTLP shares and the subsequent unresolved trading discrepancies.

198. The letter emphasized that FINRA's actions led to widespread investor harm and confusion, referencing over 40,000 letters from affected constituents. It called for transparency, an independent audited share count, and a briefing on the SEC's findings.

199. As of December 04, 2024, there is no publicly available information indicating that Representative Ralph Norman's letter to the SEC and FINRA regarding MMTLP has led  to any significant regulatory actions or policy changes.

200. While these two letters, co-signed by 114 members of Congress, called for a comprehensive review of the events surrounding MMTLP, the SEC and FINRA have not publicly disclosed any substantial measures taken in response.

201.  Brda and CEO George Palikaras of MMAT were charged by the SEC with securities fraud on June 25, 2024.

202. MMAT declared bankruptcy on August 9, 2024. Its final filing under CIK  0001431959 occurred on September 20, 2024.

203. On or about July 15, 2022, NBH received its own Central Index Key (CIK) number, 0001936756, in preparation for its planned spin-off from MMTLP. This was the same CIK initially assigned to Pole Perfect, subsequently used by TRCH, then MMAT, and now NBH, while MMAT remains a legal entity.

204. On October 2, 2024, University Lands (hereinafter referred to as "UL") issued a formal termination letter to Hudspeth, citing breaches of the Development Unit Agreement (DUA) due to non-payment of annual royalties and Hudspeth's failure to fulfill its drilling obligations for the 2024 operational year. The termination highlighted Hudspeth's lack of concrete future development plans, further violating the agreement's terms. UL demanded the lease be released within 90 days, retaining the right to pursue legal remedies if Hudspeth failed to comply with environmental responsibilities, including plugging existing wells and land remediation.

205. In response to the October 2, 2024, lease termination, McCabe, Chairman and CEO of NBH, expressed disappointment with UL' decision, framing it as a setback for the company.

206. However, NBH has taken no formal corporate measures to address the lease termination, leaving shareholders questioning the company's commitment to the Orogrande project and its broader operational strategy. This inaction has further fueled concerns about NBH's management and the viability of its core assets.

207. In early November 2024, a small group of investors got together and drafted a Shareholder Request for Information (RFI) in an effort to get answers from NBH  regarding multiple issues, such as the lost UL Lease.

208. The RFI was sent separately by Plaintiff and approx. 9 other shareholders. The RFI letters were sent via email to the NBH Investor Relations website. The emails were confirmed as early as November 11, 2024. Additionally, these RFI's were sent by USPS Registered &/or Certified Mail to NBH's registered address at 6300 Ridglea Pl, Suite 950, Fort Worth, TX, 76116. Investors were informed of receipt of these letters as early as November 13, 2024 via the USPS.

209. Despite the legal rights granted under Texas Business Organizations Code Section 21.218 and Nevada Revised Statutes  Chapter 78.257, NBH failed to provide any response to the multiple letters sent via email and certified mail. These Request for Information (RFI) letters requested a response within a specified 14-day deadline.

210. Having gotten no response to the RFI, these same shareholders together with Spears drafted a formal demand for a Books and Records Check (BRC). This document condensed the questions asked on the RFI. Shareholders deliberately chose fewer questions and asked for less documentation than requested in the RFI. This decision was made to give McCabe every opportunity to meet the 3-day turn around deadline.

211. In an effort to offer transparency and clarity, the shareholders used a licensed Texas process server to serve McCabe with the BRC. Thus all parties would be aware of the exact deadline, given the 3-day deadline.

212. The first attempt of service was attempted at 6300 Ridglea Place, Suite 950, Fort Worth, TX 76116. NBH filed a 10-Q with the SEC on September 30, 2024 which provided this address.

213. On Sunday, November 17, 2024, Spears provided the BRC document to the licensed process server along with the address for service. On Monday, November 18, 2024, Spears was informed by the process server that the NBH was no longer located at the given address. This also added a new level of concern as the company moved without notifying investors, the SEC nor The Texas Secretary of State.

214. Spears then located a business address for McCabe Petroleum Corporation (MPC). The BRC, requesting lawful shareholder access to records held by NBH and McCabe, was finally served on November 19, 2024 when McCabe accepted service at 500 W Texas Ave Ste 890, Midland, TX 79701.

215. To date, no response has been received from McCabe or NBH to either the RFI or BRC further compounding shareholder concerns about transparency and corporate governance.

216. This lack of response obstructed the shareholder's ability to assess management practices, investigate share discrepancies, and address unresolved concerns, raising   significant questions about transparency and NBH's adherence to fiduciary obligations.

217. On November 22, 2024, Auxier, one of the shareholders represented by both the RFI and BRC, issued a Formal Demand Letter to NBH Board of Directors. This demand letter reiterated entitlement to corporate records under Texas Business Organizations Code Section 21.218 and applicable federal securities laws.

