**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**MIDLAND-ODESSA DIVISION**

| | | |
|---|---|---|
| **DANIELLE SPEARS,** | ) | |
| | ) | |
| | ) | |
|    **Plaintiff,** | ) | |
| | ) | |
|    **v.** | ) | **CASE NO. 7:24-cv-00321-DC-RCG** |
| | ) | |
| | ) | |
| **SECURITIES AND EXCHANGE** | ) | |
| **COMMISSION, et al.** | ) | |
| | ) | |
| | ) | |
|    **Defendants.** | ) | |
| ——————————————————— | ) | |

**SECURITIES AND EXCHANGE COMMISSION'S MOTION TO DISMISS THE**
**SECOND AMENDED COMPLAINT**

Defendant Securities and Exchange Commission ("SEC" or "Commission") moves to dismiss Plaintiff's Second Amended Complaint ("SAC"), ECF 13, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## INTRODUCTION

This lawsuit is analogous to several failed actions in which plaintiffs seek to hold self-regulatory organizations responsible for losses that plaintiffs allegedly suffered because of frauds allegedly perpetrated by Defendants Gregory McCabe and John Brda (and social media promoters working on their behalf) who promised investors like Plaintiff "generational wealth" and "returns 'beyond investors' wildest dreams'" because of purported short-squeeze opportunities, SAC ¶ 89, in the lead up to corporate transactions executed by Meta Materials, Inc. in 2021 and 2022.[1] A key difference here is that Plaintiff has added the Commission as a defendant.[2]

The SAC contains many pages of alleged misstatements and other affirmative misconduct by McCabe, Brda, and the social media promoters whose "pervasive messages directly influenced [Plaintiff's] decision to abandon her usual investment safeguards" with her MMTLP investment. SAC ¶ 89. In contrast, Plaintiff does not allege that the Commission *did* anything improper, or even that it failed to do anything *to or for her*. Rather, Plaintiff's case

---

[1] *See, e.g., Park v. FINRA*, No. 23-CV-69, 2023, WL 11795601 (N.D. Ga. Sept. 25, 2023) (dismissing case against FINRA); *Hofman v. Fidelity Brok. Serv., LLC*, No. 23-CV-00881, 2023 WL 3872564 (C.D. Cal. May 8, 2023) (dismissing case against FINRA and DTCC); *Tawil v. FINRA*, No. 22-CV-440, 2023 WL 4353179 (N.D. Fl. May 24, 2023) (dismissing case against FINRA); *Hensley v. TD Ameritrade, Inc.*, No. 23-CV-05159, 2023 WL 12068975 (W.D. Wash. Oct. 2, 2023) (dismissing case against FINRA); *Traudt v. Rubinstein*, No. 2:24-CV -00782, ECF 103 (D. Vt. July 17, 2024) (granting FINRA motion to dismiss).

[2] A handful of other plaintiffs filed similar complaints (most in this court) naming the Commission as a defendant on or about December 9, 2024. The Commission has already filed motions to dismiss in these other cases.

against the Commission rests wholly on the Commission's alleged *inaction* towards people and entities *other than herself*. She contends the Commission should have stopped the frauds by taking (unspecified) actions against the perpetrators of the alleged frauds (some of whom the Commission *has* sued) and should have taken (unspecified) actions against the Financial Industry Regulatory Authority ("FINRA"), a private self-regulatory organization for broker-dealers, to override a trading halt FINRA issued shortly before the 2022 transaction.

The claims in the SAC against the Commission should be dismissed for lack of subject-matter jurisdiction. First, Plaintiff does not have standing to bring her claims because the causal connection between her alleged injuries and the Commission's alleged inaction is too speculative and attenuated to support Article III standing. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382-83 (2024) (noting the difficulty of establishing standing when a plaintiff challenges the government's "lack of regulation of *someone else*" and holding that the causation requirement precludes "speculative links" and "attenuated links") (cleaned up and emphasis original). Nor would a ruling in Plaintiff's favor redress her alleged injuries. Second, sovereign immunity bars Plaintiff's claims. The Supreme Court has made clear that an agency's "decision not to take the enforcement actions requested by respondents is [] not subject to judicial review" because Congress gave agencies "not [] the courts, the decision as to whether" to institute an enforcement action. *Heckler v. Chaney*, 470 U.S. 821, 838 (1985). Third, Plaintiff filed in the wrong court because any claim that the Commission failed to issue orders to end the trading halt or reinstate MMTLP trading would need to be made in the court of appeals.

Finally, even if the Court had subject-matter jurisdiction, Plaintiff has failed to state a claim upon which relief could be granted.

**BACKGROUND**

### A. Risks in the OTC Market

The securities at issue in this matter were traded on the over-the-counter ("OTC") markets. The "OTC market differs from a traditional stock market like the New York Stock Exchange. The OTC is decentralized and 'essentially anonymous.'" *HPIL Hold., Inc. v. Haining Zhang*, No. 23-CV-12050, 2025 WL 975444, at *2 n.1 (E.D. Mich. March 31, 2025) (citation omitted). "Due to the very low price, and to the lack of disclosure requirements that are generally applicable to securities listed on national exchanges, penny stocks on the OTC market are typically highly volatile in price and generally illiquid." *Tarpon Bay Part. LLC v. Zerez Hold. Co.*, 79 F.4th 206 (2d Cir. 2023) (citing Joshua T. White, *U.S. SEC, Outcomes of Investing in OTC Stocks* (Dec. 16, 2016), *available at* https://www.sec.gov/files/White_OutcomesOTCinvesting.pdf). Courts recognize that "OTC transactions are inherently riskier than those conducted on a regulated exchange." *SEC v. Lee*, 720 F. Supp.2d 305, 316 (S.D.N.Y. 2010); *HPIL Hold*, 2025 WL 975444, at *2 n.1 ("OTC markets are generally less transparent and less regulated than traditional stock markets, which makes them potentially riskier to invest in.") (citation omitted).[3]

### B. Meta Materials corporate transactions

#### 1. 2021 Merger between Metamaterials, Inc. and Torchlight Energy Resources, Inc.

Plaintiff alleges that, on or about June 25, 2021, Metamaterials, Inc. ("META I") and Torchlight Energy Resources, Inc. ("Torchlight") merged to form Meta Materials, Inc. ("META

---

[3] *See also Petro-Diamond Inc. v. SCB & Assoc., LLC*, 122 F. Supp. 3d 949, 954 (C.D. Cal. 2015) (noting the "high risks of trading on the unregulated, 'buyer beware' OTC market"); *In re Artic Glacier Int'l, Inc.*, 255 F. Supp. 3d 534, 560 n.27 (D. Del. 2017) ("Companies listed on OTC Link have been described by the SEC as among the most risky investments.") (citation omitted).

II"). *See, e.g.,* SAC ¶¶ 68, 73.[4] As part of the merger, Series A Preferred Shares, designated as

MMTLP, were issued as a dividend to Torchlight shareholders and entitled shareholders to

payments based on the value of Torchlight's oil and gas assets. *Id.* ¶ 68. Plaintiff alleges that, in

the lead up to the merger, Brda and McCabe, and others acting in concert with them, falsely

promoted the purported value of Torchlight's oil and gas assets. For example, Plaintiff alleges

that they "inflated valuations of oil reserves and exaggerated the economic potential of properties

such as Orogrande" basin. *Id.* ¶ 54. Plaintiff also alleges that a "dramatic surge in trading activity

raised significant concerns about unusual market behavior and potential trading irregularities."

*Id.* ¶ 69. Plaintiff alleges that Torchlight's leadership specifically orchestrated the surge by

promoting "the theory that the Preferred Dividend would cause a short squeeze,"[5] *id.* ¶ 71, while

they were raising approximately $137.5 million in an at-the-market offering leading up to the

merger, *id.* ¶ 70.

### 2. 2022 transition of MMTLP shares to Next Bridge Hydrocarbons, Inc.

Plaintiff alleges that MMTLP was never supposed to trade and, if the oil and gas assets

held in MMTLP were not sold, they would be spun off into Next Bridge Hydrocarbons, Inc.

("NBH"). SAC ¶ 79. On or about July 15, 2022, NBH filed a Form S-1 registration statement

with the SEC that stated that NBH would be spun-off into an independent entity and that each

shareholder of MMTLP would receive one share of NBH in exchange for each share of MMTLP,

after which shares of MMTLP would be cancelled. NBH S-1 Registration Statement (July 15,

---

[4] The Commission recognizes that factual, but not legal, allegations will be taken as true for the present motion, so it does not dispute any factual inaccuracies in the SAC.

[5] "The theory behind a short squeeze is that, if coordinated purchases of a stock drive its price up, those shorting the stock will be forced to cover their positions by buying the very stock they are shorting, creating a positive feedback loop in which the price continues to rise, affecting increasing numbers of short sellers, who then buy even more of the affected stock, and so on." *In re Jan. 2021 Short Squeeze Trad. Lit.*, 76 F.4th 1335, 1343 (11th Cir. 2023).

