# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WESTERN TEXAS
## MIDLAND/ODESSA DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DANIELLE SPEARS                                     *

Plaintiff                                           *

                                                       *   Docket Number: 7:24-cv-321

v.                                                  *

                                                       *

NEXT BRIDGE HYDROCARBONS, INC.                      *

GREGORY MCCABE, JOHN BRDA                           *

THE SECURITIES & EXCHANGE COMMISSION                *

FINANCIAL INDUSTRY REGULATORY AUTHORITY             *

JANE DOE 1-20, JOHN DO 1-20                         *

Defendant                                           *

                                                       *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT FINRA'S MOTION TO DISMISS

---

# TABLE OF CONTENTS

**I. INTRODUCTION**

    **A. Federal Question Jurisdiction**…………………………………………...… **6**

    **B. Summary of Claims and Relief Sought**…………………………………… **7**

**II. JURISDICTION AND VENUE**

    **A. Subject Matter Jurisdiction  (Exchange Act, Sherman Act, Constitutional Claims)**.................................................................................. **8**

    **B. Diversity Jurisdiction for All Defendants and Forum Retention in Texas**…... **9**

    **C. Venue Propriety**……………………………………………………….. **12**

**III. FACTUAL BACKGROUND**

    **A.  The Birth and Legal Structure of FINRA**…..……………………………… **14**

    **B. FINRA's Role as a Self-Regulatory Agency ("SRO") Under 15 U.S.C. § 78o-3**…..………………………………………………… **16**

    **C. FINRA's Governance Structure Ensures Protection of Member Firms Over Investors**……………………………………………………... **19**

**IV. IMMUNITY DOES NOT EXTEND TO ULTRA VIRES CONDUCT**

**Introduction paragraph on MMTLP event and FINRA's failures**

    **A. Immunity or No Immunity: That is the Question**………………………….. **22**

        **1. FINRA's contradictory statements regarding Regulation SHO "threshold" status**………………………………………… **24**

        **2. MMTLP met SEC's Regulation SHO threshold criteria regardless of "error" claim**……………………………………………**25**

    **B. FINRA violated its own Rule 6490 by altering the corporate action**…………. **26**

**C. Regulator turned de facto issuer — the governing law, FINRA's duties, and two independent violations**…………………………………………………… 29

**1. Aiding and abetting preservation of short positions in violation of settlement/close-out duties**………………………………………………….. 30

**2. De facto issuer conduct: removal of pay date and reclassification of corporate action**…………………………………………………… 31

**3. "Too Late to Cancel" orders and synthetic share substitution as further evidence of ultra vires conduct**……………………………………………… 32

**V. THE FOX IS GUARDING THE HENHOUSE — NO EXCHANGE-LEVEL OVERSIGHT, NO ACCOUNTABILITY**

**A. FINRA's Regulatory Responsibilities vs. Execution Failures**………………… 34

**B. Governance Conflicts and Financial Benefit From Halt**……………………… 35

**VI. MONOPOLY CONTROL AND ANTITRUST LIABILITY**

**A. FINRA's Structural Monopoly Over the OTC Market**……………………… 36

**B. Vertical Integration and Governance Conflicts**……………………………… 37

**C. Collusion, Transparency Failures, and Information Asymmetry**……………… 37

**D. Antitrust Analysis**……………………………………………………….. 37

**VII. FINAL CONSTITUTIONAL ARGUMENTS AND STANDING**

**A. Standing**……………………………………………………………….. 38

**B. Due Process Violation**……………………………………………………. 38

**C. SEC Rulemaking Requirements Not Followed**…………………………… 39

**D. Major Questions Doctrine and Nondelegation**………………………………. 39

**VIII. PRAYER FOR RELIEF**

**A. Declaratory Relief**……………………………………………………….41

**B. Monetary Relief**………………………………………………………….42

**C. Attorney's Fees**………………………………………………………….42

**D. Further Relief as Court Deems Just**……………………………………….. **42**

# <u>Table of Authorities</u>

*Alan B. Rich D/B/A Law Office of Alan B. Rich v. Cantilo & Bennett, L.L.P.,*
492 S.W.3d 755 (Tex. App.—Austin 2016, pet. denied)........................................ 6

*Alpine Securities Corp. v. FINRA,*
61 F.4th 1093 (D.C. Cir. 2023)..........................................................................6,15, 20

*A.F.A. Tours, Inc. v. Whitchurch,*
937 F.2d 82 (2d Cir. 1991)................................................................................. 8

*Axon Enterprise, Inc. v. FTC,*
598 U.S. 175 (2023)...........................................................................................6, 15
10

*Bankers Trust Co. v. Tex. & Pac. Ry.,*
241 U.S. 295 (1916)........................................................................................... 8

*Bell v. Hood,*
327 U.S. 678 (1946)........................................................................................... 4

*Bell v. Preferred Life Assurance Soc'y,*
320 U.S. 238 (1943)........................................................................................... 8

*Carden v. Arkoma Assocs.,*
494 U.S. 185 (1990)........................................................................................... 7

*Carlsberg Res. Corp. v. Cambria Sav. & Loan Ass'n,*
554 F.2d 1254 (3d Cir. 1977)............................................................................ 8

*Citizens Insurance Co. of America, Citizens, Inc., Harold Riley,*
*and Mark Oliver v. Dr. Fernando Hakim Daccach,*
217 S.W.3d 430 (Tex. 2007).............................................................................. 7

*David Fernea v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
559 F. App'x 366 (5th Cir. 2014)...................................................................... 12

*Desiderio v. NASD,*

191 F.3d 198 (2d Cir. 1999)........................................................................... 11

*DL Capital Group, LLC v. NASD Regulation, Inc.,*
409 F.3d 93 (2d Cir. 2005)........................................................................... 11, 20

*Exxon Mobil Corp. v. Allapattah Servs., Inc.,*
545 U.S. 546 (2005)........................................................................................ 9

*Fiero v. FINRA,*
660 F.3d 569 (2d Cir. 2011)......................................................................... 15

*Free Enterprise Fund v. PCAOB,*
561 U.S. 477 (2010)...................................................................................... 15

*Harvestons Securities, Inc. v. Narnia Investments, Ltd., No.*
22-20424, 2023 WL 2390716 (5th Cir. Mar. 7, 2023).......................... 6

*Howery v. Allstate Ins. Co.,*
243 F.3d 912 (5th Cir. 2001).............................................................….... 8

*Knop v. McMahan,*
872 F.2d 1132 (3d Cir. 1989)...................................................................... 8

*Langton v. Cbeyond Commc'ns, L.L.C.,*
282 F. Supp. 2d 504 (W.D. Tex. 2003)..................................................... 10

*Leroy v. Great W. United Corp.,*
443 U.S. 173 (1979)...................................................................................... 9

*McClintock v. School Bd. E. Feliciana Parish,*
299 F. App'x 363 (5th Cir. 2008)............................................................... 10

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning,*
578 U.S. 374 (2016)................................................................................ 4,12

*Nat'l Ass'n of Realtors v. NAR,*
894 F.2d 937 (7th Cir. 1990)....................................................................... 7

*National Horsemen's Benevolent & Protective Ass'n v. Black,*

53 F.4th 869 (5th Cir. 2024)..................................................................    37

*Ruhrgas AG v. Marathon Oil Co.,*
526 U.S. 574 (1999).............................................................................    9

*Scottsdale Capital Advisors Corp. v. FINRA,*
844 F.3d 414 (4th Cir. 2016)...............................................................    12

*Sparta Surgical Corp. v. NASD,*
159 F.3d 1209 (9th Cir. 1998)......................................................15, 20, 21

*St. Paul Mercury Indem. Co. v. Red Cab Co.,*
303 U.S. 283 (1938).............................................................................    8

*Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, LLC,*
757 F.3d 481 (5th Cir. 2014)................................................................    8

*Weissman v. NASD,*
500 F.3d 1293 (11th Cir. 2007).............................................................    20

**2. Statutes**

● **15 U.S.C. § 78o–3 (Exchange Act Section 15A – Registration and regulation of national securities associations)...........................................................12, 13, 34**

● **15 U.S.C. § 78f (Registration and regulation of national securities exchanges) 12, 13**
● **15 U.S.C. § 78s (SEC oversight of self-regulatory organizations)**

● **15 U.S.C. § 78aa (Jurisdiction of offenses and suits)...........................  6**

● **28 U.S.C. § 1331 (Federal question jurisdiction)...................................4, 6, 9**

- **28 U.S.C. § 1332 (Diversity jurisdiction)**....................................................**7**

---

**3. Rules and Regulations**

- **FINRA Rule 4320 (Short Sale Delivery Requirements)**.............................  **1, 22**

- **FINRA Rule 6440 (Trading and Quotation Halt in OTC Equity Securities)**.....**15**

- **FINRA Rule 6490 (Processing of Company-Related Actions)**....................**24, 15, 32**

- **SEC Rule 15c6-1 (T+2 Settlement Cycle)**............................................  **1**

- **SEC Rule 15c3-3 (Customer Protection Rule)**........................................**1, 30**

- **Regulation SHO, 17 C.F.R. § 242.203 (Close-out requirements)**.......................  **23**

- **17 C.F.R. § 240.19b-4 (Filing of proposed rule changes by SROs)**....................  **21**

## I. INTRODUCTION

This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1332, and venue is proper under 28 U.S.C. § 1391(b)(2). Plaintiff brings federal claims arising from actions taken by the Financial Industry Regulatory Authority ("FINRA") on or about December 9, 2022, when FINRA halted the trading of MMTLP, a Series A Preferred Share. The halt operated as a de facto permanent termination of trading without the statutory process required for such final market actions.

