# Supplemental FAQ: MMTLP Corporate Action and Trading Halt

NOVEMBER 06, 2023

## Introduction

On March 16, 2023, FINRA published responses to frequently asked questions concerning the MMTLP corporate action a 2023, MMTLP FAQ).[1] In that corporate action, the issuer decided that MMTLP shares would be cancelled and investors in receive a distribution of shares of Next Bridge Hydrocarbons, Inc. (Next Bridge).[2] FINRA has continued to receive questio circumstances surrounding these events. In particular, some have questioned the level of short selling in MMTLP and sug substantial amount of "counterfeit shares." Although it is not clear what is meant by the term "counterfeit shares," it has be when discussing "naked" short selling in a security and failures-to-deliver (FTDs). Some investors have expressed concer brokerage account statements include shares of Next Bridge in their account,[3] these shares may not have actually been c dealer.[4]

This Supplemental FAQ provides additional information to address these questions and concerns. The numbering for the with No. 12, following sequentially from the March 16, 2023, MMTLP FAQ.

## 12. Were the right number of Next Bridge shares distributed in connection with the corporate action?

FINRA does not have a role in distributing securities as part of a corporate action, and FINRA does not regulate issuers o according to publicly available information reported by Next Bridge in connection with the Next Bridge / MMTLP corporate distributed 165,472,241 of the outstanding shares of Next Bridge's common stock on a one-for-one basis to shareholders the close of business on December 12, 2022.[5] Next Bridge stated that the shares were distributed to Next Bridge's transfe American Stock Transfer & Trust Company, LLC (AST), which then distributed these shares either directly to any MMTLP shares were directly registered with AST or to shareholders' bank, broker, or nominee representatives.[6]

Thus, the issuer has represented that 165,472,241 Next Bridge shares were distributed in connection with the Next Bridge —the same number of shares anticipated to be distributed to MMTLP shareholders per the prospectus filed with the SEC. below in Question No. 13, FINRA does not have the jurisdiction, authority, or data necessary to audit Next Bridge's or AST information made available publicly by Meta Materials and Next Bridge—both before and after the Next Bridge / MMTLP reflect a disparity between the number of MMTLP shares the company understood to be outstanding and the number of N distributed to MMTLP shareholders on a one-for-one basis, and FINRA has not identified any information indicating otherw

## 13. Can FINRA perform an audit of Next Bridge's / MMTLP's share count?

FINRA has received questions concerning conducting a "share count audit" of Next Bridge / MMTLP shares. While it is no "share count audit" and "audited share count," the usage of those terms in social media might refer to a review to determin "counterfeit shares" in Next Bridge arising from "naked" short selling and FTDs that allegedly occurred in MMTLP. Though shares" is similarly unclear, "naked" short selling and FTDs are addressed in Question No. 15 below.

A "share count audit" might also refer to a more general review to determine whether the correct aggregate number of Nex for the relevant beneficial owners in the appropriate amounts across all custodians and the transfer agent. This is not a ty has previously conducted, nor does it have the jurisdiction, authority, or data to do so.

As noted in Question No. 12 above, Next Bridge has stated that its shares were distributed to its transfer agent and regist distributed these shares either directly to any MMTLP shareholders whose shares were directly registered with AST or to or nominee representatives. FINRA does not have jurisdiction or authority over issuers like Next Bridge or transfer agents are overseen by the SEC, are responsible for maintaining issuer security holder records, and have responsibilities concer safekeeping of securities. FINRA also does not have jurisdiction or authority over all the entities that could act as custodia securities for others and be reflected as such on the books of the transfer agent.

