# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WESTERN TEXAS
## MIDLAND/ODESSA DIVISION

**************************************************

| | |
|---|---|
| DANIELLE SPEARS | * |
| Plaintiff | * |
| | *  Docket Number: 7:24-cv-321 |
| v. | * |
| | * |
| NEXT BRIDGE HYDROCARBONS, INC. | * |
| GREGORY MCCABE, JOHN BRDA | * |
| THE SECURITIES & EXCHANGE COMMISSION | * |
| FINANCIAL INDUSTRY REGULATORY AUTHORITY | * |
| JANE DOE 1-20, JOHN DO 1-20 | * |
| Defendant | * |
| | * |

**************************************************

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT FINRA'S MOTION TO DISMISS

---

# TABLE OF CONTENTS

**I. INTRODUCTION**

    **A.** Federal Question Jurisdiction……….……………………………………………5

    **B.** Summary of Claims and Relief Sought...……………………………….…..6

**II. JURISDICTION AND VENUE**

    **A. Subject Matter Jurisdiction  (Exchange Act, Sherman Act, Constitutional Claims)**...................................................................................7

    **B. Diversity Jurisdiction for All Defendants and Forum Retention in Texas**….....7

    **C. Venue Propriety**………………………………………………….. 7

**III. FACTUAL BACKGROUND**

    **A.  The Birth and Legal Structure of FINRA**…..…………………………… 9

    **B. FINRA's Role as a Self-Regulatory Agency ("SRO") Under 15 U.S.C. § 78o-3**…..…………………………………………………… 10

**IV. IMMUNITY DOES NOT EXTEND TO ULTRA VIRES CONDUCT**

**Introduction paragraph on MMTLP event and FINRA's failures**

    **A. Immunity or No Immunity: That is the Question**………………………….. 12

        **1. FINRA's contradictory statements regarding Regulation SHO "threshold" status**……………………………………… 13

        **2. MMTLP met SEC's Regulation SHO threshold criteria regardless of "error" claim**……………………………………………14

    **B. FINRA violated its own Rule 6490 by altering the corporate action**………….. 14

    **C. Regulator turned de facto issuer — the governing law, FINRA's duties, and two independent violations**………………………………………… 17

    **1. Aiding and abetting preservation of short positions in violation of settlement/close-out duties**……………………………………………. 17

    2.   De facto issuer conduct: removal of pay date and reclassification of corporate action……………………………………………………..… 18

    3.   "Too Late to Cancel" orders and synthetic share substitution as further evidence of ultra vires conduct………………………………………..… 19

**V. THE FOX IS GUARDING THE HENHOUSE — NO EXCHANGE-LEVEL OVERSIGHT, NO ACCOUNTABILITY**

    A.  FINRA's Regulatory Responsibilities vs. Execution Failures……………..…… 22

    B.  Governance Conflicts and Financial Benefit From Halt…………………..…… 23

**VI. MONOPOLY CONTROL AND ANTITRUST LIABILITY**

    A.  FINRA's Structural Monopoly Over the OTC Market…………………..…… 24

    B.  Vertical Integration and Governance Conflicts…………………………...…… 24

    C.  Collusion, Transparency Failures, and Information Asymmetry…………..…… 25

    D.  Antitrust Analysis…………………………………………………………..…… 25

**VII. FINAL CONSTITUTIONAL ARGUMENTS AND STANDING**

    A.  Standing…………………………………………………………………...…… 25

    B.  Due Process Violation…………………………………………………………… 26

    C.  SEC Rulemaking Requirements Not Followed…………………………………… 27

    D.  Major Questions Doctrine and Nondelegation………………………………… 28

**VIII. PRAYER FOR RELIEF**

    A.  Declaratory Relief…………………………………………………………………30

    B.  Monetary Relief…………………………………………………………………30

    C.  Attorney's Fees…………………………………………………………………30

    D.  Further Relief as Court Deems Just…………………………………………… 30

# <u>Table of Authorities</u>

*Alpine Securities Corp. v. FINRA,*
61 F.4th 1093 (D.C. Cir. 2023)............................................................................................11

*Axon Enterprise, Inc. v. FTC,*
598 U.S. 175 (2023)............................................................................................................11

*Bell v. Hood,*
327 U.S. 678 (1946)..............................................................................................................6

*Citizens Insurance Co. of America, Citizens, Inc., Harold Riley,*
*and Mark Oliver v. Dr. Fernando Hakim Daccach,*
217 S.W.3d 430 (Tex. 2007).................................................................................................7

*Fiero v. FINRA,*
660 F.3d 569 (2d Cir. 2011)...............................................................................................11

*Free Enterprise Fund v. PCAOB,*
561 U.S. 477 (2010)............................................................................................................11

*Langton v. Cbeyond Commc'ns, L.L.C.,*
282 F. Supp. 2d 504 (W.D. Tex. 2003).................................................................................8

*Leroy v. Great W. United Corp.,*
443 U.S. 173 (1979)..............................................................................................................8

*McClintock v. School Bd. E. Feliciana Parish,*
299 F. App'x 363 (5th Cir. 2008)..........................................................................................8

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning,*
578 U.S. 374 (2016)..............................................................................................................6

*National Horsemen's Benevolent & Protective Ass'n v. Black,*
53 F.4th 869 (5th Cir. 2024).............................................................................................. 29

*Sparta Surgical Corp. v. NASD,*
159 F.3d 1209 (9th Cir. 1998)...................................................................…........11

5

2. Statutes

- 15 U.S.C. § 78o–3 (Exchange Act Section 15A – Registration and regulation of national securities associations)..................................................................................24

- 15 U.S.C. § 78aa (Jurisdiction of offenses and suits)................................................ 7

- 28 U.S.C. § 1332 (Diversity jurisdiction)..................................................................7

3. Rules and Regulations

- FINRA Rule 4320 (Short Sale Delivery Requirements)..........................................14, 23

- FINRA Rule 6440 (Trading and Quotation Halt in OTC Equity Securities)................
…………………………………………………………………………4, 10, 11, 22, 23, 25, 28

- FINRA Rule 6490 (Processing of Company-Related Actions).....................................
……………………………………………..……2, 10, 11, 14, 15, 16, 17, 19, 22, 23, 27

- SEC Rule 15c6-1 (T+2 Settlement Cycle)..................................................................2

- SEC Rule 15c3-3 (Customer Protection Rule)........................................................2, 21

- Regulation SHO, 17 C.F.R. § 242.203 (Close-out requirements)............................ 14

- 17 C.F.R. § 240.19b-4 (Filing of proposed rule changes by SROs)........................ 19

1

## I. INTRODUCTION

This Court possesses jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332, with proper venue under 28 U.S.C. § 1391(b)(2). Plaintiff asserts federal claims arising and suffered immediate and irreparable financial harm from the actions undertaken by the Financial Industry Regulatory Authority ("FINRA") on or about December 9, 2022, when it implemented a rare U3 Halt, reserved for regulatory pause for extraordinary market conditions, to halt trading in MMTLP, a Series A Preferred Share.

