Note

## Who Watches the Watchers?: FINRA, Self-Regulatory Organizations, and the Next Evolution of Appointment and Removal Jurisprudence

*Hans M. Frank-Holzner\**

*There are private, non-profit corporations exercising significant executive power. Known as self-regulatory organizations (SROs) these non-governmental organizations make binding rules and sometimes enforce statutory law governing massive industries. One such SRO is the Financial Industry Regulatory Authority (FINRA). In 2022 alone, FINRA permanently barred 227 individuals and suspended 328 individuals from the financial industry, imposed $54.5 million dollars in fines, ordered $26.2 million dollars in restitution, and referred 663 cases for prosecution. FINRA's regulatory jurisdiction is massive. In 2022, it oversaw 3,378 securities firms including 150,647 branch offices and 620,882 individuals nationwide. This immense power is wielded not by the government, but rather by a private non-profit corporation.*

*FINRA's oversight of the securities industry and enforcement of securities law is constitutionally suspect. In our system of delegated power, enforcing federal law is a function of the Executive Branch. Even if FINRA were a state actor, its agents who*

*    J.D. Candidate, 2025, University of Minnesota Law School; Articles Editor, *Minnesota Law Review*, Vol. 109; B.A., 2021, Concordia College—Moorhead. I would like to thank Prof. Kristin Hickman for fostering my interest in this area of law, Prof. Jill Hasday for her meaningful guidance throughout the writing process, Prof. Ilan Wurman for his helpful feedback and suggestions, Evan Dale and Ryan Liston for their patient mentorship in nurturing the development of this Note, Elissa Bowling and Marie Lundgren for their careful edits and thoughtful suggestions, and Basil Eastman-Kiesow, Amy Evans, Shana Farhang, Sara Mungo, and Jack Swain for their scrupulous cite-checking. Most of all, I would like to thank my wife, Ruthanne for her constant love and support. This Note is as much hers as it is mine. Any errors are my own. Copyright © 2025 by Hans M. Frank-Holzner.

*adjudicate complaints and levy sanctions do not meet the requirements of the Appointments Clause and are not properly subject to presidential removal.*

*The Supreme Court has held that an individual who exercises "significant authority" pursuant to the laws of the United States is an Officer of the United States. "Significant authority" includes rulemaking, adjudication, the issuing of advisory opinions, and eligibility determinations—all tasks that FINRA Officers routinely participate in. FINRA's Hearing Officers seem an awful lot like Officers of the United States. Hearing Officers are tasked by statute with enforcing the nation's securities laws. They can levy sanctions that carry the force of federal law. Hearing Officers demand testimony, rule on motions, regulate the course of a hearing, decide the admissibility of evidence, and enforce compliance with discovery orders by punishing contempt.*

*This Note argues that FINRA employees that exercise the same power as Officers of the United States are Officers of the United States. They must be appointed according to the Appointments Clause and subject to presidential removal as outlined by Supreme Court jurisprudence. This Note argues that the Supreme Court should hold that FINRA is governmental for Constitutional purposes. It then outlines a judicial and a legislative remedy to bring FINRA's officer-like employees into compliance with the Appointments Clause and Supreme Court removal jurisprudence. It concludes by advocating for the judicial remedy as both practically feasible and within the scope of the recent jurisprudence of the Roberts Court.*

INTRODUCTION

On December 7, 2016, after thirty-three years in the financial industry, Nancy Mellon was fired from Wells Fargo for submitting false expense reports.[1] Nancy had attended a paid networking event with several current and prospective clients.[2] Less than a month later, she received an invoice, and, though she had not yet paid for the event, she submitted the business expense for reimbursement.[3] Nancy eventually paid for the event, but—contrary to company policy—she did so after having received reimbursement.[4]

Following her termination, Nancy was investigated by financial regulators who filed a complaint charging her with four counts of misconduct.[5] She filed an answer to the complaint

---

1. Dep't of Enf't v. Mellon, No. 2017052760001, at 2, 5–6 (FINRA Nat'l Adjudicatory Council Oct. 18, 2022) [hereinafter Mellon Appeal] (noting that Wells Fargo reported that Nancy was terminated because she allegedly submitted expenses for reimbursement that were either not business-related or not paid by her).

2. *Id.* at 2 (noting that Nancy attended the event after a friend and Wells Fargo client suggested that it would be a good networking opportunity).

3. *Id.* at 3–5. Though Nancy wrote the check in January, she did not actually mail it until March 18. *Id.* Unfortunately, the check was returned due to insufficient funds. *Id.* Accordingly, when she received reimbursement for the expense between April 21 and June 3, she had technically not yet paid the expense. *Id.* In December, Nancy actually paid for the event. *Id.*

4. *Id.* at 3 (noting that Nancy instructed her assistant to record the expense as reimbursable, even though she had not yet paid the invoice as required for reimbursement).

5. Count one alleged that Mellon converted $4,300 from Wells Fargo, in violation of Financial Industry Regulatory Authority (FINRA) Rule 2010. *Id.* at 8; *see also* FINRA Rule § 2010 (2024), https://www.finra.org/rules-guidance/rulebooks/finra-rules/2010 [https://perma.cc/J4HD-NJ5X]. Count two alleged that Mellon also violated FINRA Rule 2010 by submitting false expense reports to Wells Fargo. Mellon Appeal, *supra* note 1, at 8; *see also* FINRA Rule § 2010. Count three alleged that by submitting false expense reports, Mellon caused Wells Fargo to maintain inaccurate books and records, in violation of FINRA Rules 4511 and 2010. Mellon Appeal, *supra* note 1, at 8; *see also* FINRA Rule § 4511 (2024), https://www.finra.org/rules-guidance/rulebooks/finra-rules/4511 [https://perma.cc/H4NL-HAJ6]; FINRA Rule § 2010. Finally, count four alleged that Mellon violated FINRA Rules 8210 and 2010 by providing false and misleading information to FINRA during its investigation. Mellon Appeal, *supra* note 1, at 8; *see also* FINRA Rule § 8210 (2024), https://www.finra.org/rules-guidance/rulebooks/finra-rules/8210 [https://perma.cc/Q9WZ-YBLF]; FINRA Rule § 2010; Complaint, Dep't of Enf't v. Mellon, No. 2017052760001 (FINRA Off. of Hearing Officers Nov. 9, 2018) [hereinafter FINRA Complaint] (listing these causes of action).

rebutting its charges and denying any misconduct.[6] Ms. Mellon argued that an administrative error had caused the mistake, and that a toxic work environment had prevented her from correcting the error in a timely fashion.[7] Following a two-day trial, Nancy was found guilty on all four counts and was barred from ever again working in the financial industry.[8] Nancy appealed, but a panel affirmed the earlier decision, and charged Nancy with the costs of the appeal.[9] As a result, Ms. Mellon will never again be free to engage in her chosen profession.[10]

With all the trappings of an adjudicatory proceeding—including an investigation, a complaint, an answer, a trial, a verdict, an appeal, and an affirmation—it may be surprising that Ms. Mellon's investigation, adjudication, and sentencing were not conducted by prosecutors, judges, or even members of an administrative agency. Indeed, no governmental entity was involved in any of the proceedings described above.[11] Instead, a non-profit, the Financial Industry Regulatory Authority (FINRA), conducted them.[12]

FINRA is a self-regulatory organization (SRO) which—under the supervision of the Securities and Exchange Commission (SEC)—"enforc[es] compliance' with the 'provisions' of the Securities and Exchange Act, and the 'rules and regulations

---

6. Mellon Appeal, *supra* note 1, at 8.

7. *Id.*

8. *Id.* ("[The Hearing Panel] concluded that Mellon committed each of the violations alleged and barred her from associating with any member firm in any capacity."); *see also* Dep't of Enf't v. Mellon, No. 2017052760001 (FINRA Off. of Hearing Officers July 11, 2019) [hereinafter Hearing Panel Decision] (finding that Mellon committed each of the violations alleged in the complaint).

9. Mellon Appeal, *supra* note 1, at 18.

10. *See id.* ("For her misconduct, Mellon is barred from associating with any member firm in all capacities, effective upon service of this decision.").

11. Following the affirmation by the panel, Nancy petitioned the Securities and Exchange Commission for review. *See* Mellon, Exchange Act Release No. 97623, 2023 WL 3750021 (May 31, 2023). This petition was denied as untimely. *Id.*

12. *See* Hearing Panel Decision, *supra* note 8, at 11 (noting that FINRA staff sent Mellon a letter as part of the investigation into her expense reports); Mellon Appeal, *supra* note 1, at 8, 18 (noting Mellon's answer, hearing, decision, and appeal, and also barring Mellon from associating with any member firm in all capacities).

thereunder.'"[13] And enforce FINRA does. In 2022 alone, FINRA permanently barred 227 individuals and suspended 328 individuals from the financial industry, imposed $54.5 million dollars in fines, ordered $26.2 million in restitution, and referred 663 cases for prosecution.[14] FINRA's regulatory jurisdiction is massive. In 2022, it oversaw 3,378 securities firms including 150,647 branch offices and 620,882 individuals nationwide.[15]

FINRA's oversight of the securities industry and enforcement of securities law is problematic. The fact that a private nonprofit corporation is enforcing federal securities law is constitutionally suspect.[16] In our system of delegated power, enforcing federal law is a function of the Executive Branch of the Federal Government.[17] Even if FINRA were a state actor, its agents who adjudicate complaints and levy sanctions do not meet the

13.    Alpine Sec. Corp. v. Fin. Indus. Regul. Auth., No. 23-cv-01506, 2023 WL 4703307, at *1 (D.C. Cir. July 5, 2023) (Walker, J., concurring) (quoting 15 U.S.C. §§ 78s(g)(1), 78o-3(b)(7)); *see also About FINRA*, FINRA, https://www .finra.org/about [https://perma.cc/586N-E4ME] ("As a self-regulatory organization, or SRO, we are registered with the SEC and perform our work under the supervision of the SEC, but we are not part of the government.").

14.    *See Statistics*, FINRA, https://www.finra.org/media-center/statistics [https://perma.cc/CD4W-ZA7S]; *2022 FINRA Annual Financial Report*, FINRA 3 (2022), https://www.finra.org/sites/default/files/2023-06/2022_Annual_ Financial_Report.pdf [https://perma.cc/HU59-7DU3] (noting that in 2022, FINRA referred 663 cases to the SEC and other law enforcement agencies for prosecution).

15.    *Statistics*, *supra* note 14.

16.    *See generally About FINRA*, *supra* note 13 and accompanying text (noting that FINRA is a non-profit corporation). This Note focuses on the constitutional issues related to compliance with the Appointments Clause. Private nondelegation, impermissible bias, and Seventh Amendment jury issues are also almost certainly present but are beyond the scope of this Note. *See, e.g.*, Carter v. Carter Coal Co., 298 U.S. 238, 311 (1936) (noting that delegation of governmental regulatory power to a subset of a regulated industry is "legislative delegation in its most obnoxious form"); Sec. & Exch. Comm'n v. Jarkesy, 144 S. Ct. 2117 (2024) (holding the Seventh Amendment entitles a defendant to a jury trial when the SEC seeks civil penalties against a person for securities fraud).

17.    U.S. CONST. art. II, § 1, cl. 1 ("The executive Power shall be vested in a President of the United States of America . . . ."); *id.* § 3 ("[H]e shall take Care that the Laws be faithfully executed."); Morrison v. Olson, 487 U.S. 654, 691 (1988) (noting that the functions performed by independent counsels are "executive" because they are law enforcement functions, and law enforcement functions are typically undertaken by officials within the executive branch).

requirements of the Appointments Clause[18] and are not properly subject to presidential removal.[19]

The Supreme Court has been clear that the Constitution vests every ounce of executive power in the President of the United States.[20] However, the Court has reasonably explained that "[b]ecause no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance."[21] The Constitution therefore provides that Congress may create Officers of the United States.[22] The Court has held that an individual who exercises "significant authority" pursuant to the laws of the United States is an Officer.[23] "Significant authority" includes rulemaking, adjudication, the issuing of advisory opinions, and eligibility determinations.[24] The Court has emphasized that "significant authority" includes performing tasks that require significant discretion such as taking testimony, conducting trials, ruling on the admissibility of evidence, and enforcing discovery orders.[25] This can be distinguished from mere ministerial tasks that do not require much discretion such as information gathering and reporting.[26]

The Appointments Clause of the Constitution requires Principal Officers—such as Article III judges and cabinet-level secretaries—to be nominated by the President and confirmed by the

---

18.   *See infra* Part II. *See generally* U.S. CONST. art. II, § 2, cl. 2 (establishing appointment powers).

19.   *See infra* Part II.

20.   Seila Law LLC v. Consumer Fin. Prot. Bureau, 140 S. Ct. 2183, 2191 (2020) ("Under our Constitution, the 'executive Power'—*all of it*—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" (emphasis added) (first quoting U.S. CONST. art. II, § 1, cl. 1; and then quoting *id.* § 3)).

