# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WESTERN TEXAS
### MIDLAND/ODESSA DIVISION

```
**************************************************
DANIELLE SPEARS                                    *
Plaintiff                                          *
                                                   *        Docket Number: 7:24-cv-321
v.                                                 *
                                                   *
NEXT BRIDGE HYDROCARBONS, INC.                     *
GREGORY MCCABE, JOHN BRDA                           *
THE SECURITIES & EXCHANGE COMMISSION               *        ORAL ARGUMENTS
FINANCIAL INDUSTRY REGULATORY AUTHORITY            *          REQUESTED
JANE DOE 1-20, JOHN DOE 1-20                        *
Defendant                                          *
                                                   *
**************************************************
```

**RESPONSE IN OPPOSITION TO BRDA & MCCABE'S MTD PLAINTIFFS SAC**

## TABLE OF CONTENTS

I. Introduction……………………………………………………………………… 1

II. Legal Standards For Denying a Motion to Dismiss………..………………..…… 4

    **A. Rule 12(b)(6) Standard**
    **B. Rule 9(b) Standard for Pleading Fraud**
    **C. PSLRA Heightened Requirements**
    **D. Standard Applied Here**

III. Article III and Statutory Standing……………..……………………………... 6

    **A. Article III Standing**
    **B. Statutory standing under Section 10(b)**
    **C. Standing for state-law claims**

IV. Statement of Facts……………………………………………………………..8

A.  McCabe's Selection Was No Coincidence - Brda's Past
B.  B. McCabe's Asset Positioning


**V. Count 1 - Section 10(b) and Rule 10b-5……………………………………………… 9**

A.  Elements and pleading posture
B.  Material misstatements and omissions
    1.  Pre-merger "non-tradable" framing
    2.  Orogrande value narrative
    3.  Post-merger tradability and liquidity expectations
    4.  Promoter amplification
C.  Scienter
D.  "In connection with" a purchase or sale
E.  Reliance
F.  Loss causation
G.  Conclusion on Count I


**VI. Count III: Negligence Against Defendants Brda and McCabe…………………… 13**

A.   Negligent statements, omissions, and communications to investors
     (Texas negligence / § 552 negligent misrepresentation)
B.  Negligent maintenance of records and disclosures; statutory standards as context
C.  Negligent hiring, supervision, and retention of undisclosed proxies and paid
    promoters
D.  Negligent failure to implement basic internal controls and oversight
E.  Proximate cause and damages


**VII. COUNT IV: FAILURE TO RESOLVE THE FINRA U3 HALT………………… 17**

A.  Material omissions and half-truths during the halt (Rule 10b-5(b))
B.  Scheme liability (Rule 10b-5(a) and (c))
C.  Scienter
D.  Loss causation
E.  Rule 9(b) and PSLRA compliance
F.   Post-halt "Newco/AST" inducement (McCabe's S-1 promise)

**VIII. COUNT V: UNJUST ENRICHMENT(Against Defendants Gregory McCabe, John
Brda, and Jane/John Does)................................................................................................ 20**

A.  McCabe and Brda personally benefited from the scheme
B.  Unjust retention of benefits
C.  Promoter coordination and Doe defendants
D.  Texas unjust enrichment standard satisfied

**IX. COUNT VI: CONSPIRACY TO COMMIT FRAUD**……………………………... **23**
 **(Against Defendants Gregory McCabe, John Brda, and Jane and John Does)**

    **A. Dissemination of Materially False Information (Section 10(b) and Rule 10b-5)**
    **B. Conspiracy to Obstruct Regulatory Enforcement (18 U.S.C. § 371)**
    **C. Wire Fraud Conspiracy and Coordinated Market Manipulation (18 U.S.C. § 1349)**
    **D. Coordinated Online Harassment Through Undisclosed Proxies (Section 10(b), Rule 10b-5)**
    **E. Evidence Supporting Conspiracy Allegations**
    **F. Legal Standards and Authorities Supporting Conspiracy Allegations**

**X. COUNT VIII: EMOTIONAL DISTRESS (INTENTIONAL OR NEGLIGENT INFLICTION)**.................................................................................................. **28**

    **A. McCabe, Brda, and Doe Defendants' orchestration of cyberbullying and harassment (Section 10(b), Rule 10b-5)**
    **B. Use of proxies to target, discredit, and humiliate Plaintiff**
    **C. Foreseeability and causation of emotional harm**
    **D. Plaintiff's documented experience of emotional distress**
    **E. Legal authority supporting Plaintiff's claim**

**XI. CONCLUSION**…………………………………………………………………..**30**

## TABLE OF AUTHORITIES

*Affco Investments 2001 LLC v. Proskauer Rose*, 625 F.3d 185 (5th Cir. 2010) ………..…30

*Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972) ..............................................5, 13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................................4

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ......................................................…13

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................................4

*Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333 (5th Cir. 2008) ...................................5, 11, 19

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) .........................................................19

*Flaherty & Crumrine v. TXU Corp.*, 565 F.3d 200 (5th Cir. 2009) ....................................5, 9, 13

*Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39 (Tex. 1992) ……………..22

*Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009) .......................................5, 10, 13, 19

*Praesel v. Johnson*, 967 S.W.2d 391 (Tex. 1998) ................................................................13, 16

*SEC v. Pirate Investor LLC*, 580 F.3d 233 (4th Cir. 2009) ..................................................30

*STL Capital Mgmt., LLC v. Brda*, 207 S.W.3d 649 (Mo. Ct. App. 2006) ..........................8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ....................................6, 9, 18

*Timothy Armstrong et al v American Pallet Leasing Inc et al*……………………………8

*United States v. Constantinescu*, Case No. 4:22-cr-612 (S.D. Tex.)..................................23

*Waffle House, Inc. v. Williams*, 313 S.W.3d 796 (Tex. 2010) .............................................14, 16

*Wansey v. Hole*, 379 S.W.3d 246 (Tex. 2012) ....................................................................14, 16

## I. INTRODUCTION

This action concerns a coordinated scheme by Defendants Gregory McCabe ("McCabe") and John Brda ("Brda") to engineer, promote, and personally profit from the creation and trading of the Series A Preferred Share, which traded under the symbol MMTLP, which they called a dividend, while misleading retail investors about the nature and value of the underlying oil-and-gas asset, the Orogrande Project, a University Lands lease in West Texas covering roughly 134,000 gross contiguous acres (SAC ¶ 35, pp. 12–13).

The motive and design come from McCabe's own words. In an April 2024 letter to University Lands, McCabe wrote:

"The short version is that I have taken my public company (Torchlight Energy) and moved it to a private company (Next Bridge Hydrocarbons). The board and I made this decision to go private in an effort to escape a broken system that encourages the destruction of public companies via short-and-distort campaigns. We have been battling these attacks for the last five years. Our very act of going private has trapped some bad actors with significant financial exposure." (Ex. 1 at 1)

**This admission is pivotal.** It expressly (1) identifies Torchlight Energy Resources, Inc. ("TRCH") as **"my public company,"** (2) ties the transaction structure to a five-year focus on short-selling pressure, and (3) acknowledges that the chosen structure "trapped some bad actors with significant financial exposure." In other words, **the market dynamics that followed were neither accidental nor unforeseen** (SAC ¶¶ 31–36, pp. 12–13).