218. The demand letter specifically sought explanations regarding the withdrawal of the SEC S-1 filing, the termination of the University Lands Lease and justifications for a $2 million loan obtained at above-average interest rates.  Many other questions were asked. Auxier, Spears and the other investors are still waiting for answers.

219. On November 25, 2024, NBH issued an official communication via investor  relations email. Amid the announcements, they rather matter of factly added that the company had relocated its corporate offices from Fort Worth to Midland.

220. NBH offered no explanation as to why the company withheld this information from the SEC and investors. Nor was there any acknowledgment of what day the company made this move in office locations.

221. The announcement only offered "Midland" as the new address of the new location. This contradicted the last two NBH filings with the SEC which were filed September 30, 2024 and October 8, 2024. Both of these filings listed the Fort Worth address as its business location.

222. NBH's failure to provide the requested documentation or address substantive inquiries within the specified response period highlights serious concerns about corporate transparency and potential violations of fiduciary duties to its shareholders.

223. Throughout 2021 and 2024, regulatory bodies including SEC and FINRA did not coordinate effectively to address market irregularities in TRCH, MMAT, and MMTLP trading. This lack of coordination contributed to prolonged issues with share reconciliation and investor harm.

224. Throughout 2022 and 2023, regulatory bodies including FINRA, the SEC, and the DTCC failed to effectively coordinate in addressing market irregularities in TRCH, MMAT, and MMTLP trading. This lack of coordination contributed significantly to unresolved share reconciliation issues, investor confusion, and financial harm.

225. Throughout 2023 and 2024, shareholders with valid CUSIP records experienced ongoing discrepancies in share reconciliation during the MMTLP-to-NBH transition. These discrepancies remain unresolved, leaving some shareholders without clarity on their holdings.

226. As of the present date, the SEC website has not assigned a CUSIP number for NBH and its shares, leaving its securities without a standardized identifier for trading or record-keeping purposes.

227. This absence creates challenges in identifying and managing transactions involving NBHs' common stock, complicating compliance with financial reporting standards and market transparency.

228. The lack of a CUSIP number for NBH highlights a gap in ensuring the orderly trading and tracking of its securities within financial markets.

229. It has been well established that over 18 different internal CUSIPs are or have been used to track MMTLP holdings in various Broker/ Dealers; such as Robinhood, TradeStation, E*Trade, JP Morgan, Fidelity, Vanguard, Interactive Brokers, among many others.

230. TDA used internal CUSIP 6DA993019, and Schwab used internal CUSIP 629999590 to track MMTLP shares that have not yet been converted to NBH through the transfer agent AST/ EQ almost two years after the spin-off to NBH.

231. While the definitive number of outstanding shares still held by broker-dealers through internal CUSIPs and not registered with AST/EQ is undetermined, even a single share not being reconciled highlights a significant issue.

232. Reports and social media posts featuring redacted brokerage statements indicate that hundreds of individuals, collectively holding thousands of shares, remain affected. In total, thousands, if not millions, of shares remain non-reconciled more than two years after the spin-off, irrespective of the FINRA-imposed U3 halt.

233. The inability to reconcile all MMTLP shares to NBH shares, years later at AST/ EQ, highlights a major gap in ensuring the orderly trading and tracking of its securities within financial markets.

234. In January 2021, the Game stop (GME) event unfolded as retail investors, coordinated through social media platforms like Reddit's WallStreetBets, initiated a short squeeze targeting heavily shorted stocks. This led to Game stop's stock price surging over 1,000% within days.

235. Regulators, including the SEC, responded swiftly with public statements about market volatility and integrity, and brokerages such as Robinhood imposed temporary trading restrictions, citing liquidity concerns. These restrictions, while controversial, were quickly lifted, allowing GME trading to resume.

236 Congressional hearings were convened within weeks, featuring testimony from Robinhood executives, hedge funds, and retail advocates, while regulators pledged to  investigate systemic risks exposed by the volatility.

237. The Games top event ultimately received widespread media attention, immediate regulatory acknowledgment, and a comprehensive examination of its impact on retail investors and the broader market.

238. In stark contrast, the MMTLP event began on December 9, 2022, when FINRA issued a sudden U3 trading halt on MMAT's Series A Preferred Shares (MMTLP) just two days before their planned transition into NBH, a private company.

239. Unlike Game stop, where trading resumed promptly after temporary restrictions, the MMTLP trading halt has remained in effect for 725 days as of December 4, 2024. FINRA cited

an "extraordinary event" to justify the halt but failed to provide a detailed  explanation at the time.

240. Despite tens of thousands of complaints submitted to FINRA, the SEC, and Congressional Representatives, no Congressional hearings or meaningful investigations have taken place. Shareholders remain unable to trade their positions, and MMTLP investors continue to face financial harm with no clear recourse.

241. Unlike Game stop, which received immediate regulatory scrutiny and resumed trading, MMTLP investors have endured prolonged inaction and a lack of accountability, highlighting significant disparities in how the two events were addressed.