2022) ("NBH S-1"), p. 4 *available at*

*https://www.sec.gov/Archives/edgar/data/1936756/000119311522281275/d302576ds1a.htm*

(explaining the transaction generally and that MMTLP "Series A Preferred Stock will be

cancelled" following issuance of NBH shares);[6] *see also* SAC ¶ 164 (referencing the NBH S-1).

The NBH S-1 also advised investors that the company did not plan to make its shares DTC-

eligible "which means that brokerage firms may be unwilling to hold or trade our Common

Stock." NBH S-1 at p. 23.

Plaintiff alleges that, in the lead up to the spinoff, "Brda and McCabe and their

undisclosed paid stock promoters" created a false and misleading narrative that "short sellers

urgently needed retail investors' long-held MMTLP shares to cover and close their short

positions," which would drive up the price of MMTLP stock. SAC ¶ 82. Plaintiff alleges that,

during this promotional period, Brda claimed he had not sold any shares, when in fact he sold

shares worth between $870,000 and $2,970,000, *id.* ¶ 119, and McCabe also sold shares worth

between $52,768,000 and $68,000,000, *id.* ¶ 121.

Plaintiff alleges that, because of the relentless social media promotion, she first bought

MMTLP shares in October 2022. *Id.* ¶ 81 ("The social media push on X was difficult to miss.").

Plaintiff alleges that the "pervasive messages" touting the purported MMTLP short squeeze[7] as a

chance for "generational wealth" and returns "beyond investors' wildest dreams," "influenced

---

[6] A court may take judicial notice of "public disclosure documents filed with the SEC." *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000).

[7] Plaintiff acknowledges that "MMTLP [was] a relatively obscure oil and gas exploration company," SAC ¶ 116, and the chance for generational wealth did not come from the real or perceived intrinsic value of the company's assets, but rather because of the opportunity presented by the purported chance to squeeze short sellers, *see id.* ¶ 234 (comparing MMTLP to another meme stock, GameStop, that at least briefly surged in value because of a purported short squeeze).

her decision to abandon her usual investment safeguards, notably removing stop-loss protections on MMTLP shares." *Id.* ¶ 89.

### 3. The FINRA trading halt

Plaintiff alleges that, on December 8, 2022, FINRA issued a "corporate action notice" about MMLTP that revised a corporate action notice FINRA issued on December 6, 2022. SAC ¶ 128; *see also* ECF 43-1, Exs. C & D.[8] The FINRA notices state: (a) NBH shares would be issued to MMTLP shareholders with settled positions as of December 12, 2022; (b) anyone who purchased MMTLP after December 8, 2022 would not be entitled to receive NBH shares because they would not have settled positions as of December 12; (c) the MMTLP shares will be cancelled on December 13, 2022; and (d) the ticker symbol MMTLP would be deleted following the cancellation of MMTLP shares. ECF 43-1, Exs. C & D.

FINRA Rule 6440(a)(3) allows FINRA to halt trading if it "determines that an extraordinary event has occurred or is ongoing that has had a material effect on the market for the OTC Equity Security * * * or has caused or has the potential to cause major disruption to the marketplace or significant uncertainty in the settlement and clearance process." https://www.finra.org/rules-guidance/rulebooks/finra-rules/6440-0. On December 9, 2022, FINRA issued a U3 trading halt in MMTLP pursuant to Rule 6440(a)(3). SAC ¶ 141; *see also Trading and Quotation Halt for Meta Materials PFD SER A (MMTLP)* ("Trading Halt Notice"), *available at* https://www.finra.org/sites/default/files/2022-12/UPC-35-2022-MMTLP%28Halt%29_2.pdf. The Trading Halt Notice said that the "trading and quoting halt will

---

[8] Because Plaintiff incorporated the FINRA notices by reference in the SAC, the Court can consider them on a motion to dismiss. *See, e.g., U.S. ex. Rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 379 (5th Cir. 2003); *U.S. v. Senseonics Hold., Inc.*, 2023 WL 2354915, at *7 n.3 (W.D. Tex. March 3, 2023) (holding "the Court may consider its [a press release referenced in the complaint] contents in ruling on the motion to dismiss").

end concurrent with the deletion of the [MMTLP] symbol effective Tuesday, December 13, 2022." *Id.*; *see also* FINRA Rule 6440(b)(3) ("After FINRA initiates a halt in an OTC Equity Security as a result of an Extraordinary Event Halt, trading and quotations in the OTC market for the OTC Equity Security may resume when FINRA determines that the basis for the halt no longer exists, or when ten business days have elapsed from the date FINRA initiated the trading and quotation halt in the security, whichever occurs first.").

Plaintiff acknowledges that FINRA issued a FAQ document on March 16, 2023, purporting to explain the reasons for the halt, but she asserts that the FAQ "failed to clearly define the 'extraordinary event' that justified the halt." SAC ¶ 167. In the FAQ Plaintiff references, FINRA stated, among other things, that it halted trading in MMTLP after December 8, 2022, because it was concerned that investors buying MMTLP on or after December 9, 2022, would not have realized that the shares they were purchasing would be imminently canceled and that they would not be entitled to receive NBH shares for their MMTLP shares prior to their cancellation. *See FAQ: MMTLP Corporate Action and Trading Halt* (March 16, 2023) ("FAQ"), *available at* [https://www.finra.org/investors/insights/FAQ-MMTLP-corporate-action-and-trading-halt](https://www.finra.org/investors/insights/FAQ-MMTLP-corporate-action-and-trading-halt); *see also Supplemental FAQ: MMTLP Corporate Action and Trading Halt* (Nov. 6, 2023), *available at* [https://www.finra.org/investors/insights/supplemental-faq-mmtlp-corporate-action-and-trading-halt](https://www.finra.org/investors/insights/supplemental-faq-mmtlp-corporate-action-and-trading-halt).[9] FINRA further stated that, as of December 12, 2022, MMTLP would no longer have been DTC-eligible (and NBH shares were not expected to be DTC-eligible),[10] so

---

[9] Because Plaintiff referenced the FINRA FAQs in the SAC, *see* FAC ¶¶ 145, 167-68, 186-88, the Court can consider them without converting this motion into a motion for summary judgment.

[10] The NBH S-1 warned investors that the company did not intend to seek DTC-eligibility for its shares "which means that brokerage firms may be unwilling to hold or trade our Common Stock." [https://www.sec.gov/Archives/edgar/data/1936756/000119312522281275/d302576ds1a.htm](https://www.sec.gov/Archives/edgar/data/1936756/000119312522281275/d302576ds1a.htm), at

it was uncertain if trades settling after December 12, 2022 (i.e., trades executed December 9, 2022, or later) would have settled in an orderly manner, including before the MMTLP shares were canceled on or about December 13, 2022. *See* FAQ.

**C. The Commission filed fraud charges relating to the 2021 merger and is investigating the 2022 NBH spinoff.**

On June 25, 2024, the Commission issued an order finding that META II fraudulently raised $137.5 million by artificially inflating the value of its common stock by structuring the 2021 merger between META I and Torchlight to include the issuance of MMTLP to create a "short squeeze." *In re Meta Materials, Inc. (f/k/a Torchlight Energy Resources, Inc.)*, SEC Securities Act Release No. 11292, 2024 WL 3178156, at *1 (June 25, 2024).[11] In addition to imposing various injunctive remedies, the Commission ordered META II to pay a $1 million fine. *Id.* at *12. On June 25, 2024, the Commission also filed an enforcement action against Brda and Georgios Palikaras relating to the merger between META I and Torchlight.[12] *See* FAC ¶ 62 (discussing the litigation). In that action, which is pending in the Eastern District of Texas, the Commission alleges that Palikaras and Brda violated various anti-fraud provisions of the federal securities laws. *SEC v. Brda*, No.4:24-cv-01048 (E.D. Tex. June 25, 2024), ECF 1. Among other remedies, the Commission is seeking disgorgement of ill-gotten gains, prejudgment interest, and civil penalties. *Id.* ¶ 144. This litigation is ongoing.

---

p. 23.

[11] "In deciding a 12(b)(6) motion to dismiss, a court may permissibly refer to matters of public record. Accordingly, the consideration of the [order against META II] does not convert this motion into one for summary judgment." *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994); *see also Corpus v. Dep't of Vet. Aff.*, SA-23-CV-01478, 2024 WL 5099213, at *5 (W.D. Tex. Nov. 15, 2024) (taking judicial notice of administrative decision on motion to dismiss).

[12] Palikaras was President and CEO of META I and became President and CEO of META II following the merger. Plaintiff did not name Palikaras as a defendant in this action. McCabe is not a defendant in the Commission's ongoing Texas enforcement action.

The Commission is also investigating MMTLP trading in the months leading up to the 2022 spinoff of NBH to determine whether any federal securities laws were broken during this period.[13] Details regarding the investigation are not public at this time.