This case concerns a self-regulatory organization ("SRO") that exceeded its delegated authority under the Exchange Act in a manner that caused foreseeable, concrete harm to investors. FINRA's conduct was not an isolated procedural error. It was the culmination of a systemic breakdown in regulatory integrity — a gross failure to perform its statutory duties in the areas of market execution and market mechanics. FINRA ignored multiple federal settlement and delivery rules designed to protect the marketplace, including SEC Rule 15c6-1 (T+2 settlement), Regulation SHO Rules 203(b)(3) and 204(a) (mandatory close-outs), SEC Rule 15c3-3 (possession or control), and FINRA Rule 4320(a) (OTC close-outs). Federal law required that all short positions in MMTLP be closed before the effective date of its conversion into a non-tradable private security. FINRA had the authority and the obligation to ensure that the corporate action notice contained those instructions and to require compliance. It did neither.

The broader issue before this Court is whether the United States can continue to delegate market-policing authority to a private organization that has demonstrated, in real time and on a global scale, that it will protect its own at the expense of not only retail investors, but also pension funds and other institutional stakeholders. FINRA's governance structure — in which

2

numerous executives from brokerage firms directly affected by its regulatory decisions hold

influential positions — creates an inherent and irreconcilable conflict of interest.

A second and equally troubling failure compounds the first. Retail investors reasonably expected

the Securities and Exchange Commission ("SEC") to ensure FINRA's compliance with its duties

under the Exchange Act. The SEC's refusal to intervene — and its statement to investors that

even if FINRA acted improperly, it was not the SEC's responsibility — represents a fundamental

abdication of its statutory oversight obligations under 15 U.S.C. § 78s(g). The result is a

regulatory vacuum in which the only entities charged with protecting investors were either

unwilling or unable to do so.

When the MMTLP halt was implemented on December 9, 2022, all of Plaintiff's open limit sell

orders were automatically canceled by the market system. In ordinary market practice, temporary

trading halts do not cancel open orders; those orders remain in the order book and resume when

trading resumes. Automatic cancellation of all open orders is characteristic of a final or

permanent halt. The immediate cancellation therefore confirms that trading was not intended to

resume and that investors were deprived, without notice or opportunity to be heard, of the right

to alienate their property.

On the morning of Friday, December 9, 2022, at 9:35 a.m. Eastern Time, just five minutes after

the market opened, Plaintiff's active Good-Til-Canceled sell limit order for 1,710 shares of

MMTLP at $420 per share was unilaterally canceled by the broker's system. Plaintiff did not

cancel this order. Because MMTLP had closed at $2.90 per share on December 8, platform rules

would have prevented Plaintiff from re-entering the same order at $420; the maximum allowable

new limit price would have been approximately $290. Canceling the $420 order therefore

3

permanently deprived Plaintiff of the opportunity to sell at that price. Minutes later, at 9:39 a.m.,

Plaintiff attempted to place a new order to sell one share at $2.90, the prior day's closing price,

but the order was immediately rejected due to FINRA's U3 halt. The rejection occurred while the

broader market was open; only MMTLP was halted. Plaintiff had no incentive to cancel the

existing $420 order and every incentive to keep it active.

After December 9, Plaintiff continued to attempt to place new sell orders for MMTLP, including

multiple orders on December 11 and December 12, 2022, at prices ranging from $2.90 to $145

per share. All such attempts were immediately rejected by the broker's system. December 12 had

been publicly identified as the "last day to trade" MMTLP, yet no trading was permitted and no

sell orders could be entered. The forced cancellation of existing orders on December 9, coupled

with the ongoing rejection of all new sell orders through December 12, confirms that the halt was

implemented as a permanent termination of trading, not a temporary pause. Plaintiff was

informed for weeks that the last day to sell her shares was December 12, 2022, at market close.

Following the halt, thousands of MMTLP investors voiced shock, anger, and outrage on social

media. Investors across the board reported the same experience: all open limit sell orders had

been canceled by all trading platforms without explanation. Brokerages told investors they did

not know what was happening and were awaiting instructions from FINRA — instructions that

never came. The outcry was not limited to United States residents; investors in Canada, Sweden,

Korea, Germany, and Israel reported identical results. Several Canadian shareholders stated that

they had purchased through Canadian brokers, including Scotia iTRADE and BMO

InvestorLine, and that their trades cleared through the Canadian Depository for Securities

("CDS"), all non-U.S. entities. Nevertheless, their market access was halted at the exact same

time as the U.S. market.

4

While Plaintiff cannot confirm its veracity, a Swedish shareholder reported that MMTLP traded for approximately $55,000 per share on December 8, 2022. That shareholder further stated that he had a "too late to cancel" order which he believed had executed for $1,700 per share, only to be told the next day that the United States had halted the stock and the trade had been canceled. This was a short squeeze in progress, and FINRA's actions operated to protect its member firms, causing harm to thousands of investors worldwide.

On December 8, 2022, Plaintiff purchased 4,005 shares for $15,908.70 with the specific intent to sell those shares on or before December 12, 2022, in a swing trade, after verifying the final trading information on FINRA's Daily List (see Exhibit 3). Plaintiff would never have spent nearly $16,000 had she been told she would never have access to those funds again.

Plaintiff alleges that FINRA's action was ultra vires, that it was not merely a neutral regulatory pause, and that it produced direct, compensable harm. Because the Complaint plausibly alleges federal claims and a factual record that cannot be resolved on the pleadings, FINRA's motion should be denied.

**A. Federal Questions Jurisdiction**

This Court has original jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims arising under the Constitution, laws, and treaties of the United States. The Complaint alleges violations and ultra vires actions under and related to the Securities Exchange Act of 1934, federal antitrust statutes, and the United States Constitution, including claims under the Due Process Clause and structural separation of powers principles. Federal question jurisdiction exists where a well-pleaded complaint establishes that federal law creates the cause of action or that the right to relief necessarily depends on resolution of a substantial question of federal law. See

5

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374, 383–84 (2016) (Exchange Act–related claims belong in federal court where federal issues are necessarily raised).

To the extent FINRA argues that certain claims lack a private right of action or fail on the merits, such contentions do not defeat jurisdiction. "[J]urisdiction is not defeated by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." *Bell v. Hood*, 327 U.S. 678, 682 (1946). Whether a claim ultimately survives under Rule 12(b)(6) is a separate merits inquiry and is not a basis for dismissal under Rule 12(b)(1). Plaintiff's constitutional claims, as well as her federal antitrust claims, independently establish jurisdiction under § 1331 regardless of the Exchange Act counts.

Because the Complaint presents federal causes of action and necessarily raises substantial questions of federal law regarding FINRA's delegated regulatory authority, its oversight under the Exchange Act, and the constitutional limits on private entities exercising governmental power, this Court has subject-matter jurisdiction pursuant to § 1331

**B. Summary of Claims and Relief Sought**

Plaintiff alleges that the Financial Industry Regulatory Authority ("FINRA") acted outside the scope of its statutory authority under the Securities Exchange Act of 1934 by imposing an unauthorized trading halt (U3 Halt) on the security known as MMTLP on December 9, 2022, improperly revising corporate action disclosures, and exercising regulatory authority reserved solely for registered national securities exchanges. Plaintiff further asserts violations of Sections 1 and 2 of the Sherman Act, alleging monopolistic control and anticompetitive conduct by FINRA within the over-the-counter securities marketplace. Additionally, Plaintiff alleges violations of her Fifth Amendment due process rights arising from FINRA's actions, which were

6

implemented without notice, proper procedure, or opportunity for challenge. Plaintiff seeks

declaratory relief, injunctive relief mandating transparency and procedural reform, treble and

compensatory damages, restitution and disgorgement of unlawful benefits, attorney's fees, and

all further relief deemed appropriate by this Court.

## II. JURISDICTION AND VENUE

### A. Subject Matter Jurisdiction (Exchange Act, Sherman Act, Constitutional Claims)

This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 78aa, as Plaintiff alleges

violations under the Securities Exchange Act of 1934. Further, jurisdiction exists under 15

U.S.C. §§ 1 and 2, as Plaintiff alleges Sherman Act violations involving monopolistic and

anticompetitive conduct. Plaintiff additionally asserts constitutional violations under the Fifth

Amendment, providing jurisdiction under 28 U.S.C. § 1331.