In addition, FINRA does not possess the information that presumably would be required to conduct such a "share count a whether "blue sheet" data could be used to conduct an audit of the Next Bridge / MMTLP share count. Blue sheet data is FINRA and SEC examination and investigation teams obtain by requesting detailed transaction data from clearing broker- security for specified dates.[9] Blue sheet data reflects *transactions* made by individuals or entities that executed trades in a specific dates, but it does not identify the *position* held in a specific security on a specific date by any person or entity. Fur not contain information about whether or how a short position was "covered" with a purchase or borrow of shares or wheth

For example, if an account purchased 5,000 shares of a security on February 1, 2023, and the account previously had a s shares, blue sheet data requested for February 1, 2023, would show only that there was a buy transaction of 5,000 share not whether the account was closing out the short position, nor that the account held a long position of 2,000 shares follow

Similarly, if an account sold short 1,000 shares of a security on February 1, 2023, and the account previously had a short blue sheet data requested for February 1, 2023, would show only that there was a short sale of 1,000 shares on February show that the account increased its short position to 2,000 shares; nor would it indicate attributes such as whether there v sale was "naked," or if delivery occurred on settlement date.

Accordingly, blue sheet data does not contain information that would allow FINRA to determine the beneficial owners of al those owners were correctly reflected in the issuer's security holder records. Moreover, blue sheet data contains sensitive and FINRA strictly limits access to blue sheet data internally to maintain its confidentiality.[10]

## 14. How much short selling was there in MMTLP around the time of the Next Bridge / MMTLP corporate action? W position in MMTLP shares?

FINRA periodically collects short interest information from broker-dealers and publishes short interest reports twice each information. As explained in the March 16, 2023, MMTLP FAQs, Question No. 8, these reports reflect a snapshot of the to existing in a security on the books and records of broker-dealers on a given reporting settlement date. The last short inter date available for MMTLP was November 30, 2022, because the issuer cancelled the MMTLP shares and the symbol was short interest reporting settlement date. Thus, short interest data for MMTLP around the time of the corporate action was available.[11]

Based on FINRA's subsequent regulatory efforts, FINRA estimates that there was an aggregate short interest position in I broker-dealers as of December 12[12] of approximately 2.65 million shares out of 165.47 million total shares outstanding, w percentage—only 1.6%—of the total shares outstanding.[13] The short interest position in MMTLP had therefore decreased 60%—between November 15 and December 12. Specifically, short interest in MMTLP as of November 15, 2022, (approxi declined around 27% to approximately 4.7 million shares as of November 30, 2022, and declined about a further 32% to a shares as of December 12.

In addition to short *interest*, FINRA's daily short sale *volume* data has been the subject of social media postings—particula number of reported short sales in MMTLP on the last day of trading (approximately 9.5 million shares), which some have represented or resulted in large short positions. However, the daily short sale volume data is a very different data set from As described in more detail in the March 16, 2023, MMTLP FAQs, Question No. 8, many of the transactions included in th data file reflect temporary shorts that are executed in the course of handling customer long sales or purchase orders, rath executed in connection with an investment strategy based on the belief that the price of the shares will decline.[14]

Thus, for example, when a customer enters an order to buy 1,000 shares of ABC stock, the broker-dealer may immediate 1,000 ABC shares (marked "short" in compliance with SEC Regulation SHO) and then immediately buy 1,000 shares of A this example, the 1,000-share short sale would be reflected in the short sale *volume* data but did not result in a short *posi* customer enters an order to sell 1,000 shares of ABC stock, the broker-dealer may immediately sell short to the open mar (marked "short" in compliance with SEC Regulation SHO) and then immediately buy 1,000 shares of ABC from the custor sale is reflected in the short sale *volume* data but did not result in a short *position*.

In any event, any short sales in MMTLP conducted on or before December 8 that were included in the short sale volume short position in an account held at a broker-dealer as of December 12 would be included within the estimates provided a interest position in MMTLP as of December 12—*i.e.*, 1.6% of total shares outstanding.