The U3 halt was executed through notifications sent to FINRA's U.S. broker-dealer members, directing them to immediately cease quoting and trading MMTLP while also coordinating clearance actions with the Depository Trust & Clearing Corporation ("DTCC"), which effectively terminated all trading activity of MMTLP on a global scale. This unprecedented measure far exceeded FINRA's delegated regulatory authority and contravened explicit statutory procedures mandated by the Securities Exchange Act of 1934 ("Exchange Act"). (See Appendix A.15, acknowledging DTCC's clearance and settlement role and related litigation, Rolo v. SEC and Pease v. SEC.) Plaintiff

When the Over-the-Counter ("OTC") opened on Friday, December 9, 2022, MMTLP was not trading. FINRA enacted the halt without notice to retail investors. In fact, FINRA's last external communication to retail investors occurred at approximately 1:10 pm EST on Thursday, December 8, 2022 explicitly stating "trade purchases of MMTLP executed after 12/8/22 will not receive the distribution. Will not be quoted Ex. Symbol: MMTLP will be deleted effective 12/13/22." In the history of the United States stock market, MMTLP remains the only asset ever

2

halted by a U3 halt and permanently barred from ever returning to trading. This deprived investors of their ability to sell shares, stripping their due process right to respond.

FINRA's U3 halt of MMTLP was imposed without adhering to the statutory process required under the Exchange Act for such final market actions. Furthermore, FINRA is not a registered exchange and thus lacks the authority to permanently halt trading.

This case concerns a self-regulatory organization ("SRO") exceeding its delegated authority, causing foreseeable, concrete harm to Plaintiff. FINRA's conduct was not an isolated procedural misstep. It represented the culmination of a systemic breakdown in regulatory integrity, a gross failure to uphold statutory duties in market execution and mechanics.

On December 7, 2022, FINRA and DTCC conducted a closed-door call, explicitly excluding the issuer, the spin-out company, and their respective counsel. Further, on or about December 8, 2022, FINRA made unilateral alterations to the corporate action in direct violation of its own Rule 6490, eliminating the pay date that would have triggered settlement and changing the term "canceled" to "deleted," subsequently claiming this caused investor confusion. Despite knowingly breaking Rule 6490 by making unauthorized and unapproved changes, FINRA chose not to correct the deficient language, failing to comply with federal rules designed explicitly to protect investors. These include SEC Rule 15c6-1 (T+2 settlement), Regulation SHO (mandatory close-outs), SEC Rule 15c3-3 (customer protection), and FINRA Rule 4320(a) (threshold OTC close-outs).

Federal law mandated short positions in MMTLP be closed before its conversion into a non-tradable private security. FINRA, however, seemingly chose not to enforce these mandates, favoring instead its broker-dealer members who controlled approximately 65 million shares of

3

the 163.3 million share allotment. At its core, this case raises a fundamental constitutional concern: whether the United States can continue delegating market-policing authority to a private SRO dominated by the very broker-dealers it is meant to regulate. Of FINRA's approximate 220 board and advisory committee seats, 140 are currently occupied by broker-dealer insiders, with an additional 50 held by former broker-dealer members. Only 30 seats are occupied by individuals without insider affiliations, meaning insiders hold 86% of these positions. The halt itself was implemented by FINRA's UPC committee, seven of whose ten members were brokers who sold MMTLP. This is not regulatory oversight; it represents structural bias, a regulator acting in the interests of its members rather than the public.

This scenario is analogous to a defendant facing a jury composed predominantly of close relatives, raising serious questions about bias and fairness, making impartial judgment effectively impossible.

The Securities and Exchange Commission ("SEC"), tasked with overseeing FINRA under 15 U.S.C. § 78s(g), has refused to intervene, failing to protect retail investors. SEC Chair Gary Gensler testified before the Senate in 2023 that FINRA neither sought nor obtained SEC approval or advice for the halt, and would not confirm whether the SEC even investigated it. In litigation responses, the SEC disclaimed responsibility, asserting that even if FINRA acted improperly, oversight was not within the Commission's role. (See Appendix A.16.) This abdication leaves investors unprotected from an unaccountable private regulator. Without transparency from the SEC regarding whether FINRA's actions were even reviewed or sanctioned, investors and this Court have no means to assess accountability.

4

On December 8, 2022, Plaintiff relied explicitly on FINRA's publicly published Daily List, which stated that trading would remain open through December 12, 2022, and accordingly purchased 4,005 shares for $15,867 for a swing trade believing in a unicorn. (See Exhibit) Given MMTLP's persistent presence on the Threshold list, Plaintiff and thousands of investors anticipated a short squeeze due to mandatory closures of short positions as the company transitioned to a private, non-tradable entity.

However, on the morning of December 9, 2022, all Plaintiffs open sell orders, priced explicitly between $1,250 and $100, were unilaterally purged from broker systems. All subsequent attempts by Plaintiff to place new sell orders were explicitly and immediately rejected. Such immediate cancellations are inconsistent with temporary regulatory halts, which typically preserve existing orders until trading resumes. By declaring the halt would continue "until deletion of the symbol," FINRA effectively converted its temporary regulatory authority into a permanent market closure, explicitly violating Plaintiff's vested property rights without notice, due process, or statutory compliance.

FINRA cited Rule 6440, claiming clearance and settlement risks. Plaintiff alleges these risks were created by FINRA's unauthorized changes to the corporate action. Rule 6440 authorizes temporary halts, not permanent closures. Additionally, as FINRA is explicitly not a registered exchange under federal securities law, it lacks statutory authority to permanently close markets. Nevertheless, FINRA imposed a de facto clearance and settlement blockade seemingly coordinated with DTCC, causing a global shutdown of MMTLP trading between December 9–12, 2022.