21.   *Id.* at 2191.

22.   U.S. CONST. art. II, § 2, cl. 2 ("Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.").

23.   Buckley v. Valeo, 424 U.S. 1, 126 (1976) (per curiam).

24.   *Id.* at 140–41 ("[E]ach of these functions also represents the performance of a significant governmental duty exercised pursuant to a public law.").

25.   Freytag v. Comm'r, 501 U.S. 868, 881–82 (1991) (finding that special trial judges who perform these functions are Officers).

26.   *See Buckley*, 424 U.S. at 137 (noting that Congress may grant non-Officers with "investigative and informative" powers without transgressing the Appointments Clause).

Senate.[27] The Clause also allows Congress to vest the appointment of Inferior Officers—like most administrative law judges––in either the President, a Court, or the Head of a Department.[28] Additionally, the Supreme Court has long held that the President enjoys a broad presumptive authority to remove Officers of the United States with only limited exceptions.[29]

The FINRA Hearing Officers that conducted Ms. Mellon's proceedings seem an awful lot like Officers of the United States. The Securities Exchange Act tasks Hearing Officers with enforcing the nation's securities laws.[30] They can "levy sanctions that carry the force of federal law."[31] Hearing Officers demand testimony, rule on motions, regulate the course of a hearing, decide the admissibility of evidence, and enforce compliance with

27.  *See* U.S. CONST. art. II, § 2, cl. 2 (providing that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . all . . . Officers of the United States"). "Officers who must be appointed by the President with the advice and consent of the Senate are often referred to as 'principal officers.'" 1 KRISTIN E. HICKMAN & RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 2.8, at 142 (7th ed. 2024).

28.  U.S. CONST. art. II, § 2, cl. 2 ("Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.").

29.  *See, e.g.*, Free Enter. Fund v. Pub. Co. Acct. Oversight Bd., 561 U.S. 477, 513–14 (2010) (holding that "as a general matter," the Constitution gives the President "the authority to remove those who assist him in carrying out his duties," and "[w]ithout such power, the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else"). Exceptions include independent agencies led by a group of principal Officers removable by the President only for good cause, *see* Humphrey's Ex'r v. United States, 295 U.S. 602, 629 (1935) ("The authority of Congress, in creating . . . agencies, to require them to act in discharge of their duties independently of executive control cannot well be doubted; and that authority includes . . . power . . . to forbid their removal except for cause . . . ."), and certain Inferior Officers with narrowly defined duties. *See, e.g.*, United States v. Perkins, 116 U.S. 483, 485 (1886) ("We have no doubt that when Congress, by law, vests the appointment of inferior officers in the heads of Departments it may limit and restrict the power of removal as it deems best for the public interest."); *see also* Morrison v. Olson, 487 U.S. 654, 687 (1988) (finding that the President's removal power was not absolute).

30.  *See* 15 U.S.C. § 78s(g)(1) (requiring FINRA, as an SRO, to "enforce compliance" with "the provisions of this chapter [and] the rules and regulations thereunder").

31.  Turbeville v. Fin. Indus. Regul. Auth., 874 F.3d 1268, 1270 (11th Cir. 2017) (citing 15 U.S.C. § 78o-3(b)(7)).

*MINNESOTA LAW REVIEW* [109:1889

discovery orders by punishing any conduct they deem contemptuous.[32]

FINRA Hearing Officers and other FINRA employees with officer-like powers should be considered Officers of the United States under Article II of the Constitution. They should be appointed according to the Appointments Clause and subject to presidential removal according to Supreme Court precedent. The fact that they are members of a nominally private corporation should not excuse them from the important safeguards imposed by Article II of the Constitution.[33] Though private, FINRA's enforcement activities are overseen by the government.[34] The Securities Exchange Act requires FINRA to enforce government standards, including statutory provisions and SEC regulations.[35] In other words, it seems that FINRA's officer-like employees "execute government laws subject to a government plan, with little to no room for private control."[36] This potentially raises at least two constitutional issues.

---

32. Alpine Sec. Corp. v. Fin. Indus. Regul. Auth., No. 23-cv-01506, 2023 WL 4703307, at *2 (D.C. Cir. July 5, 2023) (Walker, J., concurring) (citing FINRA Rules §§ 8210, 9252, 9235, 9263, 9280 (2023), https://www.finra.org/rules -guidance/rulebooks/finra-rules [https://perma.cc/3J9L-EMFJ]); *see also* Freytag v. Comm'r, 501 U.S. 868, 881–82 (1991) (holding Special Tax Judges are Officers of the United States because they "take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders" and "[i]n the course of carrying out these important functions," STJs "exercise significant discretion"); Lucia v. Sec. & Exch. Comm'n, 138 S. Ct. 2044, 2049 (2018) (noting that such powers are "'comparable to' [those] of a federal district judge conducting a bench trial" (citing Butz v. Economou, 438 U.S. 478, 513 (1978))).

33. *See Alpine*, 2023 WL 4703307, at *3 (Walker, J., concurring) (noting that though FINRA is private, its enforcement activities are substantially controlled by the government); *see also, e.g.*, *Free Enter. Fund*, 561 U.S. at 484–87 (finding those members of the Public Company Accounting Oversight Board— a private, nonprofit corporation created by Congress to enforce the Sarbanes-Oxley Act—are part of the Government for constitutional purposes and are Officers of the United States); *cf.* Manhattan Cmty. Access Corp. v. Halleck, 139 S. Ct. 1921, 1928 (2019) ("[A] private entity can qualify as a state actor . . . when the government compels the private entity to take a particular action.").

34. *See Alpine*, 2023 WL 4703307, at *3 (Walker, J., concurring) ("From start to finish, FINRA hearing officers execute government laws subject to a government plan, with little to no room for private control.").

35. *See* 15 U.S.C. § 78s(g)(1) (requiring FINRA, as an SRO, to "enforce compliance" with "the provisions of this chapter [and] the rules and regulations thereunder").

36. *Alpine*, 2023 WL 4703307, at *3 (Walker, J., concurring).

First, not a single FINRA employee (let alone those exercising officer-like powers) is appointed pursuant to the Appointments Clause.[37] Second, they are shielded from removal by the SEC except for cause.[38] Because the President may not remove SEC Commissioners at will,[39] FINRA officer-like employees are shielded by dual for-cause removal protection. This likely infringes on the President's "ability to execute the laws . . . by holding his subordinates accountable for their conduct."[40]

This Note argues that FINRA employees that exercise the same power as Officers of the United States are Officers of the United States. They must be appointed according to the Appointments Clause and subject to presidential removal according to Supreme Court precedent. Part I argues that FINRA's officer-like employees are Officers of the United States. Part II outlines the constitutional constraints the Supreme Court has applied to Officers of the United States and argues that FINRA officer-like employees do not meet these requirements. Part III concludes by arguing that in an appropriate case the Supreme Court should hold that FINRA is governmental for constitutional purposes. Such a ruling would set the stage for judicial or legislative correction of FINRA's constitutional deficiencies. This Part then outlines a judicial and a legislative remedy to bring FINRA officer-like employees into compliance with the Appointments Clause and Supreme Court removal jurisprudence. It concludes by advocating for the judicial remedy as practically feasible and within the scope of recent Roberts Court jurisprudence.

---

37.   *See id.* at *3 ("Despite seeming to exercise the executive authority of the United States, FINRA hearing officers remain private employees. . . . FINRA hearing officers are not appointed by a government body pursuant to the Appointments Clause.").

38.   *See* 15 U.S.C. § 78s(h)(4) (authorizing the SEC, as the regulatory organization overseeing FINRA, to "remove from office . . . an officer or director of such self-regulatory organization, if such appropriate regulatory agency finds, on the record after notice and opportunity for hearing, that such person has willfully violated any provision of this chapter, the rules or regulations thereunder, or the rules of such self-regulatory organization, willfully abused his authority, or without reasonable justification or excuse has failed to enforce compliance").

39.   *See* Free Enter. Fund v. Pub. Co. Acct. Oversight Bd., 561 U.S. 477, 492, 495 (2010) (holding that dual for-cause removal protections are impermissible and noting that the Commissioners are not subject to the President's direct control).

40.   *Id.* at 496.

The arguments presented in this Note are relevant because a Supreme Court decision on FINRA's self-regulatory structure is all but imminent.[41] The Roberts Court has taken a serious interest in siloing administrative power under the President.[42] Additionally, a case raising arguments about the constitutionality of FINRA Hearing Officers is already percolating in the U.S. District Court for the District of Columbia and the D.C. Circuit Court of Appeals.[43] A Supreme Court Appointment-Removal decision on FINRA's officer-like employees could have a ripple effect on a plethora of other industries regulated by SROs.[44]

## I. SOME FINRA EMPLOYEES EXERCISE POWER RESERVED FOR OFFICERS OF THE UNITED STATES

This Part argues that some FINRA employees are improperly exercising governmental power constitutionally reserved for Officers of the United States. To lawfully exercise such power, these actors must be appointed according to the Appointments Clause, and subject to presidential removal according to Supreme Court precedent. Part I.A provides a brief, general introduction to SROs. Part I.B hones in on FINRA specifically and details its robust regulatory regime. Part I.C introduces the constitutional concept of Officers of the United States. It then briefly describes the criteria the U.S. Supreme Court has laid out for

41.  *See* Kenneth Corbin, *FINRA Says Alpine Legal Challenge Could 'Eviscerate' Current Model of Brokerage Oversight*, BARRON'S (Nov. 2, 2023), https://www.barrons.com/advisor/articles/finra-alpine-challenge-sro-1bdf505f [https://perma.cc/NTN8-7D2J] (noting that many legal experts expect a challenge to FINRA's self-regulatory structure to end up before the U.S. Supreme Court).

42.  *See, e.g.*, *Free Enter. Fund*, 561 U.S. at 514 (holding members of the PCAOB are Officers of the United States and may not be insulated by two layers of "for-cause" removal protections); Lucia v. Sec. & Exch. Comm'n, 138 S. Ct. 2044, 2055 (2018) (holding that SEC ALJs are Officers of the United States that must be appointed according to the Appointments Clause); Seila Law LLC v. Consumer Fin. Prot. Bureau, 140 S. Ct. 2183, 2209 (2020) (holding that a for-cause restriction of President's executive power to remove CFPB's director was unconstitutional); United States v. Arthrex, Inc., 141 S. Ct. 1970, 1973 (2021) ("[T]he unreviewable authority wielded by [Administrative Patent Judges] during inter partes review is incompatible with their appointment by the Secretary to an inferior office.").

43.  *See generally* Alpine Sec. Corp. v. Fin. Indus. Regul. Auth., 121 F.4th 1314 (D.C. Cir. 2024) ("Alpine argues that FINRA's hearing officers are officers of the United States who must be appointed in conformance with the Appointments Clause and must be removable at will.").

44.  *See infra* Part I.A.

who qualifies as an Officer. Part I.D then directly compares FINRA Hearing Officers with SEC Administrative Law Judges (ALJs). It argues that if SEC ALJs are Officers of the United States (hint: they are) then FINRA Hearing Officers must be too.

### A. Self-Regulatory Organizations Are Ubiquitous at the State and National Levels

An SRO is a nominally nongovernmental organization that is statutorily empowered to regulate its members by adopting and enforcing rules of conduct, especially those governing fair, ethical and efficient practices.[45] SROs exist at both the state and national level.[46] One example of a common state-level SRO is mandatory bar associations that regulate the legal profession.[47] In states with mandatory bar associations, the state statutorily delegates its licensing and regulatory authority to an organization, which typically controls admission to practice and promulgates rules and standards that regulate the practice of law.[48] In

---

45.  *See Self-Regulatory Organization*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A nongovernmental organization that is statutorily empowered to regulate its members by adopting and enforcing rules of conduct, esp. those governing fair, ethical, and efficient practices."); *see also* Adam Hayes, *Self-Regulatory Organization (SRO): Definition and Examples*, INVESTOPEDIA (Feb. 11, 2025), https://www.investopedia.com/terms/s/sro.asp [https://perma.cc/WD7P-DJPY] (defining SROs as "entit[ies] such as a non-governmental organization, which has the power to create and enforce stand-alone industry and professional regulations and standards on its own").

46.  Mandatory state bar associations are a common state-level SRO example. *See State Bar Association*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("An association or group of attorneys that have been admitted to practice law in a given state . . . . [S]tate bar associations often have the authority to regulate the legal profession by undertaking such matters as disciplining attorneys and bringing lawsuits against those who engage in the unauthorized practice of law."). State bar associations are "usu[ally] created by statute, and membership is often mandatory for those who practice law in the state." *Id.* FINRA is an example of a national SRO. *About Us*, FINRA INV. EDUC. FOUND., https://www.finrafoundation.org/about-us [https://perma.cc/7PV6-NYZG] (noting that FINRA "regulates all securities firms doing business in the United States").