### The asset that made the story sell: The Orogrande Project

The centerpiece was the Orogrande Project. TRCH and Defendants repeatedly presented the Orogrande as containing 3.2–5.0 billion barrels of oil and approximately 5.8 trillion cubic feet of

natural gas and framed the Series A Preferred dividend, later assigned the ticker symbol "MMTLP," as tied to that asset (SAC ¶¶ 35, 15, pp. 12–13). The dividend was repeatedly described to investors as non-tradable, and investors were told that if the Orogrande were sold, dividend holders would receive a portion of the sale proceeds; if the oil and gas assets were not sold, the preferred would transition into a private vehicle (SAC ¶¶ 34, 36, pp. 12–13). Before the merger, investors were told that for each share of TRCH held through the closing, they would receive one share of the Series A Preferred Share (the divi) and a 0.50 share of Meta common stock, ("MMAT"), (SAC ¶ 74, p.25).

**Why Meta was inserted**

Had the true objective been solely to take TRCH private into Next Bridge Hydrocarbons, Inc. ("NBH"), TRCH could have merged directly into NBH and the dividend would never have traded. Instead, Meta was deliberately inserted into the middle. That step created a one-year period during which the "non-tradable" dividend did trade as MMTLP, the precise dynamic McCabe's letter contemplated: after **"going private,"** certain market participants would be **"trapped"** with **"significant financial exposure"** (SAC ¶¶ 34, 36, pp. 12–13; Ex. 1 at 1).

**How McCabe positioned himself, and what Brda did**

To maximize his position before that trading period, McCabe sold assets from his private entities, including McCabe Petroleum Corporation ("MPC"), Hudspeth Oil Corporation ("Hudspeth"), Magdalena Royalties ("Magdalena"), and the Orogrande Project into TRCH, taking cash and large blocks of stock; he also converted corporate debt into equity, which elevated him to the largest MMTLP shareholder at the moment it mattered (SAC ¶¶ 35, 37–41, pp. 12–16 [asset and transaction background]; ¶¶ 51–57, pp. 18–20 [misrepresentations and structure]).

As TRCH's chief executive and later a consultant at Meta, Brda signed and filed the corporate and SEC paperwork necessary to implement the dividend/merger structure (SAC ¶¶ 33–36, pp. 12–13). Publicly, he leveraged his title to cultivate investor trust, engaging directly on social media, hand-selecting voices which would eventually amplify the "know what you hold" message, and encouraging retail investors to buy and hold through both conversions, first with Meta and then the spin out to NBH (SAC ¶¶ 83–91, pp. 27–31; ¶ 118, p. 40).

**What happened next**

Within days of the merger closing, the non-tradable dividend, the very same one for which Defendants stated that a market was not expected to develop, began trading (SAC ¶¶ 36, 69, pp. 13, 23; ¶ 45, p. 16 [non-tradable language]). During the period of time between the merger and the spin-off, a stock promoting push emerged for a second time. The promoters' push was simple: buy and hold (SAC ¶¶ 83–91, pp. 27–31). This was what McCabe was banking on, retail investors buying, but more importantly, holding. FINRA's December 2022 U3 halt stopped the music and froze liquidity, but not before Defendants had realized substantial personal proceeds (SAC ¶¶ 141, 154–156, pp. 49, 51–52).

At the pleading stage, Plaintiff need not prove the entire case; she must plausibly allege it. She does, through detailed, particularized facts showing (1) material misstatements and omissions about the nature and tradability of the dividend and the Orogrande asset, (2) a strong inference of scienter supported by McCabe's own admissions and the transaction sequence (asset sales to TRCH, debt-for-equity conversions, Meta's insertion, one-year trading window), (3) reliance, and (4) loss causation when trading was halted (SAC ¶¶ 83–91, 116–122, 125–128, 141, 154–156, pp. 27–31, 40–43, 49, 51–52). The dual roles are plain: McCabe as architect and

principal beneficiary; Brda as the operational filer and public promoter who helped create and maintain investor confidence (SAC ¶¶ 33–36, 83–91, pp. 12–13, 27–31).

Defendants' Motion to Dismiss is not a defense to these allegations; it is an attempt to sidestep McCabe's written admissions and the documented sequence of events. Accepting Plaintiff's well-pleaded facts as true, as the Court must at this stage, the Motion should be denied in full.

## II. LEGAL STANDARD FOR DENYING A MOTION TO DISMISS

### A. Rule 12(b)(6) Standard

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the pleadings, not the merits of the case. To survive dismissal, a complaint need only contain sufficient factual allegations, accepted as true, "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (pleading must state a facially plausible claim; court accepts well-pleaded facts but not legal conclusions); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (plausibility standard for Rule 12(b)(6); more than a speculative level of misconduct). A claim is plausible when the allegations allow the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Plausibility "does not require probability," only more than "a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. In assessing a Rule 12(b)(6) motion, courts must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (on 12(b)(6), court accepts well-pleaded facts as true and draws reasonable inferences for the plaintiff). Courts construe pro se complaints liberally. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Conclusory allegations are disregarded, but factual allegations are presumed true at this stage. In the Fifth Circuit, the elements of a Section 10(b) / Rule 10b-5

claim are recognized as including a material misstatement or omission, scienter, a connection with the purchase or sale of a security, reliance, and loss causation. See *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (elements of a §10(b)/Rule 10b-5 claim in Fifth Circuit: misstatement/omission, scienter, connection, reliance, and loss causation). Pleading loss causation at this stage requires a plausible causal connection between the alleged misrepresentation or omission and the economic loss. See *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 244–47 (5th Cir. 2009) (loss causation can be plausibly pled at 12(b)(6) by a causal connection between the misconduct and the economic loss).

## B. Rule 9(b) Standard for Pleading Fraud

Because Plaintiff alleges securities fraud and related claims, Rule 9(b) applies. Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). In the Fifth Circuit, this means alleging the "who, what, when, where, and how" of the misstatements or omissions. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (2008) (Rule 9(b) requires the "who, what, when, where, and how" of the alleged fraud).

 At the pleading stage, Plaintiff need not prove fraud, but must identify the specific misrepresentations or omissions, their timing, and why they were materially misleading. In fraud-by-omission cases, Rule 9(b) is satisfied by identifying the type of facts omitted, where they should have been disclosed, and how their omission rendered statements misleading. *Hoffman v. AmericaHomeKey, Inc.*, 23 F. Supp. 3d 734, 745 (N.D. Tex. 2014). The Supreme Court has also recognized reliance presumptions under *Affiliated Ute* and *Basic*.