242. Contrasting the immediate regulatory response and public scrutiny surrounding the GameStop trading episode with the prolonged regulatory inaction and neglect experienced by MMTLP shareholders underscores significant disparities in governmental engagement and protection afforded to retail investors. Such inconsistency raises serious concerns regarding the fairness, transparency, and effectiveness of regulatory oversight in U.S. financial markets.

243. Institutional market participants, including broker-dealers and market makers, profited from illegal shorting during the MMTLP transition. Retail investors, however, experienced significant financial losses as a result of these trading practices.

244. These institutional participants stand to make considerable profits by not closing their short positions, particularly when illegal short selling is used as a trading tactic. If NBH were to declare bankruptcy, all shares would become worthless, relieving short sellers of all financial liabilities, regardless of the FINRA-imposed U3 halt.

245. The prolonged inaction by regulatory bodies, over the last two years, combined with unresolved trading irregularities, has contributed to diminished trust in the transparency and fairness of U.S. financial markets.

246. Institutional market participants engaged in trading practices involving the illegal shorting of MMTLP shares that created an oversupply in the market. This artificial oversupply contributed to the suppression of legitimate share prices.

247. To date, FINRA has refused all attempts to provide access to the Blue Sheet records for MMAT and MMTLP, despite repeated requests from shareholders, legal and government representatives, or advocacy groups seeking transparency regarding trading activity.

248. This lack of disclosure has obstructed efforts to investigate allegations of naked short selling, synthetic share creation, and market manipulation during the trading periods in question. Specifically, Blue Sheet data is critical to understanding the abrupt and unprecedented U3 trading halt of MMTLP shares on December 9, 2022, and whether such actions were influenced by irregular or unlawful trading practices.

249. FINRA's refusal to release these records has exacerbated the financial and emotional harm suffered by retail investors and has raised significant concerns about regulatory accountability and oversight in safeguarding market integrity.

250. Shareholders, including Plaintiff, have repeatedly requested comprehensive audits of MMTLP share discrepancies to differentiate legitimate shares from synthetic or improperly issued shares. However, as of December 4, 2024, no such comprehensive audit has been

performed, leaving critical questions unresolved regarding outstanding share counts and continued market irregularities.

251. Illegal short selling and trading irregularities during the MMTLP-to-NBH transitions have contributed to financial harm for retail investors. These actions have highlighted vulnerabilities in market oversight, transparency, and enforcement.

252. The U3 halt and the prolonged lack of resolution for investors highlight the potential concerns stemming from FINRA's privately governed structure, as it may bypass  safeguards designed to promote transparency and oversight.

253. FINRA's authority over market participants, particularly in cases of disciplinary or enforcement actions like the trading halt, underscores its substantial role in securities regulation and the constitutional considerations of its accountability and governance.

254. Questions regarding FINRA's constitutional role have been articulated in legal principles, particularly those involving the non-delegation doctrine, and are highly relevant to its handling of the MMTLP U3 trading halt issued on December 9, 2022.

## COUNT I:

### Violation of the Securities Exchange Act of 1934 (15 U.S.C. § 78) – Against All Defendants

1. Plaintiff alleges that Defendants McCabe and Brda knowingly disseminated materially false asset valuations and misleading narratives regarding short squeezes through explicitly identified social media influencers and proxy stock promoters. Plaintiff asserts these communications were timed to coincide with Defendants' substantial personal share sales, demonstrating direct personal gain, clearly satisfying scienter standards under the PSLRA.

2. Defendants violated Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 by engaging in manipulative practices, including undisclosed paid promotions, dissemination of false information, and failing to ensure market transparency, thereby undermining investor confidence, distorting market conditions, and violating federal securities laws.

3. Defendants violated Section 9(a) (15 U.S.C. § 78i(a)) by intentionally manipulating the price of MMTLP shares through artificial and deceptive trading conditions.

4. FINRA and the SEC violated Section 17(a) (15 U.S.C. § 78q(a)) by failing to maintain accurate records and transparency during the critical transition from MMTLP to NBH, causing direct financial harm to investors.

5. Brda and McCabe violated Section 13(d) (15 U.S.C. § 78m(d)) by failing to disclose material information regarding beneficial ownership and share-count discrepancies, misleading investors and impairing their ability to make informed investment decisions.

6. Brda, McCabe, and NBH violated Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 by

hiring, compensating, and orchestrating undisclosed paid proxies and promoters to deliberately disseminate false and misleading information, and coordinating cyberbullying, cyberstalking, and targeted harassment campaigns against investors, manipulating market conditions, suppressing dissent, and evading accountability.

7. Jane and John Does, acting as paid proxies and promoters under direction from Defendants Brda, McCabe, and NBH, violated Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 by engaging in coordinated manipulative activities, including cyberbullying, cyberstalking, harassment, and deceptive information dissemination intended to suppress dissent, obstruct transparency, and manipulate investor decisions.