### D. The SEC's Oversight of FINRA

Since the early 1790s, participants in the securities markets have agreed to be governed by a self-imposed set of industry rules. *See* Stuart Banner, *The Origin of the New York Stock Exchange, 1791-1860*, 27 J. Legal Stud. 113, 114-15 (1998). In the Securities Exchange Act of 1934 ("Exchange Act"), Congress determined that a system of "[s]upervised self-regulation" would preserve "the traditional private governance of exchanges" while allowing "the Government to monitor exchange business in the public interest," *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 127-28 (1973), and it subsequently extended that system to private "national securities associations" of over-the-counter (or off-exchange) brokers and dealers, *United States v. National Ass'n of Sec. Dealers, Inc.*, 422 U.S. 694, 701 n.6, 732-33 (1975). "Since 1938, Congress has repeatedly amended the Exchange Act to bolster the self-regulatory scheme by increasing government oversight while preserving self-regulatory organizations' primary role in regulating the securities industry," including by making "joining a self-regulatory organization mandatory for virtually all securities traders." *Alpine Sec. Corp. v.*

---

[13] *See SEC Charges Former CEOs with Market Manipulation, Fraud, and Other Violations*, July 2, 2024, *available at https://www.sec.gov/newsroom/press-releases/2024-77*; *see also SEC v. Brda*, No. 4:24-CV-01048, ECF 61 at p. 1 ("the SEC is investigating potential violations relating to trading in 'MMTLP' between October 2022 and December 2022"). A court can "take judicial notice of government documents, court filings, [and] press releases * * *." *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 762 n.5 (9th Cir. 2018). *See also, e.g., Krystal One Acquisitions LLC v. Bank of Am.*, 805 Fed. Appx. 283, 287 (5th Cir. 2020) ("court may also take judicial notice of matters of public record" including "filings from prior lawsuits"); *HCB Fin. Corp. v. McPherson*, 2020 WL 7685936, at *1 n.5 (W.D. Tex. Apr. 30, 2020) ("The court takes judicial notice of the filings made in the Mississippi Case as matters of public record.").

*FINRA*, 121 F.4th 1314, 1321 (D.C. Cir. 2024), *pet. for cert. filed*, No. 24-904 (U.S. Feb. 20, 2025).

The National Association of Securities Dealers ("NASD") and the New York Stock Exchange ("NYSE") created FINRA in 2007 by consolidating their member oversight functions and forming a single, renamed registered national securities association. 72 Fed. Reg. 42,169, 42,170 (Aug. 1, 2007). "FINRA is organized as a Delaware nonprofit corporation operated by private individuals and receives no funding from the federal government." *Alpine*, 121 F.4th at 1321. Rather, "[l]ike early self-regulatory organizations, FINRA is financed entirely through fees, fines, penalties, and sanctions levied against its members." *Id*. (cleaned up).

FINRA is subject to SEC supervision of its rules and disciplinary processes. 15 U.S.C. § 78s. The SEC reviews proposed rules and, where applicable, approves or rejects them, *id.* § 78s(b), and the SEC also has authority to "abrogate, add to, and delete from" any FINRA rule as the SEC "deems necessary or appropriate" to further the purposes of the Exchange Act, *id.* § 78s(c). In addition, the Commission supervises FINRA's enforcement of its rules, having power "to review a final disciplinary sanction imposed by [FINRA]," *id.* § 78s(e), either "on its own motion" or on petition by an aggrieved party, *id.* § 78s(d)(2). The SEC can also revoke FINRA's ability to enforce its rules, *id.* § 78s(g)(2), and it can step in and enforce any written rule itself, *id.* § 78o(b)(4). The Commission also has authority to monitor FINRA's compliance with the statutory requirements to be a self-regulatory organization and may suspend its registration or limit its activities if appropriate. *Id.* §§ 78s(h)(1), 78o-3(b).

### E.  Plaintiff's allegations relevant to her claims against the SEC

#### 1.  Overview of Plaintiff's allegations

At its heart, the SAC alleges that the Commission owed a duty of care to investors and

that it breached that duty by (a) allegedly failing to enforce the securities laws and prevent the alleged frauds and (b) failing to supervise FINRA, particularly with respect to the U3 trading halt. SAC p. 81-82. Plaintiff alleges that, ahead of the 2021 merger, the "SEC was very aware that TRCH was engaging in acts of market manipulation" based on a tip it received in July 2019. *Id.* ¶ 61. Similarly, Plaintiff alleges that the Commission and FINRA were "looking at the two issuers [MMAT and MMTLP] from a fraud/manipulation angle" on December 5, 2022, "[y]et the investing public were never notified of these concerns." *Id.* ¶ 137.

Plaintiff also claims the trading halt "permanently trapp[ed] [her] shares in an illiquid state." *Id.* ¶ 144. With respect to the Commission specifically, Plaintiff alleges that the "SEC allowed FINRA's U3 halt to persist indefinitely without mandating [undefined] transparency or resolution." *Id.* p. 82. Plaintiff, however, acknowledges that the halt "official[ly] lift[ed]" on or about December 13, 2022, when MMTLP shares were canceled by the issuer. *Id.* ¶ 156.

### 2. Plaintiff's claims against the Commission

Determining the nature and scope of Plaintiff's claims is difficult. Plaintiff pleads nine different counts that, individually, seek monetary damages, injunctive relief, or both. Within many of the counts, Plaintiff alleges that defendants violated multiple statutes or constitutional provisions, and the alleged violation of certain provisions purportedly serves as the basis for claims under multiple counts.[14] In addition to the enumerated counts, Plaintiff seeks a variety of declarative and injunctive relief.

---

[14] For example, Plaintiff claims that the Commission violated her Fifth Amendment rights under Count I and Count IV, and 15 U.S.C. § 78s(c) (which outlines standards for the Commission to approve or disapprove of an SRO), purportedly serves as at least part of the bases for Counts I – IV.

###### a. Plaintiff's statutory and common law claims

Plaintiff asserts the following counts against the Commission: Count I (Violation of the Exchange Act); Count II (Violation of the Sherman Antitrust and Clayton Acts); Count III (Negligence); Count IV (Failure to Resolve the FINRA U3 Halt); Count V (Unjust Enrichment); Count VI (Conspiracy to Commit Fraud); Count VII (Failure to Supervise); and Count VIII (Negligent or Intentional Infliction of Emotional Distress). Although stylized as independent counts, they are all premised on the contentions that the Commission failed to enforce the federal securities laws and/or failed to "resolve" the U3 trading halt. *See, e.g.,* SAC, Count I, ¶ 8, p. 69.

###### b. Plaintiff's petition for writ of mandamus

In Count IX, Plaintiff seeks mandamus relief ordering the Commission to (1) "enforc[e] federal securities laws prohibiting naked short selling and associated manipulative practices involving MMTLP shares," *id.* Count IX, ¶ 1, p. 79; (2) appoint "an impartial third-party Special Agent to independently oversee and administer a controlled two-day trading event, explicitly structured to reconcile and close all open positions that are not legitimate long shares in MMLTP securities," *id.* Count IX, ¶ 2, p. 79; and (3) to "produce a full and complete accounting of all MMTLP shares * * * as documented through comprehensive electronic blue sheet data," *id.* Count IX, ¶ 4, p. 80.

###### c. Plaintiff's claims for equitable relief

In addition to the enumerated Counts addressed above, Plaintiff states separate claims for declaratory and injunctive relief. Plaintiff seeks a declaration that: (1) the Commission violated various statutes, *id.* p. 84; and (2) "FINRA's operational and regulatory structure [are] unconstitutional due to inherent conflicts of interest stemming from its funding model," *id.* p.

85.[15] Plaintiff also seeks "an injunction requiring FINRA and [the] SEC to permanently establish effective oversight mechanisms to prevent the proliferation of illegal short positions, enforce securities laws consistently, and enhance transparency and public accountability." SAC p. 84.

## ARGUMENT

### I.     This Court lacks subject-matter jurisdiction over the Second Amended Complaint.

This Court lacks subject-matter jurisdiction over Plaintiff's claims because Plaintiff lacks standing to bring her claims, sovereign immunity bars her claims, and some of her claims should have been filed in a court of appeals. "The burden of establishing federal jurisdiction rests on the party seeking the federal forum." *Cleartrac, LLC v. Lanrick Contractors, LLC*, 53 F.4th 361, 364 (5th Cir. 2022) (cleaned up). "[A]t the Rule 12(b)(1) stage of the proceedings, the plaintiffs' burden is to allege a plausible set of facts establishing jurisdiction." *Physician Hosps. of Am. v. Sebelius*, 691 F.3d 649, 652 (5th Cir. 2012). The "tenet that a court must accept as true all allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court "can address jurisdictional issues in any order" it chooses.