Plaintiff's claims challenge the legality and statutory authority of FINRA's regulatory conduct

and do not arise from disputes governed by arbitration agreements or FINRA's arbitration rules.

Claims challenging regulatory authority or statutory compliance are specifically reserved for

judicial determination. See *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 190–92 (2023) (federal

courts have jurisdiction over constitutional and structural challenges to administrative agencies

without exhaustion); *Alpine Securities Corp. v. FINRA*, 61 F.4th 1093, 1111–12 (D.C. Cir. 2023)

(FINRA's ultra vires actions subject to judicial review).

The Fifth Circuit and Texas courts have clearly affirmed that regulatory, statutory, or

constitutional claims are beyond the scope of arbitration clauses and must be adjudicated by

courts. See *Alan B. Rich D/B/A Law Office of Alan B. Rich v. Cantilo & Bennett, L.L.P.*, 492

7

S.W.3d 755, 760–62 (Tex. App.—Austin 2016, pet. denied) (statutory and regulatory challenges not arbitrable); *Citizens Insurance Co. of America, Citizens, Inc., Harold Riley, and Mark Oliver v. Dr. Fernando Hakim Daccach*, 217 S.W.3d 430, 445–47 (Tex. 2007) (claims challenging statutory violations or regulatory misconduct fall squarely within judicial jurisdiction, not arbitration); *Harvestons Securities, Inc. v. Narnia Investments, Ltd.*, No. 22-20424, 2023 WL 2390716, at *5–7 (5th Cir. Mar. 7, 2023) (claims challenging regulatory authority or statutory compliance remain subject to federal judicial jurisdiction and not arbitration).

Thus, FINRA cannot validly invoke arbitration to shield itself from judicial scrutiny of its ultra vires regulatory actions, statutory violations, and constitutional infringements. These matters are explicitly reserved for this Court's jurisdiction.

## B. Diversity Jurisdiction for All Defendants and Forum Retention in Texas

In the alternative to federal question jurisdiction, this Court has subject matter jurisdiction over all claims and all Defendants under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiff and all Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs. This diversity jurisdiction, combined with the strong Texas nexus of key Defendants, ensures this case remains properly before the United States District Court for the Western District of Texas.

Plaintiff is a citizen of the State of Arizona. None of the Defendants share Plaintiff's state citizenship. Defendant Financial Industry Regulatory Authority, Inc. ("FINRA") is incorporated in Delaware and maintains its principal place of business in Washington, D.C., and is therefore a

8

citizen of Delaware and the District of Columbia for diversity purposes as defined in *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010) and *Nat'l Ass'n of Realtors v. NAR*, 894 F.2d 937, 939 (7th Cir. 1990). FINRA is a corporate entity and not an unincorporated association whose citizenship would be determined by that of its members, as explained in *Carden v. Arkoma Assocs.*, 494 U.S. 185, 189 (1990). Next Bridge Hydrocarbons, Inc. is incorporated in Nevada with its principal place of business in Texas. Gregory McCabe is a resident and citizen of Texas. John Brda is a resident and citizen of Missouri. Torchlight Energy Resources, Inc., the corporate predecessor whose merger initiated the chain of events at issue, was incorporated in Nevada but had its principal place of business in Texas at the relevant times, including the period when corporate actions setting up the disputed MMTLP distribution were conceived and executed. Because no Defendant shares Plaintiff's Arizona citizenship, complete diversity is satisfied as recognized in *Bankers Trust Co. v. Tex. & Pac. Ry.*, 241 U.S. 295, 309 (1916), *Knop v. McMahan*, 872 F.2d 1132, 1137 (3d Cir. 1989), and *Carlsberg Res. Corp. v. Cambria Sav. & Loan Ass'n*, 554 F.2d 1254, 1258 (3d Cir. 1977). See also *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001) (the party invoking federal jurisdiction bears the burden of establishing complete diversity and amount in controversy; once shown, the presumption favors jurisdiction), and *Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, LLC*, 757 F.3d 481, 483–84 (5th Cir. 2014) (diversity determined by the citizenship of each party; federal jurisdiction retained if no plaintiff shares a state of citizenship with any defendant).

Plaintiff's direct losses from FINRA's December 9, 2022 trading halt and related conduct consist of the blocked ability to sell MMTLP shares at prevailing market-driven prices prior to the halt, resulting in significant diminution in the value of Plaintiff's holdings and lost market opportunity. The market evidence from December 8–9, 2022, including large-volume "too late to

9

cancel" sell orders priced between $150,000 and $200,000 per share placed by other investors, demonstrates the trading environment and potential valuation at the time, and further confirms that the aggregate harm caused by the halt was substantial. When combined with consequential damages, punitive damages, and treble damages available under the Sherman Act, 15 U.S.C. § 15, Plaintiff's damages far exceed the $75,000 jurisdictional threshold. Punitive damages are counted toward the amount in controversy where recoverable by law, as recognized in *Bell v. Preferred Life Assur. Soc'y*, 320 U.S. 238, 240 (1943), and *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 87 (2d Cir. 1991). Under *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938), the plaintiff's claimed sum controls if made in good faith and is only rejected if it appears to a legal certainty that the claim is less than the jurisdictional amount — a showing Defendants cannot make here.

This case is not only diverse but also deeply rooted in Texas. Next Bridge Hydrocarbons' principal place of business is in Texas; McCabe resides in Texas; Torchlight Energy's headquarters were in Texas when the corporate transactions underlying this dispute were structured; and substantial parts of the events giving rise to the claims, including corporate decision-making, shareholder communications, and member-firm activities, occurred in Texas. These facts independently satisfy 28 U.S.C. § 1391(b)(2), which allows venue where a substantial part of the events or omissions giving rise to the claim occurred, as recognized in *Leroy v. Great W. United Corp.*, 443 U.S. 173, 183–84 (1979).

Plaintiff's claims arise under federal law and are independently supported by federal question jurisdiction under 28 U.S.C. § 1331. However, diversity jurisdiction under § 1332 provides an alternative and independent basis for this Court's jurisdiction, ensuring that the case remains in this District even if any portion of the federal claims were challenged, consistent with *Ruhrgas*

*AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999), and *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 553 (2005). In sum, complete diversity, the amount in controversy, and the substantial Texas nexus of critical parties and events all reinforce that this Court is both a proper and the most appropriate forum for the resolution of this dispute.

## C. Venue Propriety

Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within the State of Texas, and specifically within this District. See *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) (en banc) (substantial part of the events can be determined by considering where "the acts and omissions giving rise to the claim occurred" and "where witnesses and evidence are located"); *McClintock v. School Bd. E. Feliciana Parish*, 299 F. App'x 363, 365 (5th Cir. 2008) (venue proper where a substantial part of the events or omissions occurred in the chosen district, even if other substantial events occurred elsewhere).

Next Bridge Hydrocarbons, Inc. maintains its principal place of business in Texas. Defendant Gregory McCabe resides in Texas, and was a central figure in the corporate transactions that led to the distribution of MMTLP shares. Torchlight Energy Resources, Inc., the predecessor to Meta Materials, had its headquarters in Texas at the time it structured the corporate actions that created the MMTLP distribution. The decisions and communications surrounding these corporate actions were made or directed from Texas, involving Texas-based executives and operations.

The Western District of Texas is also home to numerous brokers and market participants who were directly impacted by FINRA's halt. The consequences of that halt were immediately felt by Texas investors and firms, and included the inability to execute trades, the cancellation of open

sell orders, and the loss of market opportunities. The presence of key parties, witnesses, and relevant documents in Texas further confirms that this District is the most appropriate and convenient forum for the resolution of this dispute.

Under *Leroy v. Great W. United Corp.*, 443 U.S. 173, 183–84 (1979), venue is proper in any district where a substantial part of the events or omissions giving rise to the claim occurred, even if other events occurred elsewhere. See also *Langton v. Cheyond Commc'ns, L.L.C.*, 282 F. Supp. 2d 504, 508 (W.D. Tex. 2003) (venue proper in this District when it contains the location where a significant part of the facts underlying the dispute took place). Here, the Texas-based decision-making, corporate activity, and market impact easily satisfy that standard. Moreover, because the claims involve overlapping facts and evidence concerning Texas-based entities and individuals, maintaining venue in this District promotes judicial efficiency and avoids the duplication of proceedings in multiple jurisdictions.

For these reasons, venue in the Western District of Texas is not only proper under § 1391(b)(2), it is the most appropriate forum for adjudicating this dispute given the factual nexus to Texas and the presence of essential parties and evidence within this District.

## III. FACTUAL BACKGROUND

### A.  The Birth and Legal Structure of FINRA

The Financial Industry Regulatory Authority ("FINRA") was created on July 30, 2007, following approval by the Securities and Exchange Commission ("SEC") on July 26, 2007. Its formation resulted from a regulatory consolidation between the National Association of Securities Dealers ("NASD") and the enforcement and regulatory functions of the New York Stock Exchange

("NYSE"). This merger was formalized under SEC Release No. 34-56145.[1] From that point

forward, FINRA became the sole registered national securities association in the United States.