## 15. Was there excessive "naked" short selling resulting in "counterfeit shares" in MMTLP at the time of the corpo

While it is not clear what is meant by the term "counterfeit shares," it has been used in social media when discussing "nak in a security.[15] A "naked" short sale is generally understood to mean a short sale where the seller does not borrow or arr securities in time to make delivery within the standard settlement period—resulting in a FTD[16] when delivery is due.[17] Whi required to be marked "short" pursuant to SEC Regulation SHO, "naked" short sales are not identified as such in the relev Nonetheless, where there is significant "naked" short selling in a security, we would expect to see indicators in the data—p of FTDs. The SEC publishes data obtained from the National Securities Clearing Corporation's (NSCC) Continuous Net S the total quantity of FTDs per security as of each reporting settlement date.[19]

FINRA has found no evidence that there was significant naked short selling in MMTLP at the end of its trading, which app social media claims regarding "counterfeit shares." The SEC did not publish FTD data for MMTLP for December 12 becau executed on the last day of its trading—December 8—were not cleared through CNS. However, FTDs as of December 9 v

shares. In addition, while CNS FTD data is not available for transactions in MMTLP due to settle on December 12, FINRA
number (0.03% of MMTLP's total shares outstanding) of the short positions in MMTLP as of December 12, 2022, would h
FTDs. Broker-dealers had stock borrows or margin securities available to cover almost 100% of the open short positions.

The limited number of FTDs through December 9 together with other factors—such as the availability of shares (stock bor
to cover almost 100% of the open short positions on December 12 (as discussed above), the successful distribution of Ne
discussed above in Question No. 12), and the low amount of short interest positions in MMTLP relative to total shares out
12 (as discussed above in Question No. 14)—run counter to claims that there was extensive "naked" short selling near th
"counterfeit shares," or that the distribution of Next Bridge common stock to many MMTLP shareholders was disrupted by

## 16. Have all MMTLP shareholders received their Next Bridge shares? What about investors who purchased their s seller?

As referenced above in Question No. 12, Next Bridge has stated that its transfer agent, AST, has distributed all shares rel
MMTLP corporate action either directly to any stockholders that held their shares directly registered with AST or to shareh
nominee representatives.[20] As explained in the March 16, 2023, MMTLP FAQs, Question No. 10, because Next Bridge ha
number for its shares, there is no uniform manner in which to identify Next Bridge common stock and broker-dealers may
Next Bridge shares in customer accounts using different numeric or alphanumeric identifiers. While the absence of a CUS
caused some confusion, it does not affect the status of the Next Bridge shares in a customer's account.

As further explained in the March 16, 2023, MMTLP FAQs, Question No. 2, a seller ceases to be a holder of shares and a
holder of shares after a transaction settles. An MMTLP purchaser who bought shares from a short seller would still have b
for the Next Bridge distribution, provided the short seller was able to deliver MMTLP shares by December 12. As noted ab
there were a very small number of short positions in MMTLP as of December 12, 2022, that could potentially have resulte

Based on the small size of short positions with broker-dealers that existed as of December 12—1.6% of the total shares o
only a limited amount of the shares traded in MMTLP around the time of the corporate action might have been settled by
borrowed shares. Any purchasers who received borrowed shares in settlement of a transaction on December 12 would ha
receive Next Bridge shares in the distribution (purchasers generally would be unaware of whether they received borrowed
because the existence of a loan does not impact the ownership rights of the purchaser).[21]

## 17. Why did FINRA halt trading in MMTLP before December 12?

FINRA is authorized under its rules to impose a quoting and trading halt in an OTC equity security where, among other fac
that an extraordinary event has occurred or is ongoing that has had a material effect on the market for the security or has
to cause major disruption to the marketplace or significant uncertainty in the settlement and clearance process.[22] FINRA r
for MMTLP and halted trading on December 9 because, after December 12 (the settlement date for trades executed on D
shares would cease to be DTC-eligible; the MMTLP shares would be cancelled by the issuer at the time of the distribution
stock was not expected to be DTC-eligible. These circumstances created significant uncertainty regarding how transactio
December 8 would settle in an orderly manner in relation to these dates.[23]

Specifically, trades executed after December 8 would not have settled in time for the purchaser to become a holder of the
December 12. The seller of MMTLP shares would still have been recorded as the holder eligible to receive Next Bridge sh
corporate action distribution, and the buyer would *not* have been recorded as eligible to receive Next Bridge shares in the
trades in MMTLP not settled by December 12 would have needed to be resolved through broker-to-broker processes outs
likely have resulted in significantly delayed delivery and FTDs, if not ongoing disputes. It also appeared likely that the MM
cancelled by the issuer before broker-to-broker settlement occurred.