Meta Materials, Inc. ("META") and Next Bridge Hydrocarbons, Inc. ("NBH") were explicitly excluded from the FINRA–DTCC call and received no advance notice of the imminent halt or unauthorized alterations to corporate actions. (See Appendix A.14.) The global impact, demonstrated by foreign trades failing due to DTCC's refusal to settle, further evidences FINRA's ultra vires actions, far exceeding its delegated authority under the Exchange Act and operating without SEC oversight or approval.

If real risks existed, FINRA could have paused trading and resumed after addressing them. Instead, despite weeks of advance notice, FINRA acted with just two trading days remaining, leaving Plaintiff no time to adapt. This forced conversion erased market liquidity without due process, SEC approval, or proper rulemaking. Either FINRA severely failed its oversight duties or deliberately delayed action to protect insiders.

Because the Complaint plausibly alleges ultra vires conduct, direct constitutional and economic harm, and multiple factual issues inappropriate for dismissal on pleadings alone, Plaintiff respectfully requests the Court deny FINRA's motion to dismiss.

## A. Federal Questions Jurisdiction

This Court has original jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims arising under the Constitution, laws, and treaties of the United States. The Complaint alleges violations and ultra vires actions under and related to the Securities Exchange Act of 1934, federal antitrust statutes, and the United States Constitution, including claims under the Due Process Clause and structural separation of powers principles. Federal question jurisdiction exists where a well-pleaded complaint establishes that federal law creates the cause of action or that the right to relief necessarily depends on resolution of a substantial question of federal law. See

6

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374, 383–84 (2016) (Exchange Act–related claims belong in federal court where federal issues are necessarily raised).

To the extent FINRA argues that certain claims lack a private right of action or fail on the merits, such contentions do not defeat jurisdiction. "[J]urisdiction is not defeated by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." *Bell v. Hood*, 327 U.S. 678, 682 (1946). Whether a claim ultimately survives under Rule 12(b)(6) is a separate merits inquiry and is not a basis for dismissal under Rule 12(b)(1). Plaintiff's constitutional claims, as well as her federal antitrust claims, independently establish jurisdiction under § 1331 regardless of the Exchange Act counts.

Because the Complaint presents federal causes of action and necessarily raises substantial questions of federal law regarding FINRA's delegated regulatory authority, its oversight under the Exchange Act, and the constitutional limits on private entities exercising governmental power, this Court has subject-matter jurisdiction pursuant to § 1331

**B. Summary of Claims and Relief Sought**

Plaintiff alleges that FINRA exceeded its statutory authority under the Exchange Act by imposing an unauthorized U3 trading halt on MMTLP (Dec. 9, 2022), unilaterally altering corporate action disclosures, and performing functions reserved for registered exchanges. Plaintiff also asserts violations of the Sherman Act (Sections 1 and 2) due to FINRA's monopolistic control of OTC markets, and a Fifth Amendment due process violation for depriving her of property without notice or opportunity to be heard. Plaintiff seeks declaratory and injunctive relief, compensatory and treble damages, restitution, disgorgement, attorney's fees, and any other relief the Court deems just.

## II. JURISDICTION AND VENUE

### A. Subject Matter Jurisdiction (Exchange Act, Sherman Act, Constitutional Claims)

This Court has jurisdiction under 15 U.S.C. § 78aa (Exchange Act), 15 U.S.C. §§ 1–2 (Sherman Act), and 28 U.S.C. § 1331 (constitutional claims). Plaintiff challenges FINRA's ultra vires conduct under the Exchange Act, antitrust law, and the Fifth Amendment. Courts have consistently held that such claims—targeting constitutional structure, statutory overreach, and non-governmental enforcement—fall within judicial review and are not subject to arbitration. See Appendix A.7. FINRA cannot shield itself from review of regulatory overreach through arbitration; this Court has jurisdiction.

### B. Diversity Jurisdiction for All Defendants and Forum Retention in Texas

In the alternative to federal question jurisdiction, Plaintiff asserts diversity jurisdiction under 28 U.S.C. § 1332. Plaintiff is a citizen of Arizona, and none of the Defendants share her state citizenship. Several Defendants are domiciled in Texas or maintain their principal place of business there. The core conduct giving rise to Plaintiff's claims, including corporate decision-making, communications, and market actions, occurred in Texas. The amount in controversy exceeds $75,000, and venue is proper under 28 U.S.C. § 1391(b)(2). Texas remains the central forum for both factual and jurisdictional purposes. Supporting authorities are listed in Appendix A.8.

### C. Venue Propriety

Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within the State of Texas, and

8

specifically within this District. See *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) (en banc) (substantial part of the events can be determined by considering where "the acts and omissions giving rise to the claim occurred" and "where witnesses and evidence are located"); *McClintock v. School Bd. E. Feliciana Parish*, 299 F. App'x 363, 365 (5th Cir. 2008) (venue proper where a substantial part of the events or omissions occurred in the chosen district, even if other substantial events occurred elsewhere).

Next Bridge Hydrocarbons, Inc. maintains its principal place of business in Texas. Defendant Gregory McCabe resides in Texas, and was a central figure in the corporate transactions that led to the distribution of MMTLP shares. Torchlight Energy Resources, Inc., the predecessor to Meta Materials, had its headquarters in Texas at the time it structured the corporate actions that created the MMTLP distribution. The decisions and communications surrounding these corporate actions were made or directed from Texas, involving Texas-based executives and operations.

The Western District of Texas is also home to numerous brokers and market participants who were directly impacted by FINRA's halt. The consequences of that halt were immediately felt by Texas investors and firms, and included the inability to execute trades, the cancellation of open sell orders, and the loss of market opportunities. The presence of key parties, witnesses, and relevant documents in Texas further confirms that this District is the most appropriate and convenient forum for the resolution of this dispute.

Under *Leroy v. Great W. United Corp.*, 443 U.S. 173, 183–84 (1979), venue is proper in any district where a substantial part of the events or omissions giving rise to the claim occurred, even if other events occurred elsewhere. See also *Langton v. Cbeyond Commc'ns, L.L.C.*, 282 F. Supp. 2d 504, 508 (W.D. Tex. 2003) (venue proper in this District when it contains the location where a

significant part of the facts underlying the dispute took place). Here, the Texas-based decision-making, corporate activity, and market impact easily satisfy that standard. Moreover, because the claims involve overlapping facts and evidence concerning Texas-based entities and individuals, maintaining venue in this District promotes judicial efficiency and avoids the duplication of proceedings in multiple jurisdictions.