47.  *See* Leslie C. Levin, *The End of Mandatory State Bars?*, 109 GEO. L.J. ONLINE 1, 2 (2020) (noting that as of 2020, thirty-one states and the District of Columbia have mandatory bar associations). Mandatory bar associations are also known as "integrated bar associations." Comment, *The Integrated Bar Association*, 30 FORDHAM L. REV. 477, 477 (1962) ("An integrated bar is defined as an official state organization requiring membership and financial support of all attorneys admitted to practice in that jurisdiction.").

48.  *State Bar Association*, *supra* note 46.

such states, membership to the official bar association is mandatory for attorneys wishing to practice law in that state.[49]

National SROs created or authorized by Congress include the Horseracing Integrity and Safety Authority,[50] the Municipal Securities Rulemaking Board (MSRB),[51] the U.S. Anti-Doping Agency (USADA),[52] and FINRA.[53] What these national SROs all have in common is that they are private non-governmental organizations authorized by Congress to regulate a particular industry. While this Note focuses on FINRA as an example, its argument could apply to any SRO whose actors are exercising officer-like power with the blessing of Congress. A Supreme Court decision on the constitutionality of such SRO actors, would upend the regulation of entire industries from athletics to finance.[54]

---

49.    *See id.* Mandatory membership to an SRO seems to suggest a certain coerciveness that ought to be confined to governmental entities.

50.    *See* 15 U.S.C. § 3052(a) ("The private, independent, self-regulatory, nonprofit corporation, to be known as the 'Horseracing Integrity and Safety Authority', is recognized for purposes of developing and implementing a horseracing anti-doping and medication control program and a racetrack safety program for covered horses, covered persons, and covered horseraces.").

51.    *See* 15 U.S.C. § 78o–4(b) (establishing the Municipal Securities Rulemaking Board); *see also The Role and Jurisdiction of the MSRB*, MSRB 2 (2021), https://www.msrb.org/sites/default/files/2022-09/Role-and-Jurisdiction -of-MSRB.pdf [https://perma.cc/5567-NBAV] (noting that the MSRB is a self-regulatory organization).

52.    *See* 21 U.S.C. § 2001 (designating the USADA as the "independent anti-doping organization for the amateur athletic competitions recognized by the United States Olympic Committee"); *see also Independence & History*, USADA, https://www.usada.org/independence-history [https://perma.cc/KZ3P-9TP6] (noting that USADA is recognized by Congress as the official anti-doping organization in the United States and is an independent, non-profit organization).

53.    *See* 15 U.S.C. §§ 78s(g)(1), 78o-3(b)(7)); *see also About FINRA, supra* note 13 ("We are a not-for-profit organization that—working under the supervision of the SEC—actively engages with and provides essential tools for investors, member firms and policymakers.").

54.    The Roberts Court's ongoing interest in siloing the administrative state under the control of a "unitary executive" makes a grant of certiorari more likely than not. *See, e.g.*, Corbin, *supra* note 41 (noting that many legal experts expect a challenge to FINRA's self-regulatory structure to end up before the U.S. Supreme Court).

### B. FINRA Is a Disproportionately Powerful SRO That Exercises Executive Power

FINRA's mission is to safeguard the investing public against fraud and deceptive practices and to ensure the fair and honest operation of securities markets.[55] FINRA emerged in 2007 when the SEC approved the merger of the enforcement arms of two independent SROs, the National Association of Securities Dealers[56] and the New York Stock Exchange.[57] The SEC explained that the purpose of the consolidation was to streamline the security broker-dealer regulatory system, combine technologies, and permit the establishment of a single set of rules governing membership matters, with the goal of improving oversight of U.S. securities firms and assuring investor protection.[58] FINRA operates under SEC oversight and is responsible for regulating all securities firms that do business with the public.[59] This regulation entails writing and enforcing rules governing the ethical activities of all registered broker-dealer firms and registered brokers in the United States, examining firms for compliance with those rules, fostering market transparency, and educating investors.[60] Because of its private status and funding structure, FINRA can pursue its government mandate at zero cost to the American taxpayer.[61]

---

55. *See Five Steps to Protecting Market Integrity*, FINRA [hereinafter *Protecting Market Integrity*], https://www.finra.org/about/what-we-do/five-steps-protecting-market-integrity [https://perma.cc/3TY6-DXAZ]; *2023 FINRA Annual Financial Report*, FINRA 4 (2023), https://www.finra.org/sites/default/files/2024-06/2023-finra-annual-financial-report.pdf [https://perma.cc/4262-7DCS] (noting FINRA is a not-for-profit SRO authorized under federal law to help protect investors and ensure the fair and honest operation of securities markets).

56. Prior to FINRA, the National Association of Securities Dealers (NASD) was the largest securities industry SRO. NASD Corp. Commc'ns, *National Association of Securities Dealers, Inc.*, FINRA 1, 5 (1997) https://www.finra.org/sites/default/files/Corporate/p009762.pdf [https://perma.cc/MS4Z-HHR9]. The NASD was organized as a non-profit corporation under the 1938 Maloney Act amendments to the Securities Exchange Act of 1934 by the securities industry in cooperation with the U.S. Congress and the SEC. *Id.* at 1.

57. *See* William A. Birdthistle & M. Todd Henderson, *Becoming a Fifth Branch*, 99 CORNELL L. REV. 1, 22–23 (2013) (discussing the merger of NASD). The New York Stock Exchange (NYSE) was founded in 1792 when twenty-four stockbrokers signed an agreement to collaborate on rules for how stocks would be traded and how commissions were set. *The History of NYSE*, NYSE, https://www.nyse.com/history-of-nyse [https://perma.cc/97J7-EBDH]. In 1971, NYSE became a not-for-profit corporation, and in 2006, a publicly traded company. CFI Team, *New York Stock Exchange (NYSE)*, CORP. FIN. INST., https://

FINRA has articulated five ways it aims to safeguard the investing public against fraud, manipulation, insider trading or any other strategy firms or individuals might use to gain any unfair advantage.[62] First, by deterring misconduct through rule enforcement,[63] FINRA writes and enforces rules and regulations for every brokerage firm and broker operating in the United States.[64] This includes requiring that "all brokers be licensed and registered by FINRA, pass [FINRA's] qualification exams,

---

corporatefinanceinstitute.com/resources/equities/new-york-stock-exchange -nyse [https://perma.cc/5N9B-3B3V].

58.   *See* Press Release, Sec. & Exch. Comm'n, SEC Gives Regulatory Approval for NASD and NYSE Consolidation (July 26, 2007), https://www.sec.gov/ news/press/2007/2007-151.htm [https://perma.cc/7ZY9-KNMX].

59.   *See id.* (noting that FINRA would be responsible for regulating all securities firms that do business with the public, "including with respect to professional training, testing and licensing of registered persons, arbitration and mediation").

60.   *See How FINRA Serves Investors and Members*, FINRA [hereinafter *Investors and Members*], https://www.finra.org/about/what-we-do [https://perma .cc/H46E-UDL2] ("FINRA offers conferences, meetings and educational resources responding to the real-world compliance challenges and questions identified by member firms."); *see also About FINRA, supra* note 13 ("[FINRA] empower[s] investors with knowledge, information and skills for financial success[.]").

61.   *Investors and Members, supra* note 60 (noting that one of the advantages of the SRO model is that FINRA is self-funded and does not require government expenditure).

62.   *Protecting Market Integrity, supra* note 55 (noting that FINRA deters misconduct by enforcing rules, detecting and prevent wrongdoing in U.S. markets, disciplining those who break the rules, educating and informing investors, and resolve securities disputes).

63.   *See About FINRA, supra* note 13 ("[FINRA] write[s] and enforce[s] rules that govern the activities of [its] member firms and their representatives[.]"); *Protecting Market Integrity, supra* note 55 ("[FINRA] write[s] and enforce[s] rules and regulations for every single brokerage firm and broker in the United States."); *What Does FINRA Do?*, VERIFF (Mar. 25, 2022), https://www .veriff.com/blog/what-is-finra [https://perma.cc/Z66J-M4A7]; *Investors and Members, supra* note 60 ("FINRA writes rules for its member firms, conducts examinations, monitors the markets, and enforces FINRA and Municipal Securities Rulemaking Board rules and federal securities laws[.]").

64.   Liz Manning, *Financial Industry Regulatory Authority (FINRA) Definition*, INVESTOPEDIA (Oct. 1, 2024), https://www.investopedia.com/terms/f/finra .asp [https://perma.cc/W46K-XP9E]; *What Does FINRA Do?, supra* note 63; *Protecting Market Integrity, supra* note 55.

and satisfy [FINRA's] continuing education requirements."[65] FINRA ensures that "broker-dealers comply with [FINRA's] own rules, federal securities laws and the rules of the Municipal Securities Rulemaking Board."[66] FINRA employs hundreds of financial professionals that examine the way brokers operate, focusing on the potential risks to markets and investors.[67] FINRA conducts "routine examinations [and] inquiries based on investor complaints and suspicious activity."[68] FINRA "also review[s] all broker advertisements, websites, sales brochures and other communications to [ensure] brokers present information [to the public] in a fair and balanced manner."[69] Every year, FINRA reviews over 50,000 individual advertisements and communications from firms to investors.[70]

Second, FINRA detects and prevents wrongdoing in the American securities markets.[71] FINRA uses technology to analyze markets and detect potential abuses.[72] Using a variety of data-gathering techniques, FINRA "detect[s] insider trading and any [improper] strategies firms or individuals use to gain an unfair advantage. FINRA processes, on average, thirty-seven

---

65.  *Protecting Market Integrity*, *supra* note 55; *Get to Know Us*, FINRA 2 (2012), www.finra.org/sites/default/files/Corporate/p118667.pdf [https://perma.cc/XE53-97JE]; *see* Manning, *supra* note 64 (discussing FINRA's administration of exams).

66.  *Protecting Market Integrity*, *supra* note 55; *see About FINRA, supra* note 13 (ensuring member compliance with relevant laws and rules); *see also Investors and Members*, *supra* note 60 (discussing FINRA's role in ensuring compliance).

67.  *See What Does FINRA Do?*, *supra* note 63 (stating FINRA oversees over 624,000 brokers); *Protecting Market Integrity*, *supra* note 55 (discussing the large number of FINRA financial examiners).

68.  *Protecting Market Integrity*, *supra* note 55; *Get to Know Us*, *supra* note 65, at 2.

69.  *Protecting Market Integrity*, *supra* note 55; *What Does FINRA Do?*, *supra* note 63 (discussing market transparency).

70.  Fin. Indus. Regul. Auth., *2023 FINRA Industry Snapshot*, FINRA 28 (Aug. 23, 2023) https://www.finra.org/sites/default/files/2023-04/2023-industry-snapshot.pdf [https://perma.cc/DJW2-DPQ2]; *see Get to Know Us*, *supra* note 65, at 3 ("Every year, FINRA reviews more than 90,000 individual advertisements and communications from firms to investors.").

71.  *See What Does FINRA Do?*, *supra* note 63; *Protecting Market Integrity*, *supra* note 55.

72.  *See What Does FINRA Do?*, *supra* note 63 ("[FINRA uses] technology and data-gathering techniques [to] detect[] insider trading and strategies firms and individuals are using to gain an unfair advantage."). It is noteworthy that FINRA analyzes up to seventy-five billion transactions every day. *Id.*

*MINNESOTA LAW REVIEW* [109:1889

billion—and up to seventy-five billion—transactions every day to build a complete, holistic picture of market trading in the United States."[73] FINRA shares this information with other regulators, including the SEC.[74]

Third, FINRA disciplines those who break the rules.[75] FINRA is empowered to levy fines against wrongdoers and suspend or bar them from FINRA membership.[76] FINRA also refers cases for prosecution.[77] In addition to the enforcement action described in the introduction, FINRA notes that through its "aggressive vigilance, in 2017, [it] fined a firm $950,000 for failing to detect and prevent a scheme that resulted in the theft of approximately $1.3 million from an 89-year-old customer's variable annuity account."[78] That same year FINRA "[e]xpelled another firm from FINRA membership" and fined it $1 million for charging customers unfair and unreasonable prices.[79]

Fourth, FINRA educates and informs investors. FINRA provides investors with tools and resources to enable better financial decision-making.[80] Through its FINRA Investor Education

---

73. *Protecting Market Integrity*, *supra* note 55.; *see What Does FINRA Do?*, *supra* note 63 (noting that FINRA oversees "billions of daily market events").

74. *Protecting Market Integrity*, *supra* note 55.

75. Roger Wohlner, *What is FINRA and What Does it Do?*, BANKRATE (June 5, 2024), https://www.bankrate.com/investing/what-is-finra [https://perma.cc/APS3-ULG4] (explaining that brokers are subject to disciplinary action when in breach of FINRA's rules); *Get to Know Us*, *supra* note 65, at 2 ("[FINRA] [i]nvestigate[s] and discipline[s] brokers and firms that violate the public trust."); *see Protecting Market Integrity*, *supra* note 55 ("If brokers break the rules, we can fire, suspend or bar them from FINRA membership."); *see also What Does FINRA Do?*, *supra* note 63 (further describing FINRA's disciplinary action).