## C. PSLRA Heightened Requirements

The Private Securities Litigation Reform Act ("PSLRA") imposes additional requirements for securities fraud claims. Specifically, the complaint must:

Identify each misleading statement or omission and explain why it is misleading, 15 U.S.C. § 78u-4(b)(1); and

State with particularity facts giving rise to a strong inference of scienter, meaning an intent to deceive, manipulate, or defraud, or at minimum severe recklessness. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007) (PSLRA scienter: court evaluates allegations holistically; inference must be at least as compelling as any opposing inference).

A "strong inference" exists when the facts are collectively cogent and compelling. (*Tellabs*).

### D. Standard Applied Here

When these standards are applied, Plaintiff's Second Amended Complaint meets and exceeds the Rule 12(b)(6), Rule 9(b), and PSLRA requirements. Plaintiff identifies specific misstatements, omissions, insider transactions, and manipulative conduct by Defendants Brda and McCabe, explains why they were false or misleading, and pleads facts supporting a strong inference of scienter. Accepting these allegations as true, as the Court must at this stage, dismissal is not warranted. These standards align with Fifth Circuit precedent on the elements and loss-causation pleading.

## III. ARTICLE III AND STATUTORY STANDING

### A. Article III standing

Plaintiff alleges a concrete economic injury when trading in MMTLP was halted and liquidity was cut off after she was induced to hold based on Defendants' statements and omissions about the dividend's nature and Orogrande's value (SAC ¶¶ 83–91, 141, 154–156, pp. 27–31, 49, 51–52). The injury is fairly traceable to Defendants' conduct, including the dividend and merger structure they designed and implemented, the repeated "non-tradable" framing of the dividend,

the Orogrande value narrative, and the "buy-and-hold" campaign pushed to retail investors (SAC ¶¶ 33–36, 34, 36, 69, 83–91, 118, 125–128, pp. 12–13, 23, 27–31, 40, 42–43); see also McCabe's University Lands letter acknowledging that the structure "trapped some bad actors with significant financial exposure" (Ex. 1 at 1). Plaintiff's injuries are redressable by damages and other relief the Court may award on her federal and state claims.

## B. Statutory standing under Section 10(b)

Plaintiff satisfies Section 10(b)'s purchaser-or-seller requirement because she purchased MMTLP in October 2022 (SAC ¶ 81). The alleged misstatements and omissions about the non-tradable nature of the dividend and the Orogrande value story were made in connection with those MMTLP purchases and the decision to continue holding (SAC ¶¶ 34–36, 35, 69, 83–91, 118, pp. 12–13, 23, 27–31, 40). The complaint also alleges the immediate commencement of trading in the "non-tradable" dividend and the ensuing liquidity trap when the U3 halt was imposed, which connects Defendants' conduct to the economic loss alleged (SAC ¶¶ 36, 69, 125–128, 141, 154–156, pp. 13, 23, 42–43, 49, 51–52). Separately, the merger consideration terms, one MMTLP share per TRCH share and 0.50 share of Meta (MMAT) per TRCH share, are pled as part of the scheme's design and investor messaging (SAC ¶ 74, p. 25); Plaintiff's standing does not depend on having held TRCH.

## C. Standing for state-law claims

Plaintiff alleges concrete financial harm caused by Defendants' conduct. That is sufficient to confer standing on her state-law claims for breach of fiduciary duty, unjust enrichment, conspiracy, and related relief (SAC ¶¶ 83–91, 116–122, 125–128, 141, 154–156, pp. 27–31, 40–43, 49, 51–52).

## IV. STATEMENT OF FACTS

The facts and transaction narrative described in the Introduction are incorporated by reference. This section supplements them with specific details not repeated elsewhere in this brief.

### A. McCabe's Selection Was No Coincidence - Brda's Past

Brda's past made him the perfect candidate to assist with executing the complex reverse merger scheme at the heart of this case. Brda had a known pattern of regulatory and legal entanglements that made him a willing and capable participant. In 2006, Brda was caught embezzling or diverting shares of Limelight Media Group from his employer, STL Capital Management, into a similarly named company he secretly controlled. In *STL Capital Management, LLC v. Brda*, 207 S.W.3d 649 (Mo. Ct. App. 2006), the Missouri Court of Appeals affirmed a judgment requiring Brda to return 425,000 shares and $45,000 he improperly diverted from his employer. The following year, in 2007, Brda was convicted of civil RICO charges in the *American Pallet Leasing* litigation, Case No. 5:07-cv-0410, where he was required to pay a $900,000 fine and surrender shares obtained through a fraudulent scheme.

By 2010, Brda launched a new venture, Torchlight Energy Resources, through a reverse merger with a failing pole-dancing business listed under the ticker symbol PPFT. Torchlight became his next platform, and he brought in Roger Wurtele as CFO, who himself had been a board member at Energy & Engine Technology Corp., a company sanctioned by the SEC for running a stock-promotion scheme involving spam-based touting and fraudulent representations. Wurtele later worked at Xtreme Oil & Gas, another troubled entity that shared Torchlight's corporate address prior to the merger.

With this cast in place, Brda, a repeat offender in securities misconduct, and Wurtele, a veteran of SEC-sanctioned entities, McCabe had found the perfect operative: a CEO with a history of executing reverse mergers, tolerating reputational risk, and publicly fronting transactions designed to enrich insiders. McCabe could remain the "silent architect" while Brda filed the paperwork, pumped the market, and cultivated trust with retail investors.

## B. McCabe's Asset Positioning

To position himself before the MMTLP trading window, McCabe transferred assets from McCabe Petroleum Corporation, Hudspeth Oil Corporation, Magdalena Royalties, and the Orogrande lease into Torchlight Energy Resources (TRCH), receiving large blocks of stock and cash in return. Several of these transactions included "back-in" provisions, allowing McCabe to retain influence or economic exposure even after divestment (SAC ¶¶ 35, 37–41, pp. 12–16).

McCabe also converted corporate debt into equity, further increasing his control and ensuring that he would be the single largest MMTLP shareholder by the time trading began (SAC ¶¶ 51–57, pp. 18–20).

## V. COUNT I (SECTION 10(b) AND RULE 10b-5)

### A. Elements and pleading posture

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege a material misstatement or omission, scienter, a connection with the purchase or sale of a security, reliance, and loss causation. See *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009). At this Rule 12(b)(6)/Rule 9(b)/PSLRA stage, the Court considers the allegations holistically and asks whether they give rise to a strong inference of scienter at least as compelling as any opposing inference. See *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

551 U.S. 308, 322–23 (2007); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 244–47 (5th Cir. 2009).

**B. Material misstatements and omissions**

Plaintiff alleges actionable misstatements and omissions in three related buckets: (1) the pre-merger "non-tradable" framing of the Series A Preferred dividend; (2) the Orogrande value narrative (3.2–5.0 billion barrels of oil and 5.8 Tcf of gas); and (3) the post-merger tradability and liquidity expectations that Defendants failed to correct or update when events made earlier statements misleading.

    1. **Pre-merger "non-tradable" framing**

        Before the merger, Defendants described the dividend as non-tradable (SAC ¶¶ 34–36, pp. 12–13). Yet within days of the merger closing the same dividend traded as MMTLP, contrary to that framing (SAC ¶¶ 36, 69, 45, pp. 13, 23, 16). That disconnect is material because a reasonable investor would care whether a security pitched as non-tradable will, in fact, trade.