8. FINRA and the SEC violated Section 17A(a)(1) (15 U.S.C. § 78q-1(a)(1)) by failing to resolve the U3 halt timely and transparently, depriving shareholders of access to their investments and violating their constitutional due process rights.

9. FINRA and the SEC violated Section 19(c) (15 U.S.C. § 78s(c)) and Section 6(b)(5) (15 U.S.C. § 78f(b)(5)) by establishing and maintaining regulatory rules and practices, such as the U3 halt, that inadequately protected investors and allowed unchecked fraudulent activities, including illegal short selling, illegal short positions, and related manipulative practices, thereby undermining market integrity and investor confidence.

10. FINRA violated Section 19(c) (15 U.S.C. § 78s(c)) by implementing and enforcing regulatory actions, including the U3 halt, that directly conflict with its statutory mandate to protect investors and maintain orderly market conditions, causing substantial disruption and harm.

11. FINRA and the SEC violated Plaintiff's constitutional rights under the Fifth Amendment's

Due Process Clause (U.S. Const. amend. V), and Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)),

by failing to provide adequate oversight, timely communication, transparency, or corrective

actions, thus depriving Plaintiff of protected property interests without due process of law.

12. Plaintiff asserts FINRA and the SEC exceeded discretionary regulatory boundaries by

engaging in or permitting deliberate acts that systematically ignored or suppressed evidence of

market manipulation, specifically evidenced through FOIA-obtained communications

acknowledging but neglecting to act on substantial market irregularities, thus breaching statutory

duties explicitly enumerated under the Securities Exchange Act and actionable under the APA

## COUNT II

## Violation of the Sherman Antitrust Act (15 U.S.C. §§ 1–2) and Clayton Act (15 U.S.C. §§ 15–23) – Against SEC and FINRA

1. FINRA violated Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 6(b)(5) of the

Exchange Act (15 U.S.C. § 78f(b)(5)) by colluding with market participants, including

broker-dealers, hedge funds, and market makers, to facilitate or negligently permit illegal short

selling activities and related anti-competitive practices, substantially restricting market

competition and causing financial harm to retail investors.

2. The SEC violated Section 2 of the Sherman Act (15 U.S.C. § 2) and Section 19(c) of the

Exchange Act (15 U.S.C. § 78s(c)) by negligently allowing monopolistic conditions and

unchecked illegal short selling activities, thereby restricting competition, distorting market

pricing, and causing direct harm to retail investors.

3. FINRA violated Section 4 of the Clayton Act (15 U.S.C. § 15) and Section 10(b) (15 U.S.C. § 78j(b)), and Rule 10b-5 (17 C.F.R. § 240.10b-5), causing direct financial harm to Plaintiff and entitling Plaintiff to recover treble damages resulting from FINRA's facilitation and oversight failures related to illegal short positions, manipulative trading practices, and market disruptions.

4. Plaintiff alleges FINRA directly facilitated anticompetitive conditions by selectively enforcing trading halts, notably the unprecedented U3 halt on MMTLP, effectively aiding institutional short-sellers in manipulating market dynamics and restricting retail investors' ability to participate freely, thus constituting direct antitrust harm and violations clearly recognized under Sherman Act § 1.5. FINRA and the SEC violated Section 13 of the Clayton Act (15 U.S.C. § 23) and Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)) by failing to enforce fair trading practices and regulatory standards consistently, thereby permitting discriminatory treatment of retail investors, widespread illegal short positions, and facilitating monopolistic and abusive market activities causing substantial harm.

## COUNT III:

### Negligence – Against All Defendants

1. Brda, McCabe, and NBH violated Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) by negligently permitting the unchecked proliferation of illegal short positions, directly harming investors and undermining market integrity.

2. Brda, McCabe, and NBH violated Section 13(b)(2)(A) (15 U.S.C. § 78m(b)(2)(A)) and Rule

13b2-1 (17 C.F.R. § 240.13b2-1) by negligently failing to maintain accurate financial records and transparency concerning MMTLP's true share structure and shareholder ownership, misleading investors and regulators.

3. Brda, McCabe, and NBH violated Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) by negligently hiring and compensating undisclosed proxies and paid promoters who disseminated materially false, misleading, and incomplete information, causing investor confusion and financial harm.

4. Brda, McCabe, and NBH violated Section 13(b)(2)(B) (15 U.S.C. § 78m(b)(2)(B)) and Rule 13b2-2 (17 C.F.R. § 240.13b2-2) by negligently failing to establish and enforce effective internal control mechanisms and oversight, facilitating widespread securities violations and fraudulent conduct detrimental to investors.

5. FINRA and the SEC violated Section 19(c) (15 U.S.C. § 78s(c)) and Section 6(b)(5) (15 U.S.C. § 78f(b)(5)) by negligently failing to enforce federal securities laws and regulations, allowing manipulative market practices and illegal short positions, directly harming investor confidence and market stability.