---

[15] In Plaintiff's original Complaint and her First Amended Complaint ("FAC"), she clearly and extensively argued that the structure and authority of FINRA was unconstitutional based on the private nondelegation doctrine and the Appointments Clause, and she included specific claims for relief based on those arguments. *See* ECF 1, pp. 47-53; ECF 3, pp. 80-88. Although the SAC refers to "[q]uestions regarding FINRA's constitutional role [that] have been raised in legal principles, particularly those involving the non-delegation," SAC ¶ 254, and claims that FINRA's structure "raises questions under the separation of powers doctrine, *id.* ¶ 158, her claims for declaratory and injunctive relief regarding the constitutionality of FINRA are expressly limited to alleged "conflict of interest stemming from its funding model," *id.* p. 85. Plaintiff does not raise claims under the private nondelegation doctrine and Appointments Clause in the SAC, unlike in the Complaint and FAC. To the extent that she did raise such claims, they would fail for the reasons outlined in similar cases. *See, e.g., Pease v. SEC et al.*, 7:24-cv-0322, ECF 35 (SEC Motion to Dismiss), pp. 28-32 (W.D. Tex. May 8, 2025). FINRA also recognizes that the SAC does not seek relief based on the nondelegation doctrine and the Appointments Clause, ECF 42-1 at p. 19 n.14 (FINRA Motion to Dismiss), but out of an apparent abundance of caution addresses the merits of the claims, *see* ECF 42-1 at pp. 3-5, 19-21.

*Acheson Hotels, LLC v. Laufer*, 601 U.S. 1, 4 (2023).

**A. The Court lacks jurisdiction over Plaintiff's claims against the Commission because she does not have standing.**

This Court lacks jurisdiction because Plaintiff has not established Article III standing. "To establish standing, a plaintiff must show an injury in fact caused by the defendant and redressable by a court order." *United States v. Texas*, 599 U.S. 670, 676 (2023); *California v. Texas*, 593 U.S. 659, 668 (2021) (plaintiffs bear the burden to plausibly allege each of these elements). "The second and third standing requirements—causation and redressability—are often flip sides of the same coin." *All. for Hippocratic Med.*, 602 U.S. at 380. "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Id.* at 381. The converse is also true. To establish causation, a plaintiff must show that her injury is "fairly traceable to the challenged action." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up).

"[W]hen (as here) a plaintiff challenges the government's unlawful regulation (or lack of regulation) of *someone else*, standing is not precluded, but it is substantially more difficult to establish. That is often because unregulated parties may have more difficulty establishing causation—that is, linking their asserted injuries to the government's regulation (or lack of regulation) of someone else." *All. for Hippocratic Med.*, 602 U.S. at 382 (cleaned up) (emphasis original). "The causation requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs." *Id.* at 383. "The causation requirement also rules out attenuated links—that is, where the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing." *Id.*

### 1. Plaintiff lacks standing because she cannot show the Commission caused any alleged injuries.

Plaintiff does not claim the Commission unlawfully regulated (or failed to regulate) *her*; she claims the Commission (1) failed to regulate Brda, McCabe, and other promotors who perpetrated the alleged frauds, and (2) failed to regulate FINRA. The link between the Commission's alleged regulatory failures and Plaintiff's alleged economic injuries is both speculative and attenuated.

Plaintiff claims that the Commission was aware of various irregularities ahead of the 2021 and 2022 transactions yet the SEC took no (or impermissibly delayed) action to address these irregularities. *See, e.g.,* SAC Count VIII, ¶ 3, p. 78. Any link between these alleged inactions and Plaintiff's alleged monetary harm is purely speculative. Even if the SEC had investigated the irregularities, it is unknown whether, and when, it would have decided to bring an enforcement action and what relief it would have sought.[16] Even if the Commission would have brought an enforcement action, a court would have needed to rule in the Commission's favor. Even if a court ruled in the Commission's favor, the court would have needed to enjoin the fraud or order recompense for monetary losses. Similarly, even if the Commission had publicized its concerns about META II and/or MMTLP, Plaintiff would have had to decide not to invest or to exit her investment. And even if Plaintiff wanted to exit her investment, her ability to do so would have been dependent on finding a willing buyer *after* public concerns about fraud had been raised. Plaintiff cannot show a causal connection between the Commission's alleged

---

[16] Plaintiff appears to allege that, because the Commission was aware of trading irregularities, it should have immediately brought an enforcement action. However, the Commission needs *evidence* of wrongdoing to bring an enforcement action and must also consider the best use of its resources in evaluating when to bring an action and what relief to seek. *See Heckler*, 470 U.S. at 827 (recognizing "the agency's expertise and better understanding of its enforcement policies and available resources").

failures and her injuries because it is not "sufficiently predictable how third parties [or even the Plaintiff] would react to government action or cause downstream injury to plaintiffs." *All. for Hippocratic Med.*, 602 U.S. at 383. *See also, e.g., U.S. v. Olis*, 429 F.3d 540, 547 (5th Cir. 2005) (noting that "a company's stock price is affected before and after fraud, by numerous extrinsic market influences as well as the soundness of other business decisions by the company").

Plaintiff's claims relating to the Commission's alleged "fail[ure] to resolve the U3 halt timely and transparently" fail for similar reasons. *See* SAC Count I, ¶ 8, p. 69.[17] Even if the Commission had overturned the trading halt, it is entirely speculative whether Plaintiff would have avoided the economic loss she now alleges. First, even if the Commission had immediately cancelled the halt, Plaintiff would have been able to sell her shares *if, and only if*, another party were willing to purchase them at the price she seeks.[18] Second, even if Plaintiff found a willing buyer, it is unclear whether or how any such trades would have settled. Third, to the extent Plaintiff complains that she "remains trapped in non-tradeable shares," SAC ¶ 145, her MMTLP shares were cancelled and her NBH shares are not tradable because of decisions META II and NBH made, including NBH's decision not to make the shares DTC-eligible, not the Commission's alleged inaction regarding the halt.

### 2. Plaintiff lacks standing because her claims cannot be redressed by this lawsuit.

Examining the other side of the coin—redressability—confirms that Plaintiff lacks

---

[17] It is not clear what exactly the Plaintiff believes the Commission should have done regarding the trading halt, but presumably she contends the Commission should have ended the halt or otherwise overruled FINRA's actions.

[18] A purchaser of MMTLP on or after December 9, 2022 would *not* have been eligible to receive NBH shares in exchange for MMTLP shares, but the MMTLP shares such a purchaser just purchased would have been canceled on or about December 13. To the extent Plaintiff claims that short sellers would have been forced to buy her shares, despite the generally unappealing prospect of buying shares that are about to be canceled, that is purely speculation.

standing. First, Plaintiff's alleged economic injuries cannot be redressed by claims for monetary damages against the Commission because they are barred by sovereign immunity, as explained in detail in Section I.C. *See, e.g., Dee v. Granholm*, No. 23-1950, 2024 WL 4263831, at *4 (D.D.C. Sept. 23, 2024) ("If a claim is barred by sovereign immunity, it is not redressable.").

Plaintiff's requests for mandamus and equitable relief are similarly deficient. If this court declared FINRA's structure unconstitutional or issued an order mandating that the Commission enforce the securities laws moving forward, it would not redress Plaintiff's injuries. Such a declaration would have no impact on Plaintiff's ability to trade or reconcile her position in MMTLP or NBH because the MMTLP shares would still be canceled and the NBH shares would still not be DTC-eligible—both pursuant to decisions made by the issuers. "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co. v. Citizens for a Better Environ*, 523 U.S. 83, 107 (1998); *see also Tex. Voters All. v. Dallas Cnty.*, 495 F. Supp. 3d 441, 456 (E.D. Tex. 2020) (finding no standing where "the Court is unable to grant relief that would effectively redress the alleged injury Plaintiffs claim to suffer"). Plaintiff's request for an order reinstating MMTLP trading for two days would not redress her injuries for the same reason: because META II canceled the shares, they no longer exist, and therefore cannot be traded. Any decision to reissue shares would have to be made by the company, and any decision to purchase any reissued shares would rest with the individual purchasers. "There is no redressability, and thus no standing, where (as is the case here) any prospective" relief "depend[s] on an independent actor who retains broad and legitimate discretion the courts cannot presume either to control or to predict." *Glanton ex. Rel. ALCOA Prescription Drug Plan v. AdvancePCS, Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006) (cleaned up).

A declaration that Defendants violated various provisions of the federal securities laws, SAC p. 84, would also not provide any redress to Plaintiff because declaratory relief "cannot conceivably remedy any past wrong." *Stringer v. Whitley,* 942 F.3d 715, 720 (5th Cir. 2019) (cleaned up). Similarly, an order mandating future reforms, an audit of MMTLP or production of blue sheet data would not redress the wrongs Plaintiff alleges she has suffered, and she also has provided no reason to believe they would address any future wrong that she expects she would suffer.

### 3.  Plaintiff does not have standing to compel the Commission to enforce laws.

In addition to lacking standing because of causation and redressability issues, Plaintiff does not have standing to "compel enforcement" of the securities laws by the Commission. *See* SAC Count IX, ¶ 3, p. 80. To the extent Plaintiff's claims are predicated upon the Commission's alleged failure to sanction the perpetrators of the frauds or FINRA, Plaintiff lacks standing because "the Executive's Article II authority to enforce federal law and the deeply rooted history of enforcement discretion in American law" precludes it. *Texas*, 599 U.S. at 684 (holding plaintiffs did not have standing to challenge the Executive's lack of enforcement); *see also Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution").