FINRA is a private, non-profit corporation—not a government agency. Courts have repeatedly

affirmed that FINRA is a private entity, not a government actor. See *DL Capital Group, LLC v.*

*NASD Regulation, Inc.*, 409 F.3d 93, 96 (2d Cir. 2005) ("NASD is a private actor, not a state

actor"); *Desiderio v. NASD*, 191 F.3d 198, 206 (2d Cir. 1999) ("NASD is a private actor for

constitutional purposes").[2] Courts across multiple circuits, including the Fifth Circuit, have

recognized that FINRA is a private self-regulatory organization rather than a governmental

entity, and that its authority exists solely by virtue of delegation from the SEC. In *David Fernea*

*v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 559 F. App'x 366, 369 (5th Cir. 2014), the Fifth

Circuit acknowledged FINRA's role as a private SRO subject to SEC oversight, not a sovereign

regulator. Likewise, in *Scottsdale Capital Advisors Corp. v. FINRA*, 844 F.3d 414, 423 (4th Cir.

2016), the Fourth Circuit confirmed that FINRA's powers are limited to those expressly

conferred by the Exchange Act and SEC-approved rules, and that it "is not a governmental

agency." These authorities underscore that FINRA's actions must remain within its delegated

scope and that any exercise of power beyond that scope is ultra vires.

FINRA is registered with the SEC under Section 15A of the Securities Exchange Act of 1934,

codified at 15 U.S.C. § 78o–3. Unlike a registered national securities exchange (which must

comply with 15 U.S.C. § 78f), FINRA was never authorized to operate a trading platform or

market. FINRA has never filed a Form 1 registration with the SEC,[3] never obtained exchange

[1] **SEC Release No. 34-56145**, "Order Approving the Proposed Rule Change Relating to the NASD and NYSE Member Regulation Consolidation," July 26, 2007.
[2] *Desiderio v. NASD*, 191 F.3d 198, 206 (2d Cir. 1999); *DL Capital Grp., LLC v. NASD Regulation, Inc.*, 409 F.3d 93, 96 (2d Cir. 2005).
[3] **17 C.F.R. § 240.6a-1** — Form 1 is required to register as a national securities exchange; FINRA has never done so.

approval under SEC Rule 6a-1,[4] and has never submitted a market operating rulebook under

Exchange Act Section 6.[5] Its rulemaking authority applies only to its member firms, and only

when acting within the scope of a properly filed rule approved by the SEC under Section 19(b).[6]

Its authority is explicitly limited to the regulation of its members, namely, broker-dealers.

The consolidation that created FINRA was intended to reduce duplicative regulation, increase

consistency, and enhance investor protection by eliminating overlapping oversight from NASD

and NYSE Regulation. However, the statutory limits on FINRA's authority remained intact: it

was created to regulate member conduct, not to operate markets or intervene in trading systems.

That limitation remains in effect today and when FINRA exceeds it, it acts *ultra vires* and

without immunity.

The legal framework that governs FINRA was established by Congress through the Securities

Exchange Act of 1934. Specifically, Section 15A (see 15 U.S.C. § 78o–3) authorizes the SEC to

register and supervise self-regulatory organizations ("SROs") like FINRA. Under this authority,

FINRA may regulate only its members (i.e., broker-dealers), not operate exchanges or perform

exchange-level regulatory functions, which are governed by 15 U.S.C. § 78f.[7]

FINRA is not a sovereign agency. Its authority is delegated, conditional, and revocable. Its

jurisdiction exists only by grace of the SEC, which serves as its federal overseer. FINRA cannot

create or expand its own powers without express SEC approval, and any action taken outside of

those limits is *ultra vires*.

---

[4] **Id.** — FINRA never obtained exchange approval under SEC Rule 6a-1.
[5] **15 U.S.C. § 78f** — Governs the registration and regulation of exchanges.
[6] **15 U.S.C. § 78s(b)(1)** — No proposed rule change shall take effect unless approved by the Commission.
[7] **15 U.S.C. § 78f** — Exchanges are subject to their own registration and rulebook obligations; FINRA is not authorized to operate as an exchange.

The rules that govern FINRA's day-to-day operations come from two sources:

1. FINRA itself, through its internal rulemaking process; and

2. The SEC, which must review and approve all proposed rule changes before they take effect

Under Section 19(b) of the Exchange Act (15 U.S.C. § 78s(b)),[8] FINRA cannot enforce or modify any rule without the SEC's formal approval. The SEC also retains authority under Section 19(c) (15 U.S.C. § 78s(c))[9] to amend or abrogate FINRA rules independently if necessary to protect investors or the public interest.

**B. FINRA's Role as a Self-Regulatory Agency ("SRO") Under 15 U.S.C. § 78o-3**

As a self-regulatory organization (SRO), FINRA operates under the direct oversight of the Securities and Exchange Commission (SEC).[10] FINRA's authority is neither inherent nor autonomous; it exists solely by virtue of statutory delegation and must be exercised in accordance with procedures set forth in Section 19 of the Exchange Act (15 U.S.C. § 78s).

---

[8] **15 U.S.C. § 78s(b)(1)** — The SEC reviews FINRA disciplinary decisions upon appeal and determines whether FINRA remains in compliance with the Securities Exchange Act.

[9] **15 U.S.C. § 78s(c)** — The SEC may "abrogate, add to, and delete from... the rules of a self-regulatory organization."

[10] As a registered SRO, FINRA is legally accountable to the Securities and Exchange Commission, which serves as its federal regulator. The SEC has ultimate authority over FINRA's rulebook, regulatory conduct, and enforcement activity. The SEC reviews FINRA disciplinary decisions upon appeal and determines whether FINRA remains in compliance with the Securities Exchange Act. Under 15 U.S.C. § 78s(h), the SEC may: (1) suspend or revoke FINRA's registration as a national securities association; (2) censure or limit FINRA's regulatory functions; and (3) initiate enforcement actions against FINRA if it fails to carry out its responsibilities under the Act. Additionally, under 15 U.S.C. § 78s(b), FINRA must file all proposed rules with the SEC, and such rules are ineffective until formally approved. In this way, FINRA's authority is not autonomous; it is delegated and conditional, and its continued existence depends entirely on SEC oversight and compliance with federal securities law.

FINRA is a private entity, not a sovereign agency, and every rule or enforcement action it undertakes must conform to the statutory framework.

Under Section 19(b) of the Exchange Act, FINRA may not create, enforce, or revise any rule unless it first submits the rule to the SEC for public notice, comment, and approval. This process applies to all substantive rules, including Rule 6440, which authorizes FINRA to direct member firms to halt trading in an over-the-counter (OTC) equity security under limited, enumerated conditions such as extraordinary market events, concerns about fraud or manipulation, or a significant uncertainty in the trading or settlement process[11], and Rule 6490, which governs the processing of issuer corporate actions in the OTC market. Rule 6490 expressly states that FINRA "may not unilaterally alter the terms of a company-related action" submitted by an issuer.[12] No FINRA rule becomes valid or enforceable until the SEC issues a formal approval order.

Courts have consistently held that FINRA may not expand its authority through implication, informal guidance, or unilateral action. See *Sparta Surgical Corp. v. NASD*, 159 F.3d 1209 (9th Cir. 1998) ("FINRA acts under the SEC's supervision, and lacks independent statutory authority to enforce securities laws or compel action without an SEC-approved rule"); *Fiero v. FINRA*, 660 F.3d 569 (2d Cir. 2011) (rejecting enforcement of unapproved rules by implication or practice); *Alpine Securities Corp. v. FINRA*, 61 F.4th 1093 (D.C. Cir. 2023) (courts may review and enjoin ultra vires acts undertaken without proper SEC approval). Even when a rule is approved, the

---

[11] FINRA Rule 6440, "Trading and Quotation Halt in OTC Equity Securities," authorizes FINRA to direct member firms to halt trading in an OTC equity security if FINRA determines that an extraordinary event has occurred or is ongoing that has the potential to cause significant uncertainty in the trading, clearance, or settlement of the security, or to otherwise significantly impact the public interest or investor protection. Available at: https://www.finra.org/rules-guidance/rulebooks/finra-rules/6440.

[12] FINRA Rule 6490, "Processing of Company-Related Actions for OTC Equity Securities," governs the procedures for issuers to provide notice of corporate actions to FINRA and limits FINRA's authority to determining whether the request is complete and in compliance with applicable laws and regulations. Rule 6490 expressly states that FINRA "may not unilaterally alter the terms of a company-related action" submitted by an issuer. Available at: https://www.finra.org/rules-guidance/rulebooks/finra-rules/6490.

SEC retains ultimate supervisory control, including the power to amend or abrogate rules under Section 19(c), review and reverse disciplinary decisions under Section 19(d), and suspend or revoke FINRA's registration under Section 19(h).