In addition, there was the potential for confusion and disagreement in the settlement process among the parties with resp
be delivered to the buyer. For example, an investor entering a buy order in MMTLP on or after December 9 might not have
would not be a holder entitled to receive the Next Bridge shares in the corporate action distribution (because the seller of
time period would have received Next Bridge shares as part of the distribution) and that the MMTLP shares purchased wo
cancelled.

FINRA believes that, in the absence of a halt, all of the above factors would have made continued trading past December
had the potential to cause significant uncertainty regarding the settlement and clearance process for any such trades. Acc
determined that an extraordinary event within the meaning of its trading halt rule had occurred and halted trading in MMTL
existence or absence of short positions in MMTLP was not relevant to FINRA's concerns regarding the clearance and sett
prompted the decision to halt trading on December 9.

We understand that certain investors are concerned about difficulties they may experience when seeking to trade their Ne
there currently is no secondary market for Next Bridge shares. *See* Question No. 19 below regarding the steps that Next I
secondary market trading in its common stock.

**18. Did the corporate action require that short positions be closed out, and did the halt allow short sellers to avoi**

The Next Bridge / MMTLP corporate action itself did not require investors with short positions in MMTLP to purchase shar positions. Further, the trading halt did not change short sellers' close-out obligations.

It is not uncommon for short positions to be open when a corporate action occurs. Broker-dealers have operational proces short positions following a corporate action, and, following the Next Bridge / MMTLP corporate action, broker-dealers adju MMTLP to reflect an equal sized short position in Next Bridge (*i.e.*, an account with a short position of 100 shares of MMT a short position of 100 shares of Next Bridge). Broker-dealers remain subject to any close-out obligations that exist under Thus, an investor with a short position in MMTLP who did not close out that position before the corporate action would ha position in Next Bridge. In addition, if the investor borrowed the shares in connection with the short sale, they would not ne purchase/return the securities to the lender until the lender recalled the loan.

As discussed below in Question No. 19, trading Next Bridge common stock is difficult as a practical matter because there market for Next Bridge shares. *See* March 16, 2023, MMTLP FAQs, Question No. 11.

**19. How can a holder of Next Bridge common stock liquidate their securities?**

Next Bridge registered its common stock with the SEC so Meta Materials could distribute Next Bridge shares to MMTLP h cancel the MMTLP shares. Thus, it was clear that MMTLP shareholders would become holders of Next Bridge stock. As r Question No. 12, it appears that the Next Bridge common stock has been distributed successfully and that former MMTLP Bridge shares—as anticipated. We understand that some Next Bridge holders now would like to trade their shares.

However, today it is very difficult for Next Bridge shareholders to trade their shares because Next Bridge has not taken the facilitate secondary market trading. When Next Bridge registered its common stock, it stated that it would not seek to mak eligible. Next Bridge acknowledged that the absence of DTC eligibility would hamper trading (because DTC-eligibility enal and settlement of securities transactions).[25] In addition, Next Bridge chose not to obtain a CUSIP number from CUSIP Gl common stock—further hampering secondary market trading. Without a CUSIP number, a broker-dealer is not able to obt Next Bridge common stock from FINRA to support quoting and trading activity. Unless Next Bridge takes steps to facilitate stock, shareholders will continue to have difficulty trading their securities.[26]

---

1 *See* FAQ: MMTLP Corporate Action and Trading Halt (March 16, 2023), available at https://www.finra.org/investors/insig corporate-action-and-trading-halt.