For these reasons, venue in the Western District of Texas is not only proper under § 1391(b)(2), it is the most appropriate forum for adjudicating this dispute given the factual nexus to Texas and the presence of essential parties and evidence within this District.

## III. FACTUAL BACKGROUND

### A.  The Birth and Legal Structure of FINRA

FINRA was created in 2007 through the SEC-approved consolidation of NASD and NYSE Regulation.[1]

FINRA's status as a private, non-governmental actor operating under limited delegated authority is addressed in Appendix A, Section A.2.

FINRA lacks exchange registration and holds limited regulatory authority.

The statutory limits on FINRA's authority, and the implications of exceeding those limits, are addressed in Appendix A, Section A.4.

FINRA's statutory limitations under Sections 15A and 6 of the Exchange Act are discussed in Appendix A, Section A.5.FINRA is not a sovereign agency. Its authority is delegated,

---

[1] See Appendix A, Section A.1 (FINRA Formation History).

conditional, and revocable. Its jurisdiction exists only by grace of the SEC, which serves as its federal overseer. FINRA cannot create or expand its own powers without express SEC approval, and any action taken outside of those limits is *ultra vires*.

The procedural requirements for FINRA rulemaking, including SEC oversight under Section 19 of the Exchange Act, are set forth in Appendix A.6.

**B. FINRA's Role as a Self-Regulatory Agency ("SRO") Under 15 U.S.C. § 78o-3**

As a self-regulatory organization (SRO), FINRA operates under the direct oversight of the Securities and Exchange Commission (SEC). FINRA's authority is neither inherent nor autonomous; it exists solely by virtue of statutory delegation and must be exercised in accordance with procedures set forth in Section 19 of the Exchange Act (15 U.S.C. § 78s). FINRA is a private entity, not a sovereign agency, and every rule or enforcement action it undertakes must conform to the statutory framework.

Under Section 19(b) of the Exchange Act, FINRA may not create, enforce, or revise any rule unless it first submits the rule to the SEC for public notice, comment, and approval. This process applies to all substantive rules, including Rule 6440, which authorizes FINRA to direct member firms to halt trading in an over-the-counter (OTC) equity security under limited, enumerated conditions such as extraordinary market events, concerns about fraud or manipulation, or a significant uncertainty in the trading or settlement process, and Rule 6490, which governs the processing of issuer corporate actions in the OTC market. Rule 6490 expressly states that FINRA "may not unilaterally alter the terms of a company-related action" submitted by an issuer. No FINRA rule becomes valid or enforceable until the SEC issues a formal approval order.

Courts have consistently held that FINRA may not expand its authority through implication, informal guidance, or unilateral action. See *Sparta Surgical Corp. v. NASD*, 159 F.3d 1209 (9th Cir. 1998) ("FINRA acts under the SEC's supervision, and lacks independent statutory authority to enforce securities laws or compel action without an SEC-approved rule"); *Fiero v. FINRA*, 660 F.3d 569 (2d Cir. 2011) (rejecting enforcement of unapproved rules by implication or practice); *Alpine Securities Corp. v. FINRA*, 61 F.4th 1093 (D.C. Cir. 2023) (courts may review and enjoin ultra vires acts undertaken without proper SEC approval). Even when a rule is approved, the SEC retains ultimate supervisory control, including the power to amend or abrogate rules under Section 19(c), review and reverse disciplinary decisions under Section 19(d), and suspend or revoke FINRA's registration under Section 19(h).

When FINRA acts outside the framework of Section 19(b) for example, by enforcing obligations not contained in an SEC-approved rule such actions are considered ultra vires and subject to judicial review without requiring exhaustion of internal remedies. See *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023); *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010).

In December 2022, FINRA invoked its authority under Rule 6440 to halt trading and quoting in MMTLP. FINRA did not need to adopt a new rule to issue the halt because Rule 6440 remained in effect, but it did need a valid legal basis under that rule. Plaintiff alleges that FINRA lacked such a basis and instead manufactured one by altering the issuer's corporate action information to create the appearance of a clearing and settlement problem. Such an alteration, if proven, would directly violate Rule 6490's prohibition on unilaterally changing the terms of a corporate action and would exceed FINRA's authority under the Exchange Act. By creating the basis for a halt through improper modification of an issuer's corporate action, FINRA acted outside the scope of its delegated authority, rendering the halt ultra vires.

## IV. IMMUNITY DOES NOT EXTEND TO ULTRA VIRES CONDUCT

This case presented FINRA with a regulatory scenario it was unprepared to handle. MMTLP was a pink sheet equity, allowed by FINRA to be heavily shorted and traded without restriction. But unlike other speculative tickers, it was tied to a known and forthcoming corporate action: it was going private. This created a once-in-history collision between unchecked short selling and the hard legal wall of an illiquid, non-tradable private security.

The market reacted accordingly: retail investors, relying on the prospectus and FINRA's published corporate action, bought aggressively under the belief that short positions would be forced to close. Yet FINRA issued no guidance to brokers, never enforced close-out procedures, and failed to address how settlement would work once trading ceased.

By the time FINRA's Head of Enforcement Sam Draddy flagged MMTLP as "hitting his fraud radar" on December 5, 2022, the market had only four trading days left. Draddy suggested discussing the issue "next week," apparently unaware MMTLP would be untradable by then.

What followed was not enforcement. It was an emergency reaction. FINRA rewrote the corporate action, halted trading, and allowed short positions to persist, locking investors out and shielding market insiders from catastrophic losses.

## A. Immunity or No Immunity: That is the Question

Although FINRA is a private corporation, it claims judicially created "absolute immunity" when performing delegated regulatory functions. This protection only applies when acting within its delegated scope: enforcing securities laws, disciplining members, and conducting arbitration.

Courts have held SROs are not immune when acting outside that scope. See Appendix A.2. These admissions confirm that the halt was imposed without statutory process or exchange-level authority and fall outside the protections of regulatory immunity. "SEC Chair Gary Gensler testified explicitly before the House Financial Services Committee on April 18, 2023, stating that FINRA 'didn't seek the SEC's advice or permission' prior to imposing the halt under their Rules." *(See exhibit 1 in Motion for Judicial Notice); House Financial Services Committee Hearing, April 18, 2023)* This sworn testimony directly contradicts any implication that FINRA was acting under SEC instruction or within the scope of delegated regulatory oversight.