76. *Statistics*, *supra* note 14 (declaring $88.9 million in fines imposed in 2023).

77. *See What Does FINRA Do?*, *supra* note 63 (noting that in 2020, FINRA "referred more than 970 fraud and insider trading cases to the SEC and other agencies for litigation and/or prosecution"). In 2023, this number was down to 623 fraud and insider trading cases referred to the SEC and other agencies for litigation and/or prosecution. *2023 FINRA Annual Financial Report*, *supra* note 55, at 3.

78. *Protecting Market Integrity*, *supra* note 55.

79. *Id.*

80. *See Get to Know Us*, *supra* note 65, at 3 ("[FINRA] offer[s] a range of free educational resources to help investors build their financial knowledge to better understand the markets and basic principles of saving and investing."); *What Does FINRA Do?*, *supra* note 63 (discussing how FINRA provides investors tools and resources that help them make sound financial decisions and that

Foundation, FINRA equips members of underserved communities "nationwide with resources needed for financial success and teach[es] investors to protect themselves from financial fraud."[81] FINRA's website offers dozens of free resources about investing and fraud avoidance, including online calculators and investor alerts.[82]

Fifth, FINRA serves as a forum to resolve securities disputes between brokers and investors.[83] FINRA "administer[s] the largest forum specifically designed to resolve securities-related disputes."[84] FINRA handles "nearly 100 percent of securities-related arbitrations and mediations from 69 hearing locations . . . in all 50 states, and Puerto Rico."[85]

As the next subpart will begin to illuminate, these functions—particularly the investigative, adjudicatory, and enforcement functions—seem very much within those powers constitutionally reserved for Officers of the United States.

## C. THE SUPREME COURT HAS DELINEATED WHO QUALIFIES AS AN OFFICER OF THE UNITED STATES

Under the Constitution's separation of powers framework, power is divided horizontally between the three branches of government[86] and vertically between the national government and

FINRA's website offers dozens of free resources about investing and avoiding fraud); *Investors and Members*, *supra* note 60 (noting that FINRA educates investors); *Protecting Market Integrity*, *supra* note 55 ("We believe an essential component of investor protection is education.").

81. *See Protecting Market Integrity*, *supra* note 55. *See generally About Us*, *supra* note 46.

82. *See Protecting Market Integrity*, *supra* note 55; *What Does FINRA Do?*, *supra* note 63.

83. *See Arbitration & Mediation*, FINRA, https://www.finra.org/arbitration-mediation [https://perma.cc/R8VK-BUUH]; *Overview of Arbitration & Mediation*, FINRA, https://www.finra.org/arbitration-mediation/about/arbitration-vs-mediation [https://perma.cc/H2E3-N7YF]; *Get to Know Us*, *supra* note 65, at 3.

84. *Get to Know Us*, *supra* note 65, at 3; *Protecting Market Integrity*, *supra* note 55; *see What Does FINRA Do?*, *supra* note 63 ("FINRA administers the largest dispute resolution forum in the country for the securities industry.").

85. *Protecting Market Integrity*, *supra* note 55.

86. *See, e.g.*, U.S. CONST. art. I, § 1, cl. 1 (vesting legislative power in Congress); *id.* art. II, § 1, cl. 1 (vesting the executive power in a president); *id.* § 3, cl. 1 (providing that the president shall take care that the laws passed by Congress are faithfully executed); *id.* art. III, § 1, cl. 1 (vesting the judicial power in

*MINNESOTA LAW REVIEW* [109:1889

the States.[87] As between the three branches of the federal government, the Constitution generally envisions Congress creating the law, the judiciary interpreting the law, and the President enforcing the law.[88] Law enforcement is a quintessentially executive power.[89] The "executive Power [is] vested in a President," who must "take Care that the Laws be faithfully executed."[90] However, the Constitution envisions the president relying on authorized subordinate Officers for assistance to fulfill that responsibility.[91] Though the Constitution mentions these Officers and regulates with some specificity the method of their appointment, it says little about exactly who qualifies as an officer.[92] Over

the judiciary); *see also* Buckley v. Valeo, 424 U.S. 1, 139 (1976) ("Legislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them or appoint the agents charged with the duty of such enforcement."); United States v. Welden, 377 U.S. 95, 117 (1964) (Douglas, J., dissenting) ("Congress is not a law enforcement agency; that power is entrusted to the Executive. Congress is not a trial agency; that power is entrusted to the Judiciary.").

87.    *See* U.S. CONST. amend. X (providing that the Federal Government only has those powers delegated in the Constitution, and any power not listed belongs to the states or to the people).

88.    *See supra* note 86 and accompanying text.

89.    *See* Morrison v. Olson, 487 U.S. 654, 706 (1988) (Scalia, J., dissenting) ("Governmental investigation and prosecution of crimes is a quintessentially executive function.").

90.    U.S. CONST. art. II, § 1, cl. 1; *id.* § 3, cl. 1; *see* Myers v. United States, 272 U.S. 52, 205 (1926) ("In the proceedings of the Constitutional Convention no hint can be found of any executive power except those definitely enumerated or inferable therefrom or from the duty to enforce the laws.").

91.    *See* Seila Law LLC v. Consumer Fin. Prot. Bureau, 140 S. Ct. 2183, 2191 (2020) (quoting Free Enter. Fund v. Pub. Co. Acct. Oversight Bd., 561 U.S. 477, 513–14 (2010)); *Myers*, 272 U.S. at 117 ("The vesting of the executive power in the President was essentially a grant of the power to execute the laws. But the President alone and unaided could not execute the laws. He must execute them by the assistance of subordinates.").

92.    U.S. CONST. art. II, § 2, cl. 2 (noting that "Ambassadors, other public Ministers and Consuls, Judges of the supreme Court" are Officers of the United States but leaving open a whole category of "all other Officers of the United States"). The clause notes that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . all . . . Officers of the United States, . . . but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.*

time, the Supreme Court has developed a general profile for who fits within this category.[93]

The Court has held that an individual who exercises "significant authority" pursuant to the laws of the United States and who occupies a continuing position established by law fits the profile of an Officer of the United States.[94] "Significant authority" includes rulemaking, adjudication, the issuing of advisory opinions, and eligibility determinations.[95] "Significant authority" does not require an Officer to have final decision-making authority; rather, it is the significance of the Officer's duties and discretion that they possess in carrying out those duties that is dispositive.[96] Tasks that require significant discretion include taking testimony, conducting trials, ruling on the admissibility of evidence, and enforcing discovery orders.[97] This can be distinguished from low-discretion, ministerial tasks, such as information gathering and reporting.[98] A continuing position established by law is a job that owes its existence to a statute and continues with some permanence rather than being temporary or occasional.[99]

---

93.   HICKMAN & PIERCE, *supra* note 27, § 2.8.1 (describing the development of Supreme Court delineation of who constitutes an Officer of the United States).

94.   Lucia v. Sec. & Exch. Comm'n, 138 S. Ct. 2044, 2047 (2018) (first quoting Buckley v. Valeo, 424 U.S. 1, 126 (1976), for the "significant authority" standard; and then quoting United States v. Germaine, 99 U.S. 508, 511–12 (1879), for the "continuing position" standard).

95.   *Buckley*, 424 U.S. at 140.

96.   Freytag v. Comm'r, 501 U.S. 868, 881 (1991) (emphasizing the importance of officers' duties—although officers lack authority to finalize decisions).

97.   *Id.* at 881–82.

98.   *See Buckley*, 424 U.S. at 137 (noting that Congress may grant non-officers with "investigative and informative" powers without transgressing the Appointments Clause).

99.   *See Lucia*, 138 S. Ct. at 2051 ("Stressing 'ideas of tenure [and] duration,' the Court there made clear that an individual must occupy a 'continuing' position established by law to qualify as an officer." (quoting *Germaine*, 99 U.S. at 511)); *see also Freytag*, 501 U.S. at 881 ("The office of special trial judge is 'established by Law,' Art. II, § 2, cl. 2, and the duties, salary, and means of appointment for that office are specified by statute."). This is distinguished from "special masters, who are hired by Article III courts on a temporary, episodic basis, whose positions are not established by law, and whose duties and functions are not delineated in a statute." *Freytag*, 501 U.S. at 881.

*MINNESOTA LAW REVIEW* [109:1889

Over the last half-century, the Supreme Court has increasingly taken an interest in whether individuals seeking to exercise executive authority are Officers of the United States and, if so, whether they meet the constitutional requirements surrounding that position.[100] The Court has labeled both individuals employed by the government and individuals employed by nonprofit corporations authorized and empowered by statute as Officers of the United States.[101] Therefore a holding that an SRO officer-like-actor is an Officer of the United States would not be at all far-fetched. Consider the following comparison between a FINRA Hearing Officer and an SEC ALJ.

D.  A COMPARISON OF FINRA HEARING OFFICERS WITH SEC ALJS DEMONSTRATES THAT FINRA HEARING OFFICERS ARE OFFICERS OF THE UNITED STATES

The SEC is an independent executive agency charged with enforcing the nation's securities laws.[102] One way it accomplishes its mission is by instituting administrative proceedings against those alleged to have broken securities law.[103] The Commission typically delegates the task of presiding over and

---

100.  *See, e.g., Buckley*, 424 U.S. at 127 (holding Commissioners of the Federal Election Commission are Officers of the United States); Morrison v. Olson, 487 U.S. 654, 671 (1988) (holding that Special Counsels are "inferior" Officers of the United States); *Freytag*, 501 U.S. at 886 (holding that Federal Tax Court special trial judges are Officers of the United States); Free Enter. Fund v. Pub. Co. Acct. Oversight Bd., 561 U.S. 477, 485–86, 492–95 (2010) (holding the members of the PCAOB are Officers of the United States and may not be shielded by two layers of for-cause removal restrictions); *Lucia*, 138 S. Ct. at 2049 (holding SEC ALJs are Officers of the United States); Seila Law LLC v. Consumer Fin. Prot. Bureau, 140 S. Ct. 2183, 2192 (2020) (holding that the single director of the CFPB is an Officer of the United States and may not be protected by for-cause removal from the President).

101.  *Compare Lucia*, 138 S. Ct. at 2049 (holding SEC ALJs—who are employed by the government—are Officers of the United States), *with Free Enter. Fund*, 561 U.S. at 485–86 (holding the members of the PCAOB—a nongovernmental non-profit corporation—are Officers of the United States).

102.  *See Lucia*, 138 S. Ct. at 2049 ("The SEC has statutory authority to enforce the nation's securities laws."); *Strategic Plan: Fiscal Years 2022-2026*, U.S. SEC. & EXCH. COMM'N 1, 4, https://www.sec.gov/files/sec_strategic_plan_fy22-fy 26.pdf [https://perma.cc/B2TD-LQKW] ("The members of the Commission act jointly to set and enforce the rules that govern the securities markets and its participants.").

103.  *See Lucia*, 138 S. Ct. at 2049.

adjudicating such proceedings to an ALJ.[104] An ALJ has the "authority to do all things necessary and appropriate to discharge his or her duties" and ensure a "fair and orderly" adversarial proceeding.[105] This authority includes "supervising discovery; issuing, revoking, or modifying subpoenas; deciding motions; ruling on the admissibility of evidence; administering oaths; hearing and examining witnesses; generally '[r]egulating the course of the proceeding, and the 'conduct of the parties and their counsel'; and imposing sanctions for '[c]ontemporaneous conduct' or violations of procedural conduct."[106] The Supreme Court has noted that SEC ALJs exercise authority "'comparable to' that of a federal district judge conducting a bench trial."[107] In *Lucia v. SEC*, the Supreme Court held that SEC ALJs were Officers of the United States and thus subject to the requirements of the Appointments Clause.[108]

FINRA also "enforces compliance" with the "provisions" of the Securities and Exchange Act, and the "rules and regulations thereunder."[109] To effectuate this purpose, FINRA employs Hearing Officers, which are nearly identical to SEC ALJs.[110] Hearing Officers are tasked by statute with enforcing the nation's securities laws.[111] They can "levy sanctions that carry the force of federal law."[112] And like SEC ALJs, Hearing Officers

---

104.  *See id.*; *see also* 17 C.F.R. § 201.110 (2024) (explaining that when Commissioner decides that an administrative law judge with be the hearing officer, they are selected by the Chief Administrative Law Judge).

105.  17 C.F.R. §§ 201.111, 200.14(a) (2024).

106.  *Lucia*, 138 S. Ct. at 2049; 17 C.F.R. §§ 201.111, 201.180, 200.14(a), 201.230 (2024).

107.  *Lucia*, 138 S. Ct. at 2049 (quoting Butz v. Economou, 438 U.S. 478, 513 (1978)).