    2. **Orogrande value narrative**

        Defendants repeatedly highlighted Orogrande as the key asset—3.2–5.0 billion barrels of oil and 5.8 Tcf of gas (SAC ¶¶ 35, 15, pp. 12–13, 9). Those statements mattered because the dividend was sold as the investor's path to value tied to Orogrande. Plaintiff further alleges that Defendants failed to disclose facts that undercut those assurances, including lease non-payment and loss at University Lands, which rendered earlier statements and later silence misleading by omission (SAC ¶¶ 52–57).

    3. **Post-merger tradability and liquidity expectations**

        Investors were told that holding TRCH through the closing would yield one MMTLP

share per TRCH share and 0.50 share of Meta common stock (MMAT) per TRCH share (SAC ¶ 74, p. 25). In the run-up to the spin-off, public communications identified December 12, 2022 as the last trading day (SAC ¶¶ 125–128, pp. 42–43). Plaintiff alleges those expectations became false or misleading when FINRA's U3 halt on December 9 froze liquidity and cut off exit paths, yet Defendants did not correct or update prior statements or half-truths, sustaining a misleading impression about liquidity and the ability to exit (SAC ¶¶ 125–128, 141, 154–156, pp. 42–43, 49, 51–52).

### 4. Promoter amplification

Plaintiff alleges Defendants coordinated promotional messaging during the merger-to-spin-off window that urged investors to "buy and hold," expect a short squeeze due to long-held shares, and rely on NBH as a fallback. These inducements reinforced existing half-truths about tradability and exit options (SAC ¶¶ 70–74, 81–92, 102–103, 118–121).

These allegations identify the who, what, when, where, and how of the misstatements and omissions and explain why they were misleading in context. That satisfies Rule 9(b) at this stage. See *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008) (Rule 9(b) requires the "who, what, when, where, and how"); *Hoffman v. AmericaHomeKey, Inc.*, 23 F. Supp. 3d 734, 745 (N.D. Tex. 2014) (omission claims satisfied by identifying what was omitted, where it should have appeared, and why the omission misled).

## C. Scienter

Read collectively, the complaint pleads a cogent and compelling inference of scienter. *Tellabs*, 551 U.S. at 322–23.

1. McCabe's admissions. In April 2024, McCabe stated that he "took [his] public company … to a private company" after "five years" of short-and-distort pressure and that "going private" had "trapped some bad actors with significant financial exposure" (Ex. 1 at 1). Those words speak directly to motive, knowledge, and the expected market effects.

2. The chosen structure and timing. Instead of a direct TRCH→NBH merger (which would not have created a trading period), Defendants inserted Meta, producing a year-long interval in which the "non-tradable" dividend traded as MMTLP (SAC ¶¶ 34, 36, pp. 12–13; Ex. 1 at 1). That structure aligns with McCabe's admissions.

3. Positioning and insider sales. Before and during that interval, McCabe sold assets from MPC, Hudspeth, and Magdalena into TRCH for cash and stock and converted corporate debt into equity—positioning himself as the largest MMTLP holder; during the trading window he sold approximately 6.7 million shares, and Brda sold approximately 300,000 shares, while retail investors were urged to hold (SAC ¶¶ 35, 37–41, 51–57, 119–122, pp. 12–16, 18–20, 40–42).

4. Public messaging versus private benefit. Brda's filings and social-media engagement built investor confidence while insiders realized proceeds (SAC ¶¶ 33–36, 83–91, 118, pp. 12–13, 27–31, 40).

These allegations support a strong inference of intent to deceive or, at minimum, severe recklessness.

**D. "In connection with" a purchase or sale**

Plaintiff alleges she purchased MMTLP in October 2022 and that the challenged statements and omissions were made in connection with those purchases and the decision to continue holding

(SAC ¶ 81; ¶¶ 34–36, 35, 69, 83–91, 118, pp. 12–13, 23, 27–31, 40). That suffices at this stage.
See *Flaherty & Crumrine*, 565 F.3d at 207.

## E. Reliance

Plaintiff relied on the non-tradable framing, the Orogrande value narrative, and the buy-and-hold
messaging, including the fallback value of NBH. These omissions and misrepresentations
materially influenced her decision to hold MMTLP shares through the announced final trading
day. This satisfies reliance pleading under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and
*Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972).

## F. Loss causation

Plaintiff pleads a plausible causal chain from Defendants' conduct to her loss: the non-tradable
messaging and promotional campaign induced purchases and holding; the structure created the
trading window; and FINRA's U3 halt on December 9, 2022, froze liquidity and cut off exit
paths (SAC ¶¶ 141, 154–156, pp. 49, 51–52; ¶ 128, pp. 42–43). Those allegations satisfy
loss-causation pleading. See *Lormand*, 565 F.3d at 244–47.

## G. Conclusion on Count I

The motion to dismiss Count I should be denied.

## VI. COUNT III: NEGLIGENCE – AGAINST DEFENDANTS BRDA AND MCCABE

Plaintiff Danielle Spears pleads Texas common-law negligence in the alternative (Fed. R. Civ. P.
8(d)(2)). Under Texas law, negligence requires (1) a legal duty, (2) breach, and (3) damages
proximately caused by the breach (cause-in-fact and foreseeability). See *Praesel v. Johnson*, 967
S.W.2d 391, 394 (Tex. 1998); *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477
(Tex. 1995). Texas also recognizes liability for negligent misrepresentation where a defendant, in

the course of business, supplies false information for the guidance of others and fails to exercise reasonable care or competence, causing pecuniary loss by justifiable reliance. See *Federal Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991) (Texas negligent misrepresentation: supplying false information without reasonable care; justifiable reliance; pecuniary loss); *McCamish, Martin, Brown & Loeffler v. Appling Interests*, 991 S.W.2d 787, 791 (Tex. 1999) (§ 552 liability extends beyond privity where information is supplied in the course of business for guidance of others). Texas permits claims for negligent hiring, supervision, and retention where a defendant fails to exercise reasonable care in selecting or supervising agents and that failure proximately causes injury. See *Wansey v. Hole*, 379 S.W.3d 246, 247–48 (Tex. 2012) (Texas recognizes negligent hiring/supervision/retention where failure to use reasonable care proximately causes injury); *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 804–05 (Tex. 2010) negligent supervision recognized; employer liability where failure to supervise causes harm).

Consistent with these principles, Plaintiff alleges that Defendants owed duties of reasonable care in (i) communicating about the nature and tradability of the Series A Preferred dividend (MMTLP) and the value/status of Orogrande, (ii) maintaining accurate share records and disclosures, (iii) hiring and supervising third-party promoters/spokespersons, and (iv) establishing basic internal controls and oversight that would have prevented foreseeable investor harm. Defendants breached those duties, and the foreseeable, direct result was economic loss when liquidity froze and exit paths were cut off.