6. FINRA and the SEC violated Section 17A(a)(1) (15 U.S.C. § 78q-1(a)(1)) by negligently permitting persistent settlement failures, share-count discrepancies, and manipulative trading practices involving illegal short positions in MMTLP, resulting in direct financial harm to investors and undermining the integrity of securities markets.

## COUNT IV:

### Failure to Resolve the FINRA U3 Halt – Against All Defendants

1. The SEC and FINRA violated Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)) by failing to promptly and transparently resolve the U3 trading halt on MMTLP shares, directly depriving investors of timely access to their investments and undermining market confidence.

2. The SEC and FINRA violated Plaintiff's constitutional rights under the Fifth Amendment and Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)) by failing to promptly lift, adequately explain, or address the U3 halt, resulting in denial of investors' protected property interests without due process, and causing ongoing financial harm and uncertainty.

3. The SEC and FINRA violated Section 17A(a)(1) (15 U.S.C. § 78q-1(a)(1)) by neglecting their statutory duty to facilitate prompt and accurate clearance, settlement, and resolution of securities transactions impacted by the halt, allowing illegal short positions to remain unresolved and causing substantial investor losses.

4. FINRA violated Section 19(c) (15 U.S.C. § 78s(c)) by failing to establish or maintain regulatory practices capable of adequately protecting investors from prolonged harm due to the unresolved U3 halt, allowing illegal short positions to persist and severely disrupting market conditions.

5. The SEC violated Section 19(c) (15 U.S.C. § 78s(c)) by failing in its statutory oversight duties over FINRA, permitting prolonged regulatory inaction, unresolved illegal short positions, and sustained harm to investor confidence and market integrity.

6. Brda, McCabe, and NBH violated Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 (17

C.F.R. § 240.10b-5) by failing to take corrective action regarding the FINRA U3 halt despite

their clear knowledge of ongoing market manipulation, unresolved illegal short positions, and

investor harm.

7. Brda, McCabe, and NBH violated Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 by

breaching their fiduciary duties through failure to meaningfully address or rectify the regulatory

disruptions from the U3 halt, thereby exacerbating investor harm, market uncertainty, and

financial losses related to ongoing illegal short positions.

## COUNT V:

### Unjust Enrichment – Against All Defendants

1. Defendants Brda, McCabe, and NBH violated Section 29(b) (15 U.S.C. § 78cc(b)) and Rule

10b-5 (17 C.F.R. § 240.10b-5) by unjustly enriching themselves through coordinated

promotional schemes and undisclosed compensation to paid proxies and promoters, thereby

inflating share prices and facilitating illegal short positions at investors' expense.

2. Defendants FINRA and the SEC violated Section 29(b) (15 U.S.C. § 78cc(b)) by unjustly

receiving and retaining fees, assessments, or other financial benefits while failing to enforce

securities laws effectively, directly enabling fraudulent market conditions and allowing illegal

short positions that harmed Plaintiff and other investors.

3. Defendants unjustly profited from investor harm caused by market manipulation, prolonged

trading halts, and illegal short selling, retaining monetary gains that resulted from artificially

distorted share prices, in violation of Rule 10b-5 (17 C.F.R. § 240.10b-5) and Section 29(b) (15 U.S.C. § 78cc(b)).

4. Jane and John Does violated Section 29(b) (15 U.S.C. § 78cc(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) by unjustly enriching themselves through undisclosed payments received as proxies and stock promoters, deliberately participating in deceptive schemes—including coordinated cyberbullying, stalking, harassment, and targeted intimidation—to facilitate and maintain illegal short positions, causing Plaintiff significant emotional distress, humiliation, and harm. Plaintiff seeks disgorgement of all payments received by these individuals, asserting entitlement to such proceeds as equitable compensation for damages.

## COUNT VI:

## Conspiracy to Commit Fraud – Against All Defendants

1. Defendants Brda, McCabe, NBH, and Jane and John Does violated Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) by conspiring to disseminate materially false and misleading information through undisclosed proxies and stock promoters, deliberately misleading investors, artificially inflating share prices, and facilitating illegal short positions.

2. FINRA and the SEC violated Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 by knowingly or negligently conspiring with, or permitting conspiracy among, market participants to facilitate, conceal, and perpetuate illegal short positions, directly harming Plaintiff and other investors.

3. Defendants violated 18 U.S.C. § 371 by conspiring among themselves, and with other entities

or individuals, to intentionally obstruct regulatory enforcement and oversight by the SEC and FINRA, facilitating illegal short positions, deceiving federal regulatory authorities, and undermining the integrity of the U.S. securities markets.

4. Defendants violated 18 U.S.C. § 1349 by participating in and facilitating an ongoing conspiracy involving wire communications, electronic dissemination of fraudulent information, and coordinated market manipulation schemes—including illegal short selling—designed to defraud investors, including Plaintiff, of property and financial interests.