### B.  The Court lacks jurisdiction over Plaintiff's programmatic challenges.

The Court lacks jurisdiction over Plaintiff's broad programmatic challenges to the Commission's enforcement and regulatory programs. Plaintiff seeks an order requiring the Commission to "establish effective oversight mechanisms" for enforcement of the securities laws. SAC p. 84. The Supreme Court, however, has "announced a prohibition on programmatic

challenges." *Sierra Club v. Peterson*, 228 F.3d 559, 566 (5th Cir. 2000) (relying upon *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990)). In *Lujan*, instead of challenging a single "order or regulation," the plaintiff challenged the "continuing (and thus constantly changing) operations" of the agency's administration of its land use review program. 497 U.S. at 890. The Court rejected this gambit, holding that the plaintiff could not "seek *wholesale* improvement of this program by court decree, rather than in the office of the [agency] or the halls of Congress, where programmatic improvements are normally made." *Id.* at 891 (emphasis original); *see also Norton v. S. Utah Wilderness All.,* 542 U.S. 55, 64 (2004) (rejecting a "broad programmatic attack" regarding land management).[19] Plaintiff likewise seeks "wholesale improvements" regarding the Commission's regulation of the securities market and oversight of FINRA, but the Court does not have authority to order such sweeping changes.

### C. Sovereign immunity bars Plaintiff's claims.

The United States has sovereign immunity absent an express waiver. *U.S. v. Sherwood*, 312 U.S. 584, 586 (1941). Waivers of sovereign immunity must be "expressed in unequivocal statutory text and cannot be implied," and they "will be strictly construed, in terms of [their] scope, in favor of the sovereign." *Lane v. Pena*, 518 U.S. 187, 192 (1996).

Plaintiff does not identify any statute that purportedly waives sovereign immunity over her claims. She alleges the Court has jurisdiction under various statutes, including 28 U.S.C. § 1331, the Exchange Act, the Securities Act of 1933 ("Securities Act"), the Sarbanes-Oxley Act

---

[19] In *Sierra Club*, the Fifth Circuit rejected a broad challenge to the agency's timber management program as an impermissible attempt to interfere with the program, even though plaintiffs identified some allegedly improper final agency actions within that program. 228 F.3d at 566. *See also Louisiana v. United States*, 948 F.3d 317, 321-22 (5th Cir. 2020) (rejecting a challenge to the Army Corps of Engineers' alleged inaction in maintaining a waterway because the plaintiff did not identify a specific agency action, but rather focused on the agency's alleged failures over a lengthy period).

of 2002 ("SOX"), and the Dodd-Frank Wall Street Reform and Consumer Protection Act

("Dodd-Frank"). SAC ¶ 8. To the extent this can be read as Plaintiff arguing that these statutes

waive sovereign immunity, this argument would fail.[20] Moreover, the "mandamus statute [28

U.S.C. § 1361] is not a general waiver of sovereign immunity." *Helfgott v. U.S.*, 891 F. Supp.

327, 329 (S.D. Miss. 1994). While sovereign immunity is waived "where a plaintiff sues to

compel a federal agency to perform a duty owed to the plaintiff," *id.* at 330-31, as explained in

Section II.F, Plaintiff does not and cannot meet that burden.

Despite Plaintiff's failure to allege a waiver of sovereign immunity, the Commission will

address certain statutes that waive sovereign immunity to demonstrate their inapplicability to

Plaintiff's claims.

### 1. The Federal Tort Claims Act does not waive sovereign immunity for Plaintiff's claims for monetary damages.

The Federal Tort Claims Act ("FTCA") "waives sovereign immunity and permits suits

against the United States for claims sounding in state tort law for money damages." *Cantu Silva*

*v. U.S.*, 110 F.4th 782, 781 (5th Cir. 2024) (citation omitted). However, the FTCA does not

waive sovereign immunity over Plaintiff's claims for numerous reasons. First, the Commission is

not a proper party to such a claim. *See, e.g., Galvin v. OSHA*, 860 F.2d 181, 183 (5th Cir. 1988)

("an FTCA claim against a federal agency or employee as opposed to the United States itself

---

[20] "[S]overeign immunity is not waived by a general jurisdictional statute such as 28 U.S.C. § 1331." *Koehler v. U.S.*, 153 F.3d 263, 266 n.2 (5th Cir. 1998). Neither the Securities Act nor Exchange Act waives sovereign immunity. *Safeway Portland Emp. Federal Credit Union v. FDIC*, 506 F.2d 1213, 1216 (9th Cir. 1974) (rejecting claim that "the Securities Act of 1933 itself constitutes a waiver of sovereign immunity and supports jurisdiction"); 15 U.S.C. § 78a et seq. Similarly, neither SOX nor Dodd-Frank waives sovereign immunity. *See Warmuth v. FDIC*, No. CV 08-6222, 2011 WL 5553897, at *12 (C.D. Ca. Nov. 14, 2011) (holding that Dodd-Frank does not waive sovereign immunity); *see also generally Hines v. Cal. Pub. Util. Com'n*, No. C-10-2813, 2010 WL 4691652, at *3 (N.D. Cal. Nov. 8, 2010) (holding SOX does not waive sovereign immunity under the Eleventh Amendment).

must be dismissed for want of jurisdiction"). Second, Plaintiff has not alleged that she exhausted administrative remedies. *See, e.g., Coleman v. U.S.*, 912 F.3d 824, 834 (5th Cir. 2019) ("holding [that] exhaustion [is] a jurisdictional prerequisite for FTCA claims that cannot be waived"); *see also* Ex. A, Declaration of Melinda Hardy, ¶ 3 (indicating a search of the SEC database containing FTCA claims "show[ed] that no administrative claims have been filed for or by Ms. Spears").[21] Third, even if Plaintiff had brought a claim against the United States after exhausting administrative remedies, the FTCA's waiver of sovereign immunity would not apply here because of the discretionary function exception, which states that sovereign immunity is not waived for a claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or any employee of the Government." 28 U.S.C. § 2680(a); *see also, e.g., Molchatsky v. U.S.*, 713 F.3d 159, 162 (2d Cir. 2013) (plaintiffs' claims that the Commission's negligence caused losses from a fraud were barred by sovereign immunity due to the discretionary function exception).[22]

## 2. The APA does not waive sovereign immunity over Plaintiff's claims.

The SAC does not invoke any provision that would waive sovereign immunity for

---

[21] The Court is permitted to consider evidence outside the complaint "in evaluating a Rule 12(b)(1) motion that presents a factual challenge to subject matter jurisdiction." *Priovolos v. FBI*, 686 Fed. Appx. 150, 152 (3d Cir. April 17, 2017) (affirming dismissal where government provided a sworn declaration stating plaintiff had not filed an administrative complaint); *see also Gordon v. Neugebauer*, No. 14-CV-0093-J, 2014 WL 7179012, at *5 (N.D. Tex. Oct. 31, 2014) (dismissing under Rule 12(b)(1) for lack of subject matter jurisdiction based on declaration from defendant indicating plaintiff "has not filed an administrative tort claim under the FTCA").

[22] To the extent Plaintiff is seeking monetary damages for her constitutional claims, "it is simply axiomatic that such damages are not available where a plaintiff directly asserts constitutional claims against the United States" because "the United States has not waived sovereign immunity for constitutional claims." *Bustos v. U.S.*, No. 20-CV-00292, 2021 WL 11670028, at *2 (W.D. Tex. Feb. 25, 2021). Similarly, to the extent Plaintiff's claims allege fraud or "manipulative or deceptive" conduct, *see, e.g.,* Counts VI and VIII, "[s]uch intentional conduct [] is explicitly exempted from the FTCA's waiver of sovereign immunity." *In re Orthopedic Bone Screw Prod. Liability Lit.*, 264 F.3d 344, 363 (3d Cir. 2001).

plaintiff's non-monetary claims. Plaintiff does not cite Section 702 of the APA, which can waive sovereign immunity for actions seeking non-monetary relief brought by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702. But even if Plaintiff had invoked Section 702, there is no waiver of sovereign immunity because (1) Plaintiff's challenges concern investigative and regulatory decisions by the Commission, which are "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and not reviewable, and (2) Plaintiff has not identified an "agency action" that caused legal wrong, *Alabama-Coushatta Tribe v. U.S.*, 757 F.3d 484, 489 (5th Cir. 2014).