When FINRA acts outside the framework of Section 19(b) for example, by enforcing obligations not contained in an SEC-approved rule such actions are considered ultra vires and subject to judicial review without requiring exhaustion of internal remedies. See *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023); *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010).

In December 2022, FINRA invoked its authority under Rule 6440 to halt trading and quoting in MMTLP. FINRA did not need to adopt a new rule to issue the halt because Rule 6440 remained in effect, but it did need a valid legal basis under that rule. Plaintiff alleges that FINRA lacked such a basis and instead manufactured one by altering the issuer's corporate action information to create the appearance of a clearing and settlement problem. Such an alteration, if proven, would directly violate Rule 6490's prohibition on unilaterally changing the terms of a corporate action and would exceed FINRA's authority under the Exchange Act. By creating the basis for a halt through improper modification of an issuer's corporate action, FINRA acted outside the scope of its delegated authority, rendering the halt ultra vires.

## C. FINRA's Governance Structure Ensures Protection of Member Firms Over Investors

FINRA presents itself as a balanced, independent regulator. On paper, its 23-member Board of Governors is evenly split between 11 "industry" governors, 11 "public" governors, and its CEO. Industry governors are elected by member firms by size category (small, mid-size, large). Public governors are appointed, not elected, by the Board which means they are chosen by the very industry insiders they are supposed to oversee.

Beneath the Board sits the Executive Committee (formerly the Operating Committee) and 13 advisory committees covering corporate financing, clearing, market regulation, and other areas. Advisory committee members are appointed by the Board, with the sole partial exception that 50% of the Small Firm Advisory Committee is elected.

In reality, there is no meaningful public representation. Nearly all "public" governors have prior senior roles in broker-dealers, investment banks, hedge funds, or corporate boards with direct market exposure. Of dozens of committee members, only a handful have purely academic or non-industry backgrounds. There is no process for ordinary members of the public, retail investors, or truly independent outsiders to hold these seats.

This closed governance system means the rulemakers and enforcers are the same people or close associates, of those they regulate. When violations occur, the decision on whether to enforce rules, and how severely, rests with the same network of insiders. The result is predictable: fines that are far smaller than the profits from misconduct, turning penalties into a mere cost of doing business.

**Recent enforcement examples confirm the pattern:**

- **Robinhood Securities (2025 SEC case)** — Mismarked over 15 million principal short sales as "long," plus millions more misclassified trades, evading locate requirements for four years. Penalty: $33.5 million, including $15 million for mismarking — a fraction of the avoided costs.

- **Oshima & Associates (2024 FINRA case)** — 140 discretionary trades mismarked as "unsolicited," falsifying records. Fine: $10,000 plus censure.

- **Unnamed Supervising Broker (2025 FINRA case)** — Failed to detect mismarked positions hiding millions in losses. Fine: $5,000 and two-month supervisory suspension.

The MMTLP halt was the inevitable product of this structure. Enforcing the rules would have required massive short-covering by member firms. Instead, FINRA altered the corporate action and issued a halt that protected those firms from catastrophic losses, trapping investors with illiquid shares.

A regulator controlled by the regulated will always protect its own. This is not independent oversight — it is self-preservation, built into the system's DNA. So long as FINRA's leadership and committees remain dominated by industry insiders, investor protection will take a back seat to member firm interests, and the next MMTLP is only a matter of time.

Given this insider-controlled structure, FINRA's claim that it acted as a neutral regulator when halting MMTLP cannot withstand scrutiny. The organization's governance and enforcement patterns show a consistent bias toward shielding its member firms from the financial and reputational consequences of their own misconduct. In the case of MMTLP, that bias translated into a regulatory decision that preserved massive uncovered short positions and eliminated the last opportunity for retail investors to liquidate their holdings. This was not the impartial application of SEC-approved rules. It was the predictable product of a system in which the

regulated control the regulator, and it led directly to conduct outside FINRA's lawful authority — conduct that strips it of any claim to immunity.

## III. IMMUNITY DOES NOT EXTEND TO ULTRA VIRES CONDUCT

This case presented FINRA with a regulatory event it had never encountered before and was wholly unprepared to handle. MMTLP was a pink sheet equity, permitted by FINRA to be shorted heavily and traded without restriction. But unlike other speculative tickers, this equity was tied to a known and forthcoming corporate action: it was going private. This created a once-in-history collision between unchecked short selling and the hard legal wall of a non-tradable, illiquid private security.

The market responded accordingly: retail investors, relying on the prospectus and published corporate action, were buying aggressively under the rational belief that short positions would be forced to close. But FINRA, as regulator, never issued guidance to broker-dealers or market makers about closing timelines, never enforced pre-closeout procedures, and never addressed the mechanics of how settlement would function once shares were no longer eligible for public trading.

By the time the trading volume and imbalance triggered concern internally at FINRA, as reflected in a December 5, 2022 email from Sam Draddy, Head of Enforcement, stating MMTLP was "hitting his fraud radar" and referencing pending blue sheet analysis, the market had only four trading days left. Draddy's own language shows that FINRA was not actively managing the situation in real time. He suggested discussing the issue "next week," apparently unaware that MMTLP would no longer be tradable by then.

20

What followed was not enforcement, it was an emergency reaction. Unable or unwilling to resolve the massive short interest it had allowed to accumulate, FINRA instead unilaterally rewrote the corporate action and halted trading, locking investors out and effectively permitting naked short positions to be preserved, unreconciled, and unclosed.

## A. Immunity or No Immunity: That is the Question

Although FINRA is a private corporation, it claims a judicially created form of "absolute immunity" when performing certain delegated regulatory functions for the SEC.[13] This immunity is not statutory and applies only when an SRO is acting within the scope of its core duties: enforcing securities laws, disciplining member firms, and conducting arbitration.[14]

Cases such as *DL Capital Group, LLC v. NASD*, 409 F.3d 93 (2d Cir. 2005), *Sparta Surgical Corp. v. NASD*, 159 F.3d 1209 (9th Cir. 1998), and *Weissman v. NASD*, 500 F.3d 1293 (11th Cir. 2007) confirms that the protection extends only to actions "undertaken in the discharge of regulatory responsibilities" and not to conduct that "exceeds the scope of delegated authority."[15] Courts have repeatedly recognized that immunity does not apply when an SRO acts outside its authority, in furtherance of private interests, or in bad faith.[16]

The D.C. Circuit's decision in *Alpine Securities Corp. v. FINRA* confirms that ultra vires conduct is reviewable.[17] There, FINRA attempted to expel a member firm without SEC review, an action

---

[13] *See DL Capital Group, LLC v. NASD*, 409 F.3d 93, 95–96 (2d Cir. 2005).
[14] *Id.*; *Sparta Surgical Corp. v. NASD*, 159 F.3d 1209, 1213 (9th Cir. 1998).
[15] *DL Capital*, 409 F.3d at 96; *Sparta Surgical*, 159 F.3d at 1213; *Weissman v. NASD*, 500 F.3d 1293, 1301
[16] *Standard Inv. Chartered, Inc. v. NASD*, 637 F.3d 112, 115 (2d Cir. 2011); *Weissman*, 500 F.3d at 1301.
[17] *Alpine Securities Corp. v. FINRA*, 982 F.3d 68, 75–76 (D.C. Cir. 2020).

beyond its delegated powers. The court allowed judicial review, and the Supreme Court denied

certiorari in 2025, leaving that limitation intact.[18]

FINRA's own filings in *Rolo v. FINRA* conceded that it "did not submit a proposed rule change

under Rule 19b-4 in connection with the decision to halt trading" and that "[t]he SEC did not

instruct or approve the halt."[19] SEC Chair Gary Gensler confirmed in sworn congressional

testimony that FINRA neither sought SEC permission nor consulted the SEC before halting

MMTLP trading.[20] Under 17 C.F.R. § 240.19b-4 and 15 U.S.C. § 78s(b), any new policy,

practice, or interpretation affecting trading — including a marketwide halt — must be submitted

for SEC review and approval. FINRA submitted no such rule; the SEC provided no such

approval.[21]

The dispositive question is not whether the MMTLP halt looked regulatory in nature, but

whether it was within FINRA's lawful authority. It was not. FINRA exercised unfettered

discretion without legal anchor, rule filing, or SEC oversight. This is ultra vires conduct — the

type of action courts have consistently held is outside the protections of SRO immunity.[22]

The facts that follow (A.1 and A.2) show in detail why the MMTLP halt cannot be shielded: they

reveal FINRA's contradictory post-halt statements, objective evidence that Regulation SHO

close-out obligations applied, and how the halt advanced private market interests at the expense

of public investors.

---

[18] *Id.*; cert. denied, 143 S. Ct. 563 (2025).
[19] *Rolo v. FINRA*, No. 3:24-cv-02053 (D. Conn.), ECF No. 57 at 16–17.
[20] Congressional Testimony of Gary Gensler, Chair, U.S. Securities and Exchange Commission: "Under FINRA's rules, they sought [a] trading halt. They didn't seek the SEC's advice or permission on that. That is something that they did separately in that matter." (Exhibit 1).
[21] 17 C.F.R. § 240.19b-4; 15 U.S.C. § 78s(b).
[22] *Sparta Surgical*, 159 F.3d at 1213; *Standard Inv.*, 637 F.3d at 115.