2 "MMTLP" was the over-the-counter (OTC) equity symbol assigned by FINRA to the Series A Preferred Shares of Meta M Materials), which were issued in connection with the June 2021 merger between Torchlight Energy Resources and Metam company that resulted from the merger—Meta Materials—had common stock that became listed on Nasdaq, the Series A unlisted and traded in the OTC market under the symbol MMTLP. The Series A Preferred shares were created as a vehicl receive value from Meta Materials' oil and gas exploration business, which ultimately was spun off into Next Bridge.

3 In connection with the corporate action announced by Meta Materials on November 23, 2022, each holder of MMTLP as received one share of Next Bridge common stock for every one share of MMTLP held, and the MMTLP shares were canc

4 "Broker-dealer" in this document generally refers to a FINRA-registered broker-dealer.

5 *See* https://uploads-ssl.webflow.com/6169e69d0075ec7c66221a8b/63eea79071ed8ab3502a9ab8_NBH%20Updated%20Press%20Release%

6 Most investors hold their shares in "street name," where their shares are registered on the records of the issuer (maint in the name of an intermediary, such as The Depository Trust Company ("DTC"). Clearing agencies (such as DTC), which not FINRA, perform functions that include serving as a central securities depository and operating a centralized system fo transactions. If a security is DTC-eligible, shares held with DTC are reflected on the transfer agent's books in the name "C is affiliated with DTC. DTC maintains records identifying the broker-dealer holders and the broker-dealers maintain record appropriate investors as beneficial owner of the shares. Less frequently, an investor holds shares in its own name directly transfer agent (either in certificate form or through direct registration). *See* SEC Investor Bulletin: Holding Your Securities, https://www.sec.gov/about/reports-publications/investor-publications/holding-your-securities-get-the-facts.

There is no clearing agency for Next Bridge's common stock because Next Bridge did not obtain DTC eligibility for its sha be held directly with the transfer agent or through a third-party whose name is registered with the transfer agent.

7 *See* https://www.sec.gov/Archives/edgar/data/1936756/000119312522292114/d302576d424b4.htm.

8 *See* https://uploads-ssl.webflow.com/6169e69d0075ec7c66221a8b/63eea79071ed8ab3502a9ab8_NBH%20Updated%20Press%20Release%

9  For several decades, the SEC requested this information by mailing questionnaire forms (known as "blue sheets" because of the color of the paper on which the forms were printed) to broker-dealers to be manually completed and mailed back to the SEC. In the late 1980s, the SEC and self-regulatory organizations worked together to develop and implement a system with a universal electronic format, commonly referred to as the "electronic blue sheet" (EBS) system, to replace the manual process. *See* Electronic Submission of Securities Transaction Information by Exchange Members, Brokers, and Dealers, Exchange Act Release No. 34-44494 (June 29, 2001) available at https://www.sec.gov/rules/2001/06/electronic-submission-securities-transaction-information-exchange-members-brokers-and.

10 FINRA makes blue sheet data available to the SEC, other regulators, and law enforcement, pursuant to specific regulatory rules and requests.

11 The next short interest reporting settlement date was December 15, 2022—after the MMTLP corporate action and after MMTLP had been cancelled by the issuer and the symbol was deleted by FINRA. Short interest reports for Next Bridge were not and have not been required because broker-dealers report short interest by security symbol, and Next Bridge does not have a symbol. If Next Bridge were to quote or publish quotations in its common stock, broker-dealers would then be able to request that FINRA assign a symbol in connection with quoting or trading, in accordance with FINRA rules and procedures. In turn, broker-dealers would be required to report short interest in Next Bridge to FINRA, and FINRA would make this information publicly available on its website. *See* Letter from FINRA to Next Bridge Hydrocarbons, Inc. (May 19, 2023), available at https://www.finra.org/sites/default/files/2023-07/nbh-finra-letter-5-19-23.pdf.