Chair Gensler also confirmed that the SEC has not released, and may never release, any investigative findings or data related to MMTLP, including blue sheet or share-count information. These admissions underscore Plaintiff's core due process concern: that FINRA acted unilaterally to impose a market-wide halt with no notice, no SEC oversight, and no opportunity for investors to obtain post hoc transparency or redress. The testimony supports Plaintiff's request for judicial notice, her motion for early discovery, and her position that FINRA's conduct was ultra vires and therefore not entitled to immunity.

The question isn't whether the halt looked regulatory, but whether it was lawful. It was not. FINRA acted without rulemaking, oversight, or legal foundation. This is the definition of **ultra vires conduct**, which courts have consistently held is **not shielded by immunity**.

## A.1 FINRA's Contradictory Statements on Threshold Status

"In November 2023, FINRA claimed a 'coding error' caused MMTLP's threshold-list designation, contradicting over 150 days of public records confirming that status. This discrepancy demonstrates ultra vires conduct warranting discovery.

## A.2 MMTLP Objectively Met Threshold Criteria

Under 17 C.F.R. § 242.203(c)(6) (Reg SHO), a threshold security is defined as one with:

 (1) 10,000+ fails-to-deliver,

 (2) value exceeding $50,000,

 (3) representing ≥ 0.5% of total shares outstanding,

 (4) over five consecutive settlement days.

Public DTCC data and FINRA's own short volume reports confirm MMTLP met these criteria well before the halt. Even if FINRA's internal system mislabeled the security, the objective data still triggered **Rule 4320 close-out obligations**.See Regulation SHO, 17 C.F.R. § 242.203 (close-out requirements for threshold securities)

By calling the designation a coding error and failing to enforce delivery, FINRA preserved uncovered short positions and allowed them to roll into a private, non-tradable equity—causing foreseeable investor harm.

## B. FINRA violated its own Rule 6490 by illegally altering the Corporate Action to remove the pay date and reclassify the event

As with its contradictory statements about MMTLP's threshold security status, FINRA's manipulation of the corporate action demonstrates ultra vires conduct undertaken in bad faith. FINRA has claimed it merely processed the issuer's corporate action regarding MMTLP, but the record shows it materially altered the notice without authority.

15

Under FINRA Rule 6490 and its published guidance, FINRA's role is limited to receiving, reviewing, and publishing issuer-submitted corporate actions.[2] If FINRA identifies a deficiency, such as fraud, missing documentation, or regulatory risk, it must return the submission to the issuer for correction. FINRA has no authority to revise corporate action terms unilaterally, change classification codes, or remove key dates from the public notice.

On December 6, 2022, FINRA published a corporate action notice stating:

> "MMTLP shareholders with settled positions as of December 12th record date will
> receive one share of Next Bridge Hydrocarbons for every one share of MMTLP held
> on the pay date of December 14th. Purchases after December 8th will not receive the
> distribution, will not be quoted X. MMTLP shares will be canceled effective
> December 13th."[3]

On December 8, 2022, FINRA reissued the notice with two critical changes:

1. The **pay date of December 14th was removed entirely**; and

2. The classification term **"canceled"** was replaced with **"deleted."**[4]

The "effective date" of December 13th remained in both notices,  meaning the real alteration was eliminating the pay date and reclassifying the action in FINRA's corporate action system. Removing the pay date materially changed shareholder expectations and settlement mechanics. Shareholders and brokers had been told that the distribution of Next Bridge shares would occur

---

[2] FINRA Rule 6490, "Processing of Company-Related Actions" (Plaintiff's Motion for Judicial Notice, Exhibit 4).
[3] FINRA Daily List, Dec. 6, 2022 — MMTLP Corporate Action Notice (Plaintiff's Motion for Judicial Notice, Exhibit 3 – Daily List 6th to 8th).
[4] FINRA Daily List, Dec. 8, 2022 — MMTLP Corporate Action Notice showing removal of Dec. 14 pay date and change from "canceled" to "deleted" (Plaintiff's Motion for Judicial Notice, Exhibit 3 – Daily List 6th to 8th).

16

on December 14th; eliminating that date without issuer consent or public explanation deprived the market of a clear settlement timeline.

The change from "canceled" to "deleted" is equally significant. FINRA's own system definitions treat "canceled" and "deleted" differently for processing and display purposes. Altering this classification changes how the event is reflected in broker systems and how settlement instructions are generated, yet FINRA's published guidance confirms it has no authority to make such changes on its own.[5]

Sworn testimony from Meta Materials CEO George Palikaras confirms that FINRA made these revisions without notifying the company, following a private discussion with DTCC that excluded the issuer. Palikaras testified that Meta Materials' original submission included the December 14th pay date and that the company never filed an amendment removing it.[6]

FINRA reissued the corporate action notice on December 8, 2022, removing the previously stated December 14 pay date and changing the classification from "canceled" to "deleted." These alterations were made without issuer consent, public notice, or SEC approval. The changes violated Rule 6490, which prohibits FINRA from unilaterally altering corporate action terms. FINRA did not file a Form 19b-4, issue a deficiency notice, or follow the public rulemaking process required under 15 U.S.C. § 78s(b)(1). These modifications had material effects on shareholder expectations, market settlement, and the perceived timeline for trading, directly facilitating the trading halt that followed. This conduct exceeded FINRA's delegated authority and caused direct harm to investors.

---

[5]  FINRA FAQ, "MMTLP Corporate Action and Trading Halt," Mar. 16, 2023 update (Plaintiff's Motion for Judicial Notice, Exhibit 5).
[6] Declaration of George Palikaras, CEO of Meta Materials (Plaintiff's Motion for Judicial Notice, Exhibit 2).

## C. Regulator turned de facto issuer — the governing law, FINRA's duties, and two independent violations

When a publicly traded equity will cease to be publicly tradable (e.g., spun into a private, non-DTC-eligible company), federal law requires timely settlement and the prompt close-out of open short positions. Trades must settle on T+2; persistent fails must be closed; and broker-dealers must maintain possession or control sufficient to deliver customer securities. These obligations are enforced through SEC and FINRA rules, including the T+2 settlement rule, Regulation SHO close-out provisions, FINRA's short-sale delivery rule for threshold OTC securities, and the customer protection rule.[1][2][3][4][5]

### 2. FINRA's duties as the SRO processing the corporate action

As the OTC market SRO, FINRA's corporate-action role is ministerial and bounded by Rule 6490. FINRA receives, verifies, and publishes issuer-submitted terms; if a deficiency is identified, FINRA's remedy is to notice the deficiency and return the action to the issuer—**not** to rewrite dates, reclassify the action, or selectively omit material settlement information. Congress also requires that FINRA's rules and actions protect investors and the public interest.[6][7]

## 1. Aiding and abetting preservation of short positions in violation of settlement/close-out duties

FINRA's own FAQs admit the MMTLP corporate action "did not require investors with short positions in MMTLP to purchase shares to close out their positions," (See Exhibit ) and that those shorts simply rolled into short positions in Next Bridge—a private, non-tradable security.[8][9] That admission is irreconcilable with the settlement and close-out framework identified above.