108.  *Id.*

109.  Alpine Sec. Corp. v. Fin. Indus. Regul. Auth., No. 23-cv-01506, 2023 WL 4703307, at *1 (D.C. Cir. July 5, 2023) (Walker, J., concurring) (quoting 15 U.S.C. §§ 78s(g)(1), 78o-3(b)(7)); *see also About FINRA*, *supra* note 13 ("FINRA is a private not-for-profit membership organization that is responsible under federal law for supervising our member firms . . . As a self-regulatory organization, or SRO, we are registered with the SEC and perform our work under the supervision of the SEC, but we are not part of the government.").

110.  *Alpine*, 2023 WL 4703307, at *2 (Walker, J., concurring) (comparing SEC ALJs with FINRA Hearing Officers and concluding that "FINRA's hearing officers are near carbon copies of [SEC] ALJs").

111.  15 U.S.C. § 78s(g)(1).

112.  Turbeville v. Fin. Indus. Regul. Auth., 874 F.3d 1268, 1270 (11th Cir. 2017) (citing 15 U.S.C. § 78o-3(b)(7)).

demand testimony, rule on motions, regulate the course of a hearing, decide the admissibility of evidence, and enforce compliance with discovery orders by punishing contempt.[113] As with SEC ALJs, the SEC can review FINRA's decisions "on its own motion, or upon application by any person aggrieved . . . filed within thirty days."[114] Indeed, the SEC's standard of review for FINRA decisions is nearly identical to the standard for reviewing an ALJ's findings.[115] This raises the question: If SEC ALJs are Officers of the United States, then why aren't FINRA's Hearing Officers?

As D.C. Circuit Judge Justin Walker put it, "[i]t would be odd if the Constitution prohibits Congress from vesting significant executive power in an unappointed and unremovable government administrator but allows Congress to vest such power in an unappointed and unremovable private [H]earing [O]fficer."[116] Indeed, as Judge Walker went on to elucidate, to tolerate such an incongruence would "create a constitutional loophole."[117] Allowing FINRA employees to wield officer-like-powers "would suggest that Congress was free to fix the constitutional infirmity with the ALJs in *Lucia* simply by moving them

---

113.    *See Alpine*, 2023 WL 4703307, at *2 (Walker, J., concurring) (noting that like the SEC ALJs that the Supreme Court in *Lucia* declared to be Officers of the United States, FINRA Hearing Officers are empowered to "demand testimony, rule on motions, regulate the course of a hearing, decide the admissibility of evidence, and enforce compliance with discovery orders by punishing contempt" (citing FINRA Rule §§ 8210, 9252, 9235, 9263, 9280 (2023), https://www.finra.org/rules-guidance/rulebooks/finra-rules [https://perma.cc/3J9L-EMFJ]).

114.    15 U.S.C. § 78s(d)(2).

115.    In *Lucia*, the Court emphasized that the SEC "adopts [an ALJ's] 'credibility finding[s] absent overwhelming evidence to the contrary.'" Lucia v. Sec. & Exch. Comm'n, 138 S. Ct. 2044, 2055 (2018) (alteration in original) (quoting Clawson, Exchange Act Release No. 48143, 2003 WL 21539920 (July 9, 2003)). The standard of review for FINRA Hearing Officers is similar. *See* Daniel D. Manoff, Exchange Act Release No. 46708, 2002 WL 31769236, at *4 n.6 (Oct. 23, 2002) (credibility determinations made by NASD—FINRA's predecessor—"can be overcome only when there is 'substantial evidence' for doing so" (citing Anthony Tricarico, Exchange Act Release No. 32356, 1993 WL 183678 (May 24, 1993))).

116.    *Alpine*, 2023 WL 4703307, at *3 (Walker, J., concurring) (citing *Lucia*, 138 S. Ct. at 2051); *see also* Dep't of Transp. v. Ass'n of Am. R.Rs. (*Amtrak*), 575 U.S. 43, 57 (2015) (Alito, J., concurring) ("There is good reason to think that those who have not sworn an oath cannot exercise significant authority of the United States.").

117.    *Alpine*, 2023 WL 4703307, at *4 (Walker, J., concurring).

outside of the Executive Branch."[118] However, moving ALJs outside the Executive Branch would not cure the basic constitutional defect that motivated the Supreme Court in *Lucia*: "Only the President and properly appointed Officers of the United States may exercise significant executive power."[119] In other words, it does not matter that FINRA is a private, non-governmental organization. If any of its employees are exercising executive power, the Constitution requires that they be appointed according to the Appointments Clause. As the next Part makes clear, they are not.

## II.  FINRA EMPLOYEES THAT QUALIFY AS OFFICERS OF THE UNITED STATES MUST MEET CONSTITUTIONAL APPOINTMENT AND REMOVAL REQUIREMENTS.

Even if the Court held that FINRA employees that exercise significant executive power—like FINRA Hearing Officers—were Officers of the United States, they would still not pass Constitutional muster. This is because they are not appointed according to the Appointments Clause, nor are they removable according to Supreme Court removal jurisprudence.[120] This Part introduces appointment and removal jurisprudence and argues that even though FINRA officer-like actors are wielding executive power, they are not properly subject to constitutional constraints. Part II.A briefly summarizes constitutional appointment and removal requirements. Part II.B argues that FINRA officer-like actors are not appointed according to the Appointments Clause. Part II.C argues that FINRA officer-like actors are not properly subject to presidential removal according to Supreme Court removal jurisprudence.

---

118.  *Id.*

119.  *Id.* (citing *Lucia*, 138 S. Ct. at 2051); *id.* (noting that there is a strong argument that FINRA Hearing Officers exercise significant executive power without presidential oversight, and that this may constitute a constitutional problem (first citing U.S. CONST. art. II, § 1, cl. 1; and then citing *id.* art. II, § 2, cl. 2)).

120.  *See infra* Parts II.B–II.C.

*MINNESOTA LAW REVIEW* [109:1889

## A. The Constitution Requires Officers of the United States To Be Appointed in a Particular Way and Generally Removable by the President

As noted *supra* Part I.C., the Constitution vests all executive Power in the President and tasks the President with taking care that the laws are faithfully executed.[121] Because it is impossible for one person to ensure the execution and enforcement of all federal laws, the Constitution provides that the President may carry out their obligations with the assistance of properly appointed subordinates.[122] These subordinates are Officers of the United States.[123] The Appointments Clause provides the only permissible mechanisms for proper appointment of Officers of the United States.[124] The Clause provides that Principal Officers must be nominated by the President by and with the advice and consent of the Senate.[125] Congress may statutorily vest the appointment of inferior Officers in the President alone, in the Courts of Law, or in the Heads of Departments.[126] Adhering to the Appointments Clause—including in the case of FINRA's officer-like employees—is important because it safeguards accountability.

The Court has held that accountability also requires the President have broad discretion to remove Officers of the United States.[127] In a system where the government is "of the people, by

---

121. *See* Seila Law LLC v. Consumer Fin. Prot. Bureau, 140 S. Ct. 2183, 2191 (2020) (citing U.S. Const. art. II, § 1, cl. 1; *id.* § 3.).

122. *See Seila Law*, 140 S. Ct. at 2197 (explaining that the subordinates may be appointed to assist the President in carrying out their duties).

123. *See generally* Myers v. United States, 272 U.S. 52, 117 (1926) ("The vesting of the executive power in the President was essentially a grant of the power to execute the laws. But the President alone and unaided could not execute the laws. He must execute them by the assistance of subordinates.").

124. *See* U.S. Const. art. II, § 2, cl. 2 ("[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . all . . . Officers of the United States, . . . but the Congress may by law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."); *see also* Hickman & Pierce, *supra* note 27, § 2.8, at 142 (noting that "[t]he Constitution explicitly limits the power to appoint Officers of the United States" to the mechanisms described in U.S. Const. art. II, § 2, cl. 2).

125. U.S. Const. art. II, § 2, cl. 2.

126. *Id.*

127. *See Seila Law*, 140 S. Ct. at 2197–2200 (summarizing Supreme Court precedent recognizing the contours of presidential removal power); *see also*

the people, for the people"[128] it is important that those who wield power under the Constitution be ultimately accountable to the people. Because Officers of the United States assist the President in wielding executive power, and the President is ultimately accountable to the people, it is crucial that Officers be properly accountable to the President.[129] If Officers are not accountable to the President, the voting public has no electoral recourse if they should disapprove of an Officer's action. This is why the Supreme Court has held that the President's executive power necessarily extends to appointing, overseeing, and controlling those who execute the laws.[130]

This power to control executive subordinates includes a broad ability to remove them.[131] Otherwise, the President would have no coercive way to ensure that the executive subordinates obey presidential commands.[132] Absent broad removal power, the President "could not be held fully accountable for discharging [their] own responsibilities."[133] This would result in an unconstitutional diffusion of executive authority and accountability.[134] Thus, the Court has held that Presidents enjoy a broad power to remove Officers of the United States, subject to a few limited

HICKMAN & PIERCE, *supra* note 27, § 2.9.1 (detailing the development of Supreme Court presidential removal power jurisprudence).

128. President Abraham Lincoln, The Gettysburg Address (Nov. 19, 1863).

129. The President is accountable to the people in two ways: via election and via impeachment. *See* U.S. CONST. art. I, §§ 2–3 (noting mechanisms for congressional impeachment of the President); *id.* art. II, § 1 (noting the presidential electoral mechanism).

130. *See Seila Law*, 140 S. Ct. at 2197 (describing how the framers understood the President's ability to control his or her subordinates (quoting 1 Annals of Cong. 463 (1789) (Joseph Gales ed., 1834))); Myers v. United States, 272 U.S. 52, 164 (1926) (noting that Article II confers on the President "the general administrative control of those executing the laws"); *id.* at 117 (noting the President must have some "power of removing those for whom he cannot continue to be responsible").

131. *See Seila Law*, 140 S. Ct. at 2197 (noting that the Executive Power "generally includes the ability to remove executive officials").

132. *Id.* (noting that the coercive effect of removal power allows the President to control Officers (citing Bowsher v. Synar, 478 U.S. 714, 726 (1986))).

133. *Id.* at 2191.

134. *See* Free Enter. Fund v. Pub. Co. Acct. Oversight Bd., 561 U.S. 477, 514 (2010) (noting that without removal power, "the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else. Such diffusion of authority 'would greatly diminish the intended and necessary responsibility of the chief magistrate himself.'" (quoting THE FEDERALIST NO. 70, at 359 (Alexander Hamilton) (Ian Shapiro ed., 2009))).

exceptions.[135] The Court has held that the multi-member heads of independent agencies may be insulated from unfettered Presidential removal through "for-cause" removal protections.[136] The Court has extended such "for-cause" removal protections to certain Inferior Officers—such as independent counsels—with narrowly defined duties.[137] Allowing FINRA officer-like employees to continue exercising executive power absent conformity with appointment and removal requirements is repugnant to the Constitution.

## B. FINRA OFFICERS ARE NOT APPOINTED ACCORDING TO THE APPOINTMENTS CLAUSE

No member of FINRA is appointed according to the Appointments Clause.[138] FINRA is overseen by a board of governors composed of twenty-two industry and public members, with ten seats designated for industry members, eleven seats designated for public members, and one seat reserved for FINRA's Chief Executive Officer.[139] No government official has any say in the selection of board members.[140] Instead, a Nominating & Governance

---

135. *See Free Enter. Fund*, 561 U.S. at 492–98 (describing the contours of Supreme Court jurisprudence regarding the President's power to remove Officers of the United States).

136. *See id.* at 493 ("The [*Humphrey's Executor*] Court distinguished *Myers* on the ground that *Myers* concerned 'an officer [who] is merely one of the units in the executive department and, hence, inherently subject to the exclusive and illimitable power of removal by the Chief Executive, whose subordinate and aid he is.' Humphrey's Ex'r v. United States, 295 U.S. 602, 627 (1935). By contrast, the Court characterized the FTC as 'quasi-legislative and quasi-judicial' rather than 'purely executive,' and held that Congress could require it 'to act . . . independently of executive control.' *Free Enter. Fund*, 561 U.S. at 627–29. Because 'one who holds his office only during the pleasure of another, cannot be depended upon to maintain an attitude of independence against the latter's will,' the Court held that Congress had power to 'fix the period during which [the Commissioners] shall continue in office, and to forbid their removal except for cause in the meantime.' *Id.* at 629.").

137. *See, e.g., id.* at 493–95; Morrison v. Olson, 487 U.S. 654, 657–58 (1988) (holding the limitation on the Attorney General's removal power of independent counsel to be permissible).

138. *See infra* notes 139–47 and accompanying text.

139. *FINRA Board of Governors*, FINRA, https://www.finra.org/about/governance/finra-board-governors#Selection_Process [https://perma.cc/YL8K-P8V2].