## A. Negligent statements, omissions, and communications to investors (Texas negligence / § 552 negligent misrepresentation)

Plaintiff alleges Defendants failed to exercise reasonable care in the preparation and dissemination of statements to investors regarding Orogrande (claimed 3.2–5.0 billion barrels of

oil and significant gas), the "non-tradable" nature of the dividend, and expected tradability/liquidity (SAC ¶¶ 34–36, 35, 15, 69, 83–91, 118, pp. 9, 12–13, 23, 27–31, 40). The complaint alleges immediate trading in MMTLP despite non-tradable framing, and a coordinated "buy-and-hold" push that reasonably induced retail investors to hold through the conversion period (SAC ¶¶ 36, 69, 45, 83–91, 118, pp. 13, 16, 23, 27–31, 40). These facts state negligent misrepresentation: Defendants, in the course of business communicating to investors, did not use reasonable care in obtaining or communicating information material to investment decisions. See *Sloane*, 825 S.W.2d at 442; *McCamish*, 991 S.W.2d at 791.

**B. Negligent maintenance of records and disclosures; statutory standards as context**

Plaintiff alleges Defendants failed to maintain accurate share records and ownership information and failed to provide transparent disclosures concerning the true share structure and outstanding positions, foreseeably misleading investors and regulators (SAC ¶¶ 37–41, 47–49, 56–57, 119–121). While this is a state-law negligence claim, Exchange Act books-and-records/internal-control provisions (e.g., 15 U.S.C. § 78m(b)(2)(A)–(B); 17 C.F.R. §§ 240.13b2-1, 13b2-2) provide relevant **standards of care** and context for what reasonable recordkeeping and internal controls look like in a public-company setting. Plaintiff is not asserting private causes of action under those provisions; rather, they help show what reasonable care entails and support the plausibility of breach and foreseeability.

**C. Negligent hiring, supervision, and retention of undisclosed proxies and paid promoters**

Plaintiff alleges Defendants hired, compensated, and coordinated undisclosed proxies and paid promoters who disseminated materially false, misleading, and incomplete information (SAC ¶¶ 70–74, 81–92, 102–103, 118–121). The complaint plausibly alleges a failure to exercise reasonable care in vetting and supervising those third parties, whose conduct Defendants could

reasonably foresee would influence retail investors (e.g., "buy-and-hold," removal of stop-loss controls, continued holding through the trading window). These allegations state negligent hiring/supervision under Texas law. See *Wansey*, 379 S.W.3d at 247–48; *Waffle House*, 313 S.W.3d at 804–05.

**D. Negligent failure to implement basic internal controls and oversight**

Plaintiff further alleges Defendants failed to establish and enforce basic internal controls and oversight—especially as to share-count integrity, beneficial ownership, and investor-facing communications—allowing widespread irregularities, manipulative practices, and investor-facing misinformation to persist (SAC ¶¶ 31, 36–41, 47–49, 52–57, 81–92, 102–103, 118–121). Plaintiff alleges NBH's financial statements were later retracted for fiscal years 2022–2024, which is consistent with deficient control environments and supports the plausibility of breach (SAC ¶¶ 185, 214, 220–222). Again, these allegations are offered to show duty and breach under Texas law; references to federal control provisions are context for the standard of care.

**E. Proximate cause and damages**

Plaintiff pleads a straightforward causal chain: negligent statements/omissions, recordkeeping/control failures, and negligent hiring/supervision induced and reinforced investor purchase and holding behavior; the structure created a trading window; and when FINRA imposed a U3 halt on December 9, 2022, liquidity froze and exit paths were cut off, causing economic loss (SAC ¶¶ 141, 154–156, pp. 49, 51–52; ¶ 128, pp. 42–43). Those allegations plausibly plead both cause-in-fact and foreseeability. See *Praesel*, 967 S.W.2d at 394–95.

**CONCLUSION AS TO COUNT III**

The motion to dismiss Count III should be denied.

**VII. COUNT IV: FAILURE TO RESOLVE THE FINRA U3 HALT**
 *(Against Defendants Gregory McCabe and John Brda)*

Plaintiff respectfully opposes Defendants' Motion to Dismiss Count IV. Plaintiff alleges a viable

Section 10(b) and Rule 10b-5 claim based on Defendants' material omissions and half-truths

during the corporate-action window and the U3 halt, and on a scheme to defraud that included

coordinated messaging and the deliberate failure to correct, update, or clarify statements that had

become materially misleading in light of the halt and known short-position dynamics (SAC ¶¶

34–36, 37–41, 45, 47–49, 61–63, 69, 70–74, 83–91, 118–121, 125–128, 141–156).

**A. Material omissions and half-truths during the halt (Rule 10b-5(b))**

 Plaintiff alleges Defendants had already spoken about the nature of the dividend (non-tradable),

the value/status of Orogrande, promoter-amplified liquidity expectations (buy-and-hold; short

sellers needed long shares), and the ability to sell through December 12 (including "short

position close-only trades") (SAC ¶¶ 34–36, 35, 45, 69, 74, 82, 83–91, 118, 125, pp. 9, 12–13,

16, 23, 25, 27–31, 40, 42). Plaintiff further alleges Defendants knew or recklessly disregarded

that these statements and expectations had become materially incomplete or misleading once the

U3 halt froze liquidity and cut off exit paths, yet they failed to correct, update, or clarify any of

those statements during the trading crisis (SAC ¶¶ 125–128, 141–156, pp. 42–43, 49, 51–52). In

the face of the halt, silence maintained a misleading impression about liquidity and exit

options—a classic omission/half-truth theory cognizable under Rule 10b-5(b).

**B. Scheme liability (Rule 10b-5(a) and (c))**

 Plaintiff also pleads a scheme to defraud: Defendants structured the sequence

(TRCH→Meta→NBH) that created a trading window for a "non-tradable" dividend, coordinated promoter messaging (buy-and-hold; shorts needed long shares; stop-loss removal; "NBH as a stop-loss"), and then failed to take corrective action or provide clarifying disclosures when the U3 halt rendered prior expectations false or misleading, all while insiders had already monetized significant positions (SAC ¶¶ 70–74, 81–92, 102–103, 118–121, 119–122, 125–128, 141–156). Those acts and omissions are actionable under Rule 10b-5(a) and (c), which reach deceptive schemes beyond pure misstatements.

## C. Scienter

Taken holistically, the complaint pleads a strong inference of scienter. See *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007). McCabe's own words acknowledge five years of short-and-distort pressure and that "going private" had "trapped some bad actors with significant financial exposure" (Ex. 1 at 1). Plaintiff pleads Defendants' knowledge of the "sell-through-December-12" window (including "short position close-only trades") and the halt's impact on liquidity; that they coordinated promoter messaging to encourage buy-and-hold through the window; and that they remained silent when the halt made that messaging and prior expectations materially misleading (SAC ¶¶ 70–74, 81–92, 102–103, 118–121, 125–128, 141–156). Plaintiff also pleads insider positioning and sales prior to the halt (SAC ¶¶ 119–122, pp. 40–42). Viewed together, these facts support a cogent and compelling inference that Defendants acted with an intent to deceive or, at minimum, severe recklessness.