5. Defendants Brda, McCabe, NBH, and undisclosed paid proxies (Jane and John Does) conspired to utilize cyberbullying, cyberstalking, and harassment as deliberate tools of market manipulation and investor suppression, furthering their fraudulent scheme and maintaining illegal short positions, in violation of Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5.

6. Plaintiff provides explicit evidence indicating Defendants coordinated through undisclosed paid proxies and influencers—clearly identified through financial arrangements, NDAs, and documented communication exchanges with Defendants McCabe and Brda—executing a common plan to manipulate market sentiment, thus constituting clear conspiracy under federal law.

## COUNT VII:

## Failure to Supervise – Against FINRA and SEC

1. FINRA and the SEC violated Section 15(b)(4)(E) (15 U.S.C. § 78o(b)(4)(E)) by failing to supervise broker-dealers and market makers adequately, enabling manipulative practices, including illegal short selling and the creation of illegal short positions.

2. FINRA and the SEC violated Rule 15c3-5 (17 C.F.R. § 240.15c3-5) by failing to adequately implement, enforce, or supervise market access controls designed to detect, prevent, and eliminate illegal short selling and other abusive trading practices, resulting in substantial investor harm and widespread market manipulation.

3. FINRA and the SEC violated Section 15(b)(4)(E) (15 U.S.C. § 78o(b)(4)(E)) and Rule 15c3-5 (17 C.F.R. § 240.15c3-5) by failing to adequately supervise regulatory personnel, allowing conflicts of interest and ineffective enforcement practices, including selective oversight and inadequate investigation of known illegal short positions, thereby enabling investor harm and market instability.

4. FINRA and the SEC violated Section 15(b)(4)(E) (15 U.S.C. § 78o(b)(4)(E)) by failing to properly supervise broker-dealers and market makers engaging in prohibited trading practices, specifically illegal short selling and the establishment of illegal short positions, directly harming investors and undermining public trust.

5. FINRA and the SEC violated Section 15(b)(4)(E) (15 U.S.C. § 78o(b)(4)(E)) by failing to properly supervise and enforce regulatory controls, negligently permitting broker-dealers and market makers to engage in illegal short selling and maintain illegal short positions, causing significant investor harm and systemic market disruption.

## COUNT VIII:

### Emotional Distress (Negligent or Intentional Infliction) – Against All Defendants

1. Brda, McCabe, and NBH violated Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) by intentionally orchestrating harassment, cyberbullying, and targeted intimidation campaigns through paid proxies, foreseeably causing significant emotional distress, humiliation, anxiety, and substantial disruption of Plaintiff's personal and social relationships.

2. Jane and John Does violated Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) through coordinated cyberstalking, harassment, and targeted emotional abuse, intentionally or negligently causing Plaintiff emotional harm, humiliation, anxiety, and degradation.

3. FINRA and the SEC violated Section 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)) by recklessly failing to address, investigate, or mitigate market manipulation, illegal short positions, cyberbullying, and investor intimidation, foreseeably causing Plaintiff severe emotional distress and prolonged mental anguish through regulatory inaction and uncertainty surrounding the U3 halt.

4. Defendants collectively violated Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) by engaging in negligent and intentional conduct designed to intimidate investors, suppress dissent, obstruct transparency, and facilitate illegal short positions, foreseeably causing Plaintiff severe emotional distress, social isolation, and reputational damage.

Docusign Envelope ID: 6C651456-D864-43A9-AE1A-4698F78D1BD0

5. Plaintiff explicitly asserts Defendants orchestrated targeted, systematic social media harassment and cyberstalking, explicitly designed to silence legitimate investor concerns through direct intimidation and humiliation, supported by detailed documentation of specific public instances, causing direct and demonstrable emotional harm.

## COUNT IX

### Petition for Writ of Mandamus Against SEC

1. Plaintiff respectfully requests that this Court issue a Writ of Mandamus compelling the SEC and FINRA to immediately and fully perform their mandatory statutory duties pursuant to the Securities Exchange Act of 1934 (15 U.S.C. § 78), specifically enforcing federal securities laws prohibiting naked short selling and associated manipulative practices involving MMTLP shares.

2. Plaintiff alleges and asserts that both regulatory entities have consistently failed or refused to uphold their legal obligations, permitting unchecked market manipulation, investor harm, and widespread violations of federal securities laws. Given the demonstrated regulatory failures and the resulting lack of investor confidence, Plaintiff further requests that the Court appoint an impartial third-party Special Agent to independently oversee and administer a controlled two-day trading event, explicitly structured to reconcile and close all open positions that are not legitimate long shares in MMTLP securities.

3. Plaintiff believes this combined remedy—a Writ of Mandamus to compel enforcement coupled with independent third-party oversight—is essential and appropriate, providing necessary accountability, transparency, and protection to harmed investors, while restoring market integrity and trust.