### a. Plaintiff's claims fall within the Section 701(a)(2) exception.

Section 701(a)(2) provides that Section 702's waiver of sovereign immunity does not apply when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The Commission's authority to decide what to investigate, how to investigate, and whether to bring an enforcement action is committed to agency discretion by the plain language of the securities laws. Section 21(a) of the Exchange Act, 15 U.S.C. § 78u(a), states that "[t]he Commission may, *in its discretion*, make such investigations as it deems necessary" to determine whether a violation of the securities laws exists (emphasis added). Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d)(1), similarly states that the Commission "may *in its discretion* bring an action in the proper district court of the United States" when "it shall *appear to the Commission* that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter" (emphasis added). Congress bestowed similar discretion upon the Commission to act against an SRO "if in *its opinion* such action is necessary" to protect investors. 15 U.S.C. § 78s(h)(1) (emphasis added).

In *Heckler*, 470 U.S. at 838, the Supreme Court made clear that an agency's "decision not

to take the enforcement actions requested by respondents is therefore not subject to judicial review under the APA." *See also id.* at 828, 830 (the "exercise of prosecutorial discretion" is the paradigmatic example of agency action committed to agency discretion by law because "a court would have no meaningful standard against which to judge the agency's exercise of discretion"); *SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 745 (1984) ("Congress intended to vest the SEC with considerable discretion in determining when and how to investigate possible violations of the statutes administered by the Commission"). The Commission also has broad discretion in deciding when and how to use its regulatory authority to supervise FINRA. *See San Francisco Min. Ex. v. SEC*, 378 F.2d 162, 165 (9th Cir. 1967) (determination whether the Commission should take an action against an SRO under Section 19 of the Exchange Act "rests within the sound discretion of the agency");[23] *In re Application of John Boone Kincaid III for Review of Action Taken by FINRA*, Exchange Act Release No. 87384, 2019 WL 5445514, at *5 (Oct. 22, 2019) (the Commission has discretion under *Heckler* whether to "take[] action against FINRA").

     **b.  Plaintiff is not challenging an agency action.**

Section 702's waiver of sovereign immunity applies only if a plaintiff "identif[ies] some 'agency action' affecting him in a specific way." *Alabama-Coushatta*, 757 F.3d at 489. "'[A]gency action' for the purposes of [Section] 702 is set forth by 5 U.S.C. § 551(13), which includes a "failure to act.'" *Id.*, quoting 5 U.S.C. § 551(13); *see also Louisiana v. U.S.*, 948 F.3d

---

[23] *See also Alpine Sec. Corp. v. NSCC*, 2025 WL 901847, at *2 (D. Utah Mar. 25, 2025) (the "SEC *may* limit a clearing agency's activities and operations or suspend or revoke its registration 'if in [the SEC's] *opinion* such action is necessary or appropriate in the public interest'") (citing 15 U.S.C. § 78s(h)(1)) (emphasis added), *appeal docketed,* No. 25-4050 (10th Cir. April 28, 2025); *Opulent Fund v. Nasdaq Stock Mkt., Inc.*, 2007 WL 3010573, at *6 (N.D. Cal. Oct. 12, 2007) (stating that § 78s(h)(1) "*permit[s]* the SEC to suspend, censure or impose other limits on an SRO for violating the Exchange Act, rules or regulations thereunder, or the SRO's own rules") (emphasis added).

317, 321 (5th Cir. 2020) (stating that "agency action" is "a term of art that does not include all

conduct") (cleaned up).  Plaintiff's claims for equitable relief challenge the Commission's

alleged "failure to act." *See, e.g.,* SAC ¶ 242 (alleging a "prolonged [period] of regulatory

inaction and neglect experienced by MMTLP shareholders").

But a "failure to act" is "properly understood as a failure to take an *agency action*—that

is, a failure to take one of the agency actions (including their equivalents) earlier defined in

§ 551(13)." *Norton*, 542 U.S. at 62. A "'failure to act' is properly understood to be limited, as are

the other items in § 551(13), to a *discrete* action." *Id.* at 63 (emphasis original); *see also Gentile*

*v. SEC*, 974 F.3d 311, 317 (3d Cir. 2020) ("the APA allows challenges to discrete agency action,

but not broad challenges to the administration of an entire program."); *Alabama-Coushatta*, 757

F.3d at 490-91 (holding that a complaint that did not name the specific actions it was challenging

was an impermissible "blanket challenge" because it was "directed at the federal agencies' broad

policies and practices"). To the extent Plaintiff's claim is a claim under the APA to compel agency

action allegedly unlawfully withheld or unreasonably delayed, 5 U.S.C. § 706(1), Plaintiff must

establish that the SEC "failed to take a *discrete* agency action that it is *required to take*.'" *Harrison*

*Cnty, Miss. v. U.S. Army Corps of Engins.*, 63 F.4th 458, 463 (5th Cir. 2023) (citing *Norton*, 542 U.S.

at 64) (emphasis original). Plaintiff's claim that the Commission "fail[ed] in its statutory oversight

duties over FINRA" regarding the trading halt, *see e.g.,* SAC p. 73, does not address a *discrete* agency

action the Commission was *required* to take. *See Harrison Cnty.*, 63 F.4th at 466 ("Because the Corps

has no duty to prepare the supplemental EIS the plaintiffs seek, the plaintiffs have no APA claim for

unlawful agency inaction, and the Corps is immune from their suit claiming otherwise.").

Plaintiff points to no basis outside of the APA for a claim based on a failure to act, but

even if she could do so, she does not identify a failure to undertake any discrete acts that she is

challenging. In addressing what the Commission should have done, she vaguely claims that the Commission "failed to act in accordance with its explicit mission to protect retail investors and market integrity," "abandoned its oversight duties," and "allowed FINRA's U3 halt to persist indefinitely." SAC p. 82. The APA does not waive sovereign immunity for Plaintiff's claims because instead of identifying agency action, she claims only that at some undefined time the Commission should have undertaken some undefined investigation, enforcement action, and/or systematic changes.[24]

### D. Plaintiff filed in the wrong court.

To the extent Plaintiff is contending that the Commission should have issued an order overturning FINRA's trading halt, *see, e.g.,* SAC Count I, ¶ 8, p. 69 (alleging the Commission "fail[ed] to resolve the U3 halt timely and transparently"), or should have reinstituted MMTLP trading, *id.* Count IX, ¶ 2, p. 79 (requesting "a controlled two-day trading event * * * to reconcile and close all open positions that are not legitimate long shares"), those claims cannot be heard in this Court. "[W]here a statute commits final agency action to review by the Court of Appeals, the appellate court has exclusive jurisdiction to hear suits seeking relief that might affect its future statutory power of review." *Telecommunications Research & Action Center v. FCC ("TRAC")*, 750 F. 2d 70, 77-78 (D.C. Cir. 1984).

This principle applies here because the Courts of Appeals would have exclusive jurisdiction to review a Commission order overturning a trading halt or reinstituting trading. Such orders would be issued under the Exchange Act, and Section 25(a) of the Exchange Act provides appellate courts with exclusive jurisdiction over review of such orders. 15 U.S.C. § 78y.

---

[24] Even if Plaintiff's claims were not improperly amorphous, neither an investigation nor an enforcement action constitutes the "whole or part of an agency rule, order, license, sanction, relief, or the equivalent," so they are not "agency actions." 5 U.S.C. § 551(13).

*See SEC v. Jett*, 514 F. Supp. 2d 532, 535 (S.D.N.Y. 2007) (Section 25(a) of the Exchange Act

"confers exclusive jurisdiction on the Court of Appeals to review the merits of a Commission

order"). Plaintiff cannot "evade the appeals courts' exclusive jurisdiction by claiming his action

sounds in tort." *U.S. v. Baxter*, No. 10-CV-00435, 2011 WL 1988437, at *7 (D. Me. May 23,

2011); *see also, e.g., Jamison v. FTC*, 628 F. Supp. 1548, 1551 (D.D.C. 1986) (allowing plaintiff

to avoid *TRAC* by couching claims in constitutional terms "would cripple the purpose of the

*TRAC* doctrine").

## II.    Plaintiff fails to state a claim upon which relief can be granted.

Even if Plaintiff had standing, sovereign immunity did not bar her claims, and she filed in

the proper court, Plaintiff fails to state a claim upon which relief can be granted. *See Iqbal*, 556

U.S. at 678 ("a complaint must contain sufficient factual matter, accepted as true, to state a claim

to relief that is plausible on its face.") (cleaned up). The SAC, therefore, should be dismissed

pursuant to Rule 12(b)(6).

### A.  Plaintiff's claims that the Commission acted negligently and failed to supervise FINRA should be dismissed.

Counts III, IV, V, VII, and VIII are premised on the notion that the Commission

negligently breached its duty to investors by failing to enforce the securities laws and/or to

resolve the FINRA U3 halt, which Plaintiff claims caused her investment losses. Plaintiff's

claims are without merit.