22

## A.1 FINRA's contradictory statements regarding Regulation SHO "threshold" status

In November 2023, FINRA publicly stated in its FAQ that MMTLP's appearance on the Regulation SHO threshold securities list in late 2022 resulted from a "coding error" in its own systems.[23] This statement directly conflicts with FINRA's own pre-halt public records showing MMTLP on the threshold list for multiple consecutive days prior to the halt.[24] Under FINRA Rule 4320, threshold designation is a formal regulatory status signaling high levels of fails-to-deliver and triggering mandatory close-out obligations on broker-dealers.[25] By calling the listing an "error" after the halt, FINRA created an unavoidable contradiction:

If the threshold listing was truly an error, then FINRA's "settlement risk" rationale for the halt was based at least in part on inaccurate regulatory data that FINRA itself generated and failed to correct in real time. Halting a market based on false, self-created data is conduct outside the scope of protected regulatory activity.

If the threshold listing was not an error, then FINRA's post-halt statement misrepresents the record to obscure the fact that close-out obligations should have applied to MMTLP prior to the deletion date. This alternative implicates intentional regulatory concealment to protect certain market participants from mandatory buy-ins, which is also outside the scope of protected regulation.

---

[23] FINRA FAQ, "MMTLP Corporate Action and Trading Halt," November 2023 update (Plaintiff's Motion for Judicial Notice, Exhibit 5a).

[24] *Willcot v. SEC*, et al., Case No. 7:24-cv-317, Exhibit A — Threshold Securities List data showing MMTLP's persistent presence for more than 150 consecutive trading days before the halt (Plaintiff's Motion for Judicial Notice, Exhibit 7).

[25] FINRA Rule 4320(a), "Short Sale Delivery Requirements" (Plaintiff's Motion for Judicial Notice, Exhibit 6).

23

Either way, FINRA's contradictory positions demonstrate that the halt was not a routine, good-faith regulatory act. It was an extraordinary intervention that either relied on, or attempted to conceal, critical compliance data—conduct inconsistent with its statutory duty under 15 U.S.C. § 78o-3(b)(6) to protect investors and the public interest.[26]

## A.2 MMTLP met the SEC's Regulation SHO threshold criteria regardless of FINRA's "error" claim

Regulation SHO, 17 C.F.R. § 242.203(c)(6), defines a "threshold security" by objective criteria at the clearing agency level: (i) aggregate fails-to-deliver of at least 10,000 shares, (ii) a total fail value of at least $50,000, (iii) representing at least 0.5% of the issuer's total shares outstanding, and (iv) persisting for five consecutive settlement days.[27] This status is based on facts in clearing data and does not depend on how an SRO "codes" or labels the security.

Publicly available DTCC data and FINRA's own published short volume figures show MMTLP fails to exceed these thresholds for multiple consecutive days before the halt.[28] Even if FINRA's internal system mislabeled the security, the objective SEC criteria were met, triggering Rule 4320 close-out requirements.

By halting trading on December 9 and later describing the threshold designation as a "coding error," FINRA avoided the regulatory consequences of those close-out obligations. Whether that description was false or simply irrelevant under the SEC's own rules, the effect was the same: large uncovered short positions were preserved instead of closed. This result benefited a specific

---

[26] 15 U.S.C. § 78o-3(b)(6).
[27] 17 C.F.R. § 242.203(c)(6).
[28] *Willcot v. SEC*, et al., Case No. 7:24-cv-317, Exhibit A — Threshold Securities List data showing MMTLP's persistent presence for more than 150 consecutive trading days before the halt (Plaintiff's Motion for Judicial Notice, Exhibit 7).

segment of market participants while harming public investors, further demonstrating that the halt was undertaken in bad faith and outside the bounds of protected regulatory activity.[29]

These contradictions in FINRA's own public statements, combined with objective evidence in the record, confirm that the MMTLP halt was not a lawful regulatory act but an ultra vires intervention. FINRA's subsequent manipulation of the corporate action itself provides further proof.

## B. FINRA violated its own Rule 6490 by illegally altering the Corporate Action to remove the pay date and reclassify the event

As with its contradictory statements about MMTLP's threshold security status, FINRA's manipulation of the corporate action demonstrates ultra vires conduct undertaken in bad faith. FINRA has claimed it merely processed the issuer's corporate action regarding MMTLP, but the record shows it materially altered the notice without authority.

Under FINRA Rule 6490 and its published guidance, FINRA's role is limited to receiving, reviewing, and publishing issuer-submitted corporate actions.[30] If FINRA identifies a deficiency, such as fraud, missing documentation, or regulatory risk, it must return the submission to the issuer for correction. FINRA has no authority to revise corporate action terms unilaterally, change classification codes, or remove key dates from the public notice.

---

[29] FINRA FAQ, "MMTLP Corporate Action and Trading Halt," November 2023 update (Plaintiff's Motion for Judicial Notice, Exhibit 5a).

[30] FINRA Rule 6490, "Processing of Company-Related Actions" (Plaintiff's Motion for Judicial Notice, Exhibit 6).

On December 6, 2022, FINRA published a corporate action notice stating:

> "MMTLP shareholders with settled positions as of December 12th record date will
> receive one share of Next Bridge Hydrocarbons for every one share of MMTLP held
> on the pay date of December 14th. Purchases after December 8th will not receive the
> distribution, will not be quoted X. MMTLP shares will be canceled effective
> December 13th."[31]

On December 8, 2022, FINRA reissued the notice with two critical changes:

1. The **pay date of December 14th was removed entirely**; and

2. The classification term **"canceled"** was replaced with **"deleted."**[32]

The "effective date" of December 13th remained in both notices, meaning the real alteration was
eliminating the pay date and reclassifying the action in FINRA's corporate action system.
Removing the pay date materially changed shareholder expectations and settlement mechanics.
Shareholders and brokers had been told that the distribution of Next Bridge shares would occur
on December 14th; eliminating that date without issuer consent or public explanation deprived
the market of a clear settlement timeline.

The change from "canceled" to "deleted" is equally significant. FINRA's own system definitions
treat "canceled" and "deleted" differently for processing and display purposes. Altering this
classification changes how the event is reflected in broker systems and how settlement

---

[31] FINRA Daily List, Dec. 6, 2022 — MMTLP Corporate Action Notice (Plaintiff's Motion for Judicial
Notice, Exhibit 3 – Daily List 6th to 8th).
[32] FINRA Daily List, Dec. 8, 2022 — MMTLP Corporate Action Notice showing removal of Dec. 14 pay
date and change from "canceled" to "deleted" (Plaintiff's Motion for Judicial Notice, Exhibit 3 – Daily List
6th to 8th).

26

instructions are generated, yet FINRA's published guidance confirms it has no authority to make such changes on its own.[33]

Sworn testimony from Meta Materials CEO George Palikaras confirms that FINRA made these revisions without notifying the company, following a private discussion with DTCC that excluded the issuer. Palikaras testified that Meta Materials' original submission included the December 14th pay date and that the company never filed an amendment removing it.[34]

By removing the pay date and reclassifying the corporate action from "canceled" to "deleted" without SEC approval, FINRA materially altered the corporate action process in violation of Rule 6490 and Section 19(b)(1) of the Exchange Act. No SEC Form 19b-4 was filed, no deficiency notice was issued, and no public notice or comment period occurred. These changes were made privately and unilaterally, for reasons FINRA has never explained.

Such conduct was neither oversight nor harmless clerical correction. Removing the pay date and changing the classification directly impacted settlement expectations and facilitated the trading halt that followed. This was a deliberate intervention that violated FINRA's statutory duties, investor protection obligations, and its own corporate action rules. It was ultra vires conduct that harmed investors by preventing the ordinary course of settlement and eliminating the promised distribution date from the public record.

## C. Regulator turned de facto issuer — the governing law, FINRA's duties, and two independent violations

---

[33] FINRA FAQ, "MMTLP Corporate Action and Trading Halt," Mar. 16, 2023 update (Plaintiff's Motion for Judicial Notice, Exhibit 5).

[34] Declaration of George Palikaras, CEO of Meta Materials (Plaintiff's Motion for Judicial Notice, Exhibit 2).