12 December 12, 2022, was the settlement date for transactions executed on MMTLP's last day of trading, December 8, due to the T+2 settlement period and the intervening weekend.

13 As a comparison, there was significant scrutiny of the level of short interest in GameStop Corp. ("GME") during the events of January 2021 in early 2021. An SEC staff study of these events found that short interest in GME from 2019 until early 2021 "hovered around 50% [of shares outstanding], hitting its high of 109.26% on December 31, 2020." *See* SEC Staff Report on Equity and Options Market Structure Conditions in Early 2021 at 24-25. The markets for securities listed on a national securities exchange (like GME) and securities that are traded over-the-counter (like MMTLP) naturally can have different trading characteristics.

14 For example, March 16, 2023, MMTLP FAQs, Question No. 8, states in part that:

"[D]aily short sale volume may reflect the execution of a short sale transaction by a firm solely to facilitate an immediate execution of a customer long sale, such that the short sale does not and was not intended to result in a short position. FINRA encourages investors to review and understand the differences between these data sets. Importantly, the daily short sale volume does not equate to an end-of-day short position and should not be confused with short interest."

15 A "failure to deliver," or FTD, occurs when a broker-dealer fails to deliver securities to the party on the other side of the transaction on the settlement date. As the SEC has explained, FTDs can result from both long and short sales, and not all FTDs result from short selling. There are other reasons why broker-dealers do not or cannot deliver securities on the settlement date. For example, a broker-dealer may experience a problem that is either unanticipated or is out of its control, such as (1) delays in customers delivering their shares to the broker-dealer, (2) the inability to obtain borrowed shares in time for settlement, (3) issues related to the physical transfer of securities, or (4) the broker-dealer fails to receive shares it had purchased to fulfill its delivery obligations. *See* https://www.sec.gov/investor/pubs/regsho.htm. The SEC also has FAQs addressing concerns that short sale transactions or stock borrowing can create "counterfeit shares." *See* https://www.sec.gov/divisions/marketreg/mrfaqregsho1204.htm.

16 While FTDs may be an indicator of "naked" short selling in a security, they can also result from other causes, as discussed above.

17 *See* SEC Fast Answers: Naked Short Sales, available at https://www.sec.gov/answers/nakedshortsale.

18 On October 13, 2023, the SEC amended the Consolidated Audit Trail Plan to require the identification of orders for which broker-dealers are relying on the bona fide market making exception in Rule 203(b)(2)(iii) of SEC Regulation SHO (which can include short sales for which locates, borrows, or arrangements to borrow have not been performed).

19 *See* https://www.sec.gov/data/foiadocsfailsdatahtm. CNS is a system operated by NSCC that serves as its core netting and settlement engine. NSCC is a subsidiary of DTCC.

20 *See* https://uploads-ssl.webflow.com/6169e69d0075ec7c66221a8b/63eea79071ed8ab3502a9ab8_NBH%20Updated%20Press%20Release%2...

21 Typically, in a securities lending arrangement, cash or securities issued in connection with a dividend would be made to the lender of the shares. The borrower is required to provide to the lender the equivalent value of the dividend—cash distributions are paid in cash to the lender when the distribution is made, and share distributions are added to the lending contract as a loan and remain open until the loan is terminated.

22 *See* the March 16, 2023, MMTLP FAQs, Question No. 1.

23 *See* March 16, 2023, MMTLP FAQs, Questions No. 1 and 7.

24 It is customary that trading halts for OTC equity securities become effective simultaneous with the issuance of public n

25 *See* https://www.sec.gov/Archives/edgar/data/1936756/000119312522281275/d302576ds1a.htm#toc302576_2.

26 *See* Letter from FINRA to Next Bridge Hydrocarbons, Inc. (May 19, 2023), available at https://www.finra.org/sites/defau letter-5-19-23.pdf.

© FINRA. All Rights Reserved.