18

Under T+2, Reg SHO (including threshold-security close-outs), and possession-or-control duties, the marketplace must resolve shorts **before** the public security disappears. By allowing shorts to persist into a private, illiquid issue, FINRA permitted a condition that could not lawfully be delivered, frustrated mandatory close-outs, and harmed investors who were denied the ability to liquidate while "Too Late to Cancel/Market Reject" order statuses proliferated.[10] [11]

Given the record (FINRA's contradictory threshold statements, the objective threshold-list data for more than 150 consecutive trading days, and the order-rejection evidence), the Court should (i) deny FINRA's immunity-based motion, (ii) permit targeted discovery into settlement risk, threshold coding, and order-management decisions, and (iii) reserve or issue an order to show cause why sanctions should not be imposed under the Court's inherent authority for bad-faith market intervention and resulting investor harm.[12]

## 2. De facto issuer conduct: removal of the pay date and reclassification of the action (ultra vires again)

FINRA's December 6 Daily List told the market that MMTLP holders "will receive one share of Next Bridge Hydrocarbons … on the pay date of December 14," and stated shares "will be canceled effective December 13." Two days later, FINRA reissued the notice **removing the pay date entirely** and changing the classification from "canceled" to "deleted," while the effective date remained December 13.[13] FINRA had no authority under Rule 6490 to delete a distribution pay date or reclassify the event on its own. Its published guidance confirms FINRA does not initiate or alter issuer actions; if a defect exists, FINRA must return it to the issuer.[14] Meta Materials' CEO attests the issuer never removed the December 14 pay date and was not consulted on FINRA's edits.[15]

Eliminating the pay date and changing the classification were material changes that directly affected settlement expectations and the mechanics of delivery. By doing so without a Rule 19b-4 filing or SEC approval, FINRA exceeded its delegated authority and acted as a de facto issuer—precisely the ultra vires conduct that defeats any claim of absolute immunity and warrants discovery and remedial relief. See 17 C.F.R. § 240.19b-4 (rule-change filing requirements for SROs)." Requested relief on Section C

Plaintiff respectfully requests that the Court: (1) deny FINRA's motion to dismiss on immunity grounds; (2) authorize limited, expedited discovery on settlement risk, threshold coding and close-out decisions, and corporate-action alterations (including a Rule 30(b)(6) deposition of FINRA); (3) issue an order to show cause why sanctions should not enter under the Court's inherent power for bad-faith market intervention and the resulting investor harm; and (4) grant such further equitable relief as is just, including restoration/clarification of the distribution terms and any appropriate adverse inferences relating to settlement and threshold-list manipulation.

## 3. "Too Late to Cancel" orders and synthetic share substitution as further evidence of ultra vires conduct

The immediate market impact of FINRA's December 9, 2022 U3 halt was not limited to canceled open orders and blocked new orders. Across multiple brokerage platforms—including TD Ameritrade, E*TRADE, and others—investors reported receiving "Too Late to Cancel" (TLTC) designations on sell orders placed before the halt, many at prices reflecting the short squeeze in progress. These TLTC orders, instead of settling under the standard T+2 framework, were rejected without execution, depriving investors of the lawful proceeds from matched trades.

20

Screenshots and transaction records (Exhibits 8, 8a–8f) show that Plaintiff and other investors had valid Good-Til-Canceled and day-limit sell orders entered before the halt, including:

- **TD Ameritrade:** Plaintiff's 1,710-share sell order at $420/share, placed before market open on December 9, was unilaterally canceled at 9:35 a.m., five minutes into the session. Multiple additional sell orders placed on December 9–11, 2022, were immediately rejected.

The "Too Late to Cancel" designation ordinarily indicates that a trade is already in the process of settlement and cannot be pulled by the client or broker. In the MMTLP case, however, TLTC orders were systematically voided—effectively unwinding matched trades to prevent delivery. This protected counterparties holding short positions from having to deliver shares they did not possess.

Further, Plaintiff has obtained a sworn investor statement alleging that TD Ameritrade substituted "synthetic" positions for fully paid-for, cash-purchased MMTLP shares, converting bona fide holdings into book-entry placeholders that could be closed internally without delivering physical shares. If proven, this substitution constitutes a direct violation of SEC Rule 15c3-3 (the customer protection rule), which requires broker-dealers to maintain possession or control of fully paid and excess margin securities for the benefit of customers.

These actions demonstrate two critical points:

1. **FINRA's halt enabled and coordinated with market practices that prevented lawful settlement** of pre-halt matched trades, violating the T+2 settlement rule, Regulation SHO close-out provisions, and the customer protection rule.

2. **The halt was used as a mechanism to preserve uncovered short positions**—including synthetic or non-deliverable shares—by nullifying trades already in the settlement pipeline.

By allowing and facilitating the mass nullification of TLTC orders and the potential substitution of synthetic positions for real securities, FINRA acted far outside its statutory role as an SRO. These actions are not protected regulatory functions but ultra vires conduct undertaken to shield member firms from catastrophic settlement obligations.

Plaintiff believes FINRA coordinated with DTCC to block clearance of all MMTLP-related CUSIPs as part of the halt directive, resulting in a functional market shutdown that exceeded FINRA's delegated authority. Plaintiff respectfully requests leave to subpoena DTCC, TD Ameritrade, and FINRA for matched trades cancelled under 'Too Late to Cancel' tags, synthetic position conversions, and halt-related communications.

**Requested relief:** Plaintiff requests that the Court treat the TLTC cancellations and synthetic share substitutions as independent violations supporting denial of FINRA's motion to dismiss, and to permit targeted discovery into:

- The identity and volume of TLTC-marked MMTLP trades voided after the halt;
- The extent of synthetic or internal ledger substitutions by broker-dealers;
- FINRA's communications with member firms regarding these practices before and after the halt.