140. *Id.* (describing the board member appointment process without mentioning any of the processes described in the Appointments Clause); *see also*

Committee has the authority to nominate candidates to run for election to fill seven seats on the Board designated by firm-size category—three small firm governors, one mid-size firm governor and three large firm governors.[141] Individuals may also petition to become candidates for these seven elected governor seats.[142] Candidates for these seats are elected by the firms eligible to vote for that category of governorship.[143] The remaining governors are appointed by the Board from candidates nominated by the Nominating Committee.[144] FINRA's CEO has broad power and responsibility for supervising the "management and administration" of FINRA's operations.[145] The CEO is appointed by FINRA's Board.[146] FINRA's Hearing Officers are employees who report directly to the CEO.[147] If FINRA's Board members, CEO, and Hearing Officers are Officers of the United States, then their appointment is discordant with the Appointments Clause.

## C. FINRA OFFICERS ARE NOT PROPERLY SUBJECT TO PRESIDENTIAL REMOVAL

As noted in Part II.A, the Supreme Court has recognized two narrow exceptions to the presumed general removal power accorded to the President under Article II.[148] First, the multi-member heads of independent agencies that do not wield substantial

---

*Investors and Members*, *supra* note 60 (noting in the "checks and balances" section that FINRA is subject to some oversight by the SEC, but with no information on accountability to the President).

141.   *FINRA Board of Governors*, *supra* note 139.

142.   *Id.*

143.   *Id.*

144.   *Id.*

145.   FINRA Bylaws, art. VIII, § 1, https://www.finra.org/rules-guidance/rulebooks/corporate-organization/officers [https://perma.cc/S2W7-WAM3].

146.   *Id.*

147.   *Office of Hearing Officers*, FINRA, https://www.finra.org/rules-guidance/adjudication-decisions/office-hearing-officers-oho/about [https://perma.cc/6D7T-SVP9].

148.   *See* Seila Law LLC v. Consumer Fin. Prot. Bureau, 140 S. Ct. 2183, 2199 (2020) (noting first, an exception for multimember bodies with "quasi-judicial" or "quasi-legislative" functions as recognized in Humphrey's Ex'r v. United States, 295 U.S. 602 (1935), and second, an exception for inferior officers as recognized in United States v. Perkins, 116 U.S. 483 (1886), and Morrison v. Olson, 487 U.S. 654 (1988)). *But see* Consumers' Rsch. v. Consumer Prod. Safety Comm'n, 91 F.4th 342, 346 (5th Cir. 2024) (applying the exception set forth in *Humphrey's*, but strenuously calling it into question).

*MINNESOTA LAW REVIEW* [109:1889

executive power may be protected by "for-cause" removal protections.[149] Second, Inferior Officers with limited duties and no policymaking or administrative authority may also be protected by "for-cause" removal protections.[150] These exceptions represent "the outermost constitutional limits of permissible congressional restrictions on the President's removal power."[151] FINRA does not fit within either exception.

Because FINRA wields substantial enforcement authority, it does not fit within the first exception. FINRA has the power not only to compel document production and sworn testimony but also to impose significant monetary fines, which is "a quintessentially executive power."[152] As noted in Part II.B, FINRA is authorized to punish broker-dealers for violations of its rules or federal securities laws through "expulsion, suspension, limitation of activities, functions, and operations, fine, censure, being suspended or barred from being associated with a member, or any other fitting sanction."[153] As noted in the introduction, in a single year FINRA permanently barred 227 individuals and suspended 328 individuals from the financial industry, imposed $54.5 million dollars in fines, ordered $26.2 million dollars in restitution, and referred 663 cases for prosecution.[154] Additionally, FINRA's rulemaking authority binds nearly all broker-dealers in the country.[155]

Even if FINRA could be characterized as consisting only of Inferior Officers, it cannot meet the second exception to unfettered presidential removal authority because it wields

---

149.   *See Seila Law*, 140 S. Ct. at 2199, 2217 (quoting *Humphrey's Ex'r*, 295 U.S. at 628 (explaining the Officers "exercise[d] no part of the executive power")).

150.   *See id.* at 2199 (citing *Morrison*, 487 U.S. 654 (allowing a good-cause tenure protection for certain independent counsel)).

151.   *Id.* at 2200 (quoting PHH Corp. v. Consumer Fin. Prot. Bureau, 881 F.3d 75, 196 (D.C. Cir. 2018) (Kavanaugh, J., dissenting)).

152.   *Id.*

153.   15 U.S.C. § 78o-3(b)(2), (7).

154.   *Statistics*, *supra* note 14 and accompanying text.

155.   *See* 15 U.S.C. § 78o-3(b) (outlining when broker-dealers should register as a national securities association); *see also* Collins v. Yellen, 141 S. Ct. 1761, 1785–86 (2021) ("[An entity] empowered to issue a 'regulation or order' . . . . [C]learly exercises executive power.").

policymaking and administrative authority.[156] FINRA makes rules and regulations that bind the entire broker-dealer industry.[157] It can make rules with the force and effect of law, set enforcement priorities, bring enforcement actions, preside over and adjudicate cases, and even expel companies from the securities industry altogether.[158] It would be absurd if a regulatory body could exercise such far-reaching executive authority untethered from presidential accountability and control through the removal power. Because FINRA Hearing Officers meet neither of the exceptions from general presidential removal power—not being either a multimember body exercising "quasi-judicial" or "quasi-legislative" functions mentioned in *Humphrey's Executor*, or the specific inferior officers discussed in *United States v. Perkins* and *Morrison v. Olson*—they are unconstitutionally wielding executive power without any accountability to the President.[159] This is problematic.

The next Part argues that to solve this constitutional problem, FINRA should be classified as governmental for constitutional purposes. Additionally, any Officer-like employee must be appointed according to the Appointments Clause and subject to presidential removal according to Supreme Court jurisprudence.

---

156.   *See* 15 U.S.C. § 78s(b) (setting up a system for notice and comment rule making). Interestingly, though Congress requires approval by the SEC of SRO-proposed rules, the statute actually does not give the SEC any discretion: "The Commission *shall* approve a proposed rule change of a self-regulatory organization if it finds that such proposed rule change is consistent with the requirements of this chapter." *Id.* § 78s(b)(2)(C)(i).

157.   *See Protecting Market Integrity*, *supra* note 55 ("We write and enforce rules and regulations for every single brokerage firm and broker in the United States.").

158.   Turbeville v. Fin. Indus. Regul. Auth., 874 F.3d 1268, 1270 (11th Cir. 2017) (noting that when member brokers or dealers violate FINRA rules or provisions of the Exchange Act, FINRA "can—indeed, must—levy sanctions that carry the force of federal law" (citing 15 U.S.C. § 78o-3(b)(7)); 15 U.S.C. § 78o-3(b)(7) ("The rules of [a national securities organization] provide that its members . . . shall be appropriately disciplined for violation of any provision of [the Exchange Act] . . . or the rules of the association, by expulsion, suspension, limitation of activities, functions, and operations, fine, censure, being suspended or barred from being associated with a member, or any other fitting sanction.").

159.   *See* Seila Law LLC v. Consumer Fin. Prot. Bureau, 140 S. Ct. 2183, 2199 (2020) (noting first, an exception for multimember bodies with "quasi-judicial" or "quasi-legislative" functions as recognized in Humphrey's Ex'r v. United States, 295 U.S. 602 (1935), and second, an exception for inferior officers as recognized in United States v. Perkins, 116 U.S. 483 (1886), and in Morrison v. Olson, 487 U.S. 654 (1988)).

## III.  FINRA SHOULD BE CLASSIFIED AS GOVERNMENTAL FOR CONSTITUTIONAL PURPOSES AND ITS OFFICERS MUST COMPLY WITH APPOINTMENT AND REMOVAL REQUIREMENTS

Though nominally private, FINRA should be classified as governmental for constitutional purposes. Any officer-like actor that wields significant authority must be appointed according to the Appointments Clause, and subject to removal according to Supreme Court jurisprudence.[160] Part I and Part II laid out the problem.[161] Part III suggests a possible solution.

Part I argued that some FINRA employees exercise power constitutionally reserved for Officers of the United States and therefore must be classified as such.[162] Part II demonstrated that FINRA employees, who are effectively Officers of the United States because of the power they wield, do not meet constitutional Appointment and Removal requirements.[163] To remedy these constitutional deficiencies, Part III.A argues that the Supreme Court should hold that FINRA is governmental for constitutional purposes. The implication of this is that FINRA employees who exercise powers analogous to Officers of the United States *are* Officers of the United States. It would follow that—as Officers of the United States—such employees must be appointed according to the Appointments Clause and removable by the President according to Supreme Court jurisprudence. Once the Supreme Court declares FINRA governmental for constitutional purposes, there are two possible routes through which to bring officer-like employees into constitutional compliance: through judicial action or through legislative action.

Part III.B argues that judicial action is likely the most straightforward and feasible solution. Under this route, the Supreme Court would hold that FINRA Officers must be appointed by the proper entity under the Appointments Clause. As presidential removal authority is inherent, solving any removal issue implicated by FINRA officer-like employees is relatively simple.

---

160.  *See supra* Part II.

161.  *See supra* Part I (describing how some SRO officer-like actors exercise significant authority normally reserved for Officers of the United States); *see also supra* Part II (describing how SRO officer-like actors are not properly appointed or subjected to presidential removal).

162.  *See supra* Part I.

163.  *See supra* Part II.

Because the statute empowering FINRA provides impermissible dual-cause removal protections, the Court need only sever the problematic protections from the statute. This would leave the FINRA Officers properly subject to presidential removal.

Part III.C alternatively suggests that, following a holding that FINRA is governmental, and its officer-like employees are Officers of the United States, the Court could require a legislative remedy rather than acting on its own. Given the current political climate and congressional gridlock, such a solution is unlikely. Therefore, the Court should proceed through judicial action.

## A.  FINRA IS GOVERNMENTAL FOR CONSTITUTIONAL PURPOSES

In an appropriate case, the U.S. Supreme Court should hold that FINRA, though nominally private, is governmental for constitutional purposes. Such a ruling would be well within the Court's recent prior precedent.[164] Despite explicit statutory language to the contrary, the Roberts Court has held that private non-profit and for-profit corporations are governmental entities for constitutional purposes.[165]

*Department of Transportation v. Ass'n of American Railroads* (*Amtrak*) provides such an example.[166] In that case, the Court held that Amtrak was a governmental entity for purposes of the Constitution's separation of powers provisions.[167] Congress created Amtrak as a for-profit corporation in 1970 to

---

164.  *See*, *e.g.*, Free Enter. Fund v. Pub. Co. Acct. Oversight Bd., 561 U.S. 477, 485–86 (2010) (noting despite statutory provisions specifying the PCAOB is not governmental, that the Board is "part of the Government" for constitutional purposes (quoting Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374, 397 (1995))); Dep't of Transp. v. Ass'n of Am. R.Rs. (*Amtrak*), 575 U.S. 43, 50, 54 (2015) (holding that despite "Congress' statutory command that Amtrak 'is not a department, agency, or instrumentality of the United States Government'. . . Amtrak act[s] as a governmental entity for purposes of the Constitution's separation of powers provisions" (quoting 49 U.S.C. § 24301(a))).

165.  *See supra* note 164 and accompanying text.

166.  *Amtrak*, 575 U.S. 43.

167.  *See id.* at 54 ("Amtrak acted as a governmental entity for purposes of the Constitution's separation of powers provisions. And that exercise of governmental power must be consistent with the design and requirements of the Constitution, including those provisions relating to the separation of powers.").

*MINNESOTA LAW REVIEW* [109:1889

provide intercity passenger train service.[168] The Rail Passenger Service Act of 1970 explicitly stated that Amtrak "is not a department, agency, or instrumentality of the United States Government."[169] Despite this statutory command, the Supreme Court held that "Amtrak act[s] as a governmental entity for purposes of the Constitution's separation of powers provisions."[170] The Court explained that governmental status for constitutional purposes is determined by an independent, functional judicial inquiry rather than by congressional pronouncement or official status.[171] After conducting such an inquiry, the Court concluded that because Amtrak was "created by the Government, is controlled by the Government, and operates for the Government's benefit" it is therefore governmental rather than an "autonomous private enterprise."[172] The Court's treatment of the Public Company Accounting Oversight Board (PCAOB) provides an even more apt example.

In *Free Enterprise Fund v. Public Company Accounting Oversight Board*,[173] the Court found that members of the PCAOB were "'part of the Government' for constitutional purposes," and that its members were Officers of the United States because they exercised "significant authority pursuant to the laws of the United States."[174] Congress established the PCAOB through the

---

168. *See Amtrak: 50 Years of Leading the Way*, AMTRAK, https://www.amtrak.com/amtrak-history-1970s [https://perma.cc/J5RK-CEQV] (describing the first Amtrak train in 1971).

169. 49 U.S.C. § 24301(a).

170. *Amtrak*, 575 U.S. at 54.

171. *See id.* at 51 ("Congressional pronouncements, though instructive as to matters within Congress' authority to address, are not dispositive of Amtrak's status as a governmental entity for purposes of separation of powers analysis under the Constitution." (citing United States *ex rel.* Totten, v. Bombardier Corp., 380 F.3d 488, 491–92 (D.C. Cir. 2004))).