## D. Loss causation

Plaintiff alleges a plausible causal chain from Defendants' omissions/half-truths and scheme to her loss. The complaint alleges investors were told there would be trading and settlement through December 12, and were induced by promoter messaging to buy-and-hold on the expectation that

shorts needed long shares to close; the U3 halt then froze liquidity and deprived Plaintiff of her sell/hold choice, forcing receipt of private, non-liquid NBH shares instead (SAC ¶¶ 82, 83–91, 118, 125–128, 141, 154–156, pp. 27–31, 40, 42–43, 49, 51–52). That suffices to plead loss causation. See *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342–47 (2005); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 244–47 (5th Cir. 2009).

### E. Rule 9(b) and PSLRA compliance

Plaintiff identifies the who (McCabe and Brda), **what** (material omissions/half-truths during the corporate-action window and the halt; coordinated messaging; failure to correct/update), when (the merger window through the December 9 halt and its immediate aftermath), **where** (investor-facing communications, corporate-action processing, and promoter channels), and **how** (silence and half-truths that sustained a false impression of liquidity/exit options and induced buy-and-hold while insiders profited) (SAC ¶¶ 34–36, 37–41, 45, 47–49, 61–63, 69, 70–74, 81–92, 102–103, 118–121, 125–128, 141–156). Those allegations satisfy Rule 9(b) particularity and the PSLRA's scienter standard. See *Tellabs*, 551 U.S. at 322–23; *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008) (Rule 9(b) "who, what, when, where, and how").

### F. Post-halt "Newco/AST" inducement (McCabe's S-1 promise)

After the U3 halt, Plaintiff believes Defendant McCabe leveraged a new inducement centered on moving NBH shares to AST. In a shareholder communication sent by Greg McCabe, investors were told that if they registered NBH shares with AST, they would receive one-for-one "Newco" shares and that an S-1 had been filed to effect that plan **(Ex. 2)**. Social-media influencers then amplified the same message, framing Newco as another asset thus increasing value and urging holders to transfer to AST. No Newco shares were ever issued, and the promised vehicle never materialized. Plaintiff relied on that representation and transferred 7200 shares to AST but

received nothing under the Newco promise. In the wake of the halt, when prior liquidity

expectations had already been upended, these statements and omissions reinforced a misleading

impression that investors would be made whole or given a superior option, while material facts

were withheld about Orogrande (including the University Lands lease non-payment and loss) and

the true feasibility of any Newco distribution. This post-halt inducement further supports

Plaintiff's Rule 10b-5(b) omissions/half-truth theory and independently pleads a deceptive

scheme under Rule 10b-5(a) and (c).

**CONCLUSION AS TO COUNT IV**

 Defendants' motion to dismiss Count IV should be denied. Plaintiff alleges a viable

omissions/half-truths claim under Rule 10b-5(b) and a scheme claim under Rule 10b-5(a) and

(c), pleads scienter with the strength the PSLRA requires, and adequately alleges loss causation

tied to the U3 halt.

**VIII. COUNT V: UNJUST ENRICHMENT**
 **(Against Defendants Gregory McCabe, John Brda, and Jane/John Does)**

Plaintiff respectfully opposes Defendants Gregory McCabe and John Brda's Motion to Dismiss

Count V of the SAC, which alleges unjust enrichment under Texas law. Plaintiff also asserts this

claim against unnamed Jane and John Doe Defendants alleged to have been retained or

coordinated by McCabe and Brda for promotional and inducement purposes (*see* SAC ¶¶ 70–74,

81–92, 102–103, 118–121, 125–128, pp. 25–31, 40–43).

**A. McCabe and Brda personally benefited from the scheme**

Plaintiff alleges that McCabe and Brda personally benefited from a sequence of actions and

omissions that misled investors about the nature and value of the Series A Preferred dividend.

These include misstatements and omissions regarding the Orogrande oil-and-gas asset, the

framing of the dividend as non-tradable, and the expectation that NBH would be a valuable fallback if a short squeeze did not materialize. These messages were amplified by social-media promoters that Plaintiff believes were retained or coordinated by McCabe, Brda or their counsel James 'Wes' Christian. At the same time, Plaintiff alleges that Defendant Brda sold approximately 388,322 shares of MMTLP prior to the FINRA U3 halt, generating proceeds estimated between $1 million and $4.85 million. During the same period, Defendant McCabe sold approximately 6,778,856 shares, earning between $53 million and $84 million. These insider sales occurred while Brda and defendants coordinated proxies publicly denied that any insider sales were taking place, reinforcing investor trust and promoting a "buy-and-hold" strategy. Plaintiff alleges these misrepresentations were materially misleading and induced investors to retain their shares, directly contributing to the harm suffered after the trading halt. (*see* SAC ¶¶ 35, 37–41, 52–57, 119–122).

## B. Unjust retention of benefits

In addition to these stock sales, Plaintiff alleges that McCabe secured a $20 million loan from Meta Materials on behalf of Next Bridge Hydrocarbons at the time of the spin-off. The loan was restructured such that McCabe paid $6 million in cash and agreed to pay another $6 million in stock purchases via $250,000 monthly installments. However, after several months, he ceased making payments. It is believed that he paid $700K in cash and returned the purchased shares and in exchange, all debt was forgiven. Ultimately, Meta forgave approximately $13.3 million of the total obligation, meaning McCabe repaid only $6.7 million. Despite this, the Form 10-Q filed on November 13, 2024, reflects the entire $20 million as outstanding debt on Next Bridge's books, along with $1.58 million in accrued but unpaid interest. Plaintiff alleges this financial maneuver falsely inflates NBH's

liabilities while hiding the benefit McCabe personally received, unjustly burdening shareholders and obscuring the true nature of the transaction.

Brda also received payments during his time as a consultant and was in a position to influence public messaging. Plaintiff relied on the induced expectations of liquidity and value, and was left with illiquid NBH shares while Defendants retained the proceeds and benefits of their earlier conduct.

### C. Promoter coordination and Doe defendants

Plaintiff further alleges that the Doe Defendants, social-media influencer proxies and promoters, were either paid directly or coordinated to spread the misleading messages tied to short interest, Orogrande value, and NBH fallback. These individuals or entities benefited through engagement, market impact, resale activity, and/or compensation, and their enrichment was unjust given the false or misleading nature of the campaign.

### D. Texas unjust enrichment standard satisfied

Under Texas law, a plaintiff must show: (1) the defendant obtained a benefit, (2) the benefit was taken knowingly, and (3) the benefit was unjust under the circumstances. *See Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). Plaintiff satisfies each element: a benefit was conferred through induced market activity and investor reliance; Defendants knew of the benefit and the misleading conduct; and the benefit was unjustly retained when investors were left with forced NBH shares and significant losses.

### CONCLUSION AS TO COUNT V

The motion to dismiss Count V should be denied.