4. Plaintiff further requests that this Court's Writ of Mandamus compel the SEC and FINRA to produce a full and complete accounting of all MMTLP shares—including long, short and illegally short as documented through comprehensive electronic blue sheet data. Plaintiff respectfully requests that this data be promptly provided to the Court-appointed impartial third-party Special Agent, ensuring transparency, accuracy, and effective reconciliation during the mandated two-day trading event.

5. Plaintiff respectfully submits this request mindful of the Court's jurisdiction and discretion, seeking remedies narrowly tailored to address specific harms directly caused by regulatory inaction, neglect, or complicity.

6. Plaintiff has no other adequate remedy at law to compel the SEC to act. The SEC's ongoing failure to fulfill its mandatory duties constitutes unlawful withholding of agency action under the Administrative Procedure Act (5 U.S.C. § 706), leaving Plaintiff with no alternative but to seek a Writ of Mandamus from this Court.

## Specific Acts of Scienter as Defined Under the Private Securities Litigation Reform Act of 1995 (PSLRA) and Federal Rule of Civil Procedure 9(b):

1. FINRA

    a. Reckless issuance of the U3 halt (December 9, 2022):

    FINRA imposed an indefinite halt on MMTLP trading without adequate investigation or justification, despite clear knowledge of widespread illegal short positions and significant trading irregularities.

    b. Failure to resolve the U3 halt:

    FINRA neglected its statutory obligation to promptly and transparently resolve the halt, violating Section 19(c) (15 U.S.C. § 78s(c)) of the Securities Exchange Act, and causing prolonged financial and emotional harm to investors.

    c. Intentional inaction despite clear awareness:

    Despite documented evidence, public complaints, and clear indicators of extensive illegal short positions, FINRA intentionally failed to conduct meaningful investigations or enforce compliance with federal securities laws.

    d. Omission of material facts in public communications:

    FINRA knowingly or recklessly misled the market by failing to disclose the true reasons for the U3 halt or the corrective actions required to resolve ongoing illegal short positions and trading discrepancies.

2. SEC

    a. Failure to enforce compliance with federal securities laws:

The SEC negligently abandoned its oversight duties by failing to investigate or effectively address systemic market irregularities, including pervasive illegal short positions.

b. Complicity in FINRA's ongoing inaction:

The SEC allowed FINRA's U3 halt to persist indefinitely without mandating transparency or resolution, intentionally violating its statutory responsibilities under Sections 15A(b)(6) (15 U.S.C. § 78o-3(b)(6)) and 17A(a)(1) (15 U.S.C. § 78q-1(a)(1)) of the Securities Exchange Act.

c. Neglect of investor protection responsibilities:

Despite clear knowledge of investor harm caused by widespread illegal short positions, the SEC intentionally or recklessly failed to act in accordance with its explicit mission to protect retail investors and market integrity.

d. Deliberate regulatory apathy:

The SEC's failure to intervene, despite possessing authority and responsibility to supervise

FINRA, broker-dealers, and market makers, demonstrates intentional disregard and reckless indifference to systemic market manipulation involving illegal short positions.


3. Torchlight Energy Resources, Inc. (John Brda) and Next Bridge Hydrocarbons (Gregory McCabe)

a. Misrepresentation of asset valuations (Gregory McCabe):

McCabe knowingly or recklessly overstated the valuation of Orogrande Basin assets to artificially inflate shareholder expectations, attract investment capital, and facilitate illegal short selling activities detrimental to retail investors.

b. Encouraging trading despite known irregularities (John Brda):

Brda knowingly encouraged retail investors to purchase MMTLP shares while simultaneously offloading his own holdings, despite awareness of ongoing illegal short positions and severe market irregularities.

c. Failure to address known trading irregularities (Brda and McCabe):

Both Brda and McCabe intentionally or recklessly neglected their fiduciary obligations to investigate, disclose, and resolve known discrepancies related to illegal short positions, causing ongoing investor harm.

d. Misleading shareholders:

Leadership communications deliberately omitted critical information about known trading irregularities and illegal short positions, misleading shareholders regarding the true condition and value of their investments.

**PRAYER FOR RELIEF**

Plaintiff respectfully requests judgment in his favor, providing relief as follows:

Declaratory Judgment:

1. Declare Defendants' actions violated the Securities Exchange Act of 1934 (15 U.S.C. § 78), specifically Sections 10(b), 9(a), 13(d), 17(a), 17A(a)(1), 15A(b)(6), 13(b)(2)(A), 13(b)(2)(B), and 19(c), Rule 10b-5 (17 C.F.R. § 240.10b-5), Rule 13b2-1, Rule 13b2-2, Rule 15c3-5, the Sherman Antitrust Act (15 U.S.C. §§ 1–2), and the Clayton Act (15 U.S.C. §§ 12–27).

2. Declare FINRA's handling of the U3 trading halt on December 9, 2022, violated Plaintiff's Fifth Amendment due process rights by depriving Plaintiff of access to investments without timely resolution or adequate transparency.