First, the Commission does not, in fact, owe a duty of care to individual investors. *See,*

*e.g., Grady v. U.S.*, No. 13-15C, 2013 WL 4957344, at *4 (Fed. Cl. July 31, 2013), *aff'd*, 565

Fed. Appx. 870 (Fed Cir. May 7, 2014).[25] In *Grady*, the plaintiff sought to hold the Commission

---

[25] To the extent the Court would look to Texas law, [a] person owes a duty of care to another person only if that duty arises out of a limited set of 'special relationships or circumstances.'"

liable for losses he suffered during a stock market "Flash Crash," arguing the Commission

violated its "statutory duty to maintain 'fair and orderly capital' markets." *Id.* The court held that

the "SEC has no such duty because the statute [the Exchange Act] does not establish any sort of

trust relationship that benefits investors." *Id.* (cleaned up). *See also Zelaya v. U.S.*, 781 F.3d

1315, 1325 (11th Cir. 2015) (questioning the claim that "the SEC breached 'the duty of care

owed to investors' as a result of violations of its federal statutory duties * * * [because] mere

breaches of federal statutory duties are, as a threshold matter, insufficient to support a cause of

action").[26] Accordingly, courts have uniformly rejected attempts to hold the Commission liable

for alleged investor losses. *See, e.g., Baer v. U.S.*, No. 11-1277, 2011 WL 6131789, at *7 (D.N.J.

Dec. 8, 2011) ("If Plaintiffs prevailed, the SEC would become the guarantor of the investment

decisions of individuals who choose to participate in regulated markets. While undoubtedly one

function of the SEC is to protect the public from people like Madoff, to impose an obligation on

the government to expend resources sufficient to uncover every wrong which could be

discovered from a proper investigation is to impose an unlimited obligation on the government *

* *").[27]

---

*Mack v. RPC, Inc.*, 439 F. Supp. 3d 897, 901 (E.D. Tex. 2020) (citing *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2000)). No such special relationship exists between the Commission and investors.

[26] In affirming dismissal, the court relied on the discretionary function exception under the FTCA to reject plaintiff's negligence claims, rather than failure to state a claim. *Zelaya*, 781 F.3d at 1326.

[27] *Baer* rejected claims that the Commission was negligent in not addressing specific tips that, if investigated promptly, may have enabled the Commission to stop a Ponzi scheme by Bernard Madoff. *See also Donahue v. U.S.*, 870 F. Supp. 2d 97, 102 (D.D.C. 2012) (rejecting plaintiff's claim that "the SEC breached a duty of care to the plaintiffs and other investors in Madoff's enterprise" based on the discretionary function exception); *Dichter-Mad Fam. Part., LLP v. U.S.*, 707 F. Supp. 2d 1016, 1018 (C.D. Ca. 2010) (rejecting plaintiff's claim "that the SEC 'owes a duty of reasonable due care to all members of the general public including all investors in the U.S. financial markets who are foreseeably endangered by its conduct").

Second, even assuming a duty to investors existed, Plaintiff does not articulate how the Commission breached that duty. For example, Plaintiff does not point to any information that the Commission had that should have enabled the Commission to stop Plaintiff from investing in a company that she now alleges grossly inflated the value of its assets and made other misrepresentations to investors or should have enabled it to bring enforcement actions relating to the 2021 fraud sooner than it did. Nor does Plaintiff identify any action the Commission should have taken in overseeing FINRA that would have had any impact on how FINRA addressed the trading in MMTLP shares. Plaintiff's conclusory claim of negligence is insufficient. *See, e.g., Hodge v. Engleman*, 90 F.4th 840, 843 (5th Cir. 2024) ("conclusory allegations, unwarranted factual inferences, or legal conclusions are not accepted as true") (cleaned up).[28] And, with respect to Plaintiff's unjust enrichment claim (Count V), Plaintiff does not allege facts showing that the Commission profited in any way from the alleged manipulation related to MMTLP.[29]

## B. Plaintiff's claim that the Commission violated the antitrust laws should be dismissed.

Count II alleges that the Commission violated the Sherman Antitrust and Clayton Acts. The Commission is not a proper defendant under the antitrust statutes, and separately, the SAC is devoid of facts supporting such claims against the Commission. *See Gonzalez v. U.S.*, No. EP-CV-263, 2015 WL 13344910, at *14 (W.D. Tex. Aug. 12, 2015) ("The United States, its agencies and officials, remain outside the reach of the Sherman Act.") (citation omitted); *see also e.g., Cole v. Alaska Island Comm. Serv., Inc.*, No. 1:18-cv-00011, 2019 WL 13211822, at *9 (D.

---

[28] Plaintiff's claims of Commission "inaction," *see, e.g.,* SAC ¶ 245, also ignore that the Commission investigated and brought enforcement actions regarding fraud surrounding the 2021 merger and is investigating potential violations of the federal securities laws regarding the 2022 spinoff.

[29] Also, unjust enrichment is an equitable claim and the "FTCA does not contain a waiver of sovereign immunity for equitable claims." *Pesnell v. U.S.*, 64 Fed. Appx. 73, 74 (9th Cir. April 29, 2003) (dismissing unjust enrichment claim for lack of jurisdiction).

Alaska Oct. 11, 2019) (dismissing claims under the Sherman and Clayton Acts because "[i]t is well established that the United States and its agencies cannot be an antitrust defendant").

### C. Plaintiff's constitutional claim regarding alleged FINRA conflicts should be dismissed.

Plaintiff claims that "FINRA's current structure [is] unconstitutional due to inherent conflicts of interest stemming from its self-funding and self-regulating design, which significantly compromises its impartiality and effectiveness in protecting retail investors." SAC p. 85. Plaintiff, however, fails to articulate any constitutional provision or principle that is violated by the alleged conflicts of interest presented by FINRA's funding mechanism.

### D. Plaintiff's claims that the Commission violated Section 10(b) of the Exchange Act and certain criminal statutes should be dismissed.

Count VI alleges that the Commission violated Section 10(b) of the Exchange Act and 18 U.S.C. §§ 371, 1349. These claims are facially deficient. Plaintiff does not allege that the Commission bought or sold any securities or that it made any statements in connection with the buying or selling of securities, nor does she allege facts supporting reliance, proximate cause, or scienter.[30] *See, e.g., Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th 2009) (laying out basic elements of a claim under Section 10(b)).[31]

Plaintiff's claims under criminal statutes fail because there is no private right of action. *See, e.g., Williams v. Ritenour*, No. SA-23-CA-01396, 2024 WL 874148, at *3 (W.D. Tex. 2024) ("Plaintiff fails to identify any private right of action that would allow him to bring suit to

---

[30] Plaintiff merely alleges that the Commission "fail[ed] to act in the face of mounting evidence of market manipulation." FAC ¶ 129. That does not suffice. Even if Plaintiff's claim could be read as an aiding and abetting claim, it would fail because there is no aiding and abetting cause of action in private suits brought under section 10(b). *Central Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164 (1994).

[31] To the extent it is even raised against the Commission, Plaintiff's claim under Section 9(a) of the Exchange Act, SAC Count I, ¶ 3, p. 68, would fail for similar reasons.

enforce the federal criminal statutes identified in his complaint," including 18 U.S.C. § 371);[32]

*Ireland v Ward*, No. 6:23-CV-00828, 2023 WL 9103066, at *2 (W.D. Tex. Dec. 6, 2024)

(dismissing claims because "Section 1349 does not expressly create a private right of action" and

there is "no general right to bring a private action under federal criminal statutes"), *adopted by*

2024 WL 57013 (Jan. 3, 2024).

### E. Plaintiff's due process claim should be dismissed.

Plaintiff claims that the Commission violated the Due Process Clause of the Fifth

Amendment "by failing to provide adequate oversight, timely communication, transparency or

corrective actions, thus depriving Plaintiff of protected property interests without due process of

law." SAC Count I, ¶ 11, pp. 69-70; *see also id.* Count IV, ¶ 2, p. 73 ("The SEC and FINRA

violated Plaintiff's constitutional rights under the Fifth Amendment * * * by failing to promptly

lift, adequately explain, or address the U3 halt.").[33]

"The Constitution guarantees that life, liberty, or property will not be taken by the

government without due process of law." *Caine v. Hardy*, 943 F.2d 1406, 1411 (5th Cir. 1991).

First, none of Plaintiff's property was taken. Plaintiff does not allege that she no longer owns her

shares; rather, she complains about difficulty trading them. The "MMTLP-to-NBH transition,"

SAC ¶ 185, does not constitute a "taking" of her MMTLP shares and, to the extent it did, the

share exchange was done by the company, not the government, and the company's actions are

---

[32] 18 U.S.C. § 371 criminalizes defrauding the United States government, so a federal agency would not be a defendant under the statute. *See generally In re RCS Engineered Prod. Co., Inc.*, 102 F.3d 223, 226 (6th Cir. 1996) ("it is axiomatic that one cannot commit a fraud or wrong against oneself").