When a publicly traded equity will cease to be publicly tradable (e.g., spun into a private, non-DTC-eligible company), federal law requires timely settlement and the prompt close-out of open short positions. Trades must settle on T+2; persistent fails must be closed; and broker-dealers must maintain possession or control sufficient to deliver customer securities. These obligations are enforced through SEC and FINRA rules, including the T+2 settlement rule, Regulation SHO close-out provisions, FINRA's short-sale delivery rule for threshold OTC securities, and the customer protection rule.[1][2][3][4][5]

   2. **FINRA's duties as the SRO processing the corporate action**

   As the OTC market SRO, FINRA's corporate-action role is ministerial and bounded by Rule 6490. FINRA receives, verifies, and publishes issuer-submitted terms; if a deficiency is identified, FINRA's remedy is to notice the deficiency and return the action to the issuer—**not** to rewrite dates, reclassify the action, or selectively omit material settlement information. Congress also requires that FINRA's rules and actions protect investors and the public interest.[6][7]

   3. **Application: two independent violations**

**A. Aiding and abetting preservation of short positions in violation of settlement/close-out duties**

FINRA's own FAQs admit the MMTLP corporate action "did not require investors with short positions in MMTLP to purchase shares to close out their positions," and that those shorts simply rolled into short positions in Next Bridge—a private, non-tradable security.[8][9] That admission is irreconcilable with the settlement and close-out framework identified above. Under T+2, Reg SHO (including threshold-security close-outs), and possession-or-control duties, the marketplace

must resolve shorts **before** the public security disappears. By allowing shorts to persist into a private, illiquid issue, FINRA permitted a condition that could not lawfully be delivered, frustrated mandatory close-outs, and harmed investors who were denied the ability to liquidate while "Too Late to Cancel/Market Reject" order statuses proliferated.[10] [11]

Given the record (FINRA's contradictory threshold statements, the objective threshold-list data for more than 150 consecutive trading days, and the order-rejection evidence), the Court should (i) deny FINRA's immunity-based motion, (ii) permit targeted discovery into settlement risk, threshold coding, and order-management decisions, and (iii) reserve or issue an order to show cause why sanctions should not be imposed under the Court's inherent authority for bad-faith market intervention and resulting investor harm.[12]

## B. De facto issuer conduct: removal of the pay date and reclassification of the action (ultra vires again)

FINRA's December 6 Daily List told the market that MMTLP holders "will receive one share of Next Bridge Hydrocarbons … on the pay date of December 14," and stated shares "will be canceled effective December 13." Two days later, FINRA reissued the notice **removing the pay date entirely** and changing the classification from "canceled" to "deleted," while the effective date remained December 13.[13] FINRA had no authority under Rule 6490 to delete a distribution pay date or reclassify the event on its own. Its published guidance confirms FINRA does not initiate or alter issuer actions; if a defect exists, FINRA must return it to the issuer.[14] Meta Materials' CEO attests the issuer never removed the December 14 pay date and was not consulted on FINRA's edits.[15]

Eliminating the pay date and changing the classification were material changes that directly affected settlement expectations and the mechanics of delivery. By doing so without a Rule 19b-4 filing or SEC approval, FINRA exceeded its delegated authority and acted as a de facto issuer—precisely the ultra vires conduct that defeats any claim of absolute immunity and warrants discovery and remedial relief.[16]

Requested relief on Section C

Plaintiff respectfully requests that the Court: (1) deny FINRA's motion to dismiss on immunity grounds; (2) authorize limited, expedited discovery on settlement risk, threshold coding and close-out decisions, and corporate-action alterations (including a Rule 30(b)(6) deposition of FINRA); (3) issue an order to show cause why sanctions should not enter under the Court's inherent power for bad-faith market intervention and the resulting investor harm; and (4) grant such further equitable relief as is just, including restoration/clarification of the distribution terms and any appropriate adverse inferences relating to settlement and threshold-list manipulation.

## C. "Too Late to Cancel" orders and synthetic share substitution as further evidence of ultra vires conduct

The immediate market impact of FINRA's December 9, 2022 U3 halt was not limited to canceled open orders and blocked new orders. Across multiple brokerage platforms—including TD Ameritrade, E*TRADE, and others—investors reported receiving "Too Late to Cancel" (TLTC) designations on sell orders placed before the halt, many at prices reflecting the short squeeze in progress. These TLTC orders, instead of settling under the standard T+2 framework, were rejected without execution, depriving investors of the lawful proceeds from matched trades.

Screenshots and transaction records (Exhibits 8, 8a–8f) show that Plaintiff and other investors had valid Good-Til-Canceled and day-limit sell orders entered before the halt, including:

- **TD Ameritrade:** Plaintiff's 1,710-share sell order at $420/share, placed before market open on December 9, was unilaterally canceled at 9:35 a.m., five minutes into the session. Multiple additional sell orders placed on December 9–11, 2022, were immediately rejected.

- **E*TRADE and other platforms:** Orders marked "Too Late to Cancel" despite being entered while the market was open, with confirmations indicating the orders had already matched a buyer before the halt.

The "Too Late to Cancel" designation ordinarily indicates that a trade is already in the process of settlement and cannot be pulled by the client or broker. In the MMTLP case, however, TLTC orders were systematically voided—effectively unwinding matched trades to prevent delivery. This protected counterparties holding short positions from having to deliver shares they did not possess.

Further, Plaintiff has obtained a sworn investor statement alleging that TD Ameritrade substituted "synthetic" positions for fully paid-for, cash-purchased MMTLP shares, converting bona fide holdings into book-entry placeholders that could be closed internally without delivering physical shares. If proven, this substitution constitutes a direct violation of SEC Rule 15c3-3 (the customer protection rule), which requires broker-dealers to maintain possession or control of fully paid and excess margin securities for the benefit of customers.

These actions demonstrate two critical points:

1. **FINRA's halt enabled and coordinated with market practices that prevented lawful settlement** of pre-halt matched trades, violating the T+2 settlement rule, Regulation SHO close-out provisions, and the customer protection rule.

2. **The halt was used as a mechanism to preserve uncovered short positions**—including synthetic or non-deliverable shares—by nullifying trades already in the settlement pipeline.

By allowing and facilitating the mass nullification of TLTC orders and the potential substitution of synthetic positions for real securities, FINRA acted far outside its statutory role as an SRO. These actions are not protected regulatory functions but ultra vires conduct undertaken to shield member firms from catastrophic settlement obligations.

**Requested relief:** Plaintiff requests that the Court treat the TLTC cancellations and synthetic share substitutions as independent violations supporting denial of FINRA's motion to dismiss, and to permit targeted discovery into:

- The identity and volume of TLTC-marked MMTLP trades voided after the halt;
- The extent of synthetic or internal ledger substitutions by broker-dealers;
- FINRA's communications with member firms regarding these practices before and after the halt.

## V. THE FOX IS GUARDING THE HENHOUSE - NO EXCHANGE-LEVEL OVERSIGHT, NO ACCOUNTABILITY

## A. FINRA'S REGULATORY RESPONSIBILITIES VS. EXECUTION FAILURES

As the sole registered national securities association under 15 U.S.C. § 78o-3, FINRA is charged with protecting investors, ensuring market integrity, and enforcing compliance with federal securities laws and SEC-approved rules. Its responsibilities include:

1. **Processing corporate actions** in the over-the-counter (OTC) market under FINRA Rule 6490, ensuring accuracy, completeness, and investor protection in issuer disclosures.

2. **Managing market halts** under Rule 6440 only in narrowly defined circumstances, with a valid basis tied to extraordinary market activity, fraud, or settlement disruption, and always within the bounds of SEC-approved procedures.

3. **Enforcing settlement and close-out obligations** under Regulation SHO, Rule 4320 (threshold securities), and related possession-or-control rules, ensuring that open short positions are closed within mandatory timeframes.

In the case of MMTLP, FINRA failed to execute each of these responsibilities:

- **Corporate Action Oversight:** FINRA unilaterally altered the issuer-submitted corporate action by removing the pay date and reclassifying the event, despite Rule 6490's express prohibition on unilateral modifications.

- **Market Halt Authority:** FINRA used Rule 6440 not for its intended purpose, but as a vehicle to impose what became a de facto permanent halt. No SEC approval was sought or obtained for this novel application, violating Section 19(b) of the Exchange Act.

- **Settlement Enforcement:** FINRA permitted large open short positions to roll into a non-tradable private company without requiring mandatory close-outs. This undermined the T+2 settlement rule, Regulation SHO's close-out provisions, and FINRA's own threshold-security delivery requirements.

By failing to carry out its statutory and regulatory duties, FINRA not only violated its own rules but also acted in direct contravention of the Exchange Act's investor protection mandate. The MMTLP halt was not the product of diligent market regulation — it was the result of regulatory inaction, selective enforcement, and an execution failure that directly benefited its member firms at the expense of the investing public.

## B. GOVERNANCE CONFLICTS AND FINANCIAL BENEFITS FROM HALT

FINRA's governance is riddled with conflicts of interest that directly undermined its impartiality in the MMTLP halt. Many of the board members, executive committee members, and advisory committee members held or previously held senior roles at firms with substantial short positions in MMTLP. These positions stood to incur significant losses if forced to cover before the corporate action closed.

By altering the corporate action and imposing the halt, FINRA's decision prevented billions of dollars in potential losses for these member firms. The halt froze trading before the December 12, 2022 conversion date, ensuring that large uncovered short positions rolled into Next Bridge Hydrocarbons — a private, non-tradable security — rather than being closed in the open market.