# V. THE FOX IS GUARDING THE HENHOUSE - NO EXCHANGE-LEVEL OVERSIGHT, NO ACCOUNTABILITY

## A. FINRA'S REGULATORY RESPONSIBILITIES VS. EXECUTION FAILURES

As the sole registered national securities association under 15 U.S.C. § 78o-3, FINRA is charged with protecting investors, ensuring market integrity, and enforcing compliance with federal securities laws and SEC-approved rules. Its responsibilities include:

1. **Processing corporate actions** in the over-the-counter (OTC) market under FINRA Rule 6490, ensuring accuracy, completeness, and investor protection in issuer disclosures.

2. **Managing market halts** under Rule 6440 only in narrowly defined circumstances, with a valid basis tied to extraordinary market activity, fraud, or settlement disruption, and always within the bounds of SEC-approved procedures.

3. **Enforcing settlement and close-out obligations** under Regulation SHO, Rule 4320 (threshold securities), and related possession-or-control rules, ensuring that open short positions are closed within mandatory timeframes.

In the case of MMTLP, FINRA failed to execute each of these responsibilities:

- **Corporate Action Oversight:** FINRA unilaterally altered the issuer-submitted corporate action by removing the pay date and reclassifying the event, despite Rule 6490's express prohibition on unilateral modifications.

- **Market Halt Authority:** FINRA used Rule 6440 not for its intended purpose, but as a vehicle to impose what became a de facto permanent halt. No SEC approval was sought or obtained for this novel application, violating Section 19(b) of the Exchange Act.

23

- **Settlement Enforcement:** FINRA permitted large open short positions to roll into a non-tradable private company without requiring mandatory close-outs. This undermined the T+2 settlement rule, Regulation SHO's close-out provisions, and FINRA's own threshold-security delivery requirements.

By failing to carry out its statutory and regulatory duties, FINRA not only violated its own rules but also acted in direct contravention of the Exchange Act's investor protection mandate. The MMTLP halt was not the product of diligent market regulation — it was the result of regulatory inaction, selective enforcement, and an execution failure that directly benefited its member firms at the expense of the investing public.

## B. GOVERNANCE CONFLICTS AND FINANCIAL BENEFITS FROM HALT

FINRA's governance is riddled with conflicts of interest that directly undermined its impartiality in the MMTLP halt. Many of the board members, executive committee members, and advisory committee members held or previously held senior roles at firms with substantial short positions in MMTLP. These positions stood to incur significant losses if forced to cover before the corporate action closed.

By altering the corporate action and imposing the halt, FINRA's decision prevented billions of dollars in potential losses for these member firms. The halt froze trading before the December 12, 2022 conversion date, ensuring that large uncovered short positions rolled into Next Bridge Hydrocarbons — a private, non-tradable security — rather than being closed in the open market.

This was not an abstract benefit. Member firms avoided forced buy-ins, upward price pressure, and exposure of the true volume of synthetic shares in circulation. At the same time, retail

24

investors were deprived of the ability to sell, liquidate, or transfer their holdings, locking in their losses.

In effect, FINRA's governance structure — dominated by those with direct financial ties to the outcome — ensured that the halt served industry interests first. The result was a regulatory decision that functioned as a protective shield for market participants within FINRA's own membership, while inflicting foreseeable and disproportionate harm on investors.

## VI. MONOPOLY CONTROL AND ANTITRUST LIABILITY

### A. FINRA's Structural Monopoly Over the OTC Market

 FINRA holds exclusive regulatory authority over the over-the-counter (OTC) market in the United States under 15 U.S.C. § 78o–3. No other entity may regulate broker-dealer conduct in this market. This exclusive control gives FINRA a structural monopoly over the regulatory framework governing OTC trading, including the authority to approve or deny corporate actions, enforce trade reporting, and direct halts under Rule 6440.

### B. Vertical Integration and Governance Conflicts

 FINRA's governance structure is dominated by industry insiders. Of its 22 voting board members, 10 are elected by member firms, and the so-called "public" seats are routinely filled by former industry executives. Advisory committees, including the Uniform Practice Code (UPC) Advisory Committee, are similarly dominated by market participants with direct financial interests in the outcome of regulatory decisions.

This structure creates vertical integration between regulator and regulated: the firms subject to FINRA's rules also control the body that writes and enforces those rules. When member firms

face substantial financial exposure, such as large uncovered short positions, the structural

incentives favor regulatory decisions that protect those firms rather than investors.

## C. Collusion, Transparency Failures, and Information Asymmetry

In the case of MMTLP, the same member firms with large short positions benefited from

FINRA's decision to halt trading without requiring short position close-outs. Those firms were

also embedded in FINRA's advisory and governance structure. This dual role creates the

appearance and functional effect of collusion, where regulatory discretion is exercised to protect

member firms at the expense of market transparency and investor protection.

## D. Antitrust Analysis

FINRA's control over the OTC market and the firms within it is a form of monopoly power

under the Sherman Act. While regulatory authority alone is not an antitrust violation, the use of

that authority to foreclose market access, favor specific participants, and suppress lawful trading

activity for competitive gain meets the Rule of Reason standard for antitrust liability. Here, the

decision to halt MMTLP trading preserved large short positions and prevented retail investors

from accessing the market, producing anticompetitive effects without legitimate procompetitive

justification.

## VII. FINAL CONSTITUTIONAL ARGUMENTS AND STANDING

## A. Standing

Plaintiff has Article III standing because she suffered a concrete, particularized, and quantifiable

injury: the permanent loss of the ability to sell MMTLP shares at market prices between

December 9–12, 2022, resulting in unrecoverable financial losses. This injury is directly

traceable to FINRA's halt directive, which unilaterally canceled all open orders and rejected all

new orders, and is redressable through declaratory, equitable, and monetary relief. Plaintiff expressly disclaims any intent to proceed as a class action; this claim is brought solely in her individual capacity.

**B. Due Process Violation- Unauthorized Clearing Blockade and Denial of Property Rights**

FINRA's halt deprived Plaintiff of vested property rights in her MMTLP shares without notice or opportunity to be heard. Although publicly described as a temporary regulatory action, the halt operated as a permanent closure: it immediately canceled all open orders, rejected all new orders, and triggered a systemic trading lockout from December 9–12, 2022.

Critically, this was not limited to FINRA-member brokers or U.S. markets. Global brokers; including in Canada, Korea, Germany, Sweden, and the UK, all reported that MMTLP trading was blocked during this period, even for investors using non-U.S. platforms and clearing outside the direct scope of FINRA jurisdiction.