172. *Id.* at 44. In reaching this conclusion, the Court noted that the "political branches created Amtrak, control its Board, define its mission, specify many of its day-to-day operations, have imposed substantial transparency and accountability mechanisms, and, for all practical purposes, set and supervise its annual budget." *Id.* at 55. Accordingly, the Court held that Amtrak is a governmental entity, not a private one, for purposes of determining the constitutional issues presented in the case. *Id.*

173. 561 U.S. 477 (2010).

174. *See id.* at 485–86 (first quoting Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374, 397 (1995); and then quoting Buckley v. Valeo, 424 U.S. 1, 125–26 (1976) (per curiam) (quoting U.S. CONST. art. II, § 2, cl. 2)).

Sarbanes-Oxley Act of 2002 to regulate accounting firms.[175] Congress modeled the PCAOB after private self-regulatory organizations in the securities industry—like FINRA—that investigate and discipline their own members subject to SEC oversight.[176] Like Amtrak, Congress created the PCAOB as a private "nonprofit corporation," whose Board members and employees were explicitly disclaimed as Government "officer[s] or employee[s]" for statutory purposes.[177]

*Amtrak* and *Free Enterprise Fund* demonstrate that the Supreme Court has no qualms declaring nominally non-governmental entities governmental for constitutional purposes. *Free Enterprise Fund* additionally shows that the Court is comfortable declaring officer-like actors Officers of the United States and requiring they be (1) appointed according to the Appointments Clause, and (2) removable according to Supreme Court jurisprudence. FINRA's similarity to the PCAOB makes the Court's judicial remedy to the PCAOB's constitutional appointment and removal deficiencies a realistic and likely option.

## B. A JUDICIAL REMEDY IS THE MOST FEASIBLE OPTION

FINRA and the PCAOB are substantially similar. Just as all securities brokers are required to register with FINRA and abide by its regulations, all firms that participate in auditing of public companies under securities law are required to "register with the [PCAOB], pay it an annual fee, and comply with its

---

175. *See id.* at 484.

176. *Id.*

177. *Id.*; 15 U.S.C. § 7211(a)–(b). One reason Congress chose to create a non-profit to regulate the accounting industry was so that the PCAOB could recruit its members and employees from the private sector by paying salaries far above the standard Government pay scale. *Free Enter. Fund*, 561 U.S. at 484–85. The Court noted the current salary for the Chairman of the PCAOB in 2010 was $673,000, while other board members earned $547,000. *Id.* at 485 n.1. At the end of 2022, these salary figures had not changed. Soyoung Ho, *SEC Commissioner Hester Peirce Criticizes PCAOB's 'Ballooning' Budget*, THOMSON REUTERS (Dec. 28, 2022), https://tax.thomsonreuters.com/news/sec-commissioner-hester-peirce-criticizes-pcaobs-ballooning-budget [https://perma.cc/KB89-YNYM]. By comparison, in 2024 the maximum an SEC employee can earn as base pay is $233,115 and the maximum a senior SEC officer can make is $311,235. *Compensation Overview*, U.S. SEC. & EXCH. COMM'N (Mar. 12, 2025), https://www.sec.gov/about/careers/sec-compensation [https://perma.cc/45RB-P4CT].

*MINNESOTA LAW REVIEW* [109:1889]

rules and oversight."[178] Similar to FINRA, the PCAOB is
charged with enforcing securities laws, the SEC's rules, its own
rules, and professional accounting standards.[179] Like FINRA,
the PCAOB promulgates regulations and ethics standards, "per-
forms routine inspections of all accounting firms, demands doc-
uments and testimony, and initiates formal investigations and
disciplinary proceedings."[180] A willful violation of a FINRA or
PCAOB rule is treated as a willful violation of the Securities Ex-
change Act and is "a federal crime punishable by up to 20 years'
imprisonment or $25 million in fines ($5 million for a natural
person)."[181] Both FINRA and the PCAOB themselves "can issue
severe sanctions in [their] disciplinary proceedings, up to and in-
cluding the permanent revocation of a firm's registration, a per-
manent ban on a person's associating with any registered firm,"
and significant monetary penalties.[182]

Like FINRA, the Securities and Exchange Act "places the
Board under the SEC's oversight, particularly with respect to the
issuance of rules or the imposition of sanctions."[183] Prior to the
Court's decision in *Free Enterprise Fund*, the individual mem-
bers of the PCAOB—like the officers and directors of FINRA—
were "substantially insulated from the [SEC]'s control."[184] The
SEC was not empowered to "remove PCAOB members at will,
but only 'for good cause shown,' 'in accordance with' certain pro-
cedures."[185] Because members of the SEC are insulated from
presidential removal except for cause under the *Humphrey's Ex-
ecutor* exception for multi-member headed independent agen-
cies, this situation created an improper dual for-cause insulation
for PCAOB members.[186]

Members of FINRA currently enjoy similar insulation. Un-
der 15 U.S.C § 78s(h)(4), the SEC may only remove a FINRA

---

178. *See Free Enter. Fund*, 561 U.S. at 485 (citing 15 U.S.C. §§ 7211(a),
7212(a), (f), 7213, 7216(a)(1)).

179. *See id.*

180. *See id.* (citing 15 U.S.C. §§ 7213–7215).

181. *See id.* (citing 15 U.S.C. §§ 78ff(a), 7202(b)(1)).

182. *See id.* (citing 15 U.S.C. § 7215(c)(4)).

183. *See id.* at 486 (citing 15 U.S.C. § 7217(b)–(c)).

184. *See id.*

185. *Id.* (quoting 15 U.S.C. § 7211(e)(6)).

186. *See id.* at 487 (quoting Humphrey's Ex'r v. United States, 295 U.S. 602,
620 (1935)); *id.* at 492 ("We hold that the dual for-cause limitations on the re-
moval of Board members contravene the Constitution's separation of powers.").

Officer if the SEC finds, "on the record after notice and opportunity for hearing," that an Officer has willfully violated the law, abused their authority, or without reasonable justification has failed to enforce compliance with the relevant provisions.[187]

The Court held that "such multilevel protection from removal is contrary to Article II's vesting of the executive power in the President."[188] The Court reasoned that the President could not "'take Care that the Laws be faithfully executed' if [they] cannot oversee the faithfulness of the Officers who execute them."[189] Here, the President was unable to remove members of the PCAOB, even if the President determined that the Officer was "neglecting [their] duties or discharging them improperly."[190] The President would have to trust this determination to the SEC, "who may or may not agree with the President's determination, and [whose members] the President cannot remove" on the basis of disagreement with the President's determination.[191] The Court found that "[t]his contravenes the President's 'constitutional obligation to ensure the faithful execution of the laws.'"[192]

To remedy this constitutional deficiency, the Court severed the unconstitutional tenure protections from the remainder of the statute.[193] Under Supreme Court precedent, when the unconstitutionality of a part of an Act does not necessarily defeat or affect the validity of its remaining provisions, in an exercise of judicial restraint, the Court only invalidates the offending portion of the statute rather than the whole.[194] The Court reasoned

---

187. 15 U.S.C § 78s(h)(4).

188. *Free Enter. Fund*, 561 U.S. at 484.

189. *Id.* (quoting U.S. CONST. art. I, § 3).

190. *Id.*

191. *Id.*

192. *Id.* (quoting Morrison v. Olson, 487 U.S. 654, 693 (1988)).

193. *Id.* at 508 ("[W]e agree with the Government that the unconstitutional tenure provisions are severable from the remainder of the statute."). The Court has previously held that "when confronting a constitutional flaw in a statute, [it] tr[ies] to limit the solution to the problem," severing any "problematic portions while leaving the remainder intact." Ayotte v. Planned Parenthood of N. New Eng., 546 U.S. 320, 328–29 (2006) (citing United States v. Booker, 543 U.S. 220, 227–29 (2005)).

194. *See* Champlin Refin. Co. v. Corp. Comm'n of Okla., 286 U.S. 210, 234 (1932) (holding that unconstitutional parts of an act do not necessarily affect the remaining provisions); *see also* Brockett v. Spokane Arcades, Inc., 472 U.S.

that the existence of the PCAOB—absent the substantive removal restrictions imposed by 15 U.S.C. §§ 7211(e)(6) and 7217(d)(3)—was not unconstitutional.[195] Because under the traditional default rule, presidential removal is incidental to the power of appointment, the Court concluded that severing the problematic removal restrictions left the PCAOB removable by the SEC at will.[196] This in turn left the PCAOB permissibly insulated from Presidential removal by only a single level of for-cause removal protection.[197] With full discretion to remove PCAOB members for any reason, the SEC—whose members are properly appointed by the President and subject to a permissible removal exception—assumed proper oversight and responsibility for the actions of the PCAOB.[198] The actions of the PCAOB were now subject to the exact same (constitutionally permissible) presidential oversight as the actions of the SEC.

The Court should take the same route with FINRA. Severing the for-cause tenure protections in 15 U.S.C § 78s(h)(4) would not render the rest of the statutory scheme unworkable.[199]

---

491, 504 (1985) (noting that the "normal rule" is "that partial, rather than facial, invalidation is the required course" when the Act can function without the unconstitutional portion).

195.   *See Free Enter. Fund*, 561 U.S. at 508–09 (discussing severing the constitutionally offending portion of the Sarbanes-Oxley Act).

196.   *See id.* at 509 (referencing Sampson v. Murray, 415 U.S. 61, 70 n.17 (1974), and Myers v. United States, 272 U.S. 52, 119 (1926), for the default removal rule).

197.   *Id.*

198.   *See id.* ("The Commission is then fully responsible for the Board's actions, which are no less subject than the Commission's own functions to Presidential oversight.").

199.   A possible, workable excision of the unconstitutional removal protections could be as follows:

> (4) The appropriate regulatory agency for a self-regulatory organization is authorized, by order, if in its opinion such action is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this chapter, to remove from office or censure any person who is, or at the time of the alleged misconduct was, an officer or director of such self-regulatory organization, ~~if such appropriate regulatory agency finds, on the record after notice and opportunity for hearing, that such person has willfully violated any provision of this chapter, the rules or regulations thereunder, or the rules of such self-regulatory organization, willfully abused his authority, or without reasonable justification or excuse has failed to enforce compliance~~.

Instead, it would simply allow for the surgical excision of the unconstitutional dual for-cause removal insulation leaving FINRA Officers removable at-will by the SEC. Like the PCAOB, this would leave FINRA Officers permissibly insulated from presidential removal by only a single level of for-cause removal protection.[200] This would vest the properly appointed and permissibly insulated SEC with full responsibility and oversight for FINRA Hearing Officer's actions.[201] In such a scenario, the actions of FINRA would be subject to the exact same (constitutionally permissible) presidential oversight as the actions of the SEC.

However, in an unlikely scenario where the Court holds that Congress would not have enacted the statutory scheme independently of the unconstitutional provision, the Court would be unable to excise the unconstitutional provision.[202] In such a scenario, the Court would have to strike down the whole statute as unconstitutional, leaving Congress to redraft the offending provisions.[203]

Should the Court rule FINRA is governmental for constitutional purposes (which is well within its established precedent), that FINRA Hearing Officers are Officers of the United States (well within precedent), and excise the constitutionally impermissible "for-cause" removal protections from the statute (also well within established precedent), the issue of FINRA Hearing Officer appointments would still need to be dealt with. As discussed, the Appointments Clause requires that the President:

> [S]hall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . all . . . Officers of the United States, . . . but the

---

15 U.S.C. § 78s(h)(4). Such an excision by the Court only removes the "for cause" language that requires the SEC (the "appropriate regulatory agency") to make certain findings and afford due process to FINRA Hearing Officers ("officer[s] or director[s] of such self-regulatory organization") before removing them.

200.   *Free Enter. Fund*, 561 U.S. at 509.

201.   *See id.*

202.   *See id.* at 509–10 (noting that the Court was required to sustain any remaining constitutional provisions "[u]nless it [was] evident that the Legislature would not have enacted those provisions . . . independently of that which is [invalid]" (quoting Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 684 (1987))).

203.   *See id.* at 510 (implying that if the statute's text or historical context made it evident that Congress, faced with the limitations imposed by the Constitution, would have preferred no Board at all to a Board whose members are removable at will, the Court would be forced to invalidate the whole statutory provision).

*MINNESOTA LAW REVIEW* [109:1889

> Congress may by Law vest the Appointment of such inferior Officers,
> as they think proper, in the President alone, in the Courts of Law, or
> in the Heads of Departments.[204]

Thus, if FINRA Hearing Officers are Principal Officers, they must be appointed by the President with the advice and consent of the Senate.[205] Alternatively, if FINRA Hearing Officers are inferior officers, they may be appointed the same way as principal officers, or, if Congress has specified, by the President, a Court of Law, or the Head of a Department without the advice and consent of the Senate.[206]

---

204. U.S. CONST. art. II, § 2, cl. 2.

205. "Officers who must be appointed by the President with the advice and consent of the Senate are often referred to as 'principal officers.'" HICKMAN & PIERCE, *supra* note 27, § 2.8, at 142.