## IX. COUNT VI: CONSPIRACY TO COMMIT FRAUD
 **(Against Defendants Gregory McCabe, John Brda, and Jane and John Does)**

Plaintiff *Danielle Spears* respectfully opposes Defendants Gregory McCabe, John Brda, and Jane and John Does' Motion to Dismiss Count VI (*Conspiracy to Commit Fraud*) of Plaintiff's Second Amended Complaint ("SAC"). Plaintiff has properly alleged detailed factual elements demonstrating that Defendants conspired to commit fraud, in violation of *Section 10(b)* (15 U.S.C. § 78j(b)), *Rule 10b-5* (17 C.F.R. § 240.10b-5), *18 U.S.C. § 371*, and *18 U.S.C. § 1349*.

### A. Dissemination of Materially False Information (Section 10(b) and Rule 10b-5)

In *United States v. Constantinescu*, Case No. 4:22-cr-612 (S.D. Tex.), the Department of Justice has charged eight individuals, Edward Constantinescu, Perry "PJ" Matlock, John Rybarczyk, Gary Deel, Stefan Hrvatin, Tom Cooperman, Mitchell Hennessey, and Daniel Knight, with conspiring to manipulate securities through a coordinated pump-and-dump scheme. The indictment alleges that these defendants used social media platforms to promote various stocks, including Torchlight Energy Resources, Inc. (TRCH), while secretly planning to sell their own shares for profit. The charged conduct included coordinated false and misleading posts and deceptive trading tactics that artificially inflated stock prices and volumes. The inclusion of TRCH in the DOJ's criminal market manipulation case reinforces Plaintiff's theory that the promotional campaign surrounding MMTLP was not isolated but part of a broader pattern of fraudulent activity tied to the same underlying asset. Plaintiff further alleges that MMTLP was a rinse-and-repeat scheme, closely mirroring the tactics used just prior to the reverse merger with Meta Materials, Inc. In that transaction, an at-the-market (ATM) offering raised $137.5 million for Meta, capitalizing on promotional momentum surrounding Torchlight's Orogrande asset and the proposed merger. Plaintiff alleges that Defendants deployed nearly identical promotional and

structural tactics again with MMTLP, this time under the guise of a non-tradable dividend, enabling them to profit while exposing retail investors to eventual harm.

Plaintiff alleges Defendants McCabe, Brda, and Jane and John Does actively conspired to disseminate materially false and misleading information through undisclosed proxies and paid stock promoters. The Defendants deliberately misled investors regarding the valuation of Torchlight Energy Resources' Orogrande assets, falsely asserting reserves of between 3.2–5.0 billion barrels of oil and 5.8 trillion cubic feet of natural gas, despite known geological uncertainties, unpaid royalties, and terminated leases (*see* SAC ¶¶ 31, 36, 52–57, 204–206). These false representations artificially inflated share prices, directly benefiting Defendants through personal sales of inflated stock (*see* SAC ¶¶ 61–63, 70–74, 81–92, 102–103, 118–121).

Plaintiff alleges that Defendants coordinated with undisclosed paid proxies and stock promoters to disseminate misleading narratives regarding imminent short squeezes and the alleged scarcity of MMTLP shares, thereby manipulating investor perceptions and causing substantial harm (*see* SAC ¶¶ 70–74, 81–92, 102–103).

**B. Conspiracy to Obstruct Regulatory Enforcement (18 U.S.C. § 371)**

Plaintiff alleges that Defendants intentionally conspired among themselves and with other entities or individuals to obstruct regulatory enforcement and oversight by federal agencies, including the SEC and FINRA. Defendants facilitated and perpetuated illegal short positions, deceived regulatory authorities, and undermined the integrity of U.S. securities markets through coordinated manipulation schemes, including withholding material information and obstructing transparency (*see* SAC ¶¶ 141–157, 204–206). These conspiratorial actions demonstrate a deliberate intent to deceive regulators and investors alike.

**C. Wire Fraud Conspiracy and Coordinated Market Manipulation (18 U.S.C. § 1349)**

Plaintiff further alleges that Defendants violated *18 U.S.C. § 1349* by participating in an ongoing

conspiracy involving wire communications and electronic dissemination of fraudulent

information. These coordinated actions included the use of social media, proxy messaging, and

digital platforms to promote illegal short selling and to inflate share prices through fraudulent

means. The scheme was designed to defraud investors, including Plaintiff, of their money and

property (*see* SAC ¶¶ 61–63, 70–74, 81–92, 102–103, 118–121).

**D. Coordinated Online Harassment Through Undisclosed Proxies (Section 10(b), Rule 10b-5)**

Plaintiff alleges that Defendants McCabe, Brda, and certain Jane and John Does conspired to use

coordinated online harassment, cyberbullying, and proxy disinformation campaigns to suppress

investor dissent, intimidate shareholders, and control the public narrative surrounding MMTLP.

These efforts were not random or independent; they formed part of a deliberate strategy to

silence critics, undermine legal challenges, and sustain investor belief in misleading narratives

about the dividend, short interest exposure, and the value of Orogrande (See SAC ¶¶ 81–92,

102–103).

The campaign was carried out through undisclosed proxies who have publicly claimed to be

"trusted" by McCabe and Brda, stated that they were communicating directly with them, or

appeared in photos with them during the relevant period. These individuals were responsible for

publicly attacking Plaintiff and other pro se litigants and whistleblowers, mocking court filings,

spreading false narratives about Plaintiffs' motives, and creating an atmosphere of fear,

reputational risk, and personal intimidation. One influencer publicly declared that whistleblowers

"will have to pay that price." Others amplified messages accusing Plaintiff of "trying to bankrupt" the company and betraying fellow shareholders.

Plaintiff further alleges, on information and belief, that this coordinated messaging effort may have been supported or encouraged by Defendants' counsel. Specifically, according to a NBH press release in February 2025, hired lead litigation attorney, James 'Wes' Christian, to pursue legal action against "bad actors" and to "protect loyal shareholders." Approximately one month later, Plaintiff received a legal threat letter from the same law firm. That timing, along with the identical language used across legal and online channels, raises a reasonable inference that McCabe intended to fund or facilitate proxy retaliation and to chill litigation by weaponizing public attacks. Brda was at one time represented by the same counsel as part of Flamethrower.

Plaintiff alleges these actions caused severe emotional distress, reputational damage, and economic harm. The pattern of harassment, rooted in Defendants' relationships with unofficial surrogates and amplified through targeted public intimidation, including a post by Brda himself, supports Plaintiff's conspiracy claim under Rule 10b-5(a) and (c).Plaintiff further alleges that attorney James 'Wes' Christian, who represented John Brda as recently as 2023 and is believed to currently represent Next Bridge Hydrocarbons and Defendant Greg McCabe, engaged in conduct that contributed to a broader campaign of intimidation and reputational harm. In March 2025, Mr. Christian sent Plaintiff a direct message on social media attaching a demand for preservation of electronically stored information (ESI). When questioned about the message, he described it as a standard communication. Shortly thereafter, Mr. Christian submitted a five-page letter to this Court in connection with his motion to withdraw as counsel, in which he identified Plaintiff by name and labeled her a "perpetrator" and "co-conspirator," despite her being a private pro se litigant in an active matter. (See Dkt. 35) Plaintiff alleges these statements were

designed to discredit her legal claims and undermine her standing in this litigation. While the

Court granted Mr. Christian's motion to withdraw, Plaintiff includes this episode to illustrate the

broader pattern by which Defendants and their agents have attempted to silence and intimidate

dissenting voices through both public messaging and formal legal channels.