Injunctive Relief:

1. Plaintiff respectfully requests the appointment of an impartial third-party Special Agent, independent of SEC and FINRA, to oversee and administer a court-supervised two-day trading event explicitly structured to reconcile and forcibly close all open illegal short positions in MMTLP shares, with positions forcibly closed at the higher of the closing market price or a price set by this Court.

2. Plaintiff requests an order compelling the SEC and FINRA to produce comprehensive electronic "blue sheet" data identifying all MMTLP shares, including legitimate long, short, and illegal short positions, and to deliver this data promptly to the court-appointed Special Agent.

3. Plaintiff respectfully requests this Court issue an injunction requiring FINRA and SEC to permanently establish effective oversight mechanisms to prevent the proliferation of illegal short positions, enforce securities laws consistently, and enhance transparency and public accountability.

84

4. Plaintiff respectfully requests this Court mandate complete transparency, including a public accounting and disclosure of all records, communications, and actions related to the FINRA U3 halt. Plaintiff requests the identities and actions of all FINRA, SEC, and external entities involved be fully disclosed to ensure public accountability.

5. Plaintiff respectfully requests that this Court declare FINRA's existing operational and regulatory structure unconstitutional due to inherent conflicts of interest stemming from its funding model, and order comprehensive structural reform or its replacement with a constitutionally compliant regulatory body.

6. Plaintiff asserts injunctive relief is narrowly tailored, proposing an impartial Special Agent appointed explicitly to reconcile and forcibly close illegal short positions over a defined, supervised two-day trading period, justifying this extraordinary equitable remedy as necessary due to regulatory failure, irreparable investor harm, and ongoing market instability.

Declaratory and Injunctive Relief Regarding FINRA:

Plaintiff respectfully requests the Court declare FINRA's current structure unconstitutional due to inherent conflicts of interest stemming from its self-funding and self-regulating design, which significantly compromises its impartiality and effectiveness in protecting retail investors. Plaintiff further requests that the Court order comprehensive structural reforms, increased transparency measures, independent oversight, or, if necessary, the dissolution and replacement of FINRA with a constitutionally compliant regulatory body to ensure fair and impartial enforcement of securities laws.

Compensatory and Monetary Relief:

1. Plaintiff seeks compensatory damages in an amount determined at trial, including compensation for financial losses caused by Defendants' violations, loss of liquidity, suppressed share value, and associated harms directly attributable to Defendants' misconduct involving illegal short positions.

2. Plaintiff requests compensatory damages of no less than $500,000 for emotional distress and mental anguish caused by Defendants' prolonged misconduct, lack of transparency, prolonged U3 halt, and targeted harassment campaigns.

3. Plaintiff requests treble damages pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15) for harm caused by Defendants' anti-competitive conduct, market manipulation, and maintenance of illegal short positions.

4. Plaintiff requests punitive damages sufficient to deter similar future misconduct by Defendants and others similarly situated.

5. Plaintiff respectfully requests the Court award Plaintiff disgorgement and divestiture of all illicit financial gains obtained by Defendants, including payments made to undisclosed proxies, promoters, and other parties involved in market manipulation and harassment campaigns.

Additional Relief:

6. Plaintiff respectfully requests that the Court recognize and compensate Plaintiff for significant burdens incurred in exhaustive attempts to seek resolution prior to litigation,

86

including extensive communications, complaints, and correspondence with the SEC, FINRA, DOJ, IRS, IC3, TD Ameritrade, Schwab, Senators, Congressional Representatives, state Attorneys General, and other governmental entities, as well as extensive collaborative efforts with fellow shareholders through social media platforms and direct communication channels.

7. Plaintiff requests a tax gross-up to fully offset any additional taxes arising from awarded damages or settlement payments.

8. Plaintiff requests reimbursement for all reasonable court costs, fees, and expenses incurred in pursuing this action, as deemed appropriate by the Court.

9. Plaintiff requests punitive damages sufficient to deter Defendants and similarly situated entities or individuals from future wrongful conduct involving market manipulation, investor intimidation, illegal short positions, and regulatory negligence.

10. Plaintiff requests any further relief that this Court deems just, proper, and equitable to fully remedy the harm caused by the Defendants' actions and regulatory failures, to restore market integrity, investor confidence, and Plaintiff's personal and financial well-being.


VIII.    <u>DEMAND FOR JURY TRIAL</u>

1. The Plaintiff hereby demands a trial by jury for all claims and issues that may be tried as of right pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: March 12, 2025

SIGN HERE

Signed by:

*Danielle Spears*

CAC0EAB17D654A1...

Danielle Spears, Pro Se

12206 West Harrison Street,

Avondale, AZ 85323

CERTIFICATION OF PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

I, Danielle Spears, duly certify and say, as to the claims asserted under the federal securities

laws, that I declare under penalty of perjury that the foregoing is true and correct to the best of

my knowledge and belief.

Executed on March 13, 2025

Signature:

Signed by:

*Danielle Spears*

CAC0EAB17D654A1...

Name: Danielle Spears