[33] Plaintiff does not allege violation of Due Process as a separate count; rather, she incorporates it as a basis in support of Counts I (Violation of the Exchange Act) and IV (Failure to Resolve the FINRA U3 Halt). The Commission will address it to the extent it could be viewed as raising the claim directly.

not attributable to the government. *See, e.g., Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019) (holding a private entity's actions can be attributed to the government in only "a few limited circumstances" none of which are applicable here).[34]

Moreover, due process "protections, whether procedural or substantive, are not triggered * * * by negligent inaction." *Olabisiobotosho v. Cty. of Houston*, 185 F.3d 521, 526 (5th Cir. 1999). The Commission's alleged failure to oversee FINRA does not support a due process claim because "[o]nly an affirmative act can amount to a violation of substantive due process. The Due Process Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *Lombardi v. Whitman*, 485 F.3d 73, 79 (2d Cir. 2007) ("It is not enough to allege that a government actor failed to protect an individual from a known danger of bodily harm or failed to warn the individual of that danger.").[35]

### F. Plaintiff's Petition for Writ of Mandamus should be denied.

Mandamus "is a drastic and extraordinary remedy reserved for really extraordinary causes." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 380 (2004) (citation omitted). A writ can be granted only if: (1) petitioner has no other adequate means to attain the relief she desires; (2) the writ is appropriate under the circumstances; and (3) the petitioner must demonstrate a "clear and indisputable right to the writ." *In re JPMorgan Chase & Co.*, 916 F.3d

---

[34] Similarly, Plaintiff seems to allege that actions by transfer agents and broker-dealers caused difficulties with reconciliation of shares and accurate share counts. *See* SAC ¶¶ 229-33. But confusion over shareholder records does not mean Plaintiff's shares have been "taken," and even if it did, the transfer agents and broker-dealers are private entities, not the government, and their actions are likewise not attributable to the government. Nor is NBH's decision to make its shares ineligible for DTC, which contributed to the trading and reconciliation difficulties, attributable to the government.

[35] *See also Doe v. Rosa*, 795 F.3d 429, 439 (4th Cir. 2015) ("a plaintiff must show that the state actor created or increased the risk of the private danger, and did so directly through affirmative acts, not merely through inaction or omission").

494, 499 (5th Cir. 2019) (citing *Cheney*, 542 U.S. at 381)). If the action Petitioner seeks to compel is discretionary, there is no clear right to relief, and mandamus is not an appropriate remedy. *See, e.g., Heckler v. Ringer,* 466 U.S. 602, 616 (1984); *see also Ingalls Shipbuilding, Inc. v. Asbestos Health Claimants*, 17 F.3d 130, 133 (5th Cir. 1994) ("Mandamus is only appropriate when the claim is clear and certain and the duty of the officer is ministerial and so plainly prescribed as to be free from doubt.") (citation omitted).

Plaintiff's mandamus claim fails because she does not have a clear and indisputable right to the relief that she seeks. As discussed above, the Commission has discretion regarding how it enforces the federal securities laws, *see Heckler*, 470 U.S. at 828, 830, and Plaintiff is not entitled to an order mandating that the Commission take any particular investigatory or enforcement actions regarding MMTLP or FINRA. Nor does the Commission have a ministerial, nondiscretionary duty to appoint a special master to administer a two-day MMTLP trading event.[36] Similarly, Plaintiff has no clear and indisputable right to an accounting related to MMTLP or to the release of electronic blue sheet data.[37]

### G. Plaintiff's claims seeking an order requiring systematic reforms should be dismissed.

Plaintiff's request that the Court order the Commission to "permanently establish effective oversight mechanisms to prevent proliferation of illegal short positions, enforce securities laws consistently, and enhance transparency and public accountability," SAC p. 84,

---

[36] Such an event, in fact, would be impossible because (among other reasons) MMTLP shares were canceled by the issuer, and only the company—not the Commission or any special agent appointed by the Commission—has the power to reissue them.

[37] Plaintiff also may have another adequate means to obtain the information she seeks. Individuals can seek documents from the Commission via the Freedom of Information Act ("FOIA"), but Plaintiff does not allege that she has filed a FOIA request, and she has not brought a claim under the FOIA.

should be dismissed because courts cannot issue such vague, overly broad declarations. *See, e.g.,*
*Lee v. Centurion of Fl., LLC*, No. 19-CV-210, 2020 WL 13845102, at *7 (N.D. Fl. July 21,
2020) (dismissing claims for declaratory and injunctive relief that were "overly broad and
vague"); *Kristich v. Casady*, No. CIV-23-544-R, 2024 WL 4150475, at *5 (W.D. Okla. July 19,
2024) (recommending dismissal of "request for declaratory/injunctive relief [that] is overly
broad and non-specific" because it "is not narrowly tailored enough to correct the specific
violations claimed by Plaintiffs"), *adopted by* 2024 WL 3814046 (Aug. 14, 2024). *See also U.S.*
*v. State of Wash.*, 759 F.2d 1353, 1357 (9th Cir. 1985) ("Precise resolution, not general
admonition, is the function of declaratory relief.").

## H. Plaintiff's claims regarding various provisions of the Exchange Act are without merit.

Within her nine enumerated counts, Plaintiff alleges that the Commission violated
various provisions of the Exchange Act and that these purported violations support the
enumerated counts. These claims are wholly without merit.

First, many of the provisions cited lack a private right of action. For example, alleged
violations of 15 U.S.C. § 78s(c) (Section 19(c) of the Exchange Act) purportedly support Counts
I – IV. However, there is no "private right of action under Section[] * * * 19 of the Exchange
Act." *Shah v. NASD*, No. 98 C 5355, 1999 WL 240342, at *8 (N.D. Ill. April 9, 1999). Similarly,
alleged violations of U.S.C. § 78q-1(a)(1) purport to support Counts I, II, and IV, but "Section
17A of the Securities Exchange Act, codified 15 U.S.C. § 78q-1, does not imply a private right
of action to remedy violations." *Ahr v. Raymond James & Assoc., Inc.*, No. 1:08-CV-507, 2008
WL 11351382, at *4 (S.D. Ohio Oct. 9, 2008).[38]

---

[38] *See also, e.g., Copeland v. E*Trade Cap. Mgmt., LLC*, No. 24-10658, 2025 WL 66732 (5th Cir.
Jan. 10, 2025) (holding that the books and records provisions of 15 U.S.C. § 78q(a)(1) do not

Second, many are facially inapplicable to the Commission and/or this litigation. For example, Plaintiff cites 15 U.S.C. § 78cc(b) (which governs validity of contracts in violation of the Exchange Act) in support of Count V (unjust enrichment), but the FAC is devoid of any allegations relating to contracts. Similarly, 15 U.S.C. § 78q-1(a)(1), which supposedly supports Counts I, II, and IV, is a Congressional finding of fact, not a provision that can be breached.

To the extent Plaintiff's citation to various provisions of the Exchange Act could be read as asserting additional claims beyond her enumerated counts, they should be dismissed.

## CONCLUSION

For the foregoing reasons, Plaintiff's Second Amended Complaint should be dismissed.

---

provide a private right of action); *Loftus v. FINRA*, No. 20-CV-7290, 2021 WL 325773, at *4 (S.D.N.Y. Feb. 1, 2021) (holding there is no private right of action under 15 U.S.C. § 78o-3); *Fraser v. Fid. Tr. Co., Int'l*, No. 04-cv-6958, 2005 WL 6328596, at *14 (S.D.N.Y. June 23, 2005) (holding that "Section 15 of the Exchange Act [specifically 15 U.S.C. § 78o(b)(4)(E)] * * * do[es] not provide Plaintiff with a private right of action"); *Great Pac. Sec. v. Barclays PLC*, No. CV 14-1210, 2016 WL 11502178, at *16 (C.D. Cal. Oct. 19, 2016) (holding no private right of action under 17 C.F.R. § 240.15c3-5 or Sections 17(a) or 15 of the Exchange Act); *Mill Bridge V, Inc. v. Benton*, No. 08-2806, 2009 WL 4639641, at *11 (E.D. Pa. Dec. 3, 2009) (holding there is no private right of action under 15 U.S.C. § 78f(b)).

Respectfully Submitted,


Date: May 20, 2025                          /s/ Eric A. Reicher_____

                                            Melinda Hardy*
                                            D.C. Bar No. 431906
                                            Eric A. Reicher**
                                            D.C. Bar No. 490866
                                            Securities and Exchange Commission
                                            100 F Street NE
                                            Washington, DC 20549
                                            (202) 551-7921 (phone) (Reicher)
                                            hardym@sec.gov
                                            reichere@sec.gov

                                            Jason J. Rose
                                            Texas Bar No. 24007946
                                            Securities and Exchange Commission
                                            801 Cherry Street, Suite 1900
                                            Fort Worth, Texas 76102
                                            (817) 978-1408 (phone)
                                            (817) 978-4927 (facsimile)
                                            rosej@sec.gov

                                            Counsel for Defendant

                                            *   Pro Hac Vice Forthcoming
                                            ** Admitted Pro Hac Vice

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of May, 2025, I filed or caused to be filed the foregoing SEC's Motion to Dismiss through the CM/ECF system which will provide service to counsels of record and to Plaintiff since she has been granted permission to file electronically by the Court.

*/s/ Eric A. Reicher*
Eric A. Reicher
Special Trial Counsel
U.S. Securities and Exchange Commission