This was not an abstract benefit. Member firms avoided forced buy-ins, upward price pressure, and exposure of the true volume of synthetic shares in circulation. At the same time, retail

investors were deprived of the ability to sell, liquidate, or transfer their holdings, locking in their losses.

In effect, FINRA's governance structure — dominated by those with direct financial ties to the outcome — ensured that the halt served industry interests first. The result was a regulatory decision that functioned as a protective shield for market participants within FINRA's own membership, while inflicting foreseeable and disproportionate harm on investors.

## VI. MONOPOLY CONTROL AND ANTITRUST LIABILITY

### A. FINRA's Structural Monopoly Over the OTC Market

 FINRA holds exclusive regulatory authority over the over-the-counter (OTC) market in the United States under 15 U.S.C. § 78o–3. No other entity may regulate broker-dealer conduct in this market. This exclusive control gives FINRA a structural monopoly over the regulatory framework governing OTC trading, including the authority to approve or deny corporate actions, enforce trade reporting, and direct halts under Rule 6440.

### B. Vertical Integration and Governance Conflicts

 FINRA's governance structure is dominated by industry insiders. Of its 22 voting board members, 10 are elected by member firms, and the so-called "public" seats are routinely filled by former industry executives. Advisory committees, including the Uniform Practice Code (UPC) Advisory Committee, are similarly dominated by market participants with direct financial interests in the outcome of regulatory decisions.

This structure creates vertical integration between regulator and regulated: the firms subject to FINRA's rules also control the body that writes and enforces those rules. When member firms face substantial financial exposure, such as large uncovered short positions, the structural incentives favor regulatory decisions that protect those firms rather than investors.

**C. Collusion, Transparency Failures, and Information Asymmetry**

In the case of MMTLP, the same member firms with large short positions benefited from FINRA's decision to halt trading without requiring short position close-outs. Those firms were also embedded in FINRA's advisory and governance structure. This dual role creates the appearance and functional effect of collusion, where regulatory discretion is exercised to protect member firms at the expense of market transparency and investor protection.

**D. Antitrust Analysis**

FINRA's control over the OTC market and the firms within it is a form of monopoly power under the Sherman Act. While regulatory authority alone is not an antitrust violation, the use of that authority to foreclose market access, favor specific participants, and suppress lawful trading activity for competitive gain meets the Rule of Reason standard for antitrust liability. Here, the decision to halt MMTLP trading preserved large short positions and prevented retail investors from accessing the market, producing anticompetitive effects without legitimate procompetitive justification.

**VII. FINAL CONSTITUTIONAL ARGUMENTS AND STANDING**

**A. Standing**

Plaintiff has Article III standing because she suffered a concrete, particularized, and quantifiable injury: the permanent loss of the ability to sell MMTLP shares at market prices between

December 9–12, 2022, resulting in unrecoverable financial losses. This injury is directly traceable to FINRA's halt directive, which unilaterally canceled all open orders and rejected all new orders, and is redressable through declaratory, equitable, and monetary relief. Plaintiff expressly disclaims any intent to proceed as a class action; this claim is brought solely in her individual capacity.

## B. Due Process Violation

 FINRA's halt deprived Plaintiff of vested property rights in her MMTLP shares without notice or an opportunity to be heard. The halt operated as a permanent market closure disguised as a temporary pause, immediately canceling all open orders and rejecting all new orders. This action was based on facts not disclosed to the public and on alterations to a corporate action the issuer did not request or approve, exceeding FINRA's lawful authority under its own rules. Due process principles forbid such arbitrary and unilateral deprivation of property, particularly where the regulator acts without transparency, without SEC approval, and in a manner that foreclosed any meaningful opportunity for Plaintiff to avoid or mitigate her losses.

## C. SEC Rulemaking Requirements Not Followed

Section 19(b) of the Exchange Act, 15 U.S.C. § 78s(b), requires FINRA to submit any proposed rule change — including new interpretations or applications affecting trading — to the SEC for public notice, comment, and approval. This safeguard is designed to ensure transparency, accountability, and to give investors a meaningful opportunity to protect themselves against market-altering decisions.

Rule 6440 allows FINRA to issue temporary OTC halts for clearance and settlement concerns, but the MMTLP halt far exceeded that scope. By blocking the SEC-approved corporate action

set for December 12, 2022 — the delisting and share conversion into a non-tradable security — without issuer consent, FINRA effectively rewrote the corporate action and created a de facto permanent market closure. This was not "routine enforcement"; it was a novel and material policy shift.

FINRA has admitted it did not file a proposed rule change for this specific action, and the SEC confirmed it neither directed nor approved the halt. Using Rule 6440 in this new way to override a corporate event was a policy change that required SEC approval under § 78s(b). By bypassing this process, FINRA deprived investors of both due notice and any opportunity to avoid billions in foreseeable losses tied to unresolved short positions.

### D. Major Questions Doctrine and Nondelegation

The MMTLP halt raises grave constitutional concerns under both the Major Questions Doctrine and the private nondelegation doctrine.

The Major Questions Doctrine requires clear congressional authorization for agency actions with "vast economic and political significance." Here, a private self-regulatory organization — dominated by the very industry it regulates — unilaterally shut down trading in a security affecting more than $10 billion in investor holdings, disrupted a lawful corporate action, and altered the rights of thousands of shareholders. Congress did not clearly delegate to FINRA the authority to impose permanent market closures of this magnitude without SEC oversight.

The private nondelegation doctrine likewise forbids delegating core governmental powers to unaccountable private entities without sufficient public oversight. In *National Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869 (5th Cir. 2024), the Fifth Circuit struck down a similar SRO scheme for this very reason. FINRA's structure — a 23-member Board with

"public" seats appointed by industry insiders, an Executive Committee, and 13 advisory committees filled almost entirely with individuals from member firms — ensures that enforcement decisions are made by those with direct or indirect financial interests in the outcomes.

Recent enforcement history underscores the danger. FINRA has allowed its member firms to mismark millions or even billions of trades, violating Regulation SHO and falsifying books and records, only to impose penalties that amount to a minor cost of doing business:

- **Robinhood Securities (2025 SEC case)** — over 15 million short sales mismarked as "long," plus millions more improperly labeled, evading locate requirements for four years. Penalty: $33.5 million, including $15 million for mismarking.

- **Oshima & Associates (2024 FINRA case)** — 140 discretionary trades mismarked as "unsolicited." Fine: $10,000 plus censure.
- **Unnamed Supervising Broker (2025 FINRA case)** — failed to detect mismarked positions that hid millions in losses. Fine: $5,000 and a two-month suspension.

When a regulator is structurally incentivized to protect its members rather than enforce the rules, predictable outcomes follow. In MMTLP, enforcing the rules would have required massive short-covering by member firms; instead, FINRA acted to protect them. This combination of unchecked private power, industry domination, and selective enforcement is exactly what the Constitution forbids — and exactly why judicial scrutiny is required.

**VIII. PRAYER FOR RELIEF**

**Plaintiff respectfully requests that the Court:**

**IX. PRAYER FOR RELIEF**

**Plaintiff respectfully requests that the Court:**

**A. Declare that FINRA's** governance structure, statutory delegation, and exercise of regulatory authority violate the United States Constitution, including separation-of-powers and nondelegation principles, and that FINRA is unconstitutional in its present form.

**A1.Declare that FINRA's** actions in altering the MMTLP corporate action and imposing a U3 halt were ultra vires, unlawful, and void.

**B. Permanently enjoin FINRA**, in any form, from exercising regulatory authority over the OTC market or broker-dealers absent direct government control and accountability.

**C. Order that Congress** or the SEC establish a constitutionally valid regulatory framework to replace FINRA's functions, with direct public oversight and representation for investors.

**D. Award monetary damages** for losses sustained as a direct and foreseeable result of FINRA's actions.

**D1. Award attorney's fees** and costs pursuant to applicable law.

**E. Grant such other and further relief** as the Court deems just and proper to protect investors and the integrity of the securities markets.

40

Respectfully submitted,          August 11, 2025

/s/Danielle Spears

Danielle Spears Plaintiff pro se

12206 W Harrison Street

Avondale, AZ 85323

480-476-1091

PAYMMTLPNOW@GMAIL.COM

**<u>CERTIFICATE OF CONFERENCE</u>**

Pursuant to Local Rule CV-7(G), the undersigned hereby certifies that, as pro se Plaintiff, she has

conferred with Defendants Next Bridge Hydrocarbons, Inc. counsel Joshua Frost on or about

July , 2025, by email and counsel indicated he is unopposed to the motion and relief requested.

<u>/s/ Danielle Spears</u>

Danielle Spears

**<u>CERTIFICATE OF SERVICE</u>**

I certify that I served the foregoing document on all counsel of record via the Court's CM/ECF

system on August 12, 2025.

<u>/s/ Danielle Spears</u>

Danielle Spears