The only plausible mechanism for this worldwide shutdown was a clearance blockade coordinated with DTCC, an entity FINRA does not regulate and over which it has no statutory authority. This circumstantial but strong evidence, including sworn affidavit testimony confirming a private, ex parte call between FINRA and DTCC on December 8 (See Exhibit 2) indicates that FINRA effectively commandeered DTCC's clearing function to enforce a global lockout of the security, without SEC oversight, without public disclosure, and without issuer participation.

This action was based on alterations to a corporate action that the issuer did not request or approve, again exceeding FINRA's authority under Rule 6490. Due process principles forbid such arbitrary and unilateral deprivation of property, particularly where:

- the regulator operates with no notice or hearing; changes terms of a published corporate action; strips investors of access to the market; and privately engages a third-party clearing house to enforce a halt outside the scope of FINRA's delegated power.

Such conduct is not protected by regulatory immunity. It is ultra vires, structurally unlawful, and demands discovery into communications between FINRA and DTCC regarding:

- clearance restrictions imposed between Dec. 9-12, 2022; global trade rejection protocols;
- and the functional mechanism by which settlement was blocked.

**C. SEC Rulemaking Requirements Not Followed**

Section 19(b) of the Exchange Act, 15 U.S.C. § 78s(b), requires FINRA to submit any proposed rule change — including new interpretations or applications affecting trading — to the SEC for public notice, comment, and approval. This safeguard is designed to ensure transparency, accountability, and to give investors a meaningful opportunity to protect themselves against market-altering decisions.

Rule 6440 allows FINRA to issue temporary OTC halts for clearance and settlement concerns, but the MMTLP halt far exceeded that scope. By blocking the SEC-approved corporate action set for December 12, 2022 — the delisting and share conversion into a non-tradable security — without issuer consent, FINRA effectively rewrote the corporate action and created a de facto

permanent market closure. This was not "routine enforcement"; it was a novel and material policy shift.

FINRA has admitted it did not file a proposed rule change for this specific action, and the SEC confirmed it neither directed nor approved the halt. Using Rule 6440 in this new way to override a corporate event was a policy change that required SEC approval under § 78s(b). By bypassing this process, FINRA deprived investors of both due notice and any opportunity to avoid billions in foreseeable losses tied to unresolved short positions.

**D. Major Questions Doctrine and Nondelegation**

The MMTLP halt raises grave constitutional concerns under both the Major Questions Doctrine and the private nondelegation doctrine.

The Major Questions Doctrine requires clear congressional authorization for agency actions with "vast economic and political significance." Here, a private self-regulatory organization dominated by the very industry it regulates, unilaterally shut down trading in a security affecting more than $10 billion in investor holdings, disrupted a lawful corporate action, and altered the rights of thousands of shareholders. Congress did not clearly delegate to FINRA the authority to impose permanent market closures of this magnitude without SEC oversight.

The private nondelegation doctrine forbids delegating core governmental functions to private entities that lack public accountability and independent oversight. In *National Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869 (5th Cir. 2024), the Fifth Circuit struck down a similar SRO scheme on exactly these grounds.

29

FINRA's structure epitomizes the problem. Of its 149 governing and advisory seats, at least 119 are filled by insiders from member broker-dealer firms—the very entities FINRA is supposed to regulate. Its 23-member Governing Board includes 11 members elected by broker-dealers, who then appoint the remaining 11, plus CEO Robert Cook. That Board, in turn, appoints the Executive Committee and 13 advisory committees, each with up to 10 seats.

This industry-dominated structure ensures that key enforcement decisions are controlled by those with a financial stake in avoiding accountability. The MMTLP trading halt was implemented by FINRA's Uniform Practice Code (UPC) Committee, where 7 of 10 members were broker-dealers who sold MMTLP. This was not regulatory neutrality—it was nepotistic capture.

If a drunk driver ran over a pedestrian and the jury was made up of eight of his siblings, no one would call that justice. That is the scale of conflicted self-policing FINRA has normalized.

Recent enforcement history confirms the consequences:

- Citadel Securities (2015–2020): Mismarked millions of short-sale orders as long due to a "coding error" in its automated system, affecting untold volumes of U.S. retail order flow. Fine: $7 million (SEC). Revenue during the same period: $6+ billion/year. No meaningful deterrent.

- Goldman Sachs (2015–2018): Mismarked nearly 60 million short-sale orders as long due to one line of faulty code. Conduct persisted over 814 trading days. Fine: $3 million (FINRA).

- Robinhood Securities (2019–2023): Over 15 million short sales were mismarked as long. Part of a broader compliance failure including recordkeeping and AML violations. Total fine: $45 million (SEC) — a fraction of the firm's market value and annual revenue.

These fines were not regulatory deterrents, they were costs of doing business. And they all benefited FINRA members, regulated by FINRA, investigated by FINRA, and ultimately judged by committees populated with other FINRA members.

The Court must allow discovery. Otherwise, FINRA's conflict-heavy structure will continue to evade scrutiny behind the shield of immunity, immunity that does not extend to ultra vires conduct, private interest protection, or structural violations of constitutional norms.

## VIII. PRAYER FOR RELIEF

**Plaintiff respectfully requests that the Court:**

**A. Declare that FINRA's** governance structure, statutory delegation, and exercise of regulatory authority violate the United States Constitution, including separation-of-powers and nondelegation principles, and that FINRA is unconstitutional in its present form.

 **A1.Declare that FINRA's** actions in altering the MMTLP corporate action and imposing a U3 halt were ultra vires, unlawful, and void.

**B. Permanently enjoin FINRA**, in any form, from exercising regulatory authority over the OTC market or broker-dealers absent direct government control and accountability.

**C. Order that Congress** or the SEC establish a constitutionally valid regulatory framework to replace FINRA's functions, with direct public oversight and representation for investors.

**D. Award monetary damages** for losses sustained as a direct and foreseeable result of FINRA's actions.

**D1. Award attorney's fees** and costs pursuant to applicable law.

31

**E. Grant such other and further relief** as the Court deems just and proper to protect investors and the integrity of the securities markets.

Respectfully submitted,        August 21, 2025

/s/Danielle Spears

Danielle Spears Plaintiff pro se

12206 W Harrison Street

Avondale, AZ 85323

480-476-1091

PAYMMTLPNOW@GMAIL.COM

32

## CERTIFICATE OF SERVICE

I certify that I served the foregoing document on all counsel of record via the Court's CM/ECF system on August 21, 2025.

/s/ Danielle Spears

Danielle Spears