206. U.S. CONST. art. II, § 2, cl. 2. In *Free Enterprise Fund* the appointment issue was dealt with relatively easily, whereas in *Lucia*, it was a bit less straightforward. With the PCAOB in *Free Enterprise Fund*, the statute provides that members of the PCAOB are appointed by the SEC. 15 U.S.C. § 7211(e)(4) (prescribing appointment of the initial Board and the process for filling vacancies). The Appointments Clause provides that "Congress may by law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. CONST. art. II, § 2, cl. 2. Thus, after ruling that PCAOB members were inferior Officers, the Court reasoned that the SEC could properly appoint them as a multi-member "head" of a department. *Free Enter. Fund*, 561 U.S. at 510–13. *Lucia*, on the other hand, was a bit more complex. While the statute at issue in *Lucia* does provide that the SEC may delegate its adjudicatory functions to an ALJ, it does not specify that the SEC appoints the ALJs. 15 U.S.C. § 78d-1(a). Indeed, in *Lucia*, the ALJ in question was hired by SEC staff, not the SEC itself. Lucia v. Sec. & Exch. Comm'n, 138 S. Ct. 2044, 2049 (2018) ("The SEC currently has five ALJs. Other staff members, rather than the Commission proper, selected them all."). The Administrative Procedure Act (APA) directs agencies to appoint as many ALJs "as necessary to conduct proceedings in accordance with the APA's main adjudicative provisions." *Selection of Administrative Law Judges*, ADMIN. CONF. OF THE U.S., https://www.acus.gov/newsroom/administrative-fix-blog/selection-administrative-law-judges [https://perma.cc/2VF2-DW6C] (citing 5 U.S.C. §§ 556, 3105). Despite this, "[t]he APA does not, however, specify what procedure should be used to appoint ALJs." *Id.* Historically, ALJs "have been appointed pursuant to a selection process administered by the Office of Personnel Management." Jack M. Beermann & Jennifer L. Mascott, *Research Report on Federal Agency ALJ Hiring after* Lucia *and Executive Order 13843*, at 1–2 (Geo. Mason Univ. L. Stud., Rsch. Paper No. LS 19-19, 2019). After *Lucia*, the President issued Executive Order 13843, which eliminated the existing United States Office of Personnel Management-administered process for the selection of ALJs. *Id.* at 3–4. Post-*Lucia* agencies altered "their ALJ hiring procedures to conform to both the *Lucia* decision and the executive order." *Id.* at 4. Beerman and Mascott note that "[e]ven though the Court clearly indicated that the [SEC]

The most constitutionally straightforward ruling the Court could make would be to declare that FINRA Hearing Officers must be appointed by the President with the advice and consent of the Senate. Such a ruling, because presidential appointment with the advice and consent of the Senate is the default, would satisfy a finding of FINRA Hearing Officers as Principal or Inferior Officers. While such a ruling would be simple, it would also likely be undesirable. The Senate confirmation process can be slow, difficult, and politically charged.[207] Though potentially undesirable to the political branches, such a decision would be a good strategy for the Court as it may motivate congressional action to amend the statute and specify the appointment mechanism for FINRA Hearing Officers.[208]

Though this judicial remedy would likely result in a congressional response vesting the appointment of FINRA Hearing Officers in the SEC, it is still more likely that the Court would choose this route rather than holding the whole statute unconstitutional. Requiring the default appointment mechanism of presidential appointment with the advice and consent of the Senate—while perhaps inefficient and politically unpleasant—

---

was a valid appointing authority for inferior officers under the Appointments Clause, the Court declined to specify precisely what actions the SEC needed to take to properly appoint the administrative law judges." *Id.* at 21. The SEC and many other agencies have adopted procedures to "ratify" or vest the appointment of ALJs by department heads. *Id.* This is likely consistent with the APA because it allows agencies to hire ALJs but does not specify the mechanism. 5 U.S.C. §§ 556, 3105.

207.  *See Senate Confirmation Process Slows to a Crawl*, CTR. FOR PRESIDENTIAL TRANSITION, https://presidentialtransition.org/wp-content/uploads/sites/6/2020/01/Senate-Confirmations-Issue-Brief.pdf  [https://perma.cc/ZU6D-PJP7] (noting the increasing length and difficulty of the Senate confirmation process).

208.  This may actually be the only constitutional remedy the Court can require. Unlike ALJs, where Congress has specifically granted agencies the power to hire them, 5 U.S.C. §§ 556, 3105, Congress has been silent explicitly regarding FINRA Hearing Officers. Such silence likely only allows the Court to require the statutory default of presidential appointment with the advice and consent of the Senate. U.S. CONST. art. II, § 2, cl. 2. The alternatives are permissive— "Congress *may by law* vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.* (emphasis added). Without a law (like the APA) vesting the appointment of FINRA Hearing Officers in the SEC (or another permissible entity), appointment by the President with the advice and consent of the Senate is the only remaining option.

*MINNESOTA LAW REVIEW* [109:1889

would not make the statute unworkable.[209] Such a holding would fit into the Roberts Court's structuralist incrementalist approach to reshaping administrative institutions.[210]

Professor Kristin Hickman has noted that the Roberts Court decisions regarding separation of powers and administrative agencies tend to be narrow and carefully calibrated.[211] The Court's decisions tend to incrementally tweak the day-to-day of administrative governance, rather than causing a wholesale renovation.[212] Saliently here, Hickman notes that this incrementalism has revealed itself in the Court's "choice of remedies, such as its use of severability as a remedy for constitutional flaws in agency design decisions."[213] Such incremental doctrinal shifts demonstrate a preference for restraint within the Roberts Court "designed to accommodate rather than undermine the continued functioning of the administrative state."[214] This tendency for restraint—at least in the administrative law context[215]—makes it

---

209.  *See Free Enter. Fund*, 561 U.S. at 508. The Court has previously held that "when confronting a constitutional flaw in a statute, [it] tr[ies] to limit the solution to the problem," severing any "problematic portions while leaving the remainder intact." *See* Ayotte v. Planned Parenthood of Northern New Eng., 546 U.S. 320, 328–29 (2006).

210.  *See* Kristin E. Hickman, *The Roberts Court's Structural Incrementalism*, 136 HARV. L. REV. F. 75, 76–77 (2022) (arguing that Roberts Court decisions on administrative agencies are "calibrated to tweak the day-to-day of administrative justice incrementally").

211.  *Id.* Professor Hickman also notes the irony of this incrementalism juxtaposed with "lofty flights of rhetoric about the Framers, liberty, and other constitutional values." *Id.* (citing Gillian E. Metzger, *The Supreme Court, 2016 Term—Foreword: 1930s Redux: The Administrative State Under Siege*, 131 HARV. L. REV. 1, 36 (2017)).

212.  *See id.* at 77 (describing how the Roberts Court's doctrinal shifts tend to be "substantially more limited than they could be and seem designed more to accommodate rather than undermine the continued functioning of the administrative state").

213.  *See id.*

214.  *Id.*

215.  *Cf.* Dobbs v. Jackson Women's Health Org., 142 S. Ct. 2228 (2022) (overruling Roe v. Wade, 410 U.S. 113 (1973), and Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833 (1992), and thus rescinding what the Court had recognized for nearly fifty years as a constitutional right to abortion). Admittedly, Loper Bright Enters. v. Raimondo, 144 S. Ct. 2244 (2024) (overruling Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984), which required courts to defer to an agency's reasonable interpretation of ambiguous statutory provisions) also cuts against the Roberts Court's track record of incrementalism—and in this case in the administrative law context.

more likely that the Court would choose to excise the problematic "for-cause" removal protections and require the constitutional default of presidential appointment with the advice and consent of the Senate for FINRA Hearing Officers rather than invalidating the whole statute, jeopardizing the entire SEC until Congress organized the political capital necessary for redrafting the entire statute. Rather than coercing congressional action, imposing the inconvenience of presidential appointment with Senate approval allows Congress to consider and choose a course of action without the pressure of resurrecting a completely disempowered agency. For these reasons, judicial action is the most straightforward, feasible, and likely solution to the constitutional problems posed by FINRA Hearing Officers.

## C.  A LEGISLATIVE REMEDY, WHILE POSSIBLE, IS UNLIKELY

Though it is likely that the Court would find the Securities and Exchange Act could remain fully operative absent FINRA's unconstitutional tenure restrictions, there is a possibility the Court could find otherwise.[216] The Court would come to such a conclusion if it found that Congress would not have enacted any of the provisions independently of the constitutionally invalid provisions.[217]

In reaching such a conclusion, the Court may reason that the language providing for for-cause removal is only one of several statutory provisions that, working together, produce a constitutional violation. The Court may feel that to achieve constitutionality, the Court must excise the statute of all statutory provisions granting FINRA officer-like actors "significant authority" so that their members would no longer be Officers of the United States. It may feel that it must restrict FINRA's enforcement powers, so that it would be a purely recommendatory

---

216.  *See, e.g.*, Alaska Airlines, Inc. v. Donovan, 594 F. Supp. 92, 92 (D.D.C. 1984) (holding that the "section of Airline Deregulation Act creating 'Employee Protection Program' was unconstitutional due to its special provision for legislative veto, which provision was not severable"), *rev'd*, 766 F.2d 1550 (D.C. Cir. 1985), *aff'd sub nom.* Alaska Airlines, Inc. v. Brock, 480 U.S. 678 (1987).

217.  *See* Free Enter. Fund v. Pub. Co. Acct. Oversight Bd., 561 U.S. 477, 510 (2010) ("The remaining provisions are not 'incapable of functioning independently,' and nothing in the statute's text or historical context makes it 'evident' that Congress, faced with the limitations imposed by the Constitution, would have preferred no Board at all to a Board whose members are removable at will." (citation omitted) (quoting *Alaska Airlines*, 480 U.S. at 684)).

*MINNESOTA LAW REVIEW* [109:1889

panel. Should the Court find such statutory renovations necessary to achieve constitutionality, it would almost certainly invalidate the statute and leave it to Congress to enact such amendments. Such an approach would likely be ineffective due to increased congressional gridlock and polarization.[218] Additionally, such a holding is unlikely because it does not fit within the structurally incrementalistic approach of the Roberts Court.[219] It is much more likely that the Court would exercise judicial restraint and proceed with the judicial remedy.

## CONCLUSION

A nongovernmental, nonprofit corporation investigated, indicted, prosecuted and banished Nancy Mellon from ever again engaging in her lifelong chosen profession.[220] The Constitution reserves the exercise of such significant and coercive enforcement power for duly appointed Officers of the United States who are properly subject to presidential oversight.[221]

This Note has argued that some FINRA employees—such as the FINRA Hearing Officers that prosecuted and adjudicated Nancy Mellon's case—exercise power constitutionally reserved for Officers of the United States. It notes that FINRA officer-like actors who wield such power are not appointed according to the Appointments Clause, nor are they subject to removal according to Supreme Court jurisprudence.[222] Indeed, FINRA's Officers are currently insulated from presidential removal by two layers of for-cause removal protections—the same structure the Court found unconstitutional in *Free Enterprise Fund v. Public Accounting Oversight Board.*

---

218. *See* Donald Wolfensberger, *Policy Gridlock: Is It the New Regular Order?*, WILSON CTR. (Oct. 9, 2012), https://www.wilsoncenter.org/publication/policy-gridlock-it-the-new-regular-order [https://perma.cc/6DYR-K3MN] (discussing the current climate of congressional gridlock); Christopher Ingraham, *Congressional Gridlock Has Doubled Since the 1950s*, WASH. POST (May 28, 2014), https://www.washingtonpost.com/news/wonk/wp/2014/05/28/congressional-gridlock-has-doubled-since-the-1950s [https://perma.cc/T87Q-RNPR].

219. *See* Hickman, *supra* note 210, at 76–77 (describing how the Roberts Court's doctrinal shifts tend to be "substantially more limited than they could be and seem designed more to accommodate rather than undermine the continued functioning of the administrative state").

220. *See supra* Introduction.

221. *See supra* Parts I–II.

222. *See supra* Part II.

As it did in *Amtrak* and *Free Enterprise Fund*, in an appropriate case the Court should hold that FINRA is governmental for Constitutional Purposes, and rule that employees exercising significant executive power are Officers of the United States.[223] To make FINRA Officers compliant with appointment requirements, the Court should require FINRA Officers be appointed by an appropriate authority under the Appointments Clause.[224] To make FINRA Officers compliant with Supreme Court removal jurisprudence, the Court should sever any language in FINRA's empowering statute that insulates officer-like-employees with dual-for-cause removal protection.[225] Only then will FINRA be appropriately answerable to the President who is in turn democratically accountable to the American people.

---

223.  *See supra* Part III.B.
224.  *See supra* Part III.B.
225.  *See supra* Part III.B.

***