**E. Evidence Supporting Conspiracy Allegations**

Plaintiff alleges specific acts and facts showing coordination between Defendants and

promotional agents. Plaintiff anticipates discovery, including subpoenas for payment records,

NDAs, and communications, will confirm these relationships. Plaintiff further alleges that

Defendants participated in a common plan, including coordinated messaging, influencer activity,

and strategic concealment of material facts, to defraud investors and suppress transparency (*see*

SAC ¶¶ 61–63, 70–74, 81–92, 102–103, 118–121).

**F. Legal Standards and Authorities Supporting Conspiracy Allegations**

Plaintiff's SAC further alleges that McCabe and Brda used third-party proxies to carry out the

conspiracy, including orchestrating attacks against Plaintiff personally. These proxies acted to

discredit and humiliate Plaintiff for filing this lawsuit, mocked her legal filings online, and

repeated false narratives designed to paint her as dishonest or disloyal to other investors. Such

conduct goes beyond mere criticism, it was part of a pattern intended to chill litigation, obstruct

scrutiny, and protect Defendants' reputational and financial interests. These facts, viewed in light

of the case law, support a plausible inference that Defendants knowingly participated in and

directed a fraudulent scheme, using intermediaries to carry out actions they did not want publicly

attributed to themselves.

**CONCLUSION AS TO COUNT VI**

For the reasons stated above, Plaintiff respectfully requests the Court deny Defendants Gregory

McCabe, John Brda, and Jane and John Does' Motion to Dismiss Count VI (*Conspiracy to

Commit Fraud*). Plaintiff's allegations meet all applicable legal standards and justify targeted

discovery and further proceedings.

## X. COUNT VIII: EMOTIONAL DISTRESS (INTENTIONAL OR NEGLIGENT INFLICTION) (Against Defendants Gregory McCabe, John Brda, and Jane and John Does)

Plaintiff Danielle Spears respectfully opposes Defendants Gregory McCabe, John Brda, and

unidentified Jane and John Does' Motion to Dismiss Count VIII of Plaintiff's Second Amended

Complaint. Plaintiff alleges that Defendants engaged in intentional and negligent conduct that

caused severe emotional distress, humiliation, anxiety, reputational damage, and disruption to

Plaintiff's personal and social life.

### A. McCabe, Brda, and Doe Defendants' orchestration of cyberbullying and harassment (Section 10(b), Rule 10b-5)

Plaintiff alleges that McCabe and Brda, together with undisclosed proxy defendants,

intentionally coordinated and amplified harassment campaigns through social media and online

channels. These efforts included cyberbullying, intimidation, and ridicule designed to silence

dissenting investors, discredit legal claims, and chill litigation activity. The conduct caused

Plaintiff substantial emotional distress, anxiety, and reputational harm and disrupted her ability to

participate in investor forums and public discourse. The SAC alleges this conduct as part of

Defendants' broader scheme to manipulate public perception and suppress legal exposure (see

SAC ¶¶ 70–74, 81–92, 102–103).

### B. Use of proxies to target, discredit, and humiliate Plaintiff

Plaintiff further alleges that McCabe and Brda enlisted or coordinated with third-party

individuals who acted as undisclosed proxies. These individuals publicly claimed to be "trusted" by the company, stated they were in direct contact with Defendants, and used social media platforms to attack Plaintiff personally. They ridiculed Plaintiff's legal filings, published misleading narratives about her motives, and circulated images and messages intended to shame and isolate her. These coordinated acts inflicted emotional distress, anxiety, and reputational harm, and were intended to deter further legal action and suppress transparency (see SAC ¶¶ 70–74, 81–92, 102–103, 118–121, 204–206).

## C. Foreseeability and causation of emotional harm

Plaintiff alleges that Defendants knew or should have known that these coordinated intimidation efforts would cause emotional injury. The messaging campaign against Plaintiff was launched shortly after she filed suit and intensified after she challenged Defendants' conduct in bankruptcy proceedings. The retaliation was foreseeable, avoidable, and directly linked to Defendants' own legal and reputational interests. The SAC provides detailed examples of the targeted conduct and its direct emotional impact on Plaintiff (see SAC ¶¶ 81–92, 102–103).

## D. Plaintiff's documented experience of emotional distress

Plaintiff has retained and submitted documentation of specific social media posts, threats, and public attacks that were part of the harassment campaign. The conduct caused emotional harm, anxiety, humiliation, reputational injury, and isolation from investor communities. The attacks were not limited to disagreement but included personalized ridicule, targeted defamation, and emotional pressure designed to intimidate and silence her.

## E. Legal authority supporting Plaintiff's claim

Federal courts recognize that emotional distress claims may survive a motion to dismiss where

the plaintiff pleads intentional or reckless conduct that foreseeably caused emotional injury. *In SEC v. Pirate Investor LLC*, 580 F.3d 233 (4th Cir. 2009), the court upheld liability for coordinated online attacks used to manipulate public perception. *In Affco Investments 2001 LLC v. Proskauer Rose, L.L.P.*, 625 F.3d 185 (5th Cir. 2010), the Fifth Circuit acknowledged that where a defendant's conduct foreseeably results in emotional injury, a claim may proceed. Plaintiff's allegations meet these standards by identifying specific defendants, describing the coordinated nature of the attacks, and alleging actual harm.

**CONCLUSION AS TO COUNT VIII**

 For the reasons stated above, Plaintiff respectfully requests that the Court deny the Motion to Dismiss Count VIII. Plaintiff's allegations meet the applicable pleading standards and support the claims of intentional and negligent infliction of emotional distress.

**XI. CONCLUSION**

For the reasons stated above, Plaintiff respectfully requests that the Court deny the Motion to Dismiss filed by Defendants Gregory McCabe and John Brda in its entirety, or in the alternative, as to the specifically challenged counts. Plaintiff's allegations satisfy all applicable pleading standards under Rule 12(b)(6), Rule 9(b), and the PSLRA, and warrant proceeding to discovery and trial.

Respectfully submitted this 15th day of September, 2025.


/s/Danielle Spears
Danielle Spears, pro se
12206 W Harrison St
Avondale, AZ 85323
paymmtlpnow@gmail.com
480-476-1091

**<u>CERTIFICATE OF SERVICE</u>**

I certify that I served the foregoing document on all counsel of record via the Court's CM/ECF

system on September 15, 2025.

> /s/Danielle Spears
> Danielle Spears,  pro se
> 12206 W Harrison St
> Avondale, AZ 85323
> paymmtlpnow@gmail.com
> 480-476-1091